DERICK E. KONZ, SB No. 286902
dkonz@akk-law.com
WILLIAM J. BITTNER, SB No. 292056
wbittner@akk-law.com
ISABELLE P. CARMICHAEL, SB No. 367390
icarmichael@akk-law.com
**ANGELO, KILDAY & KILDUFF, LLP**
Attorneys at Law
601 University Avenue, Suite 150
Sacramento, CA 95825
Telephone: (916) 564-6100
Telecopier: (916) 564-6263

Attorneys for Defendants CITY OF MT. SHASTA and JEREMIAH CAPURRO

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JULIA DETWEILER,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF MT. SHASTA, et al.,<br><br>Defendants. | Case No.: 2:24-CV-03100-WBS-SCR<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS CITY OF MT. SHASTA AND JEREMIAH CAPURRO'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>**DATE: December 21, 2026**<br>**TIME: 1:30 P.M.**<br>**DEPT: 5, 14th Floor** |

## TABLE OF CONTENTS


I. SUMMARY .... 7

II. THE COMPLAINT (ECF NO. 1) .... 8

III. UNDISPUTED MATERIAL FACTS .... 8

IV. SUMMARY JUDGMENT STANDARD .... 12

V. ARGUMENT .... 12

A. **No Reasonable Jury Could Find the Use of Deadly Force Unreasonable.** .... 12

1. Detweiler Swung a Punch at Garrett with Brass Knuckles and Then Tried to Choke Him; There is no Triable Issue that Deadly Force was Reasonable. .... 13

2. Consideration of Additional Factors Does Not Change the Conclusion. .... 14

3. This is Dispositive of the Federal Claims and Battery and Bane Act Claims. .... 15

B. **Officer Capurro is Entitled to Qualified Immunity.** .... 16

C. **No Reasonable Jury Could Find that the Use of Deadly Force Shocks the Conscience.** .... 17

1. Officer Capurro is Entitled to Qualified Immunity on the Fourteenth Amendment Claim. .... 19

D. **No Reasonable Jury Could Find that Officer Capurro Failed to Render Medical Aid.** .... 19

E. **No Reasonable Jury Could Find that Officer Capurro Unlawfully Detained Detweiler.** .... 19

F. **No Reasonable Jury Could Find that Detweiler's ADA Rights Were Violated.** .... 20

G. **No Reasonable Jury Could Find Officer Capurro Negligent.** .... 22

H. **No Reasonable Jury Could Find that Officer Capurro Violated the Bane Act.** .... 23

VI. CONCLUSION .... 24

# TABLE OF AUTHORITIES

**Cases**

*Alves v. Cty. of Riverside*
135 F.4th 1161, 1166 n.3 (9th Cir. 2025) .................................................................. 15, 22
*Anderson v. Creighton*
483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)......................................... 16
*Arizona v. Johnson*
555 U.S. 323, 326 (2009).............................................................................................. 20
*Arpin v. Santa Clara Valley Transp. Agency*
261 F.3d 912, 924-25 (9th Cir. 2001) ............................................................................ 20
*Ayala v. City of S. San Francisco*
C06-2061, 2007 U.S. Dist. LEXIS 54051, 2007 WL 2070236, at *7 (N.D. Cal. July 13, 2007.......................................................................................................................... 13
*Barnes v. Felix*
605 U.S. 73, 80 (2025)............................................................................................ 12, 22
*Barrera v. City of Woodland*
No. 2:18-cv-00329-JAM-KJN, 2023 U.S. Dist. LEXIS 102612 at *9-13 (E.D. Cal. June 12, 2023) .................................................................................................................... 19
*Celotex Corp. v. Catrett*
477 U.S. 317 ................................................................................................................. 12
*Chinaryan v. City of Los Angeles*
113 F.4th 888, 907 (9th Cir. 2024) ......................................................................... 16, 23
*City & County. of S.F. v. Sheehan*
135 S.Ct. 1765 (2015).................................................................................................... 21
*Contra Maddox v. City of Los Angeles*
792 F.2d 1408, 1415 (9th Cir. 1986) ............................................................................. 19
*County of Los Angeles* v. *Mendez*
581 U. S. 420, 427-28 (2017) ........................................................................................ 12

*County of Sacramento v. Lewis*
523 U.S. 833, 836 (1998)........................................................................................ 18
*District of Columbia v. Wesby*
583 U.S. 48, 63 (2018).............................................................................................. 16
*Dubner v. City and County of San Francisco*
266 F.3d 959, 964 (9th Cir. 2001) ............................................................................ 20
*Ericson v. City of Phoenix*
C14-1942, 2016 U.S. Dist. LEXIS 152641, 2016 WL 6522805, at *13 (D. Ariz. Nov. 3, 2016) ......................................................................................................................... 13
*Espinosa v. City & Cnty. of S.F.*
598 F.3d 528, 537 (9th Cir. 2010) ............................................................................ 14
*Fletes v. City of San Diego*
No. 13cv2279 JAH(JMA), 2015 U.S. Dist. LEXIS 194278, at *25 (S.D. Cal. Sep. 28, 2015) ....................................................................................................................... 18
*George v. Morris*
736 F.3d 829, 838 (9th Cir. 2013) ............................................................................ 13
*Harper v. Cty. of Merced*
No. 118CV00562LJOSKO, 2018 WL 5880786, at *7 (E.D. Cal. Nov. 8, 2018)............ 21
*Hayes v. County of San Diego*
736 F.3d 1223, 1230 (9th Cir. 2013) ................................................................... 17, 18
*Hayes v. Cty. of San Diego*
57 Cal. 4th 622, 629 (2013) ...................................................................................... 22
*Hunter v. Durell*
No. C16-1445-MJP, 2018 U.S. Dist. LEXIS 202545, at *35 (W.D. Wash. Nov. 29, 2018) ....................................................................................................................... 13
*In re David V.*
48 Cal. 4th 23, 26 (2010) ............................................................................................ 8
*Krause v. Cty. of Mohave*

