DERICK E. KONZ, SB No. 286902
dkonz@akk-law.com
WILLIAM J. BITTNER, SB No. 292056
wbittner@akk-law.com
ISABELLE P. CARMICHAEL, SB No. 367390
icarmichael@akk-law.com
**ANGELO, KILDAY & KILDUFF, LLP**
Attorneys at Law
601 University Avenue, Suite 150
Sacramento, CA 95825
Telephone: (916) 564-6100
Telecopier: (916) 564-6263

Attorneys for Defendants CITY OF MT. SHASTA and JEREMIAH CAPURRO

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JULIA DETWEILER,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF MT. SHASTA, et al.,<br><br>Defendants. | Case No.: 2:24-CV-03100-WBS-SCR<br><br>**VOLUME OF EVIDENCE IN SUPPORT OF DEFENDANTS CITY OF MT. SHASTA AND JEREMIAH CAPURRO'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>**DATE:** **December 21, 2026**<br>**TIME:** **1:30 P.M.**<br>**DEPT:** **5, 14th Floor** |

Defendants CITY OF MT. SHASTA and JEREMIAH CAPURRO ("Defendants") hereby submit the following exhibits in support of their motion for summary judgment or in the alternative summary adjudication.

| Exhibit | Document Name | Page No.: |
|---|---|---|
| A | Office Jeremiah Capurro's Body Worn Camera – lodged on flash drive | 3 |
| B | Dispatch audio file from Amtrak employee Garrett – lodged on flash drive | 4 |

| | | |
|---|---|---|
| D | Photographs of Office Jeremiah Capurro | 6 |
| E | Photographs of the taser in the ceiling | 21 |
| F | Photographs of the brass knuckles | 25 |
| G | Still frame of grabbing taser | 28 |
| H | Still frame of putting on brass knuckles | 30 |
| I | Still frame of punching Garrett | 38 |
| J | Still frame of choking Garrett | 42 |
| K | Still frame of blood on hands | 45 |
| L | Still frame of brass knuckles near body | 48 |
| M | Excerpts from the deposition transcript of Officer Capurro taken on March 27, 2026 | 52 |
| N | Excerpts from the deposition transcript of Bruce Garrett taken on December 17, 2025 | 78 |
| O | Excerpts from the deposition transcript of Scott DeFoe taken on August 19, 2026 | 102 |


Dated: October 16, 2026

ANGELO, KILDAY & KILDUFF, LLP

*/s/ Derick E. Konz*
By:___________________________________
DERICK KONZ
Attorneys for Defendants
CITY OF MT. SHASTA and JEREMIAH CAPURRO

Officer Capurro's Body Worn Camera Submitted on Flash Drive

# EXHIBIT A

Dispatch Audio from Amtrak Employee Garrett Submitted on Flash Drive

# EXHIBIT B

Dispatch Audio from Amtrak Submitted on Flash Drive

# EXHIBIT C

# EXHIBIT D

Confidential



Confidential



J. CAPURRO
POLICE

Confidential



Confidential





Confidential



Confidential



Confidential



Confidential



Confidential



Confidential



Confidential



Confidential



# EXHIBIT E

Confidential



Confidential



Confidential



# EXHIBIT F

Confidential



Confidential



# EXHIBIT G


2023-12-25 00:27:48 -0800
AXON BODY 4 D01A1245J

# EXHIBIT H


2023-12-25 00:28:32 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:28:32 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:28:33 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:28:34 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:28:34 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:28:39 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:28:39 -0800
AXON BODY 4 D01A1245J

# EXHIBIT I


2023-12-25 00:28:42 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:28:42 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:28:42 -0800
AXON BODY 4 D01A1245J

# EXHIBIT J


2023-12-25 00:28:46 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:28:47 -0800
AXON BODY 4 D01A1245J

# EXHIBIT K


2023-12-25 00:29:18 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:29:19 -0800
AXON BODY 4 D01A1245J

# EXHIBIT L


2023-12-25 00:30:36 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:30:36 -0800
AXON BODY 4 D01A1245J


2023-12-25 00:30:36 -0800
AXON BODY 4 D01A1245J

# EXHIBIT M

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiffs,

vs. Case No. 2:24-cv-03100-WBS-SCR

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF JEREMIAH CAPURRO

FRIDAY, MARCH 27, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24838

A. I'm working for the Yreka Police Department.
Q. And that's different than the city of Eureka?
A. Correct.
Q. And how long have you worked for them for?
A. Approximately, a year and a half.
Q. Are you assigned to patrol there or something else?
A. I -- I am. I'm a detective with them.
Q. Okay. So let's talk a little bit about this incident. My understanding was you were at the station when you heard a call come out related to this incident; is that right?
A. That's correct.
Q. And what general information did you initially have on the call?
A. I was advised by my dispatch that Amtrak was going to be stopping in Mount Shasta City limits to have a passenger, who was causing a disturbance on the train and threatening people with brass knuckles.
I believe she also advised me the subject on the train had previously assaulted officers in the past, and they were going to be stopping at the Lake Street.
Q. Any other information you recall receiving on the call, other than what you told me so far?
A. No, I don't believe so. Not that I can recall.

Q. And did that come over your police radio?
A. No. I was -- I was in the office when the call came in, and she verbally advised me of that.
Q. Do you know --
MR. KONZ: Dale, I have an objection.
Are you asking did he receive the 911 call or the information from dispatch?
MR. GALIPO: No. I understand he doesn't get 911 calls, Derek. I'm talking about the information from dispatch, whether that came over his police radio.
BY MR. GALIPO:
Q. Is that how you understood the question?
A. Yeah. It -- it -- it did not come over the radio because I was in the office, and I was only a few feet from the dispatch center, so she verbally advised me of it.
Q. Do you know if she put it out over the radio, in addition to advising you of it verbally?
A. She did not. There would be really no reason for her to put it out over the radio, because I was the only officer on.
Q. Okay. So there would be no recording, to your knowledge, of the information you received; is that fair?
A. Correct.

Q. Did you have any understanding what the nature of the threat was, specifically; whether it was verbal? Non-verbal? What it was?

