Michael E. Murphy, Esq. (Bar #174408)
Selim Mounedji, Esq. (Bar #173347)
SIMS LAW FIRM, LLP
101 Pacifica, Suite 210
Irvine, California 92618
(949) 253-7900
(949) 253-7930 - FAX

Attorneys for Defendants NATIONAL RAILROAD PASSENGER CORPORATION service mark AMTRAK and BRUCE GARRETT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 2:24-cv-03100-WBS-SCR<br><br>**DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION SERVICE MARK AMTRAK AND BRUCE GARRETT'S POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT**<br><br>Date: November 23, 2026<br>Time: 1:30 p.m.<br>Courtroom: 5, 14th Floor<br><br>Complaint Filed: November 7, 2024<br>Trial Date: March 9, 2027 |

TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . ii

1. INTRODUCTION. . . . . . . . . . 1

2. SUMMARY OF UNDISPUTED MATERIAL FACTS. . . . . . . . . . 2

   A. The Alleged Incident. . . . . . . . . . 2

   B. Relevant Background Information Regarding Decedent . . . . . . . . . . 6

   C. Garrett's Amtrak Employment and Certified Conductor Training . . . . . . . . . . 7

   D. Plaintiff’s Complaint. . . . . . . . . . 7

   E. Deposition Testimony of Plaintiff's Expert Scott DeFoe . . . . . . . . . . 8

3. APPLICABLE LEGAL STANDARD . . . . . . . . . . 8

4. THERE IS NO EVIDENCE TO SUPPORT PLAINTIFF'S NEGLIGENCE CLAIM AGAINST GARRETT AND AMTRAK.. . . . . . . . . . 9

5. THERE IS NO EVIDENCE TO SUPPORT PLAINTIFF'S CLAIM THAT AMTRAK NEGLIGENTLY TRAINED GARRETT. . . . . . . . . . 10

6. PLAINTIFF'S BATTERY CLAIM AGAINST GARRETT AND AMTRAK HAS NO MERIT . . . . . . . . . . 13

7. PLAINTIFF'S ADA CLAIM AGAINST GARRETT AND AMTRAK HAS NO MERIT . . . . . . . . . . 13

8. PLAINTIFF HAS NO EVIDENCE TO SUPPORT HER PUNITIVE-DAMAGES CLAIM AGAINST GARRETT . . . . . . . . . . 14

9. CONCLUSION. . . . . . . . . . 15

TABLE OF AUTHORITIES

**State Cases:**

*Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917–18 (1996) . . . . . 9

*Ramirez v. Plough, Inc.*, 6 Cal. 4th 539, 546 (1993) . . . . . 9

*Swigart v. Bruno*, 13 Cal. App. 5th 529, 534 n.4 (2017) . . . . . 9

**State Statutes:**

*Cal. Civ. Code* § 2186. . . . . 7

*Cal. Civ. Code* § 2188. . . . . 7, 14

Cal. Civ. Code § 3294. . . . . 14

*Cal. Penal Code* § 21810 . . . . . 3

**Federal Cases:**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) . . . . . 8

*Burlington N. Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 796–97 (7th Cir. 1999) . . . . . 12

*Carter v. Nat'l R.R. Passenger Corp.*, 63 F. Supp. 3d 1118, 1155–56 (N.D. Cal. 2014). . . . . 11

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) . . . . . 8, 9

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993) . . . . . 10, 11

*Katzowitz v. Long Island R.R.*, 58 F. Supp. 2d 34, 37 (E.D.N.Y. 1999). . . . . 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) . . . . . 9

*Scott v. Harris*, 550 U.S. 372 (2007) . . . . . 9

*Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 868 (9th Cir. 2003). . . . . 11, 12

**Federal Statutes:**

Fed. R. Civ. P. 56(a) . . . . . 8

49 C.F.R. pt. 37. . . . . 13, 14

49 C.F.R. § 242. . . . . 10, 11, 12

42 U.S.C. § 12134. . . . . 13, 14

49 U.S.C. § 20101. . . . . 10

49 U.S.C. § 20106. . . . . 10, 11, 12

Defendants National Railroad Passenger Corporation service mark Amtrak ("Amtrak") and Bruce Garrett ("Garrett") move this Court for summary judgment based on the following points and authorities:

## 1. INTRODUCTION

Plaintiff Julia Detweiler ("Plaintiff") brings this wrongful death and survival action arising from Officer Jeremiah Capurro's shooting of Nicholas Detweiler ("Decedent") aboard an Amtrak train. At the time, Decedent was a convicted felon on supervised probation and subject to an arrest warrant for probation violations. Decedent's past criminal conduct included assaulting multiple police officers and jail deputies and staff.

