Michael E. Murphy, Esq. (Bar #174408)
Selim Mounedji, Esq. (Bar #173347)
SIMS LAW FIRM, LLP
101 Pacifica, Suite 210
Irvine, California 92618
(949) 253-7900
(949) 253-7930 - FAX

Attorneys for Defendants NATIONAL RAILROAD PASSENGER CORPORATION service mark AMTRAK and BRUCE GARRETT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 2:24-cv-03100-WBS-SCR<br><br>**DECLARATION OF BRUCE GARRETT IN SUPPORT OF DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION SERVICE MARK AMTRAK AND BRUCE GARRETT'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT**<br><br>Date: November 23, 2026<br>Time: 1:30 p.m.<br>Courtroom: 5, 14th Floor<br><br>Complaint Filed: November 7, 2024<br>Trial Date: March 9, 2027 |

I, Bruce Garrett, declare as follows:

1. I am a United States Citizen over 21 years of age and a named defendant in this lawsuit. I am currently employed with Amtrak as a conductor and have been employed by Amtrak since July 2015.

2. I have personal knowledge of the following facts and if called upon to testify, I could and would competently testify to them. My personal recollection of the facts was refreshed by my

review of my post-incident interview with the Department of Justice and my review of the on body camera video worn by officer Capurro.

3. Plaintiff's lawsuit arises from a City of Mt. Shasta Police Department shooting on December 25, 2023, aboard Amtrak Train 11 at approximately 12:28 a.m. in the City of Mt. Shasta. The individual shot on that day was a passenger named Nicholas Detweiler (Decedent). I was working aboard that train as an assistant conductor at that time and was a direct witness to the facts that gave rise to this lawsuit.

4. I boarded the train at Klamath Falls at approximately 10:13 p.m. on December 24, 2023, along with Decedent and my crew. I served as the assistant conductor aboard the train and my duties included checking passengers' tickets. Decedent was the only passenger who boarded the train at Klamath Falls.

5. At the station, we held a job briefing during which an Amtrak station agent told me that Decedent had been acting strangely and had a history of police issues.

6. After the briefing, I went to the lobby and asked to see Decedent's ticket. Decedent stood, raised his left arm in what looked to me as a "Dracula pose," and asked, "Why are you talking to me." Decedent then produced a valid ticket for travel from Klamath Falls to Emeryville, so I issued him a boarding pass. I thought that Decedent was a bit "weird" and probably just a "meth head," but Decedent's conduct did not cause me enough concern at that time to deny him boarding.

7. During the boarding process, Decedent walked in the wrong direction toward the head end of the train, so I directed him to the correct coach car. Decedent carried no luggage other than a couple of plastic Walmart-type bags. He was assigned to Car 11, Seat 9, approximately four rows behind the front vestibule connecting Car 11 to Car 12.

8. The train's next stop was Dunsmuir, approximately two hours and twenty minutes away. Within five minutes of departing, a passenger informed me that a passenger matching Decedent's description had brandished brass knuckles on his hand menacingly in the café car. When I went to investigate, other passengers told me that the person brandished brass knuckles then went to the coach cars. I eventually found Decedent in the vestibule area connecting cars 11 and 12. Decedent

told me that he was trying to go to Emeryville. I reassured Decedent that the train was traveling to Emeryville. I calmed Decedent, who returned to his seat. The trip from Klamath Falls to Emeryville aboard Amtrak Train 11 lasts approximately ten hours.

9. Cellphone reception becomes spotty approximately 10 minutes out of Klamath Falls until the train gets near Mt. Shasta. If a public safety issue arises en route from Klamath Falls to Mt. Shasta, I calls my engineers on my low power radio pack-set, and the engineers use the powerful locomotive radio to call Union Pacific's ("UP") dispatcher. UP's dispatcher then calls UP's Response Management Communication Center ("RMCC"), and RMCC calls local law enforcement/emergency personnel.

10. When Train 11 entered a siding at Worden, I spoke with my conductor. The Worden siding lies approximately 13 to 14 rail miles south of the Klamath Falls Amtrak Station. My conductor and I discussed that brass knuckles are a deadly weapon and that we faced a long trip through the darkness, so we decided to remove Decedent from the train.