846 F. App'x 569, 571 (9th Cir. 2021) .... 19

*Lopez v. Gelhaus*
871 F.3d 998, 1005-06 (9th Cir. 2017) .... 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574, 585 (1986) .... 12

*Moreland v. Las Vegas Metro. Police Dep't*
159 F.3d 365, 371 n.4 (9th Cir. 1998) .... 15

*Mullenix v. Luna*
577 U.S. 7, 12 (2015) .... 16

*Napouk v. L.V. Metro. Police Dep't*
123 F.4th 906, 917-18 (9th Cir. 2024) .... 13, 18

*Nehad v. Browder*
929 F.3d 1125, 1138 (9th Cir. 2019) .... 14

*Pearson v. Callahan*
555 U.S. 223, 129 (2009) .... 16

*People v. Aguilar*
16 Cal.4th 1023, 1037 (1997) .... 8

*People v. Gabriel*
206 Cal.App.4th 450 (2012) .... 9, 15

*People v. Garrett*
195 Cal.App.3d 795 (1987) .... 9, 15

*People v. Vera*
No. F066398, 2014 Cal. App. Unpub. LEXIS 5873, at *7 (Aug. 20, 2014) .... 8, 15

*Porter v. Osborn*
546 F.3d 1131, 1139 (9th Cir. 2008) .... 18

*Saucier v. Katz*
533 U.S. 194, 202 (2001) .... 16

*Scott v. Harris*

550 U.S. 372, 380-81 (2007) .......... 12

*Scott v. Henrich*
39 F.3d 912, 914 (9th Cir. 1994) .......... 12

*Shafer v. County of Santa Barbara*
868 F.3d 1110, 1117 (9th Cir. 2017) .......... 17

*Sheehan v. City & County of S.F.*
743 F.3d 1211, (9th Cir. 2014) .......... 21

*Tennessee v. Garner*
471 U.S. 1, 3 (1985) .......... 12

*Uzun v. City of Santa Monica*
54 F.4th 595, 596 (9th Cir. 2022) .......... 16

*Vasilenko v. Grace Fam. Church*
3 Cal. 5th 1077, 1083 (2017) .......... 22

*Villanueva v. Figueroa*
No. CV 13-4811-ABC (DFM), 2014 U.S. Dist. LEXIS 154000, at *20 (C.D. Cal. July 9, 2014) .......... 8

*Vos v. City of Newport Beach*
892 F.3d 1024, 1036 (9th Cir. 2018) .......... 21

**Statutes**

28 C.F.R. § 35.130(b)(7) .......... 20

42 U.S.C. § 12132 .......... 20

Cal. Civ. Code § 52.1 .......... 23

Penal Code §§ 21810 and 16590 .......... 8

Defendants City of Mt. Shasta and Jeremiah Capurro move this Court for summary judgment or in the alternative summary adjudication pursuant to Fed. R. Civ. P. 56.

## I. SUMMARY

This case involves the shooting death of Nicholas Detweiler ("Detweiler") by Mt. Shasta Police Officer Jeremiah Capurro ("Officer Capurro") on an Amtrak train. Defendants submit body-worn camera video that clearly shows Detweiler put brass knuckles on his right hand and throw a right-hand punch at the head of the Amtrak train conductor ("Garrett") who was about one foot away. This was an immediate threat of death or serious bodily injury. In response, Officer Capurro fired four shots within approximately two seconds. Detweiler and Garrett went to the ground where Detweiler put Garrett in what any reasonable officer would perceive as a chokehold. Officer Capurro fired two shots within 1-2 seconds. This is all clear on video. No reasonable jury could find this use of deadly force unreasonable. Plaintiff's own police practices expert opined that using deadly force against an individual that attempts to punch someone in the head with brass knuckles is appropriate. In the alternative, Officer Capurro is entitled to qualified immunity.

Even when looking beyond the moment of the shooting, the conclusion remains the same. Detweiler was reported by Amtrak staff to have been threatening passengers and staff with brass knuckles and requested that Mt. Shasta Police Department remove him from the train. Officer Capurro attempted to detain him and remove him from the train, but Detweiler ignored several commands to keep his hands up and not touch anything. He grabbed a bag that contained unknown items, struggled with Officer Capurro who attempted to prevent him from accessing the bag, grabbed Officer Capurro's taser, and punched Officer Capurro in the face at least twice (photos of Officer Capurro's face are submitted). Officer Capurro attempted less-lethal alternatives to detain Detweiler and Garrett tried to help detain Detwiler, but neither were effective. Officer Capurro held Detweiler at gunpoint and ordering him to get on the ground several times, but Detwiler refused, put on brass knuckles, swung at Garrett's head and tried to choke him. None of this changes the conclusion that Officer Capurro's final resort to deadly force was reasonable as a matter of law. Officer Capurro and the City of Mt. Shasta respectfully request dismissal of all claims.