A. I was assuming it was more than just a verbal, because I recall there was threats and brass knuckles were brandished.

Q. Okay. Do you know if he attempted to hit anyone with the brass knuckles, for example?

A. I don't believe I received that specific information.

Q. Do you know if he had verbally threatened to harm anyone with the brass knuckles?

A. I don't believe I received that information.

Q. Did you have an understanding as to when this -- this brandishing of the brass knuckles took place, time-wise?

A. I was assuming it was just prior to them notifying law enforcement.

Q. Did anyone tell you when it had taken place, aside from your assumption?

A. I don't believe so.

Q. When did you get the information, approximately, when you were at the station, in relation to the shooting?

A. When did I receive my call for service --

Q. Yeah. In other words, I think you said the shooting happened maybe about 12:20 in the morning, approximately?
A. Yeah. I would -- I would -- yeah. That's what I would estimate. Just from memory, I would say the call came in -- I know it was Christmas morning, so it was probably just after midnight.
Q. Did anyone tell you that this -- this alleged brandishing of the brass knuckles had happened approximately an hour and a half or an hour and 45 minutes earlier?
A. No.
Q. And what was your understanding as to what was being requested of you in this call?
A. To have the passenger removed from the train.
Q. And who was it -- who did you understand wanted the passenger removed?
A. The Amtrak staff members. I don't know who, exactly.
Q. So at some point, you head out towards where you understand the train was going to stop?
A. Correct.
Q. And did the train get there a little earlier than you had anticipated?
A. It did.

Q. Was there some type of a plan that you were going to board the train at some point after it stopped?

A. Of course.

Q. And was part of that plan that you were -- initially, at least, that you were going to board the train with some deputy sheriffs?

A. That's correct.

Q. And how did that plan come to take place? Was there some communication, if you know, between your department and the sheriff's department?

A. Yeah. When I received the initial call for service and I was given that information, especially with the subject having a history of -- of assaulting police officers and knowing that there was a prohibited deadly weapon involved, I had her contact the sheriff's department for additional units and give them a time frame.

Q. So did you do that over your police radio?

A. No. Well, the dispatcher contacted the sheriff's department, I would say, on the telephone. And then when I left the department, I contacted one of the deputies, with my telephone, asking what their ETA was, and that the train was going to be there in a certain time frame.

Q. You placed a call in to one of the deputies?

A. Yes.
Q. Did you have their phone number or cell phone number?
A. Yes.
Q. Do you recall the name of that deputy?
A. Yeah, it was Deputy Paulis.
Q. Do you know how to spell that?
A. I don't.
Q. Is that a first name? I assume that's a last name?
A. Correct.
Q. Do you know the first name?
A. I can't recall.
Q. Did you customarily have some of the cell phone numbers of some of the people on the sheriff's department?
A. Yes.
Q. And what was the nature of that conversation?
A. I asked if they had received the request to assist Mount Shasta. And the response was, "Yes, we heard, and we're approximately" -- I don't think they gave a time frame. I think they gave a location. Which, working the area, I knew the location was at least 15 to 20 minutes out.
Q. Do you recall in your statement indicating your

Q. And I take in your training at the academy and field training, up to that point in time, you learn of the advantages of having multiple officers, when you can?

A. Yes.

Q. And what were some of the advantages you learned in that regard?

A. Well, there's power in numbers. It's great to have a team and cover units. There's several advantages.

People are less likely to potentially use force if there's multiple units there. You can -- there's definitely more strategy and strategic things you can do with -- with more officers on scene.

Q. At some point, you decided to board the train without waiting for the backup officers to arrive. Is that a fair statement?

A. Yeah. Yes, it is.

Q. But you did you understand they were en route?

A. Yes.

Q. And you understood, at least the initial plan, was to board the train together?

A. It was a request, yes.

Q. Did you call back this deputy that you had his cell phone number to let him know you were boarding the

train?

A. I don't recall. I believe while I was -- while I was on the phone, I believe I heard the train arriving. While I was on the phone with that deputy, I believe I heard the train in the distance.

Q. Did you ask him, if you remember, how far out he was?

A. Again, I think it was a location.

Q. What location do you recall?

A. It was somewhere in -- in Weed.

Q. Did you have a supervisor on that shift?

A. An on-call supervisor.

Q. And who was that?

A. I don't recall who the supervisor -- the on-call supervisor was that night.

Q. Is that a person that you can call, if necessary?

A. Yes.

Q. Did you have that person's phone number, or would you generally have the phone number?

A. Yes.

Q. Did you call the person to let them know you were considering boarding the train by yourself and see if they thought that was a good idea?

A. No.

Q. So you, yourself, decided you were going to board the train and not wait. Is that a fair statement?
A. That's a fair statement.
Q. And did you see anyone that you believed was an Amtrak employee, prior to boarding the train?
A. Yes. There was an Amtrak employee that greeted me at the doorway.
Q. Okay. And do you remember if that was a male or female?
A. A male.
Q. And did you take that time to try to get some information from the employee as to exactly what was going on, just so you had that information before boarding the train?
A. I don't recall. I remember the train pulling up and the door opening while it was still moving, so I figured whatever was happening was -- whatever disturbance was taking place was still occurring. And I remembered the employee's demeanor was -- he seemed a little upset, so I figured there was something happening.
So my initial response was to get to that location as quickly as possible, so I don't recall how much information was exchanged between me and the employee.

recall seeing any other Amtrak employee, other than the person you said that was sitting down and walked away?

A. I remember there was one that was involved with the incident, and I'm not sure if that was the same one that greeted me at the door or was already in the upstairs train car. But I believe there was two of them.