Officer Capurro responded to Amtrak's request to remove Decedent after Decedent repeatedly brandished brass knuckles, a deadly weapon, at passengers and Amtrak crew members. Amtrak assistant conductor Bruce Garrett called the City of Mt. Shasta Police Department after passengers reported Decedent's threatening conduct and Garrett personally observed it. Officer Capurro boarded the train to remove Decedent. Decedent disobeyed his commands, fought him, and escalated the encounter until Officer Capurro used deadly force.

Officer Capurro's body worn camera video (BWC) captured the interaction and shooting. The BWC video shows Decedent disobeying Officer Capurro's commands, resisting arrest, assaulting Officer Capurro, placing brass knuckles on his hand, and throwing an overhand punch at Garrett's head while Officer Capurro held him at gunpoint. Even after being shot several times, Decedent put Garrett in a headlock and pulled him to the ground, where Officer Capurro shot him two more times. Two of the bullets in the series of six struck Garrett.

Plaintiff's Complaint alleges causes of action for negligence and battery against Garrett. In addition to seeking to hold Amtrak vicariously liable for Garrett's conduct, the Complaint alleges that Amtrak negligently trained Garrett and violated the Americans with Disabilities Act ("ADA"). The Complaint also alleges punitive damages against Garrett.

Defendants Amtrak and Garrett are entitled to summary judgment for the following reasons:

(1) Plaintiff's negligence claim fails because the undisputed facts show that Garrett and Amtrak did not breach any duty owed to Decedent or Plaintiff. Passengers reported that Decedent

had brandished brass knuckles, and Garrett personally observed Decedent display them. Those contemporaneous facts justified Garrett's request that law enforcement remove Decedent from the train. The undisputed material facts, including the BWC video and Plaintiff's expert testimony, establish that Garrett acted reasonably under the circumstances. Plaintiff's expert, Scott Defoe, identifies no fault by Garrett or Amtrak.

(2) Plaintiff's battery claim fails because the undisputed facts establish that Garrett acted lawfully and was privileged to defend himself and others, including Officer Capurro, who was attempting to make a lawful arrest, and the passengers Garrett reasonably sought to protect. Garrett acted in defense of himself and others and did not intend to harm Decedent. The undisputed material facts establish that Decedent attacked Garrett; Garrett was not the aggressor.

(3) Federal law preempts Plaintiff's negligent-training claim because Garrett held federal conductor certification. In any event, no evidence connects Garrett's training to Decedent's injuries. To the contrary, Garrett followed his training by twice deescalating Decedent and calling local authorities to remove him safely.

(4) Plaintiff's claim that Amtrak violated the Americans with Disabilities Act ("ADA") fails as a matter of law. Amtrak and Garrett never denied Decedent equal access because of his alleged mental health disabilities. The undisputed evidence shows that Amtrak and Garrett sought Decedent's removal because he brandished a deadly weapon while threatening passengers and employees, not because of any disability.

(5) There is no evidence to support a punitive damage claim against Garrett.

## 2. SUMMARY OF UNDISPUTED MATERIAL FACTS

### A. The Alleged Incident

Plaintiff's lawsuit arises from a City of Mt. Shasta Police Department shooting on December 25, 2023, aboard Amtrak Train 11 at approximately 12:28 a.m. in the City of Mt. Shasta. (UMF No. 1). Decedent and the relief train crew, including Garrett, boarded the train at Klamath Falls at approximately 10:13 p.m. on December 24, 2023. (UMF No.2 ). Garrett served as the assistant conductor aboard the train, with duties that included checking passengers' tickets. (UMF No. 3). Decedent was the only passenger who boarded the train at Klamath Falls. (UMF No. 4) During the