11. While the train remained in the Worden siding, RMCC advised that no local authorities were available and recommended taking Decedent to Dunsmuir or Mt. Shasta, which is just north of Dunsmuir. My conductor and I agreed. We planned to walk through the train more often and to continue to monitor Decedent.

12. Approximately three minutes after Train 11 departed the Worden siding, a female passenger told me that a man in Car 12 was menacing people with brass knuckles. I walked from the café car through Car 11 to Car 12 with a male dining car attendant. I saw Decedent in Car 12 through the end door window. I approached Decedent, reminded him that we had just talked, and asked him to return to his seat in Car 11. Decedent pulled out the brass knuckles and stood in a "Dracula" like pose. The dining car attendant who had accompanied me with a crowbar told Decedent to put the brass knuckles away. I directed the dining car attendant to stand down and relied on my 8.5 years of training and experience as an Amtrak conductor to successfully deescalate the encounter.

13. I convinced Decedent to return to his seat and sit down. After that, I stayed in Car 11 near the stairs in the middle of the car to watch Decedent for 15 minutes, during which Decedent

stayed in his seat. I then went to the dining car for water and talked to my conductor again. We now definitely did not want Decedent walking around with brass knuckles and wanted him removed from the train.

14. At approximately midnight, I coordinated with dispatching railroad UP's RMCC regarding the train's expected arrival time in Mt. Shasta for local law enforcement's removal of Decedent from the train. After a couple of hours, I had not yet heard back from UP's dispatcher or RMCC so I decided to call the Mt. Shasta police department as the train got closer to Mt. Shasta.

15. I asked for Mt. Shasta Police Department removal of Decedent from the train at Lake Street. I provided Decedent's name, information about Decedent's rumored prior police incidents, and information about Decedent's brass knuckles.

16. As Train 11 approached Lake Street, I went downstairs, locked the door to the lower-level passenger seating area, and positioned myself near the upper-level stairs. The conductor remained on the lower level and gave the locomotive engineers the car count needed to stop Car 11 at Lake Street. After the train stopped, the conductor met Officer Capurro at the door and directed him upstairs. I then walked past Decedent, pointed him out to Officer Capurro, and continued to the vestibule between Cars 11 and 12 so Officer Capurro could remove Decedent.

17. I stood in the vestibule between Cars 11 and 12 after pointing out Decedent to Officer Capurro. I disabled the automatic door-opening mechanism to prevent Decedent from entering Car 12, where other passengers were located. My conductor remained in the middle of Car 11 near the stairs after Officer Capurro followed met to Decedent's seat.

18. Officer Capurro told Decedent that he needed to leave the train and instructed him to keep his hands raised and not touch anything. Decedent stood up suddenly and moved into the aisle where he faced off with Officer Capurro, placing himself between Officer Capurro and myself who had moved to the front of the railcar into the vestibule area after pointing out Decedent to Officer Capurro.

19. Decedent ignored Officer Capurro's commands and reached for a bag on the adjacent seat. Officer Capurro attempted to take the bag while again ordering Decedent to keep his hands raised, but Decedent continued to resist.

20. Decedent continued to ignore Officer Capurro's requests, prompting Officer Capurro to draw his taser. Decedent grabbed the taser, and the ensuing struggle discharged it into the ceiling and rendered it useless. Officer Capurro deployed his baton next, but Decedent continued to resist and fight while I stood a few feet away in the vestibule. During the altercation, Decedent struck Officer Capurro twice in the face.

21. During the fight, Decedent backed away from Officer Capurro into the Car 11 vestibule, where I had already been standing, backing me up farther against the vestibule door. I attempted to restrain Decedent from behind to protect myself, the passengers, and Officer Capurro, but Decedent broke Garrett's grip and continued resisting arrest. Decedent placed the brass knuckles on his right fist while facing Officer Capurro, who had drawn his service weapon and pointed it at Decedent. I reached out in an unsuccessful attempt to hold Decedent's arm against the wall, but Decedent again broke free, turned, and threw a brass-knuckle-clad punch at me with his right fist. Officer Capurro immediately fired four shots in response, but Decedent continued to choke me even after we both fell to the floor. The gunfire struck me twice in my sides. Surgeons removed one projectile during emergency surgery, but the other shattered and remained in my body.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed 10-14-2026, in West Sacramento, CA

Bruce Garrett

Bruce Garrett