## II. THE COMPLAINT (ECF NO. 1)

The plaintiff is Julia Detweiler, appearing individually and as successor in interest to her adult son, Nicholas Detweiler. She is proceeding under ECF No. 1 that asserts eight (8) claims. There are four 42 U.S.C. § 1983 claims against Officer Capurro for (1) excessive force; (2) unlawful detention and arrest; (3) denial of medical care; and (4) interference with familial relations. The fifth claim alleges a violation of the Americans with Disabilities Act by the City of Mt. Shasta. The sixth, seventh, and eighth claims allege state-law battery, negligence, and violation of the Bane Act against Officer Capurro and vicariously against the City of Mt. Shasta.

## III. UNDISPUTED MATERIAL FACTS

Jeremiah Capurro ("Officer Capurro") was working as a sworn police officer for the City of Mt. Shasta ("City") on the night of December 24, 2023. (Separate Statement of Undisputed Material Facts ("UMF") 1) He was in full uniform. (UMF 2) Officer Capurro was the only patrol officer on-duty in the City during this shift. (UMF 3)

At approximately midnight, he was in the police department dispatch center and was advised of the following by the dispatcher: (1) Amtrak train staff had just called and reported that a passenger was threatening people with brass knuckles on the train; (2) the train was would be making a stop in the City to have the passenger removed (or according to the Amtrak employee, "extracted") and requested that Mt. Shasta Police Department remove him; and (3) the passenger had a history of assaulting police officers. (UMF 4)

Brass knuckles are a prohibited weapon and illegal to possess in California. Penal Code §§ 21810 and 16590. Brass knuckles may be a deadly weapon and can support a Penal Code § 245(a)(1) conviction for assault with a deadly weapon. *People v. Aguilar*, 16 Cal.4th 1023, 1037 (1997), cited by *Villanueva v. Figueroa*, No. CV 13-4811-ABC (DFM), 2014 U.S. Dist. LEXIS 154000, at *20 (C.D. Cal. July 9, 2014); *In re David V.*, 48 Cal. 4th 23, 26 (2010) ("Typical metal knuckles, manufactured as weapons, are deemed inherently dangerous so that mere possession is illegal regardless of the defendant's purposes."); *People v. Vera*, No. F066398, 2014 Cal. App. Unpub. LEXIS 5873, at *7 (Aug. 20, 2014) ("Vera possessed brass knuckles, a weapon also included in the class of weapons enumerated in former section 12020 that are normally used only

for criminal purposes. Thus, as in *People v. Garrett,* 195 Cal.App.3d 795 (1987) and *People v. Gabriel*, 206 Cal.App.4th 450 (2012), mere possession of brass knuckles is a crime of moral turpitude because it evinces a willingness to do evil.").

According to Plaintiff's police practices expert, possession of brass knuckles in California can be charged as a felony and they are considered a deadly weapon if used to attempt to strike someone. (UMF 5)

Officer Capurro left the dispatch center and parked his patrol car at the location where the train was expected to stop (Lake Street where it intersects the train tracks). (UMF 6) As he waited for the train, he contacted a Siskiyou County Sheriff's Deputy to request that they assist and asked for their location. (UMF 7) He estimated that assistance was at least five minutes away. (UMF 8) While he was on the phone, he heard the train in the distance and very shortly after, it arrived. (UMF 9)

The train stopped, blocking Lake Street, a door opened, and an Amtrak employee met Officer Capurro at the door. (UMF 10) The employee showed Officer Capurro onto the train and walked him to the passenger that they wanted removed ("Detweiler"). (UMF 11)

Detweiler was sitting in his seat in the upstairs level of Car 11. (UMF 12) The aisle was approximately 2-3 feet wide and the lighting was dim. (UMF 13) Officer Capurro intended to detain Detweiler, escort him off the train, and then investigate the possibility of arrest for possession of brass knuckles. (UMF 14)

Detweiler appeared to be either sleeping or pretending to be asleep. (UMF 15) He had a plastic bag filled with objects unknown to Officer Capurro in the seat next to him. (UMF 16) He had on black gloves and a hood pulled over his head partially obscuring his face. (UMF 07) Officer Capurro shined a flashlight on him, said, "hey bud," tapped him on the shoulder, pulled his hood back, and said, "hey, how's it going?" (UMF 18) Detweiler appeared startled and immediately stood up. (UMF 19) Officer Capurro said, "hey, police department." (UMF 20) Detweiler responded, "is this the stop?" (UMF 21) Officer Capurro responded, "yeah this is the stop, you're coming off" and told him "keep your hands up" four times. (UMF 22) Officer Capurro pointed his taser at Detweiler's midsection. (UMF 23) Detweiler did not keep both hands up. (UMF 24)

Officer Capurro told Detweiler two times, "turn around," intending to handcuff him and remove him from the train. (UMF 25) Detweiler did not turn around. (UMF 26)