Q. And the second one, you didn't ask any questions of, either?

A. No.

Q. At some point, did someone point out to you where the individual was seated?

A. Yes.

Q. And who did that, if you recall?

A. Again, I don't know which one it was, but it was one of the two Amtrak employees.

Q. And did the person appear to be sleeping when you first saw him?

A. I guess that's fair.

Q. Did the person appear to be involved in any criminal activity when you first saw them sleeping in the seat?

A. No.

Q. Were you intending to arrest the person?

A. Yes.

Q. And what were you going to arrest them for?
A. Well, the plan was to detain him with possibility of being arrested for the possession of the brass knuckles.
Q. Did you ever tell the person he was going to be detained?
A. I don't recall if I told him he was going to be detained.
Q. Did you ever --
(Simultaneous speakers.)
A. But --
Q. Other, sorry.
A. I was going to say, typically I would have him removed from the train to discuss it, somewhere a little bit safer.
Q. So your intent was to remove him from the train, and then have the discussion with him?
A. Yes, that was my initial intent.
Q. But to your recollection, you never told him he was being detained or under arrest while he was on train? Is that fair?
A. I don't believe I used either one of those two words, no.
Q. Did you ask him to leave the train?
A. I did, initially.

A. Again, I didn't have the opportunity.

Q. At some point, do you shoot the Taser at the roof or ceiling of the train car?

A. I do.

Q. Why do you do that?

A. So that it wasn't pointed back in my direction. After he had grabbed it, he started pointing it back at me, so I safely discharged it away from any civilians, as well as myself and to the roof of the train car.

Q. Were you trying to -- looking at Exhibit 6 on the screen, were you trying to Tase Nicholas at this point?

A. No.

Q. What was your purpose of pointing your Taser at him at this point?

A. A use of force.

Q. You said earlier you were trained in the issue of de-escalation?

A. Uh-huh. Yes.

Q. Did you have a police radio on you?

A. I did.

Q. Did you ever call for backup at this point?

A. I knew back up was en route.

Q. Did you know how close they were?

A. At this point, I did not.

MR. GALIPO: Can we show Exhibit 7, please?
(Exhibit Number 7 was marked.)
BY MR. GALIPO:
Q. Do you know if you were attempting to Tase Nicholas at this point?
MR. KONZ: Objection. Calls for speculation.
I think without watching the video, it's pretty difficult to tell exactly when this happened and what was going on.
But to the best -- based on your view of this still photo, I guess --
THE WITNESS: I don't -- I don't know. I couldn't tell you.
BY MR. GALIPO:
Q. Was there a light coming from your Taser, if you know?
A. Yes.
MR. GALIPO: Going to Exhibit 8.
(Exhibit Number 8 was marked.)
BY MR. GALIPO:
Q. Are you able to see that on your screen?
A. Yes.
Q. At some point, did you notice that the Amtrak employee had grabbed Nicholas from behind?
A. I did.

Q. Did you have the impression that the Amtrak employee was trying to help you?
A. Yes.
MR. GALIPO: Can we look at Exhibit 9, please?
(Exhibit Number 9 was marked.)
BY MR. GALIPO:
Q. Does it appear that the Amtrak employee is grabbing Nicholas in this image?
MR. KONZ: I'm sorry. Calls for speculation. Lacks foundation, based on an image.
BY MR. GALIPO:
Q. You may answer, if you can.
A. I can't tell.
Q. Do they appear to be in physical contact?
MR. KONZ: Same objections.
THE WITNESS: All I see is an arm. I don't know if that's the front or the back.
BY MR. GALIPO:
Q. And the arm that you see, you associate that arm with the Amtrak employee?
MR. MURPHY: Objection. Calls for speculation.
MR. KONZ: Same objections.
BY MR. GALIPO:
Q. I'm just trying to distinguish whether you're referring to Nicholas arm or someone else's arm?

A. It's an arm and head in a maroon sweatshirt. I can't tell you.

MR. KONZ: We can all see the picture just the same and draw the same -- different -- same conclusions, so --

MR. GALIPO: I'm not so sure about that latter part, but I would agree with you that we could all see it.

Okay. We can take that down, Ben.

BY MR. GALIPO:

Q. So did you -- and I think you've already told me, you didn't give any verbal warning you were going to Tase him?

A. No. It was implied. My Taser was drawn and pointed in his direction.

Q. And did you ever try to drive-stun him before you shot the Taser into the ceiling of the train car?

A. No.

Q. Did you ever try to drive-stun him after you shot the Taser probes in the ceiling of the train car?

A. Yes. After he struck me several times, I did attempt to drive-stun him.

Q. He struck you several times, where?

A. In the head.

Q. Where exactly did he strike you?
A. He struck me in the left side of the head and the left upper cheek bone.
Q. And when you say "the left side of the head," can you be more specific? What -- where are you referring to?
A. Above the left ear, and the cheek bone, to the left eye socket, between the nose and the eye.
Q. So you're saying that he struck you twice?
A. At least, from what I can remember, yes.
Q. Do you know what hand he struck you with, whether it was his left hand or right?
A. I don't recall.
Q. Do you know how much time there was between the first strike and the second strike?
A. Seconds. I don't know, exactly.
Q. Did these strikes take place after you fired the Taser prongs into the ceiling or before?
A. I believe it was after.
Q. And where did you attempt to drive-stun him?
A. I believe I already answered that question earlier. It was in his backside, lower left back.
Q. And how many deployments, again?
A. I don't recall, exactly. I believe it was approximately three attempts.

Q. Was Nicholas facing in your direction when the Amtrak employee was -- appeared to be pulling Nicholas off you?

A. I don't recall.

Q. Did you see how the Amtrak employee was pulling Nicholas off you?

A. No. And to be honest, I don't know if he pulled him off, or -- or if Nicholas turned around and began to fight with him. I don't -- I don't recall.

Q. So after you fired your Taser into the roof line of the car and attempted to drive-stun Nicholas on three occasions, at some point, did you take out your baton?

A. Eventually, yes.

Q. And when you say "Eventually," how much time do you think passed between your last drive-stun and your first baton strike?