job briefing, an Amtrak station agent told Garrett that Decedent had been acting strangely and had a history of police issues. (UMF No. 5). Garrett went to the lobby and asked to see Decedent's ticket. (UMF No. 6). Decedent stood, raised his left arm in what Garrett described as a "Dracula pose," and asked, "Why are you talking to me?" (UMF No. 7). Decedent produced a valid ticket for travel from Klamath Falls to Emeryville, so Garrett issued him a boarding pass. (UMF No.8). Garrett thought that Decedent was a bit "weird" and probably just a "meth head," but Decedent's conduct did not cause Garrett enough concern at that time to deny him boarding. (UM No. 9). During the boarding process, Decedent walked in the wrong direction toward the head end of the train, so Garrett directed him to the correct coach car. (UMF No 10). Decedent carried no luggage other than a couple of plastic Walmart-type bags. (UMF No.11). Amtrak assigned him to Car 11, Seat 9, approximately four rows behind the front vestibule connecting Car 11 to Car 12. (UMF No. 12). The train's next stop was Dunsmuir, approximately two hours and twenty minutes away. (UMF No. 13).

Within five minutes of departing, a passenger informed Garrett that a passenger matching Decedent's description had brandished brass knuckles on his hand menacingly in the café car. (UMF No. 14). California law criminalizes the possession of metal knuckles. (UMF No. 15, Cal. Penal Code § 21810.) When Garrett went to investigate, other passengers told him that the person brandished brass knuckles then went to the coach cars. (UMF No. 16). Garrett found Decedent in the vestibule area connecting cars 11 and 12. (UMF No. 17). Decedent told Garrett that he was trying to go to Emeryville. (UMF No. 18). Garrett reassured Decedent that the train was traveling to Emeryville. (UMF No. 19). Garrett calmed Decedent, who returned to his seat. (UMF No. 20). The trip from Klamath Falls to Emeryville aboard Amtrak Train 11 lasts approximately ten hours. (UMF No. 21).

///

///

///

///

///

Cellphone reception becomes spotty approximately 10 minutes out of Klamath Falls until the train gets near Mt. Shasta. (UMF No.22). If a public safety issue arises en route from Klamath Falls to Mt. Shasta, Garrett calls his engineers on his low power radio pack-set, and the engineers use the powerful locomotive radio to call Union Pacific's ("UP") dispatcher. (UMF No. 23). UP's dispatcher then calls UP's Response Management Communication Center ("RMCC"), and RMCC calls local law enforcement/emergency personnel. (UMF No. 24.)

When Train 11 entered a siding at Worden, Garrett spoke with his conductor. (UMF No. 25). The Worden siding lies approximately 13 to 14 rail miles south of the Klamath Falls Amtrak Station. (UMF No. 26). Garrett and his conductor discussed that brass knuckles are a deadly weapon and that they faced a long trip through the darkness, so they decided to remove Decedent from the train. (UMF No. 27). While the train remained in the Worden siding, RMCC advised that no local authorities were available and recommended taking Decedent to Dunsmuir or Mt. Shasta, which is just north of Dunsmuir. (UMF No. 28) Garrett and his conductor agreed, planned to walk through the train more often, and continued to monitor Decedent. (UMF No. 29).

Approximately three minutes after Train 11 departed the Worden siding, a female passenger told Garrett that a man in Car 12 was menacing people with brass knuckles. (UMF No. 30). Garrett walked from the café car through Car 11 to Car 12 with a male dining car attendant. (UMF No. 31). Garrett saw Decedent in Car 12 through the end door window. (UMF No.32). Garrett approached Decedent, reminded him that they had just talked, and asked him to return to his seat in Car 11. (UMF No. 33). Decedent pulled out the brass knuckles and stood in a "Dracula" like pose. (UMF No. 34). The dining car attendant who accompanied Garrett with a crowbar told Decedent to put the brass knuckles away. (UMF No. 35). Garrett directed the dining car attendant to stand down and relied on his 8.5 years of training and experience as an Amtrak conductor to successfully deescalate the encounter. (UMF No. 36).