Detweiler grabbed the plastic bag that was on his seat. (UMF 27) Officer Capurro told him six times, "don't touch anything." (UMF 28) Detweiler did not put the bag down. (UMF 29) Officer Capurro attempted to take it from him, but Detweiler pulled it away. (UMF 30)

Plaintiff's own retained police practices expert (Scott DeFoe) opines that it was appropriate for Officer Capurro to attempt to prevent Detweiler from accessing the bag and to attempt to restrain his hands before exiting the train ("I don't want him – I want nothing in his hands. I want his hands restrained, and that's what the objective should have been."). (UMF 31) Mr. DeFoe also opines that it would be a felony to "try to disarm a police officer and take any of his less lethal force options." (UMF 32)

Detweiler, still holding the bag, moved into the aisle away from Officer Capurro and in the direction of the Amtrak train conductor ("Garrett") who was approximately ten feet away. (UMF 33)

Officer Capurro attempted to tase Detweiler. (UMF 34) Detweiler grabbed the taser and the two struggled over it. (UMF 35) During the struggle, Officer Capurro was able to point it at the ceiling and discharge it in an attempt to prevent it from being used. (UMF 36)

Garrett grabbed Detweiler from behind and tried to "help pull [Detweiler] off of the officer" because he "felt a sense of duty to interject and try and help the situation" and because he thought Detweiler was "possibly… getting the upper hand." (UMF 37) According to Garrett, Detweiler was "fighting with the officer" and "attacking the officer." (UMF 38) Officer Capurro was able to create a couple feet of distance from Detweiler and discharged his taser at him. (UMF 39) Garrett was attempting to hold Detweiler and said, "I need assistance, I need assistance now." (UMF 40) Officer Capurro attempted to go hands-on with Detweiler and Detweiler punched him at least twice in the face. (UMF 41) Officer Capurro felt dazed and thought he was on the verge of blacking out. (UMF 42) After the incident, he went to the hospital emergency room and was told that he suffered a concussion. (UMF 43)

Officer Capurro transitioned to his baton. (UMF 44) Another passenger was seated a couple feet away. (UMF 45) Officer Capurro struck and jabbed Detweiler at least ten times with his baton with "medium force" due to the narrow confines of the train. (UMF 46) Detweiler remained standing within about a foot of Garrett and showed no obvious sign of injury. (UMF 47) Officer Capurro ordered him to get on the ground three times. (UMF 48) Detweiler did not get on the ground and instead told Officer Capurro that he wanted to get off the train and asked Officer Capurro to grab his things which were now behind Officer Capurro. (UMF 49)

Officer Capurro unholstered his handgun and pointed it at Detweiler. (UMF 50) While holding Detweiler at gun-point, Officer Capurro gave him four more commands to get on the ground. (UMF 51) Detweiler did not get on the ground. (UMF 52)

While at gun-point and being ordered to get on the ground, Detweiler put brass knuckles on his right hand. (UMF 53) Officer Capurro briefly removed his left hand from his handgun to operate his radio and radioed, "one at gunpoint." (UMF 54) At that moment, Detweiler, who was approximately one foot away from Garrett, turned around "with a look of rage in his eyes" and swung a right-hand punch at Garrett's head ("he started swinging on me")." (UMF 55) Officer Capurro immediately fired four shots within approximately 1-2 seconds. (UMF 56)

According to Plaintiff's police practices expert, deadly force is appropriate on a subject who was going to punch someone in the head with brass knuckles ("if Capurro knew that he swung at him with brass knuckles on and he reasonably believed he was going to be punching him in the head with brass knuckles, then he could articulate there was an imminent threat of great bodily injury or death and the shooting would be reasonable"). (UMF 57)

Detweiler and Garrett went to the ground and Detweiler had Garrett in a choke hold with his right arm around Garrett's neck. (UMF 58) Officer Capurro fired two additional shots at Detweiler in approximately 1-2 seconds. (UMF 59) Officer Capurro wiped blood from his face where he had been punched. (UMF 60)

Officer Capurro radioed, "shots fired" and "I need medical." (UMF 61) He put Detweiler in handcuffs, inspected his wounds, and then tended to Garrett who was also shot. (UMF 62) First responders arrived and provided medical aid to Detweiler, who passed away. (UMF 63)

## IV. SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing the district court "there is an absence of evidence to support the [non-movant's] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325. The burden then shifts to the non-movant to show "there is a genuine issue of material fact..." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585 (1986). The non-movant must do more than simply show that there is some "metaphysical doubt" as to the material facts. *Id.* at 586. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

## V. ARGUMENT

### A. <u>NO REASONABLE JURY COULD FIND THE USE OF DEADLY FORCE UNREASONABLE</u>.

Courts apply the "objective reasonableness" standard established in *Graham v. Connor*, 490 U.S. 386 (1989) in assessing Fourth Amendment claims of excessive force. Under this standard, the use of force must be evaluated from the perspective of a reasonable officer on the scene, rather than with the benefit of hindsight. *Id*. at 396. The use of deadly force is "reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or physical injury to the officers or others." *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). That inquiry into the reasonableness of police force requires analyzing the totality of the circumstances as then known to the officer. *County of Los Angeles* v. *Mendez*, 581 U. S. 420, 427-28 (2017). The totality of the circumstance inquiry (as then known to the officer) has no time limit. *Barnes v. Felix*, 605 U.S. 73, 80 (2025). The situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review. *Id.* But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. *Id.*

While courts generally weigh several factors in making the reasonableness determination,

whether the suspect posed an immediate threat of death or serious bodily injury is the most important factor. *Lopez v. Gelhaus*, 871 F.3d 998, 1005-06 (9th Cir. 2017). Here, that factor is dispositive.