A. I couldn't tell you. It's -- it's been too long.

Q. Do you have any estimate?

A. No.

Q. Are you trained that, in terms of baton strikes, you have to justify every strike?

A. I would hope so, yes.

Q. Up to the time of your last drive-stun, did you

see any weapon in either of Nicholas's hands?
A. Up to the last use of my Taser?
Q. Yes.
A. No.
Q. And then the baton strikes, we talked about those a little bit. Were you doing those with one hand or two?
A. I don't recall.
Q. Do you recall if they were full-force strikes; in other words, you were trying to hit him as hard as you could?
A. I remember that it was extremely tight with all of the seating in there, and I could not get sufficient power for the baton to be effective. So, no, I couldn't hit him full force.
Q. Well, how would you describe your hits that you were doing?
MR. KONZ: Objection. Vague.
THE WITNESS: "Describe" them, in what way?
BY MR. GALIPO:
Q. Well, would you say they were light taps? Would you say they were medium strikes? Hard strikes? Crushing strikes? Any words you want to use.
MR. KONZ: Objection. Vague.
THE WITNESS: Considering how tight the area

was, I would say medium strikes.

BY MR. GALIPO:

Q. Do you recall after the incident, telling a supervisor that you were crushing his hand with the baton?

A. I don't recall.

Q. Were you crushing his hand with your baton?

MR. KONZ: Objection. Vague.

THE WITNESS: I don't know how to answer that question. I hit his hand.

BY MR. GALIPO:

Q. How many times do you think you hit his hand with your baton?

A. Maybe three.

Q. And how many times do you think you hit his arm with your baton?

A. I don't recall hitting his arm.

Q. What other body parts do you recall hitting with your baton, other than his hand?

A. I remember attempting to hit his torso, as I was trained use the baton. Whether his put his arm out and the arm got struck, I couldn't tell you, but I do remember hitting his hand and attempting to hit his torso.

Q. And how many strikes do you think you attempted

altogether with the baton?
A. I believe I told you that earlier, and it was approximately six.
Q. Are you aware the video shows about 16 to 17 strikes?
A. No, I'm not aware of that. I haven't seen it in a while.
Q. And during any of your baton strikes, did you ever see during your baton strikes any weapon in Nicholas's hand?
A. No.
Q. At some point, you pull out your gun. Is that correct?
A. Correct. Yes.
MR. GALIPO: Can we look at -- I don't know what number we're up to. Can we look at Exhibit 10, please?
(Pause.)
MR. GALIPO: Let's look at 10, please.
(Exhibit Number 10 was marked.)
BY MR. GALIPO:
Q. Okay. Does that appear to be your baton?
A. Yes.
Q. In addition to attempting to swing the baton at Nicholas, did you ever try to jab him with your baton,

cause death.
Q. Okay. So let me clean it up for the objections. Why did you use deadly force on Mr. Detweiler? What did you observe?
A. There was imminent threat of great bodily injury or death if I did not do something about that.
Q. Did you see Mr. Detweiler apply brass knuckles to his hand?
A. Yes. While I had him at gunpoint, he applied his brass knuckles.
Q. Okay. Did you see and hear Mr. Detweiler refuse to obey your multiple commands not to touch his bag?
A. Yes.
Q. Did you fear that Mr. Detweiler may have weapons in that bag?
A. Yes.
Q. Did you see -- did you see Mr. Detweiler refuse multiple commands for him to get on the ground?
A. Yes.
Q. And after that, did you see him apply the brass knuckles to his fist?
A. Yes.
Q. And after that, did you see him swinging and apparently going to make contact with a civilian's head

with brass knuckles?

A. Yes.

Q. And after you saw all of that, you -- you shot him?

A. Correct.

Q. Okay. Does your department policy or your training require you to wait until a suspect kills a civilian before shooting them?

A. No.

Q. Based on the totality of the circumstances, in the minute or so that this entire encounter lasted with Mr. Detweiler, did you deem his -- his swinging fist with brass knuckles at the head of a civilian, an imminent threat of death or serious injury to a civilian?

A. Yes.

Q. All right. And that's why you deployed your weapon?

A. Correct.

Q. Up until that point, you did not intend to deploy your weapon; true?

A. True.

Q. In the video that we just watched, did you see that when Mr. Detweiler and the conductor went to the ground, after you had fired four shots, that Mr.

Detweiler still had a choke hold on the Amtrak conductor before you fired the next two shots?

A. Yes.

MR. GALIPO: Objection. Leading, and assumes facts not in evidence.

MR. MURPHY: Okay. Let's clean it up.

BY MR. MURPHY:

Q. After you fired the four shots, did you see Mr. Detweiler and the conductor going to the ground?

A. Yes.

Q. And what did you see next?

A. I saw Detweiler still had control of the conductor, appearing to still be causing harm to him, which resulted in me firing two more times.

Q. When you say he -- "Mr. Detweiler still had control of the conductor," describe that for me. What made you think that?

A. He had his arms around his neck, holding on to him.

Q. All right. And I'm going to switch gears. When did you first realize that your assumption of an emergent incident, something happening where Mr. Detweiler is walking around the train, brandishing brass knuckles and menacing people, when did you first realize that that assumption was incorrect?

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 7th day of April, 2026.

______________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT N

Bruce Garrett

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

JULIA DETWILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiffs,

vs. Case No. 2:24-cv-03100-WBS-SCR

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.
___________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF BRUCE GARRETT

WEDNESDAY, DECEMBER 17, 2025

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 21830

with him, the second one, towards the front of car number 11?

A. Within ten minutes of departing of Klamath Falls, we had a passenger come up in a dining car where myself and conductor Eric McNay were sitting, and they mentioned that a passenger had come into the dining car, put his bookbag down on one of the tables, and pulled out a pair of brass knuckles, and was kind of motioning with his hands and making sure that everybody saw that he had them.

And that person had come up into the dining car to let myself know and the conductor know, and then I proceeded forward in the train to go locate this individual.

Q. And then at some point, you located Mr. Detwiler again?

A. Yes. The person who came into the dining car to report this behavior gave me a description what this person looked like, and it -- it matched Mr. Detwiler's -- what he was wearing.

I walked up into car 11, and I saw him standing towards the front of car 11, and I interacted with him to try and get him to go back to his seat.

Q. And were you successful in doing so?

A. I was, yes.

"I'm going to Emeryville. I have a ticket to Emeryville."

I said, "Yes, Nick, you have a ticket. You're good to go."

And then he eventually complied and sat down in his seat.

BY MR. GALIPO:

Q. So based on that, you were thinking he could be a little bit off or have some type of mental health issue?

A. Based on my interactions up to that point, yes. The thought had crossed my mind.

Q. And it sounds like, over the years, Bruce, with your work, with Amtrak, you have dealt with other people that you also thought potentially had mental health issues?