///

///

///

///

Garrett convinced Decedent to return to his seat and sit down. (UMF No. 37). Garrett stayed in Car 11 near the stairs in the middle of the car to watch Detweiler for 15 minutes, during which Decedent stayed in his seat. (UMF No. 38). Garrett then went to the dining car for water and talked to his conductor again. (UMF No. 39). They now definitely did not want Decedent walking around with brass knuckles and wanted him removed from the train. (UMF No. 40).

At approximately midnight, Garrett coordinated with dispatching railroad UP's RMCC regarding the train's expected arrival time in Mt. Shasta for local law enforcement's removal of Decedent from the train. (UMF No. 41). After a couple of hours, Garrett had not yet heard back from UP's dispatcher or RMCC so he decided to call the Mt. Shasta police department as the train got closer to Mt. Shasta. (UMF No. 42).

Garrett asked for Mt. Shasta Police Department's removal of Decedent from the train at Lake Street. (UMF No. 43) Garrett provided Decedent's name, information about Decedent's rumored prior police incidents, and information about Decedent's brass knuckles. (UMF No.44).

As Train 11 approached Lake Street, Garrett went downstairs, locked the door to the lower-level passenger seating area, and positioned himself near the upper-level stairs. (UMF No. 45). The conductor remained on the lower level and gave the locomotive engineers the car count needed to stop Car 11 at Lake Street. (UMF No. 46). After the train stopped, the conductor met Officer Capurro at the door and directed him upstairs. Garrett then walked past Decedent, pointed him out to Officer Capurro, and continued to the vestibule between Cars 11 and 12 so Officer Capurro could remove Decedent. (UMF No. 47).

Garrett stood in the vestibule between Cars 11 and 12 after pointing out Decedent to Officer Capurro. (UMF No. 48). Garrett disabled the automatic door-opening mechanism to prevent Decedent from entering Car 12, where other passengers were located. (UMF No. 49). Garrett's conductor remained in the middle of Car 11 near the stairs after Officer Capurro followed Garrett to Decedent's seat. (UMF No. 50).

Officer Capurro told Decedent that he needed to leave the train and instructed him to keep his hands raised and not touch anything. (UMF No. 51). Decedent stood up suddenly and moved into the aisle where he faced off with Officer Capurro, placing himself between Officer Capurro

and Garrett, who had moved to the front of the railcar into the vestibule area after pointing out Decedent to Officer Capurro. (UMF No. 52). Decedent ignored Officer Capurro's commands and reached for a bag on the adjacent seat. Officer Capurro attempted to take the bag while again ordering Decedent to keep his hands raised, but Decedent continued to resist. (UMF No. 53).

Decedent continued to ignore Officer Capurro's requests, prompting Officer Capurro to draw his taser. (UMF No. 54). Decedent grabbed the taser, and the ensuing struggle discharged it into the ceiling and rendered it useless. (UMF No. 55). Officer Capurro next deployed his baton, but Decedent continued to resist and fight while Garrett stood a few feet away in the vestibule. (UMF No. 56). During the altercation, Decedent struck Officer Capurro twice in the face with enough force that it disabled his earpiece and Officer Capurro was feeling on the verge of blacking out. (UMF No. 57) .

During the fight, Decedent backed away from Officer Capurro into the Car 11 vestibule, where Garrett had already been standing, backing Garrett up farther against the vestibule door. (UMF No. 58). Garrett attempted to restrain Decedent from behind to protect himself, the passengers, and Officer Capurro, but Decedent broke Garrett's grip and continued resisting arrest. (UMF No. 59). Decedent placed the brass knuckles on his right fist while facing Officer Capurro, who had drawn his service weapon and pointed it at Decedent. (UMF No. 60). Garrett reached out in an unsuccessful attempt to hold Decedent's arm against the wall, but Decedent again broke free, turned, and threw a brass-knuckle-clad punch at Garrett with his right fist. (UMF No. 61 ). Officer Capurro immediately fired four shots in response, but Decedent continued to choke Garrett even after both men fell to the floor. (UMF No. 62). Officer Capurro fired two more shots before Decedent released Garrett. (UMF No. 63). The gunfire struck Garrett twice in his sides. (UMF No. 64). Surgeons removed one projectile during emergency surgery, but the other shattered and remained in Garrett's body. (UMF No. 65).