**1. Detweiler Swung a Punch at Garrett with Brass Knuckles and Then Tried to Choke Him; There is no Triable Issue that Deadly Force was Reasonable.**

Detweiler, while being held at gunpoint and repeatedly ordered to get on the ground, put on brass knuckles and swung a punch at Garrett's head. This is supported by video evidence, testimony from Officer Capurro and Garrett and photos of the brass knuckles. No reasonable jury could find anything other than that Detwiler posed an immediate threat of death or serious bodily injury to Garrett when he swung at his head with brass knuckles. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."); cited by *Napouk v. L.V. Metro. Police Dep't*, 123 F.4th 906, 917-18 (9th Cir. 2024) (finding deadly force reasonable against a suspect who possessed a plastic toy that looked like a bladed weapon, refused to comply with commands, and came within 9 feet of an officer). Plaintiff's own police expert opined that it would be appropriate to use deadly force on an individual that attempted to punch someone in the head with brass knuckles. No reasonable jury could find this unreasonable.

Once on the ground, Detweiler had Garrett in a choke hold around the neck. This is supported by the video and testimony. It was reasonable for Officer Capurro to believe that this posed another immediate threat of death or serious bodily injury to Garrett. See *Ayala v. City of S. San Francisco*, C06-2061, 2007 U.S. Dist. LEXIS 54051, 2007 WL 2070236, at *7 (N.D. Cal. July 13, 2007 (finding that a chokehold could constitute deadly force); *Ericson v. City of Phoenix*, C14-1942, 2016 U.S. Dist. LEXIS 152641, 2016 WL 6522805, at *13 (D. Ariz. Nov. 3, 2016) (finding that a chokehold could result in great bodily injury); *Hunter v. Durell*, No. C16-1445-MJP, 2018 U.S. Dist. LEXIS 202545, at *35 (W.D. Wash. Nov. 29, 2018) (chokeholds are "considered by many police departments to be deadly force"). Officer Capurro justifiably responded with deadly force by firing two additional shots in 1-2 seconds to stop the threat of Detweiler choking Garrett. No reasonable jury could find this unreasonable. There is no triable

issue. Officer Capurro respectfully requests that the Court find his use of deadly force reasonable as a matter of law.

**2. Consideration of Additional Factors Does Not Change the Conclusion.**

Even when looking at additional factors[1] beyond the most important one (the threat that Detweiler posed in these final moments), the conclusion remains the same.

**a. Severity of the Crime(s)**

The video is clear that Detweiler, at the very least, possessed brass knuckles (a deadly weapon). This is a violation of Cal. Penal Code § 21810 (possession of brass knuckles) that could be charged as a misdemeanor or felony. Detweiler also refused repeated commands to keep his hands up and put his bag down which is at least a misdemeanor violation of Cal. Penal Code § 148(a)(1). He then grabbed Officer Capurro's taser, which Plaintiff's own police expert admits is a felony. He punched Officer Capurro in the face multiple times, a violation of Cal. Penal Code § 243(c)(2) (battery on a peace officer engaged in the performance of duty). Then, after all of this, he put on brass knuckles and threw a punch at the train conductor, a clear violation of at least Cal. Penal Code § 245(a)(1) (assault with a deadly weapon) and possibly attempted murder (Cal. Penal Code §§ 664 and 187). Detweiler then put Garrett in a choke hold on the ground, a violation of at least Cal. Penal Code § 242 (aggravated battery) and possibly attempted murder. The severity of the crime factor weighs so heavily in Officer Capurro's favor that no reasonable jury could use it to find deadly force unreasonable.

**b. Clear Warnings, Active Resistance, and Relative Culpability**

The video is clear that Officer Capurro told Detwiler four times to keep his hands up before he grabbed the bag and told him two times to turn around before he grabbed the bag. Plaintiff's

---

[1] Courts must also consider the severity of the crime at issue and whether the individual is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Courts can consider whether warnings were given and the availability of alternative methods. *Nehad v. Browder*, 929 F.3d 1125, 1138 (9th Cir. 2019). The "relative culpability" of the parties— i.e., which party created the dangerous situation and which party is more innocent— may also be considered in determining the reasonableness of the force used. *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010).

own police expert opines that these were lawful commands. Detweiler did not comply. He punched Officer Capurro in the face as they struggled in the narrow aisle (see photos of Capurro's face submitted herewith). While the baton was used and then when Detweiler was held at gunpoint, he was given seven commands to get on the ground (obvious implicit warnings of deadly force). Detweiler did not comply, he put on brass knuckles and swung at Garrett's head. There is no dispute that Detweiler remained intent on resistance in the face of multiple lawful commands and despite the fact that he was subject to lawful arrest; to any reasonable officer, he appeared intent on a course of continued, escalating, and violent criminal activity, without limit. See *People v. Vera*, No. F066398, 2014 Cal. App. Unpub. LEXIS 5873, at *7 (Aug. 20, 2014) ("Vera possessed brass knuckles, a weapon also included in the class of weapons enumerated in former section 12020 that are normally used only for criminal purposes. Thus, as in *People v. Garrett*, 195 Cal.App.3d 795 (1987) and *People v. Gabriel*, 206 Cal.App.4th 450 (2012), mere possession of brass knuckles is a crime of moral turpitude because it evinces a willingness to do evil."). No reasonable jury could find that these factors favor Detweiler.