A. Correct.

Q. Could you tell one way or the other whether he was under the influence of anything at that point?

A. No.

Q. After your second interaction with Mr. Detwiler, what, if anything, did you do?

A. After he sat down, I proceeded back to the dining car to go talk to the conductor, Eric McNay, and I informed him on what I found. And, you know,

Eric made a decision that we're going to -- this guy needs to get removed from the train.

Q. How does that generally work? I take it it's not like the old days when you want to throw someone off the moving train in between cities. Do you generally try to go to a place where the train can stop and maybe law enforcement can assist with taking him off?

A. Yes. If we're going to do a law enforcement extraction, we're going to go somewhere where it's easily accessible for any services we might need.

Q. And was that what the thought or the thinking was at the time, to try to get to a place where the train could come to a stop and law enforcement could come on to assist?

A. Yes.

Q. Over the years, have you done that, in other occasions with other passengers?

A. Yes.

Q. And do you have an estimate as to how often, you know, per month, per year, that that has happened, at least while you've been working?

A. An estimate would be four times a year.

Q. And so once that decision was made, that he should be removed from the train, what steps did you next take -- take in that regard?

complaint?

A. I looked at the conductor, Eric McNay, and said, "Hey, Eric, I'll go, once again, and take care of this. I'll go up there and find this guy because I have success with getting him to go back to his seat."

I proceeded up into car 12, where Nick was, and him and I had another interaction.

Q. Okay. Tell me about that interaction, please.

A. Nick was towards the front of car 12. I -- at this point, I believe -- I would have to go back to my DOJ interview. I believe at this point, I did see him with the brass knuckles.

And when I confronted him, there was another Amtrak employee from the dining car that was still awake, that had come back to assist me with dealing with this individual, with Nick. And I believe I saw -- I'd have to go back to the DOJ entire. I believe I saw him with the brass knuckles this time.

It was the same thing. Somebody had come up and said, "Hey, there's a guy with brass knuckles waving them around and scaring everybody."

I walked up there, and he did have the brass knuckles on him. And it was the same thing as before: "Hey, Nick, come on, this is not your car. We have to go back to car 11. You're in the wrong car."

And then I waved off the other person that was with me, the other Amtrak employee, because I didn't feel like I needed him at the time. I could tell that Nick was maybe getting agitated by seeing both of us there, feeling possibly boxed in, so I waved the Amtrak employee away and said, "Hey, I'll -- I'll handle this." And I was able to get Nick up to his seat in car 11, again.

Q. And is the reason that you waved the other employee off, just to try to de-escalate the situation a bit, in case that was affecting Nick?

A. Correct.

Q. And you did that, in part, because of your impression of his mental health status?

A. I saw a gentleman sitting there with brass knuckles. I could see him getting more agitated. Nick was in between myself and the other Amtrak employee, and I felt that it created a boxed-in situation. And I wanted to get the other guy to go away because I felt like I could handle Nick.

Q. In part, because you had success in doing that before?

A. Correct.

Q. And you felt you had built a little bit of a rapport with him?

A. My height would be 5 feet, 11 inches; weight, approximately, 225.
Q. And with respect to Mr. Detwiler, do you have any estimate as to his height and weight?
A. My estimate, I would say 6'2". Estimated weight, 220.
Q. And what would you estimate his age to be, approximately?
A. Estimated age, 29.
Q. Were you hoping, Bruce, that the officer would come on board and be able to take Mr. Detwiler off of the train without any force being used? Was that, at least, your hope?
A. That's always the hope, is that it would be a quick, painless extraction, and we can have minimal delay and continue on our journey, always.
Q. Did you have any conversation with the officer when he arrived, that you recall?
A. I don't recall having exchanged any pleasantries. I believe, to my best knowledge, he came up and asked where the individual was seated.
Q. Did you tell him anything as to why you wanted him off the train or anything like that?
A. I don't recall us having that conversation. I can't be certain.

A. No, I did not.
Q. Were you thinking, at that point, you were just going to have the police officer deal with it?
A. Correct.
Q. Did you hear the police officer say anything to Mr. Detwiler at that point?
A. I -- they did exchange words. I -- the memory is hazy on exactly what was said. So I -- I can't -- I don't want to put words in the officer's mouth, but there were some words exchanged initially.
Q. How far away were you from them, approximately, when the initial words were exchanged?
A. Approximately, 10 feet.
Q. And are you saying that, right now, you don't recall anything that was said?
A. I have some memories, but I would have to refer to the -- the body camera footage. I -- I -- I can't -- I mean, I have some memories, but it's not enough to where I can expect -- you know, guess on what was said.
Q. If you were able to listen to some of the audio on the body-worn camera footage, that might refresh your recollection?
A. Sure, yes.
Q. When you were about 10 feet away and they were having this initial verbal exchange, were you looking in

you said that, you know, Mr. Detwiler might feel boxed in, do you recall who that employee was?

A. I cannot recall his name, no.

Q. Was one of the reasons that you wanted Mr. Detwiler removed from the train, in addition, obviously, to the complaints you explained to me, was because, you know, there was a period in the ride now it was getting dark, and you had less help on the train? Were those factors in your mind?

A. Some of those might -- yes, some of those were factors.

Q. Can you explain that, please?

A. Well, once we leave Klamath Falls, it's two hours and 20 minutes run time without interruptions until my next stop of Dunsmuir. And in between Klamath Falls and Dunsmuir, it's pretty sparsely populated.

So we don't go through city centers where there's police, fire, or EMS support, so it's best if you have a problem around Dunsmuir or Klamath Falls to make an attempt to, you know, get the ambulance there to take care of a medical situation, have the police there to remove somebody, because in between Klamath and Dunsmuir, there's -- there's not much support available.

We lose cell phone coverage at times, so we're on our own.

Q. So was that one of the reasons you wanted to do it at Mount Shasta?

A. Yes.

Q. And then you talked about, I guess it would have to be very egregious behavior to have someone removed from the train between stops. Is that the generally a fair statement?