**B. Relevant Background Information Regarding Decedent**

Decedent had an extensive criminal history in the States of California, Oregon, and Illinois. (UMF No. 66). His criminal history included multiple convictions for burglary, assault with a deadly weapon, robbery, interference with a peace officer, resisting arrest, assault on a peace

officer, battery on a peace officer, and multiple convictions for resisting arrest. (UMF No. 67). At the time of the incident, Decedent was on active felony supervised probation for possession of ammunition by a convicted felon and had a felony no-bail arrest warrant for a violation of his probation. (UMF No. 68). Notably, even Decedent's mother, Plaintiff herein, called the police twice due to Decedent threatening her. (UMF No. 69). Decedent's sister also called the police on him after Decedent threatened her and her daughter with a knife, and she filed a restraining order against him. (UMF No. 70).

### C. Garrett's Amtrak Employment and Certified Conductor Training

At the time of the incident, Garrett held federal conductor certification under 49 C.F.R. pt. 242. (UMF No.71). Conductors direct train operations and protect passenger safety. (UMF No. 72). Amtrak's Police Department trains conductors in deescalation techniques. (UMF No.73) .Amtrak's rules and California law authorize Amtrak conductors to remove passengers who present a safety risk to themselves or others. (UMF No. 74 and Cal. Civ. Code §§ 2186, 2188 [§ 2186: common carrier may require passengers to conform to rules of carriage, if they are lawful, public, uniform in their application, and reasonable; § 2188: passenger who refuses to conform to any lawful regulation of the carrier may be ejected.]).

### D. Plaintiff's Complaint

Plaintiff's Complaint seeks damages against Officer Capurro, the City of Mt. Shasta, Garrett, and Amtrak. (UMF No. 75). Plaintiff asserts three claims against Amtrak and Garrett: the Fifth Claim for Relief under the Americans with Disabilities Act ("ADA"); the Sixth Claim for Relief for battery; and the Seventh Claim for Relief for negligence. (UMF No. 76). Plaintiff bases her negligence and battery theories against Garrett on his alleged restraint of Decedent during the altercation with Officer Capurro. (UMF No. 77). As to Amtrak, the Complaint alleges that Amtrak is vicariously liable for Garrett's acts and "for negligently improperly training him with regard to situations involving police officers on Amtrak trains, with regard to addressing disturbances on trains and involving passengers, and with regard to the use of physical restraint and other force against passengers." (UMF No. 78). The Complaint bases its ADA theory against Amtrak and Garrett on Amtrak's alleged failure to train Garrett to "respond and interact peacefully with

individuals who have mental health impairments and/or are experiencing mental health crises" and on Garrett's alleged "failing to follow procedures for dealing with individuals with mental impairments and/or who are experiencing mental health crises." (UMF No 79.)

**E. Deposition Testimony of Plaintiff's Expert Scott DeFoe**

Plaintiff designated Scott DeFoe as her sole liability expert. (UMF No. 80). DeFoe offers opinions concerning police and security practices, including use of force, premises liability, and foreseeability, and he has testified and prepared reports in railroad cases. (UMF No. 81). DeFoe reviewed Garrett's interview transcripts, Garrett's deposition transcript, and Plaintiff's Complaint. (UMF No. 82). He opined that Officer Capurro boarded the train without first debriefing train personnel or developing and communicating a tactical plan; DeFoe attributed those failures to Officer Capurro, not to Garrett or Amtrak. (UMF No. 83). DeFoe identifies no fault by Amtrak or Garrett, describes Garrett as "trying to help," attributes responsibility solely to Officer Capurro, and intends to offer no adverse opinion about Amtrak or Garrett at trial. (UMF No. 84).

**3. APPLICABLE LEGAL STANDARD**

Rule 56 requires the Court to grant summary judgment when the movant shows no genuine dispute as to any material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). Under Rule 56(a), the Court may grant summary judgment on all claims or partial summary judgment on fewer than all claims or defenses; under Rule 56(g), the Court may identify material facts that are not genuinely disputed. The Court must enter judgment for the moving party "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986).