**c. Alternative Methods**

Officer Capurro used several alternatives to deadly force (verbal commands, taser, baton, hands-on) and none proved effective. When Detweiler spun and swung a punch at Garrett with brass knuckles, it happened so quickly that no reasonable jury could find that there was time for alternative methods. The same is true when Detwiler tried to choke Garrett on the ground after the first volley of shots. No reasonable jury could use this factor to find that the use of deadly force was unreasonable.

**3. This is Dispositive of the Federal Claims and Battery and Bane Act Claims.**

The use of deadly force was reasonable as a matter of law. This is dispositive of the Fourth Amendment excessive force and Fourteenth Amendment due process familial association claim. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 n.4 (9th Cir. 1998), as amended (Nov. 24, 1998) (Fourteenth Amendment due process claim for loss of familial association governed by a higher standard than a Fourth Amendment excessive force claim).

This is also dispositive of the state-law battery and Bane Act claims. *Alves v. Cty. of*

*Riverside*, 135 F.4th 1161, 1166 n.3 (9th Cir. 2025) ("California battery claims are coextensive with claims for excessive force under the Fourth Amendment."); *Uzun v. City of Santa Monica*, 54 F.4th 595, 596 (9th Cir. 2022) ("Because we hold the officers did not use excessive force, we affirm summary judgment on Uzun's battery claim."); *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 907 (9th Cir. 2024) ("The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a 'specific intent to violate' a constitutional right."). Defendants request dismissal of these claims.

**B. OFFICER CAPURRO IS ENTITLED TO QUALIFIED IMMUNITY.**

Alternatively, under the two-prong qualified immunity analysis, courts assess whether the officer's conduct violated a constitutional right, and if so, whether that right was "clearly established" at the time of the conduct in question. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The first prong has been addressed above. Even if the Court finds a triable issue on whether the use of deadly force violated a constitutional right, Officer Capurro is entitled to qualified immunity and dismissal of the federal claims.

The law is clearly established when precedent is "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). It must be "clear to a reasonable officer" in the defendant's position "that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223, 129 (2009). That inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. "[S]pecificity is especially important in the Fourth Amendment context, where . . . '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (last alteration in original) (quoting *Saucier*, 533 U.S. at 205). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12. Outside of an obvious case, there must be precedent addressing the Fourth Amendment question in a "more particularized . . . sense." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct.

3034, 97 L. Ed. 2d 523 (1987)). It is the plaintiff who bears the burden of showing that the right allegedly violated was clearly established. *See Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).

At time of this shooting, there was no clearly established law that Officer Capurro's use of deadly force under these particular circumstances was unreasonable. There is no Ninth Circuit or Supreme Court case considering what would be a peace officer's reasonable response to an individual that put on brass knuckles and swung at the head of an innocent civilian, much less a case where the court found it to be unreasonable to use deadly force in response. Moreover, there is no case where an individual, immediately after this occurred, put the innocent civilian in what reasonably appeared to be a choke hold on the ground. No prior case has found the use of deadly force under these particular circumstance unconstitutional.

When the broader pre-shooting circumstances and environmental context of the shooting are considered, this case looks even more unprecedented. Officer Capurro was confronted with a non-compliant and armed individual who he was asked to remove from a narrow, dark, and confined train car that contained other passengers. Detweiler had reportedly threatened other passengers with brass knuckles; he refused lawful commands to keep his hands up and put his bag down; he grabbed the officer's taser; punched the officer in the head; was held at gunpoint and repeatedly ordered to get on the ground; put on the brass knuckles, threw a punch at the train conductor's head, and tried to choke him on the ground. There is no precedent with similar-enough facts to have put every reasonable officer on notice that a final resort to deadly force is unreasonable under these circumstances. Accordingly, Officer Capurro is entitled to qualified immunity. This is dispositive of the Fourth Amendment excessive force and Fourteenth Amendment due process claims.

### C. <u>No Reasonable Jury Could Find that the Use of Deadly Force Shocks the Conscience</u>.

If the Court finds a triable Fourth Amendment issue and denies qualified immunity as to that claim, the Fourteenth Amendment claim still fails under the higher "shocks the conscience" standard.