A. That -- that would be a fair statement.

Q. And when you were describing in your DOJ interview, your strategy of having the other employee leave so that Mr. Detwiler didn't feel boxed in, do you recall describing that as a form of de-escalation, from your perspective?

A. I cannot say with certainty if those were the words I used when answering that question, but certainly de-escalation was something that I was, you know, thinking -- I mean, it wasn't the only thing I was thinking of, but it was part of my rational for having -- waving him off.

Q. And did it seem to work, from your perspective? Once the other person left, you were able to calm Mr. Detwiler down and get him to sit back down?

A. Yes.

Q. And to your knowledge, he stayed in that seat for about an hour and 50 minutes until the police

officer made contact with him?

A. Correct.

Q. In your opinion -- strike that.

So you initially heard Eric talking to someone downstairs when the train stopped in Mount Shasta, and then shortly after that, you saw the police officer. Is that fair?

A. I can't recall whether I heard Eric talking to the person downstairs. No, I -- I can't recall if I heard him have a conversation.

Q. You mention in your statement that: "Once the officer made contact with Mr. Detwiler, it kind of started going sideways."

Do you remember using that word?

A. I don't remember using that word, but if -- if it's in the -- the transcript, then I would stand by it.

Q. Were you expecting the officer to start Tasing Nick when he did?

A. I am not now nor have never been law enforcement, so I have no expectations. I don't know police procedure. I can't comment on that.

Q. At some point did you try to get on Nick's back, prior to the shots going off?

A. I have a recollection, at some point, I believe -- I'd have to default back to the body camera

footage. I believe Nick was, you know, fighting with the officer, and I felt that, you know -- I felt a sense of duty to interject and try and help the situation.

Q. And do you recall what you did to help the situation?

A. I believe, to the best of my knowledge, I went up there and tried to pull Nick off his back. I would default to the camera footage, again. You know, I -- I can't -- without watching the video, I can't exactly say for certain what I did, but I do remember going up there and -- and -- and trying to help pull Nick off the officer.

Q. Do you recall having a hand on the back of Nick's head?

A. At which point in the --

Q. At any point before the shots went off.

A. The hand on the back of Nick's head?

Q. Yes.

A. Yes, I believe I did have, as kind of a bracing position, like this, toward the end of the video. I believe where you stopped it, it shows me in the vestibule with him like this.

(Indicating.)

Q. Okay. Were you in physical contact wit Nick at any time before the shots?

A. Yes.
Q. And what parts of your body were in physical contact?
A. When -- before the shooting, like I had mentioned earlier, a few questions ago, I had felt that the officer might need some help pulling Nick off of him, so I went up there. I can't recall exactly what I did without looking at the body camera footage.
And then, before the shooting, Nick and I were back in the -- we call it the "vestibule" area, the upper door there of car 11, and I had put my hands up in a bracing position to create some separation between Nick and myself.
Q. When -- as Nick was moving closer to you, was he moving away from the officer, if you could tell?
A. At what point in the video are we --
Q. In between the time he got up from his seat. Because I think you said you were about 10 feet away, initially.
A. Correct.
Q. So during the Tasing and the baton strikes, did it appear to you that Nick continued to move closer to you?
A. Yes. Nick was getting closer to me as the situation unfolded, correct.

A. Me, personally, no, I did not.
Q. And I kind of asked you this before, and the only reason I bring this up, I saw some references in your statement. Did you do something to the door at about the time the police officer was there, with Nick? I don't know if locking it's the right thing, or making it so it can it only open manually. Do you remember anything like that?
A. Correct. Yes. I put the door that I had my back to, to manual. So you could open the door -- you could just put your hand on the door and slide it open, but could not press the buttons to open the door.
Q. I see.
And what was your purpose in doing that?
A. To not allow the situation to go through a car -- into car 12, car 13 and, you know, progress forward in the train.
Q. So your back would have been close to the door shortly before the shots were fired?
A. That is correct.
Q. I guess what I'm trying to figure out, at some point in your statement, you say you "moved forward and try to get on Nick's back to try and pull him off."
I'm reading from a transcription. Do you know what you were referring to?

A. That was when Nick and the officer were, you know -- I felt Nick was attacking the officer, and I felt that I needed to, you know, get involved in the situation and try and pull Nick off the officer.

Q. And what did you do to try to pull him off?

A. I would have to defer to the body camera footage. I don't -- I cannot clearly state what I did. I would have to default to the camera -- to the body camera footage.

Q. But would you have grabbed some portion of Nick's body and pulled him backwards?

A. Yes.

Q. Did you --

MR. KONZ: Belated objection. Lacks foundation.

He already said he didn't remember it.

BY MR. GALIPO:

Q. Did you also -- strike that.

Did you actually see Nick striking the officer at any time?

MR. KONZ: Vague. It's been asked and answered.

But go ahead.

THE WITNESS: Yeah. I -- I can't say for certain, but there was a reason why I felt I needed to

Q. You had finished that a maneuver?

A. To the best of my knowledge, that -- that maneuver was finished, and, you know, it was seconds later or however longer later in the whole event.

Q. How much time do you think passed from you trying to pull Nick backwards, towards you, I take it; right?

A. Correct. Towards myself.

Q. How much time would you say passed from you trying to pull Nick backwards to hearing the shots?

A. Approximately, 15 to 20 seconds.

Q. Do you know if any baton strikes were occurring when you tried to pull Nick backwards?

A. I can't recall one way or another.

MR. GALIPO: Okay. I think that's all the questions I have. I don't know whether the other lawyers have any questions today.

MR. KONZ: I just have couple. I know this has been a long day and this is kind or tiring, so I'll try to make this real quick. Okay?

THE WITNESS: Okay.

EXAMINATION

BY MR. KONZ:

Q. Okay. Bruce, you testified earlier that the first interaction you had with Mr. Detwiler was in the

train station at Klamath Falls when you checked his ticket; right?

A. That is correct.

Q. Did you have any information about Mr. Detwiler before that point?

A. I did, yes.

Q. And what information was that?

A. One of the station agents had mentioned to the conductor, Eric McNay, that Mr. Detwiler had a, you know, criminal history, and that part of his history involved police resistance, fighting police officers.