Under Rule 56, a district court must enter summary judgment against a plaintiff "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

When the nonmoving party bears the burden of proof at trial, the moving party need not negate the opponent's claim. *Id.* Nor must the moving party produce evidence affirmatively showing the absence of a genuine issue of material fact. *Id.* at 325. "Instead, [] the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* Once the moving party satisfies this burden, the nonmoving party must identify facts showing a genuine issue for trial. *Id.* at 324. A "metaphysical doubt" does not establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## 4. THERE IS NO EVIDENCE TO SUPPORT PLAINTIFF'S NEGLIGENCE CLAIM AGAINST GARRETT AND AMTRAK.

California law requires a negligence plaintiff to establish (a) a legal duty to use due care; (b) a breach of that duty; and (c) the breach as the proximate or legal cause of the resulting injury. *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917–18 (1996). The court formulates the standard of care as a question of law. *Ramirez v. Plough, Inc.*, 6 Cal. 4th 539, 546 (1993). Once the court formulates that standard, the jury applies it to the facts *if* reasonable minds might differ as to whether the defendant's conduct conformed to the standard. *Id.* (emphasis added).

The Court should credit video evidence over self-serving affidavits that the video contradicts. See *Scott v. Harris*, 550 U.S. 372 (2007); *Swigart v. Bruno*, 13 Cal. App. 5th 529, 534 n.4 (2017) ("To the extent that [Plaintiff's] witnesses' testimony was inconsistent with the video, we do not consider such inconsistency a disputed fact and have relied on the evidence in the video.").

No reasonable jury could find that Garrett or Amtrak breached a duty of care because the undisputed facts and BWC video establish that both acted reasonably. The evidence forecloses Plaintiff's portrayal of Decedent as a compliant passenger whom Garrett restrained while Officer Capurro tased, struck, and shot him. The evidence instead shows that Decedent resisted from the outset, rose from his seat, placed himself between Officer Capurro and Garrett, and rapidly

escalated the encounter. Decedent's conduct forced Officer Capurro to progress from his taser, to his baton, and ultimately to his firearm when Decedent prepared to strike Garrett with brass knuckles while Garrett remained trapped behind the altercation. (UMF Nos. 51-63).

Garrett briefly attempted to restrain Decedent only after Decedent rose from his seat, confronted Officer Capurro, and positioned himself between Officer Capurro and Garrett in the vestibule. (UMF No. 59). Garrett touched Decedent only after Decedent wrestled the taser from Officer Capurro, fought him, and repeatedly struck him in the head, thereby endangering Garrett, Officer Capurro, the passengers, and the crew. (UMF Nos. 54-61).

**5. THERE IS NO EVIDENCE TO SUPPORT PLAINTIFF'S CLAIM THAT AMTRAK NEGLIGENTLY TRAINED GARRETT.**

At the time of the incident, Garrett held federal conductor certification. (UMF No. 71). Federal regulations govern conductor eligibility, training, testing, certification, and monitoring. 49 C.F.R. § 242.1(a)–(b). Those regulations cover the subject matter of Plaintiff's asserted state-law training duties and therefore preempt Plaintiff's claim unless she establishes an applicable exception under 49 U.S.C. § 20106(b). Plaintiff identifies no federal standard or internal rule that Amtrak violated when training or instructing Garrett.

Under established principles of federal preemption, when state law, including state court allegations of presupposed duties in litigation, "conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993) (citing U.S. Const. art. VI, cl. 2). The Supremacy Clause of the U.S. Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Congress has the power under the Supremacy Clause to preempt state law. Preemption occurs when Congress expresses a clear intent to occupy a particular field. Pursuant to its Congressional mandate, Congress delegated its railroad conductor training and safety responsibilities to the Secretary of Transportation pursuant to the Federal Railway Safety Act ("FRSA"), which was enacted to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA contains an express preemption provision, which states in pertinent part:

(a) National uniformity of regulation.--(1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.

(2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order-

(A) is necessary to eliminate or reduce an essentially local safety or security hazard;

(B) is not incompatible with a law, regulation, or order of the United States Government; and

(C) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106.