Conduct violates substantive due process when it "shocks the conscience." *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). If a defendant confronts a situation where "actual deliberation [was] practical," then their "deliberate indifference" to the harm they caused may be sufficient to shock the conscience. *Hayes*, 736 F.3d at 1230. "Mere negligence is never enough." *Napouk v. Las Vegas Metro. Police Dep't*, 669 F. Supp. 3d 1031, 1045 (D. Nev. 2023)

Courts apply the deliberate-indifference standard when officials had "ample time to correct their obviously [wrongful conduct]," such as in Eighth Amendment prisoner-treatment cases or in wrongful-detention cases. *See Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008). On the other hand, if the defendant had to make a "snap judgment because of an escalating situation," then their conduct does not shock the conscience unless they "act[ed] with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes*, 736 F.3d at 1230; *see also County of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998). Courts apply the purpose-to-harm standard when officials are required to make "repeated split-second decisions" about how best to respond to a risk, such as during a high-speed car chase or when confronting a threatening, armed suspect. *Porter*, 546 F.3d at 1139 (citation omitted); *see, e.g., Lewis*, 523 U.S. at 853-54; *Hayes*, 736 F.3d at 1230. In *Porter*, the court applied the purpose-to-harm standard to a five-minute incident that forced the officer to confront "an evolving set of circumstances that took place over a short time period necessitating 'fast action'" *Id.* at 1139 (quoting *Lewis*, 523 U.S. at 853).

The entire incident from the point that Officer Capurro first contacted Detweiler to the point that deadly force was used lasted less than three minutes. It was rapidly evolving and required fast action and quick decision-making. The purpose-to-harm standard should apply.

Applying that standard, there is no evidence that Officer Capurro used deadly force for any reason other than a split-second decision to stop the perceived threat that Detweiler posed to Garrett (a legitimate law enforcement objective). *See Fletes v. City of San Diego*, No. 13cv2279 JAH(JMA), 2015 U.S. Dist. LEXIS 194278, at *25 (S.D. Cal. Sep. 28, 2015) (dismissing a Fourteenth Amendment claim due to a lack of evidence of any reason for the use of deadly force other than officer protection–a legitimate law enforcement purpose). No reasonable jury could

find that Officer Capurro shot Detweiler for any reason other than the legitimate law enforcement purpose of protecting Garrett. There is no triable issue. This is dispositive of the Fourteenth Amendment due process claim.

**1. Officer Capurro is Entitled to Qualified Immunity on the Fourteenth Amendment Claim.**

Because the standards under the Fourth and Fourteenth Amendments are different, a violation of the Fourth Amendment would not clearly establish a violation of the Fourteenth Amendment. *See Barrera v. City of Woodland*, No. 2:18-cv-00329-JAM-KJN, 2023 U.S. Dist. LEXIS 102612 at *9-13 (E.D. Cal. June 12, 2023). Even if the Court finds precedent to deny qualified immunity on the Fourth Amendment claim, there is no clearly established law that Officer Capurro's use of deadly force was a Fourteenth Amendment due process violation. Officer Capurro is entitled to qualified immunity with respect to this claim.

**D. NO REASONABLE JURY COULD FIND THAT OFFICER CAPURRO FAILED TO RENDER MEDICAL AID.**

"Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Contra Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986); *Krause v. Cty. of Mohave*, 846 F. App'x 569, 571 (9th Cir. 2021) (affirming summary judgment on a denial of medical care claim because the officers fulfilled their due process obligation by calling for medical assistance within one minute of Krause being shot).

There is no dispute that Officer Capurro summoned medical assistance within approximately twenty seconds after shots were fired. No reasonable jury could find that Officer Capurro was deliberately indifferent to Detweiler's medical needs. There is no triable issue. This is dispositive of the failure to summon medical care claim.

**E. NO REASONABLE JURY COULD FIND THAT OFFICER CAPURRO UNLAWFULLY DETAINED DETWEILER.**

Plaintiff's second claim alleges that Officer Capurro never had reasonable suspicion or

probable cause to believe that Detweiler committed a crime at any point during the incident.

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City and County of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). The showing of probable cause is a defense to a false arrest claim under § 1983. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 924-25 (9th Cir. 2001). "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Dubner*, 266 F.3d at 966.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), officers may conduct a brief, investigative stop of an individual when they have reasonable suspicion that the "person apprehended is committing or has committed a criminal offense." *See also Arizona v. Johnson*, 555 U.S. 323, 326 (2009).

Here, Officer Capurro was provided information from Amtrak that Detweiler possessed and had brandished brass knuckles on the train. Based on this information, Officer Capurro had reasonable suspicion that Detwiler had committed a crime. This justified a lawful detention and investigation. Officer Capurro intended to safely escort Detweiler off the train to conduct this investigation and gave Detwiler lawful commands to keep both hands up and not touch anything, (particularly his bag that contained unknown objects. Plaintiff's police expert opines that these were lawful commands. Detweiler refused these lawful command in violation of Cal. Penal Code § 148(a)(1). That creates probable cause for arrest. Detweiler then grabbed Officer Capurro's taser and punched him in the head. This created probable cause for a more serious crime that Officer Capurro was not only a witness to, but a victim of. Detweiler then put on brass knuckles in front of Officer Capurro (a crime) and swung at Garrett (another crime). No reasonable jury could find that Officer Capurro lacked reasonable suspicion to detain Detweiler or probable cause to arrest him. There is no triable issue.

### F. NO REASONABLE JURY COULD FIND THAT DETWEILER'S ADA RIGHTS WERE VIOLATED.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination includes a failure to reasonably accommodate a person's disability. 28 C.F.R. § 35.130(b)(7).