Q. Do you recall during that first interaction with him at the train station, thinking that he may be on methamphetamine?

A. Not -- no.

Q. Okay. Do you recall saying during your DOJ interview that you thought he might be a meth head?

A. I believe I said his behavior lent itself towards, you know, meth-head behavior that I had seen in the past.

Q. Okay. Are there cameras on the train?

A. There are no cameras in any car on any train -- or on this particular train set.

Q. Okay. Whose decision was it to remove Nick from the train?

A. When I originally entered the dining car after the first instance, the first onboard interaction with Nick, I relayed to the conductor, Eric McNay about the -- well, actually, I'm going to go back.

When the first person came in and told the story of what this person had seen with Nick, with the brass knuckles in the cafe car, Eric, the conductor, was there and able to hear everything. I told him I will go back there and find this guy and deal with the situation. I'll take care of it.

I went back there. Handled the situation. Came back to the dining car. Told Eric what I saw. And he said, "He's got to go." And I agreed.

Q. Is there anything in the Amtrak training that tells you that Amtrak is private property, the train is private property, and you have authority to kick somebody off for trespassing?

A. Yes. It's federal -- the train is federal property, and we have the authority to remove people for various reasons.

Q. Was that the request from the police officer, that he remove Mr. Detwiler at the request of Amtrak?

MR. GALIPO: Objection. Calls for speculation. It lacks foundation.

THE WITNESS: Can you rephrase that question,

please?

BY MR. KONZ:

Q. Sure. What I am trying to get at is when you spoke to the police department -- with the dispatch for the police department, were you asking them to come onto the train to remove Mr. Detwiler?

A. Yes.

Q. The shooting occurred in car 11; right?

A. Correct.

Q. And the car behind car 11, where the vestibule is that you were in, that's car 12; is that right?

A. That is correct.

Q. And approximately how many people do you recall being in car 12 when this happened?

A. I don't have an approximate -- just from looking at the body camera footage, as we walked through the car, it looked to be pretty packed. Best estimate would be 60 people.

Q. Okay. And then how about -- how many people were in car 11 when this all happened?

A. The exact number, I do not have. An estimate would be between 20 to 30.

Q. Okay. Is that -- there's a downstairs and an upstairs to car 11; right?

A. Correct.

Q. Is that both 20 to 30 people total?

A. There were people downstairs in the lower level of car 11. I can't recall how many. I did not include that amount. I was just doing my estimate on the upstairs portion of car 11.

Q. I don't know if you recall this or you may have seen it on the video. Just tell me which one this information comes from, in your head. But do you recall there was another passenger in car 11, in the seat basically closest to the vestibule where the shooting occurred?

A. I do remember there was, I believe, a gentleman sitting there, in that first seat. Yes.

Q. And how -- in your estimation, how far away was he from Mr. Detwiler when Mr. Detwiler was involved in this sort of hand-to-hand combat with the officer?

MR. GALIPO: Objection. Assumes facts not in evidence.

THE WITNESS: He -- he would have been between 3 to 6 feet away. As Mr. Detwiler moved, the distance grew, but probably 3 to 6 feet most of the time.

BY MR. KONZ:

Q. And this is during the time where the officer is using the baton on Mr. Detwiler? That's the time frame we're talking about?

A. Yes. I believe -- well, I'd have to look at the video camera footage or the body camera foot. I believe while the baton was being used, Mr. Detwiler was pretty where I was in the vestibule. So that gentleman would have been, you know, 3, 4 feet away.

Q. Did you ever -- before the police officer came onto the train, did you ever tell Mr. Detwiler that he was going to be removed?

A. Absolutely not. No.

Q. Do you know if any other Amtrak employees told him that?

A. I can't say with certainty. I was the last person back in the coaches. The conductor, Eric, did not go back there at all. So unless somebody snuck by me, nobody else would have been able to say anything to him.

Q. And we watched the body camera video earlier today; right? You saw that?

A. Correct.

Q. Did you see just seconds prior to the shooting, Mr. Detwiler put the brass knuckles on?

A. From the body camera footage, yes, I did see that.

Q. Could you see that when the incident was happening, or was your view obscured, or did you not

remember it?

A. My view was obscured. I can't say with certainty if I saw it, you know, live, in person.

Q. Okay. And when you watched the video earlier today, did you also see Mr. Detwiler take a swing at your head when he had the brass knuckles on?

A. Yes.

Q. Do you recall that, when it happened?

A. My last clear memory is when Mr. Detwiler Was -- when I was bracing myself to keep some distance, he turned around and looked at me, and he a look of range in his eyes. And then he started swinging on me.

And then that's pretty much my last memory until I was on my knees.

Q. So in that moment when he turned to look back at you, and you said he had a look of range in his eyes, you said during your DOJ interview you thought, "Oh, shit." Is that accurate? Did that cross your mind?

A. Yes, because -- yes, it did.

Q. Did you see in the video today when you and Mr. Detwiler both went to the ground together?

A. Yes.

Q. Could you see in the video that he had you in some type of a choke hold?

MR. GALIPO: Objection. Mischaracterizes the

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 4th day of January, 2026.

______________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT O

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

JULIA DETWILER, )
) Case No.
Plaintiff, ) 2-24-CV-03100-SCR
)
vs. )
)
CITY OF MT. SHASTA, et al., )
)
Defendants. )
)

--oOo--

VIDEOCONFERENCE DEPOSITION

OF

SCOTT A. DeFOE

--oOo--

WEDNESDAY, AUGUST 19, 2026

--oOo--

CERTIFIED TRANSCRIPT

26-357
Stenographically Reported By:
KELLEY JORDAN, CSR 6780

A. Once again, if Det- -- if Capurro knew that he swung at him with brass knuckles on and he reasonably believed he was going to be punching him in the head with brasses knuckles, then he could articulate there was an imminent threat of great bodily injury or death and the shooting would be reasonable.

Q. Okay. And that's exactly what happened, isn't it?

MR. LEVINE: Assumes --

THE WITNESS: I'm not assuming that line of facts, Counsel. I -- I -- he turned towards him.