"[P]reemption will lie [when] the federal regulations substantially subsume the subject matter of the relevant state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663–64 (1993). When applying FRSA preemption, the Court must focus on the subject matter and safety purpose of the federal regulation. See *id.* at 665–75. The Secretary of Transportation promulgated regulations that establish "[f]ederal safety standards for the eligibility, training, testing, certification and monitoring" of conductors so "that only those persons who meet minimum Federal safety standards serve as conductors, to reduce the rate and number of accidents and incidents and to improve railroad safety." 49 C.F.R. § 242.1(a)–(b). Federal law therefore preempts state tort claims alleging inadequate safety eligibility, training, testing, certification, and monitoring unless a plaintiff can establish the failure-to-comply or internal-rule-violation exceptions in 49 U.S.C. § 20106(b). Plaintiff has not identified any federal standard or internal rule that Amtrak violated when training or instructing Garrett and has not otherwise satisfied 49 U.S.C. § 20106(b). The Court should therefore reject Plaintiff's claims of negligent or inadequate eligibility, training, testing, certification, and monitoring. See *Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 868 (9th Cir. 2003) ("It is clear that the federal training regulations do 'substantially subsume' the subject of employee training."); *Carter v. Nat'l R.R. Passenger Corp.*, 63 F. Supp. 3d 1118, 1155–56 (N.D. Cal. 2014) (finding preemption of crew training and supervision claims).

The federal regulations expressly cover the subject matter of Plaintiff's asserted state-law duties and therefore preempt those claims. Plaintiff alleges that Amtrak had a duty to train Garrett differently to reduce incidents involving violent passengers with mental or emotional disturbances and to improve railroad safety. But the conductor-certification regulations already prescribe "[f]ederal safety standards for the eligibility, training, testing, certification and monitoring of all conductors to whom [Part 242] applies" to ensure "that only those persons who meet minimum Federal safety standards serve as conductors, to reduce the rate and number of accidents and incidents and to improve railroad safety." 49 C.F.R. § 242.1(a)–(b).

The FRSA precludes Plaintiff's allegations concerning conductor training and Decedent's safety because federal regulations subsume conductor safety training, education, instruction, discipline, supervision, and qualification. 49 C.F.R. pt. 242. Amtrak trained Garrett under its FRA-approved written program, and Garrett held federal certification at the time of the incident. (UMF No. 71-74). The Court therefore cannot impose negligence liability on Amtrak based on Garrett's eligibility, training, testing, certification, or monitoring concerning passenger safety. 49 C.F.R. § 242.1; 49 C.F.R. § 242.5; 49 U.S.C. § 20106; 76 Fed. Reg. 69,802, 69,840–41. See *Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 868 (9th Cir. 2003); *Burlington N. Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 796–97 (7th Cir. 1999) (finding that the federal training regulations generally preempt state laws regarding railroad crew training and qualifications).

Even absent preemption, the evidence defeats the negligent-training claim. Amtrak trained Garrett in deescalation, and Garrett successfully deescalated two encounters with Decedent before transferring responsibility for Decedent's removal to law enforcement. Moreover, Plaintiff's sole liability expert does not criticize Garrett's conduct or training. No evidence therefore permits a reasonable jury to find for Plaintiff on this claim.

///

///

///

///

///

**6. PLAINTIFF'S BATTERY CLAIM AGAINST GARRETT AND AMTRAK HAS NO MERIT.**

To establish her battery claim, Plaintiff must prove that Garrett intentionally touched Decedent with the intent to harm or offend, that Decedent did not consent, and that Decedent was harmed or offended by the conduct. CACI No. 1300. Here, Plaintiff's claim must fail because Plaintiff cannot satisfy all the elements of the tort.

First, the evidence indisputably shows that Garrett did not touch Decedent with an intent to harm or offend Decedent. Garrett briefly attempted to restrain Decedent to protect himself, Officer Capurro, and the passengers, and to defuse an escalating threat.

Second, the video evidence also shows that Garrett did not cause any harm to Decedent. Decedent's assault on Garrett with brass knuckles prompted Officer Capurro to fire; the gunfire also struck and injured Garrett.

The BWC video shows that Decedent assaulted Garrett with brass knuckles, prompting Officer Capurro to fire and wounding Garrett in the process. Even after Officer Capurro shot him several times, Decedent continued to hold Garrett by the neck.