In the Ninth Circuit, Title II applies to arrests. *Sheehan v. City & County of S.F.*, 743 F.3d 1211, (9th Cir. 2014), reversed in part on other grounds by *City & County. of S.F. v. Sheehan*, 135 S.Ct. 1765 (2015). In this arrest context, two theories of Title II violations apply: (1) "wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity"; and (2) where police, in the course of investigation or arrest, "fail to reasonably accommodate the person's disability ... causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.* at 1232.

To state a claim under Title II of the ADA, a plaintiff must generally show: (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of his disability. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036 (9th Cir. 2018).

The same facts regarding whether a use of force was reasonable inform an accommodation analysis. *Vos*, 892 F.3d at 1037; *Harper v. Cty. of Merced*, No. 118CV00562LJOSKO, 2018 WL 5880786, at *7 (E.D. Cal. Nov. 8, 2018) ("where such exigent circumstances were present, courts have rejected ADA reasonable accommodation claims as a matter of law"). It is unsettled whether Title II of the ADA requires "any accommodation of an armed and violent individual." *Id.* at 1036, citing *Sheehan II*, 135 S.Ct. at 1772, 1774 ("Although the Supreme Court granted certiorari as to whether Title II requires 'any accommodation of an armed and violent individual,' it later dismissed that issue as improvidently granted.").

Under 28 C.F.R. § 35.139(a) ("Direct Threat"), a public entity is not required to "permit an individual to participate in or benefit from the services, programs, or activities of that public

entity when that individual poses a direct threat to the health or safety of others." Under 28 C.F.R. § 35.139(b), "[i]n determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."

Here, there is no evidence that Detweiler had a disability that qualified him for ADA rights. Moreover, there is no dispute that he posed a direct threat to Garrett, Officer Capurro, and others on the train. This was an exigent situation and Detweiler was an armed and violent individual that did not require ADA accommodations. No reasonable jury could find an ADA violation.

**G. NO REASONABLE JURY COULD FIND OFFICER CAPURRO NEGLIGENT.**

Under California negligence law, a plaintiff must show that the defendant has a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury. *Alves v. Cty. of Riverside*, 135 F.4th 1161, 1169-74 (9th Cir. 2025), citing *Vasilenko v. Grace Fam. Church*, 3 Cal. 5th 1077, 1083 (2017). The California Supreme Court has recognized that law enforcement officers have a duty to act reasonably when using deadly force against a suspect. *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013). "The reasonableness of an officer's conduct is determined in light of the totality of the circumstances." *Id.* at 629. "[S]uch liability can arise if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Id.* at 626. "In other words, preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable." *Id*. at 630. Pre-force conduct should not be considered in isolation; it is merely one "part of a continuum of circumstances" surrounding the reasonableness of an officer's use of deadly force. *Id.* at 638. Since *Barnes v. Felix*, 605 U.S. 73, 80 (2025), both the Fourth Amendment and Negligence standards require consideration of more than just the moment of the use of deadly force.

Officer Capurro identified himself as a peace officer, had authority to detain Detweiler

from the beginning of the encounter; reasonably required that put his bag down; and gave many clear commands to keep his hands up, not to touch anything and eventually to get on the ground. Detweiler never complied, punched Officer Capurro in the face and then threatened immediate death or serious bodily injury to Garrett. There is no evidence to support a jury finding that Officer Capurro breached a duty or caused Detweiler to attack Garrett. There are no preshooting tactics that a reasonable jury could use to find the use of deadly force unreasonable. There is no triable issue. Officer Capurro respectfully requests dismissal of this claim.

### H. NO REASONABLE JURY COULD FIND THAT OFFICER CAPURRO VIOLATED THE BANE ACT.

Under California's Bane Act, a plaintiff must prove that an officer interfered with their constitutional rights through "threats, intimidation, or coercion." Cal. Civ. Code § 52.1. "The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a 'specific intent to violate' a constitutional right." *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 907 (9th Cir. 2024). An officer acts with the requisite specific intent if "the right at issue [is] clearly delineated and plainly applicable under the circumstances of the case," and the officer "commit[s] the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right." *Id.*

There is no triable issue on the § 1983 claim and therefore no triable issue on the Bane Act claim. In addition, there is no "specific intent" evidence. It has not been clearly delineated that the use of deadly force under these unique circumstances is unreasonable and there is no evidence that Officer Capurro used deadly for any purpose other than to prevent death or serious bodily injury to Garrett. There is no triable issue. Officer Capurro requests dismissal of this claim.

///

///

///

///

///

## VI. CONCLUSION

Detweiler put brass knuckles on while being lawfully held at gunpoint and swung a punch at Garrett's head. Even Plaintiff's police expert opines that deadly force in that situation would be appropriate. Then, after being shot, Detweiler put Garrett in a chokehold. No reasonable jury could find deadly force under these circumstances unreasonable, negligent, or that it shocks the conscience. In the alternative, Officer Capurro is entitled to qualified immunity. There is no triable issue. Officer Capurro respectfully requests that the Court grant summary judgment and dismiss all claims.

Dated: October 16, 2026

ANGELO, KILDAY & KILDUFF, LLP

*/s/ Derick E. Konz*

By:_______________________________

DERICK E. KONZ
Attorneys for Defendants CITY OF MT. SHASTA and OFFICER CAPURRO