Q. BY MR. KONZ: Which one -- what fact are you not assuming?

A. Well, I'm -- when he turned towards him and attempted to swing, I'm not saying he was trying to punch him in the head. Those are your facts.

I'm just saying when he went to swing, it appeared he was looking to swing at that point, but once again, I can't discern from looking at the video if I would reasonably believe that that punch was going to be striking him in the head, or he was looking to leave the train, or he was looking to create space so he could leave the train. I can't tell from the video.

So I can't discern that he was attempting to punch him in the head with the brass knuckles on, based

on my review of the video.

Q. Okay. So then I'll just create a little hypothetical. Let's just assume he was trying to punch Garrett in the head with the brass knuckles. Would deadly force be acceptable then?

MR. LEVINE: Incomplete hypothetical. Assumes facts not in evidence.

THE WITNESS: If I reasonably believed that a subject was about to strike someone in the head with brass knuckles which would cause, I believe, depending on the level of force, serious or great bodily injury or death, then the use of lethal force would be reasonable, based on those -- your hypothetical.

Q. BY MR. KONZ: Okay. What's your understanding of the legality of possessing or using brass knuckles?

A. It's a felony in the State of California.

Q. It's a felony to even have them; right?

A. Correct.

Q. And what -- is it your understanding that if you actually used brass knuckles on a person, you -- you could be convicted for assault with a deadly weapon?

MR. LEVINE: Objection. Vague and ambiguous.

THE WITNESS: Yes. Once again, if you use them and it caused, you know, injury to the subject, there's a likelihood that you could be convicted of 245

of the Penal Code.

Q. BY MR. KONZ: Or in other words, brass knuckles are considered a deadly weapon under -- under the law?

MR. LEVINE: Vague and ambiguous.

THE WITNESS: Yes, they are considered a deadly weapon under the law if used in that manner.

Q. BY MR. KONZ: Okay. Have you ever been involved, in your police career, with an individual that possessed brass knuckles?

A. Yes.

Q. Have you ever seen somebody attacked with brass knuckles?

A. I've taken complaints as a detective with LAPD or conducted investigations and interviewed people who were victims of someone being struck with brass knuckles. I have.

Q. Were they struck -- well, what kind of injuries did they sustain?

A. Contusions, bruising. I think one matter -- one had a loss of a couple teeth, I believe, if I can recall. The bruising. It's just -- once again, it's going to be depending on the level of the force associated with the strike, but bruising, contusions would be considered serious bodily injury based on I

see some movements on the video. I couldn't discern if the hand was causing the struggle or -- or if Capurro was attempting to drive stun Mr. Detweiler again and he was trying to fend him off to keep the Taser away from him, I don't -- I couldn't determine which one.

Q. BY MR. KONZ: If an individual grabbed an officer's Taser and tried to take it away from him, is that a crime?

A. Yes.

MR. LEVINE: Assumes facts. Calls for speculation. Incomplete hypothetical.

Q. BY MR. KONZ: What is the -- what's the crime? What's the Penal Code Section? Would it be a misdemeanor or felony? What is it?

MR. LEVINE: Same objection.

THE WITNESS: It would be a felony. I don't know the actual section, but it would be a felony to try to disarm a police officer and take any of his less lethal force options and/or a -- obviously, a handgun.

Q. BY MR. KONZ: Okay. But you don't -- you don't base your opinions on any fact that Detweiler actually tried to do that; right?

Your opinions are based on a fact that Detweiler was actually just trying to push the Taser away, because he was -- it was hurting him? Is that the

just want to make sure.

You don't have an issue with Officer Capurro demanding that Detweiler, like, leave his bag alone and keep his hands free; right? You think that's an okay -- that was an okay tactic?

A. Well, sure. I mean, a better tactic, as I just stated, are let me get the bags away from the seat. I don't know what's in them; so I'm not going to give you access to something, especially when you're sleeping. Before I wake you up, let me just get that stuff away from you. I don't know what's in it; so I'm going to get that away before I shine a light on you and before I startle you. I want those bags away from you to prevent access.

But to answer your question, being that he didn't do that, which would have been reasonable, yeah, I don't -- yes, I don't want him grabbing a bag of any sort or anything. I believe he does so, because he believes he's obviously leaving the train, but nonetheless, an explanation would have been better because, once again, Detweiler seemed confused as to why he couldn't grab his bag and then became, you know, the tugging of the bag between the two of them.

So -- but yes, I don't want him -- I want nothing in his hands. I want his hands restrained, and

that's what the objective should have been.

Q. Okay. I'll move to your second opinion. This would be on page 12, and the opinion is that -- there's a few in here. The first one I -- I can find is that, "Officer Capurro failed to formulate, communicate, and implement a reasonable tactical plan before initiating contact with Detweiler (as read)."

That's one of your opinions; right?

A. Correct. That's what we just discussed. That's correct.

Q. Yeah. Okay. So we've -- we've gone over that.

Your next opinion -- you have another opinion in here under -- this is under Opinion 2, but there's several, like, I guess subparts to this -- that Officer Capurro "failed to obtain or request additional information" from the conductor. You've -- you fault him for that; right?

A. Yes, sir.

Q. Okay. And we've talked about that.

You have another part in here that he "failed to wait for backup before boarding the train."

You've discussed that; right?

A. Yes, sir.

Q. You have a part in here that says he "failed

REPORTER'S CERTIFICATE

State of California )
) ss.
County of Humboldt )

I, KELLEY JORDAN, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That I am a disinterested person herein; that the witness, SCOTT A. DeFOE, named in the foregoing deposition, was by me duly sworn via Zoom videoconference to testify the truth, the whole truth, and nothing but the truth; that the deposition was reported in shorthand by me, KELLEY JORDAN, a Certified Shorthand Reporter of the State of California, and thereafter transcribed using computer-aided transcription and is a true and correct record of the testimony so given.

IN WITNESS WHEREOF, I hereby certify this transcript at my office in the County of Humboldt, State of California, this 4th day of September, 2026.

KELLEY JORDAN, CSR NO. 6780
Certified Shorthand Reporter of
the State of California