Finally, even if Garrett's conduct otherwise constituted battery, his privilege to defend himself and others bars liability because Garrett "reasonably believed the plaintiff was going to cause harm to the defendant (or another person); and . . . used only the amount of force that was reasonably necessary for protection." See CACI No. 1304. Garrett attempted to protect the passengers, crew, and Officer Capurro. (UMF No. 59). Garrett had received reports that Decedent threatened passengers with brass knuckles, had personally witnessed that conduct, and had heard reports—later confirmed—of Decedent's prior criminal history. (UMF Nos. 5, 14, 30, 66-70). Garrett then witnessed Decedent assault Officer Capurro with enough force to make Garrett reasonably fear for his own safety and Officer Capurro's safety. Garrett therefore acted reasonably in defense of himself, Officer Capurro, and the Amtrak passengers.

**7. PLAINTIFF'S ADA CLAIM AGAINST GARRETT AND AMTRAK HAS NO MERIT.**

Title II of the ADA directs the Federal Transit Administration ("FTA") of the Department of Transportation to regulate the provision of public transportation services to individuals with

disabilities. See 42 U.S.C. § 12134(a); 49 C.F.R. pt. 37 (Transportation Services for Individuals with Disabilities). The FTA's written interpretations and guidance state the DOT's official interpretation of those regulations. 49 C.F.R. § 37.15. Section 37.5 provides that "[n]o entity shall discriminate against an individual with a disability in connection with the provision of transportation service." 49 C.F.R. § 37.5(a). Under the ADA rules, "public entities are prohibited against affording to qualified individuals with disabilities opportunities to participate in or benefit from benefits or services that are not equal to the opportunities afforded to non-disabled individuals." *Katzowitz v. Long Island R.R.*, 58 F. Supp. 2d 34, 37 (E.D.N.Y. 1999).

Plaintiff's ADA claim fails because the undisputed evidence shows that Amtrak did not deny Decedent equal access because of an alleged disability. Amtrak permitted Decedent to board and transported him until his conduct created a safety risk. Garrett requested police assistance because Decedent displayed brass knuckles and threatened passengers and employees, not because of any actual or perceived disability.

Garrett and Amtrak treated Decedent as they lawfully could treat any passenger, disabled or not. "A common carrier of persons may make rules for the conduct of his business, and may require passengers to conform to them, if they are lawful, public, uniform in their application, and reasonable." Cal. Civ. Code § 2186. Civil Code § 2188 provides that "A passenger who refuses . . . to conform to any lawful regulation of the carrier, may be ejected from the vehicle by the carrier. But this must be done with as little violence as possible, and at any usual stopping-place or near some dwelling-house." The Amtrak crew followed those requirements: it transported Decedent to Mt. Shasta and arranged for police to remove him at a regular stop in a populated area.

**8. PLAINTIFF HAS NO EVIDENCE TO SUPPORT HER PUNITIVE-DAMAGES CLAIM AGAINST GARRETT.**

Under California law, "[i]n an action for the breach of an obligation not arising from contract," a plaintiff may recover punitive damages if she proves "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). To defeat summary judgment on a punitive-damages claim, Plaintiff must produce clear and convincing evidence of malice, oppression, or fraud. Cal. Civ. Code § 3294(a).

Plaintiff offers no evidence from which a reasonable jury could find, by clear and convincing evidence, that Garrett acted with malice, oppression, or fraud. The testimonial evidence and BWC video show that Garrett called the police after Decedent threatened passengers and crew members with brass knuckles. Garrett intervened only after Decedent repeatedly defied Officer Capurro's commands, fought with Officer Capurro, moved into the vestibule between Garrett and Officer Capurro, and attempted to strike Garrett in the head with brass knuckles. Because Garrett acted to protect himself, Officer Capurro, the passengers, and the crew, the Court should grant summary judgment on Plaintiff's request for punitive damages.

## 9. CONCLUSION

For all the foregoing reasons, Defendants Amtrak and Bruce Garrett respectfully request entry of summary judgment in their favor on all claims asserted against them. Alternatively, Defendants request partial summary judgment on each claim asserted against them and on Plaintiff's request for punitive damages.

DATED: October 16, 2026 SIMS LAW FIRM, LLP

*/s/ Selim Mounedji*

By ___________________________________

Selim Mounedji
Attorneys for Defendant NATIONAL RAILROAD PASSENGER CORPORATION service mark AMTRAK and BRUCE GARRETT