Michael E. Murphy, Esq. (Bar #174408)
Selim Mounedji, Esq. (Bar #173347)
SIMS LAW FIRM, LLP
101 Pacifica, Suite 210
Irvine, California 92618
(949) 253-7900
(949) 253-7930 - FAX

Attorneys for Defendants NATIONAL RAILROAD PASSENGER CORPORATION service mark AMTRAK and BRUCE GARRETT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 2:24-cv-03100-WBS-SCR<br><br>**DECLARATION OF MICHAEL E. MURPHY IN SUPPORT OF DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION SERVICE MARK AMTRAK'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT**<br><br>Date: November 23, 2026<br>Time: 1:30 p.m.<br>Courtroom: 5, 14th Floor<br><br>Complaint Filed: November 7, 2024<br>Trial Date: March 9, 2027 |

I, MICHAEL E. MURPHY, declare as follows:

1. I am an attorney at law duly licensed to practice before the United States District Court, Eastern District of California. I am a partner at Sims Law Firm, LLP, attorneys of record for Defendant NATIONAL RAILROAD PASSENGER CORPORATION service mark AMTRAK, and I make this Declaration in support of its motion for summary judgment, which is being served and filed concurrently.

2. I have personal knowledge of the following facts and if called as a witness could competently testify about them.

3. Attached as Exhibit A is a true and correct copy of Mt. Shasta Police Officer Jeremiah Capurro's BodyWorn Camera Video of the December 25, 2023 incident. The video was produced and authenticated by the City of Mount Shasta in discovery and during the deposition of Officer Capurro.

4. Attached as Exhibit B are true copies of relevant portions of the deposition of Officer Jeremiah Capurro, taken on March 27, 2026, via remote video technology.

5. Attached as Exhibit C is a true copy of the cited relevant portion of Officer Jeremiah Capurro's official statement after the December 25, 2023 incident. The statement was part of the investigation report that was produced and authenticated by the City of Mount Shasta as part of its responses to discovery.

6. Attached as Exhibit D are true copies of decedent's criminal records, which were obtained through subpoenas to the applicable state agencies.

7. Attached as Exhibit E are true copies of relevant portions of the deposition of Julia Detweiler, taken on April 17, 2026, via remote video technology.

8. Attached as Exhibit F are true copies of relevant portions of the deposition of Stamatia Haritoudis, taken on April 16, 2026, via remote video technology.

9. Attached as Exhibit G are true copies of relevant portions of the deposition of Ricky Witt, taken on July 15, 2026, via remote video technology.

10. Attached as Exhibit H are true copies of relevant portions of the deposition of Douglas Cacagno, taken on July 15, 2026, via remote video technology.

///

///

///

///

///

///

///

///

11. Attached as Exhibit I are true copies of relevant portions of the deposition of Scott A. DeFoe, taken on August 19, 2026, via remote video technology.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of October 2026, in Irvine, California.

/s/ *Michael E. Murphy*

MICHAEL E. MURPHY

# Lodged Video

# EXHIBIT "A"

# EXHIBIT "B"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiffs,

vs. Case No. 2:24-cv-03100-WBS-SCR

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF JEREMIAH CAPURRO

FRIDAY, MARCH 27, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24838

APPEARANCES (Remote)

FOR THE PLAINTIFFS:

LAW OFFICES OF DALE K. GALIPO
BY: DALE K. GALIPO, ESQ.
BENJAMIN LEVINE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
dalekgalipo@yahoo.com
blevine@galipolaw.com

FOR THE DEFENDANTS CITY OF MT. SHASTA and JEREMIAH CAPURRO:

ANGELO, KILDAY & KILDUFF, LLP Attorneys at Law
BY: DERICK E. KONZ, ESQ.
601 University Avenue, Suite 150
Sacramento, CA 95825
916.564.6100
dkonz@akk-law.com

FOR THE DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION:

SIMS LAW FIRM, LLP
BY: MIKE MURPHY, ESQ.
19712 MacArthur Boulevard, Suite 120
Irvine, California 92612
949.253-7900
mmurphy@sms-law.com

ALSO PRESENT:

Said Hofiani, Videographer

Julia Detweiler, Plaintiff

--oOo--

--oOo--

BE IT REMEMBERED, that set on Friday, the 27th day of March, 2026, commencing at the hour of 10:03 a.m., thereof, JEREMIAH CAPURRO, appeared remotely in Yreka, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the oath was administered by the Certified Shorthand Reporter.)

THE VIDEOGRAPHER: Good morning. We're on record at 10:03 a.m. Today's date is March 27th, 2026. This is the recorded remote deposition of Jeremiah Capurro, in the matter of Detweiler versus City of Mount Shasta, Case No. 2:24-cv-03100-WBS-SCR.

This deposition is being held via web conference. My name is Said Hofiani. I'm the videographer with Focus Litigation Solutions. The court reporter is Kimberly D'Urso.

Counsel, please introduce yourselves and state whom you represent, after which the court reporter will state her CSR license number and swear in the witness.

MR. GALIPO: Dale Galipo with Benjamin Levine, from my office, on behalf of the plaintiff.

MR. KONZ: Okay. I'll go. Derek Konz for Officer Capurro and the City of Shasta.

MR. MURPHY: And Mike Murphy for Amtrak and Bruce Garrett.

(Whereby the oath was administered to the deponent by the Certified Shorthand Reporter.)

THE WITNESS: I do, yes.

MR. GALIPO: Thank you.

EXAMINATION

BY MR. GALIPO:

Q. Can you please state your name for the record?

A. Jeremiah Capurro.

Q. Are you able to hear me okay so far?

A. I am.

Q. If you have any trouble hearing me at any time, will you please let me know?

A. Yes.

Q. I will try to ask you questions you understand, but if I ask you something and you don't understand it, please let me know and I'll try to ask it in a better way. Okay?

A. Okay.

Q. I usually go about an hour and then take a break, but if you need to take a break at any time

before that, you just let me know and we will take a break at that time.

Does that sound all right?

A. Okay. Sounds good.

Q. Have you reviewed any documents in preparation for the deposition?

A. No.

Q. For example, have you reviewed any body-worn camera footage?

A. No.

Q. Have you reviewed any of your interviews or statements that you have given?

A. No.

Q. Did you give a statement at some point following the shooting?

A. Yes.

Q. And do you recall the date of the shooting?

A. Yes. It was December 25th, early morning, possibly around 12:20-ish. I believe it was 2023.

Q. Okay. And when did you give your statement or interview in relation to the shooting?

A. I want to say it was either the following day or the day after. I'll say it was within a couple days.

Q. Do you recall where you gave that statement?

A. Yes, at the Mount Shasta Police Department.

understanding was they were five minutes out?
A. I don't recall.
Q. Were some of the details, you think, fresher in your mind when you gave your statement than they are now?
A. Oh, of course.
Q. Regarding this alleged prior assault on law enforcement, did you have any specifics about what the nature of that was?
A. No, I did not.
Q. In other words, do you know if the person was ever arrested for that? Charged? Convicted of any of that?
A. Prior to leaving the department to go to my call?
Q. Yes.
A. I don't believe so.
Q. Do you know if any officer had ever been injured by him, specifically?
A. I can't recall.
Q. So the initial plan was to board the train with a couple of deputy sheriffs?
A. Correct.
Q. And you understood that two were on their way?
A. Yes.

Q. And at some point, did you see a separate Amtrak employee?
A. Yeah. I believe there was two of them.
Q. Did you ask the second Amtrak employee any questions about what was going on or what had happened?
A. No. I believe the second employee was in a seat and got up and left as soon as I came in. I don't even --
Q. I'm sorry?
A. It was very dark. I don't remember if I knew it was an employee immediately, because I think he was sitting in a seat and it was dark. And I think as soon as he got up, I saw his clothing and saw that it was an employee. But it's been a while, so I can't say for sure.
Q. At some point, at the end of this incident, you were aware that you had unintentionally struck with one or more of your shots, an Amtrak employee; is that fair?
A. That's fair.
Q. Was that the same person, the one you shot that greeted you when you first came on the train, or was that someone else?
A. I don't know.
Q. I'm just wondering -- I understand you saw the Amtrak employee that greeted you at first. Do you

recall seeing any other Amtrak employee, other than the person you said that was sitting down and walked away?

A. I remember there was one that was involved with the incident, and I'm not sure if that was the same one that greeted me at the door or was already in the upstairs train car. But I believe there was two of them.

Q. And the second one, you didn't ask any questions of, either?

A. No.

Q. At some point, did someone point out to you where the individual was seated?

A. Yes.

Q. And who did that, if you recall?

A. Again, I don't know which one it was, but it was one of the two Amtrak employees.

Q. And did the person appear to be sleeping when you first saw him?

A. I guess that's fair.

Q. Did the person appear to be involved in any criminal activity when you first saw them sleeping in the seat?

A. No.

Q. Were you intending to arrest the person?

A. Yes.

(Exhibit Number 4 was marked.)

BY MR. GALIPO:

Q. Do you recall him, at some point, holding some bags?

A. Yeah. He took the bag out of my hand when I tried to grab the bag.

Q. Could you see both of his hands in this image?

A. Yes.

Q. Would this be before you Tased him, if you know?

A. Well, I didn't Tase him. I drew my Taser. But, yes.

Q. And we can see your Taser in this image?

A. Yes.

Q. Is your Taser in your left hand at this time?

A. That's correct.

MR. GALIPO: Could we look at Exhibit 5, pleases?

(Exhibit Number 5 was marked.)

BY MR. GALIPO:

Q. Can you see both of his hand in this image?

A. Yes.

Q. Up to this point in time, do you see any brass knuckles?

MR. KONZ: Objection.

A. Again, I didn't have the opportunity.
Q. At some point, do you shoot the Taser at the roof or ceiling of the train car?
A. I do.
Q. Why do you do that?
A. So that it wasn't pointed back in my direction. After he had grabbed it, he started pointing it back at me, so I safely discharged it away from any civilians, as well as myself and to the roof of the train car.
Q. Were you trying to -- looking at Exhibit 6 on the screen, were you trying to Tase Nicholas at this point?
A. No.
Q. What was your purpose of pointing your Taser at him at this point?
A. A use of force.
Q. You said earlier you were trained in the issue of de-escalation?
A. Uh-huh. Yes.
Q. Did you have a police radio on you?
A. I did.
Q. Did you ever call for backup at this point?
A. I knew back up was en route.
Q. Did you know how close they were?
A. At this point, I did not.

Q. Was Nicholas facing in your direction when the Amtrak employee was -- appeared to be pulling Nicholas off you?
A. I don't recall.
Q. Did you see how the Amtrak employee was pulling Nicholas off you?
A. No. And to be honest, I don't know if he pulled him off, or -- or if Nicholas turned around and began to fight with him. I don't -- I don't recall.
Q. So after you fired your Taser into the roof line of the car and attempted to drive-stun Nicholas on three occasions, at some point, did you take out your baton?
A. Eventually, yes.
Q. And when you say "Eventually," how much time do you think passed between your last drive-stun and your first baton strike?
A. I couldn't tell you. It's -- it's been too long.
Q. Do you have any estimate?
A. No.
Q. Are you trained that, in terms of baton strikes, you have to justify every strike?
A. I would hope so, yes.
Q. Up to the time of your last drive-stun, did you

cause death.

Q. Okay. So let me clean it up for the objections. Why did you use deadly force on Mr. Detweiler? What did you observe?

A. There was imminent threat of great bodily injury or death if I did not do something about that.

Q. Did you see Mr. Detweiler apply brass knuckles to his hand?

A. Yes. While I had him at gunpoint, he applied his brass knuckles.

Q. Okay. Did you see and hear Mr. Detweiler refuse to obey your multiple commands not to touch his bag?

A. Yes.

Q. Did you fear that Mr. Detweiler may have weapons in that bag?

A. Yes.

Q. Did you see -- did you see Mr. Detweiler refuse multiple commands for him to get on the ground?

A. Yes.

Q. And after that, did you see him apply the brass knuckles to his fist?

A. Yes.

Q. And after that, did you see him swinging and apparently going to make contact with a civilian's head

with brass knuckles?
A. Yes.
Q. And after you saw all of that, you -- you shot him?
A. Correct.
Q. Okay. Does your department policy or your training require you to wait until a suspect kills a civilian before shooting them?
A. No.
Q. Based on the totality of the circumstances, in the minute or so that this entire encounter lasted with Mr. Detweiler, did you deem his -- his swinging fist with brass knuckles at the head of a civilian, an imminent threat of death or serious injury to a civilian?
A. Yes.
Q. All right. And that's why you deployed your weapon?
A. Correct.
Q. Up until that point, you did not intend to deploy your weapon; true?
A. True.
Q. In the video that we just watched, did you see that when Mr. Detweiler and the conductor went to the ground, after you had fired four shots, that Mr.

Detweiler still had a choke hold on the Amtrak conductor before you fired the next two shots?
A. Yes.
MR. GALIPO: Objection. Leading, and assumes facts not in evidence.
MR. MURPHY: Okay. Let's clean it up.
BY MR. MURPHY:
Q. After you fired the four shots, did you see Mr. Detweiler and the conductor going to the ground?
A. Yes.
Q. And what did you see next?
A. I saw Detweiler still had control of the conductor, appearing to still be causing harm to him, which resulted in me firing two more times.
Q. When you say he -- "Mr. Detweiler still had control of the conductor," describe that for me. What made you think that?
A. He had his arms around his neck, holding on to him.
Q. All right. And I'm going to switch gears. When did you first realize that your assumption of an emergent incident, something happening where Mr. Detweiler is walking around the train, brandishing brass knuckles and menacing people, when did you first realize that that assumption was incorrect?

A. Well, there was no active threat or altercation or anything occurring because he was in his seat, so I figured it had occurred just prior to my arrival.

Q. All right. And when you realized -- strike that.

When was the first active threat from Mr. Detweiler that you observed?

A. When he grabbed my Taser and started pointing it back at me.

Q. Immediately after you attempted to arouse him from his sleep or fake sleep?

MR. GALIPO: Objection. Mischaracterizes the testimony, and assumes facts not in evidence.

MR. MURPHY: Strike it, sir.

BY MR. MURPHY:

Q. When Mr. Detweiler stood up and put his arm at you, did you consider that a potential threat?

MR. GALIPO: Objection. Assumes facts not in evidence.

BY MR. MURPHY:

Q. You can answer.

A. Yes, I did.

Q. All right. And was that first potential threat that you actually observe from Mr. Detweiler?

A. Yes, which continued to escalate into more and

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 7th day of April, 2026.

____________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT “C”

Officer Capurro feared that if he was tased, or otherwise incapacitated, DETWEILER would gain access to his firearm and potentially kill him and/or passengers on the train.

Officer Capurro felt DETWEILER, who he described as being taller with more reach, overpowering him and gaining control of Officer Capurro's taser. To make the taser useless to DETWEILER, Officer Capurro intentionally discharged both taser cartridges into the ceiling of the cabin when he was able to do so. Officer Capurro recalls around that time that DETWEILER broke contact with him, either because he thought the taser was useless now, or because the employee, Bruce, had got involved to help. Officer Capurro recalls jamming the now expended taser into DETWEILER's leg for another drive stun. At around that time, Officer Capurro recalled DETWEILER striking him in the face area. Officer Capurro described being struck multiple times, including on the left side of his face, which disabled his earpiece so he could no longer hear dispatch radio traffic.

Officer Capurro describes he was nearing blacking out from the strikes by DETWEILER. Officer Capurro states he remembered things going silent and feeling on the verge of blacking out. He felt adrenaline was all that was keeping him awake at that moment and sort of pushed him onto autopilot for a bit as he was dazed.  Officer Capurro also recalled being inadvertently electrocuted by the taser wires that were now hanging from the ceiling and brushing against him.

Officer Capurro states around his time, DETWEILER was struggling with the employee, Bruce, and moving towards the train car exit door. Knowing his taser was ineffective, he transitioned to another less-lethal option, the baton. Officer Capurro advises that he remembers telling DETWEILER to get on the ground, or something to that effect. Officer Capurro recalls thrusting several times into DETWEILER's chest area and then overhand swinging his baton at DETWEILER's hand to try and gain compliance, while also ordering DETWEILER to the ground. After attempting to use the baton, Officer Capurro recalls seeing the metal knuckles in DETWEILER's hand. Officer Capurro recalls transitioning to his firearm and pointing it at the suspect.

Officer Capurro describes how he mentally was aware that his pistol was not likely to over penetrate through the metal walls into the next cabin like a rifle might. Officer Capurro described how when he first observed the suspect equip the metal knuckles and turn to begin striking the employee, Bruce, that he had two options running through his head. He could either attempt to go hands on with DETWEILER again, or fire upon him. Officer Capurro elected not to go hands on with DETWEILER because he felt the events leading up to that point displayed to him that DETWEILER was capable of overpowering Officer Capurro, and his actions were demonstrative of someone seeking violence on others, meaning he may incapacitate Officer Capurro and remove his firearm, leading to further violence on innocent people. Officer Capurro, fearing for the safety of the train conductor, himself, and the passengers aboard that train, fired upon DETWEILER.

Officer Capurro recalls firing 5 times at the suspect, with one final shot as the suspect was on the ground. During follow-up interview, after Officer Capurro watches his body worn camera video, he can more clearly articulate that he fired four times as the suspect was standing, and twice as the suspect was on the ground, choking Bruce.

# EXHIBIT "D"

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD090731024**

CONTROLLED DOCUMENT - DO NOT DUPLICATE

## Incident Information

Date/Time Reported: **07/31/2009 1852** Occurred Between: **07/31/2009 1852** & **07/31/2009 1852**

Location: **MOTHERS BEACH, FORESTVILLE CA**

UCR Status: Officer: **CHRISTOPHER MAHONEY 1101639**

Summary:

Related Cases: No Associated Cases

## Charges

Statute:
**12020 (A)(1) PC - (M)MANUFACTURE/SELL/POSSESS DANGEROUS WEAPONS/EXPLOSIVES/ETC**

Attempted/Completed: **Completed**

Classification: / Possession of Weapons Weapon: **Other**

Location:

## Offenders

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **DETWEILER, NICHOLAS HARITOUDIS** | **12/04/91** | **17/White/Male** | **6'00"/160** |

Address: 14325 GREEN VALLEY RD, FORESTVILLE CA 95436 887-8688

Employer/School: NORTH VALLEY SCHOOL - 3164 CONDO CT

## Vehicle

| Year/Make/Model/Style/Color/License/State: | VIN: | Value: |
|---|---|---|
| **1991/Lexus/LS400/SEDAN, 4 DOOR/BROWN/5CML216/CA** | | $0.00 |

Status:

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD090731024**

## Narrative

**Initial Narrative**
Written by: **CHRISTOPHER MAHONEY 1101639**
Date/Time: **07/31/2009 19:08:13**

On 7-31-09 at approximately 1915 hrs, ABC Agent Dave Bickel and I were on patrol in a marked patrol car in the area of River Drive and Mothers Beach in Forestville. I observed a brown Lexus four door sedan traveling in front of us on River Drive, displaying a 2008 registration tab. I made an enforcement stop on the above listed vehicle for violating section 4000(a)(1) PC (expired registration). Upon contacting the driver, later identified as Nicholas Detweiler (S), I informed him if the violation and requested his driver`s license. While Speaking with Detweiler I observed green leafy marijuana remnants scattered around the center console of the vehicle. I observed the odor of marijuana coming from inside the vehicle as well. I asked Detweiler if he had a medical marijuana recommendation and he stated yes. I asked him if he had it with him and he stated it was in the glove box. Detweiler looked through his glove box and was unable to locate the medical marijuana recommendation.

Based on the odor of marijuana, the presence of marijuana remnants and Detweiler`s failure to produce a medical marijuana recommendation, I instructed him to exit the vehicle. I placed Detweiler in the rear seat of my patrol vehicle, while I conducted a search of his vehicle for additional marijuana. In the center console of Detweiler`s vehicle, I located a set of metal knuckles. The weapon was constructed of a hard metal and silver in color. I picked up the weapon and was able to place four of my fingers through the four holes and clench the device in my hand. The metal knuckles were later photographed and booked into evidence. The photograph is attached in my report.

After locating the metal knuckles, I removed Detweiler from the rear seat of my patrol car and asked him what he was doing with the metal knuckles. Detweiler said he was holding them for his friend who had left them in his car. Detweiler stated he would not tell me who his friend was. Based on the above listed evidence and statements, I placed Detweiler under arrest for violating section 12020(a)(1) PC (possession of a dangerous weapon). I placed him in handcuffs, checking for tightness and double locking them. Detweiler was later advised of his Miranda rights and a voice mail message was left with his mother, informing her of the arrest.
During an inventory search of Detweiler`s vehicle, I located several dried marijuana plant components, with buds still attached. The dried marijuana was in a box along with e set of small gardening trimmers. Agent Bickel conducted a search of Detweiler`s wallet incident to his arrest and located an expired medical marijuana recommendation. The recommendation had expired less than a month ago. I asked Detweiler if he renewed his medical marijuana recommendation and he stated yes, the new one is at his home. Based on Detweiler`s statements and his recently expired medical marijuana recommendation, the small amount of dried marijuana was secured in his trunk.

Detweiler`s vehicle was towed incident to his arrest and he was later transported to Juvenile Hall where he was booked on the above listed charge.

No further information at this time.

**RTE - CARTER-MYERS, M - 08/03/2009**
Written by: **MICHELE CARTER-MYERS 1101881**
Date/Time: **08/03/2009 15:02:40**

When approved email the rept to Ermelinda Miramontes, Juv Prob, 8/3/09, 1881-MCM
PCI, 08-09-09,GMS,808
EMAILED JUV PROB,ERMINLINDA MIRAMONTES, 08-09-09,GMS,808
juv da, evid sht, 08-17-09,gms,808

**NL - CORDERO, K - 08/21/2009**
Written by: **Cordero, Kimberlee 1101882**
Date/Time: **08/21/2009 15:35:12**

EV SHT, VEH REL, CLETS, 8/21/09, 1882-KF

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD090731024**

JUV REF, 180, CLETS, PROP REL, 9/4/09, 1882-KF

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD140310022**

CONTROLLED DOCUMENT - DO NOT DUPLICATE

## Incident Information

Date/Time Reported: **03/10/2014 1620** Occurred Between: **03/10/2014 1620** & **03/10/2014 1620**

Location: **14604 CANYON 1 RD, RND CA**

UCR Status: Officer: **Jaap, Caroline 110921**

Summary: During a violent struggle, the suspect strangled the victim to the point of unconsciousness. Victim is over age 65.

Related Cases: No Associated Cases

## Charges

Statute:
**245 (A)(1) PC - (FEL) ADW NOT FIREARM**
Attempted/Completed: **Completed**

Classification: Assault: Firearm
Weapon: **Personal Weapon (hands; feet; teeth; etc.)**

Location:

Statute:
**368 (B)(1) PC - (FEL) CAUSE HARM/DEATH OF ELDER /DEPENDENT ADULT**
Attempted/Completed: **Completed**

Classification: Other Offenses
Weapon: **Personal Weapon (hands; feet; teeth; etc.)**

Location:

## Offenders

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **DETWEILER, NICHOLAS HARITOUDIS** | **12/04/91** | **22/White/Male** | **6'00"/190** |

Address: 14604 CANYON 2 RD,

Employer/School: -

## Victims

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **JOHNSON, FRANK LEO** | **03/08/46** | **68/White/Male** | **/** |

Address: 14604 CANYON 1 RD, 707-703-7244

Employer/School: -

Victim of: 245 (A)(1) PC 368 (B)(1) PC

## Others Involved

| Inv Type: | Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|---|
| **Other** | **RAMPONE, GLENN** | **12/16/54** | **59/White/Male** | **/** |

Address: 15003 MERRY, GUERNEVILLE CA 95446

Employer/School: RUSSIAN RIVER FIRE DEPT. - 14100 ARMSTRONG WOODS RD, GNVL

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD140310022**

## Others Involved

| Inv Type: | Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|---|
| **Other** | **HARITOUDIS, MAIA** | **03/04/11** | **03/White/Female** | **/** |

Address: 14686 CANYON 2 RD,

Employer/School: -

| Inv Type: | Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|---|
| **Witness** | **DETWEILER, JULIA FAY** | **07/20/56** | **57/White/Female** | **5'05"/150** |

Address: 14604 CANYON 1, RIO NIDO CA 95471

Employer/School: UNEMPLOYED -

| Inv Type: | Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|---|
| **Reportee** | **HARITOUDIS, STAMATIA** | **10/20/88** | **25/White/Female** | **5'06"/160** |

Address: 14686 CANYON NO. 2 RD, RIO NIDO CA 95471 228-3848

Employer/School: "LIL DARLINGS" - BROADWAY & COLUMBUS SAN FRANCISCO, CA

## Narrative

**Initial Narrative**
Written by: **Jaap, Caroline 110921**
Date/Time: **03/10/2014 16:57:58**

On 03/10/2014 at approximately 1621 hours, Deputy Dan Mori, Deputy Aaron Hunt, Sgt. Andy Salas and I were dispatched to 14604 Canyon 1, Rio Nido, regarding a 9-1-1 call with a female heard yelling, "Hurry", and "He stabbed you".

Deputies Mori and Hunt, along with Sgt. Andy Salas, arrived on scene first at approximately 1626 hours. They separated all of the involved parties. The two subjects who were involved in the physical fight were 68-year-old (V) Frank Johnson and 22-year-old (OF) Nicolas Detweiler. Both Johnson and Detweiler were bleeding from knife wounds and were treated by Russian River Fire Medic 576 Paramedic Glenn Rampone. Deputy Mori retrieved the folding knife from the residence which had been left on the window sill by Frank, which I collected and later placed in evidence. The blade was approximately three inches long.

I contacted the victim first, Frank Johnson. He was bleeding from a laceration in his left ear, he had a laceration on his right middle finger, he had redness on his left ribs, and he had redness on his throat and neck. Frank thought that one of his ribs might be injured. I later photographed his injuries. Johnson had difficulty catching his breath and he seemed excited. I asked him what happened. Johnson told me that he was lying down in the bedroom sleeping when (RP) Stamatia Haritoudis came into the room and stated that her brother, (OF) Nicolas Detweiler, was "having a problem". Stamatia said that Nicolas was accusing Frank of touching Stamatia`s 3-year-old daughter`s bottom (Maia Haritoudis). Frank told me this was completely unfounded. Frank got up and went to wash his face in the bathroom. After that, he went into the kitchen. Nicolas was standing in the kitchen and ordered Frank to clean the kitchen with the broom. All of the sudden, Nicolas pushed Frank and then grabbed him from behind by the throat in a "choke hold". Frank told me that he "couldn`t breathe". Frank estimated that Nicolas held him in a "choke hold" for three to four minutes, and Frank lost consciousness during the incident for one to two minutes. Frank said that he was able to reach into his pocket and retrieve his folding pocket knife for "self-defense". He was able to open the blade. Frank described that he and Nicolas were "going all over the place" in the kitchen, which he elaborated that they were grappling while standing up and then while on the ground. Frank told me again that he was trying to defend himself. Frank said when the struggle ended, Nicolas went outside. Frank told me again that he could not breathe. Frank told me that he was inadvertently cut by his own knife in his left ear and his right middle finger during the struggle. I asked Frank if he stabbed or cut Nicolas with the knife. Frank adamantly denied intentionally stabbing or intentionally cutting Nicolas during the struggle.

I next contacted Nicolas. He was sitting quietly in the ambulance. He had a bloody laceration on his left hand. I saw blood on his pants and a tear in his pants on the left leg thigh area. I asked Nicolas if he was injured. Nicolas agreed to show me his left thigh area. I saw two small minor bloody lacerations. Nicolas` left knee had extensive "rug burns" as he described it from the struggle on the ground. I photographed Nicolas` injuries. I asked Nicolas what happened. Nicolas said that Frank moved in about one

week ago. Ever since he moved in, Frank has been "argumentative and disrespectful". This afternoon, Nicolas was talking to his sister, Stamatia, about how Frank was trying to take control of the house. Nicolas also told Stamatia that Frank put his hand on Stamatia`s daughter`s bottom. Nicolas did not have any further details about this alleged incident. Nicolas told me that Stamatia "laughed it off" and told him to "keep it down" because Nicolas was getting loud. Frank came out of the bedroom and went into the kitchen where Nicolas was. Nicolas told Frank that he needed to sweep the floor to earn his keep. Nicolas told me that Frank "pushed past him", bumping him in the shoulders. Nicolas said that he "felt it was time to defend himself", so he grabbed Frank by the shirt with both of his hands. Nicolas told me that Frank tried to "take him to the ground", so Nicolas "grabbed Frank around the neck". Frank then pulled out a pocket knife with the blade out. Nicolas tried to push Frank`s hand away that was holding the knife before it went deeper into his skin, and then the knife fell out of Frank`s hand. Nicolas thought that Frank then bit him on the left hand. Nicolas told me that he "kept squeezing Frank`s neck". Nicolas told me that he "felt he was in jeopardy". Nicolas` mother, Julia Detweiler, was hovering over both Nicolas and Frank while they were on the ground. Nicolas told his mother to "back off". Nicolas then got off Frank. Frank went back into his bedroom.

I spoke with Paramedic Glenn Rampone. Rampone told that Frank does not have any teeth. In regards to the laceration on Nicolas` left hand, it most likely was not a "bite mark" which was Nicolas` first impression, and it was possibly a laceration from the knife caused during the struggle. Rampone told me that Frank was going to seek his own medical care at Sutter Hospital. Rampone added that Frank did not have any obvious petechial hemorrhages. Frank signed the medical records release form. There was no medical exigency requiring that Nicolas be transported to the hospital by ambulance for treatment for his lacerations.

I contacted the reporting party, Stamatia Haritoudis. Stamatia told me that she started arguing with her brother, Nicolas, this afternoon. Nicolas told Stamatia that Frank touched her daughter`s bottom. Stamatia told me that her daughter has never been left alone with Frank and that she has never seen this. Stamatia did not believe there was any merit to Nicolas` claim. Stamatia then addressed this issue with Frank and warned him that if anything were to happen to her daughter, then she would "fully pursue the law". Frank then came into the kitchen. Nicolas told Frank to get to work with the broom. Nicolas seemed upset. Stamatia told Nicolas to "please stop". Nicolas and Frank then "butted chests", and they started "choking and shoving each other". Stamatia grabbed her daughter, went into another room away from the fight, and she called 9-1-1. Stamatia did not see the majority of the incident. After the fight was over, Stamatia went into the kitchen and saw that Frank had a knife. Stamatia told Frank to put the knife away, which he did. Nicolas left and went outside. Stamatia reiterated that she did not believe there was any merit to Nicolas` claims that Frank touched her daughter`s bottom. Stamatia said that her daughter is completely verbal and has never made any comments about this whatsoever. Stamatia repeated that Frank has never been left alone with her daughter. Stamatia completed a written statement.

I spoke with Julia Detweiler. Julia told me that Nicolas and Frank were in the kitchen. All of the sudden, Nicolas "took Frank down to the ground". Julia saw that "Frank was turning blue in the face". Nicolas had Frank pinned to the ground in a "choke hold". Frank could not breathe. I asked Julia if she noticed if Frank lost consciousness, and she said she did not know. Julia tried to pull Nicolas off Frank. Once Nicolas got off Frank, Julia saw a knife in Frank`s hand. Julia did not see the knife during the incident. Frank told Julia that he needed to defend himself. Nicolas went outside. Julia estimated that the fight lasted about one to two minutes or longer. Julia told me that Nicolas was the primary aggressor. She explained that Nicolas has extreme mood swings that can become explosive. Lately Nicolas has been getting worse and deteriorating, becoming more aggressive. Nicolas has PTSD and OCD. He is not currently taking any medications. Julia completed a written statement.

Deputy Hunt photographed the scene, which showed a couple of tin cans on the kitchen floor with a smear of blood. I later placed the CD in evidence.

Based on my investigation, I determined that Nicolas was the primary aggressor. I placed Nicolas under arrest for 368(b)(1) PC (Elder Abuse) and 245(a)(1) PC (Assault with a deadly weapon / strangling the victim to the point of unconsciousness). Deputy Gary Thornton transported Nicolas to the Guerneville Sheriff`s Substation at 16255 1st Street for pre-booking.

I contacted Judge Gary Nadler and requested an emergency protective order, with Frank and Julia as the protected parties since they both live with Nicolas. Judge Nadler granted the EPO with standard terms and included a "move out" order. I served Nicolas with the EPO and carefully explained the terms to him. Nicolas was calm and said that he understood the terms. Stamatia and her daughter live at another location and were not victims of a crime.

Deputy Theodore VanBebber transported Nicolas to the Main Adult Detention Facility for booking. The jail nurse evaluated Nicolas.

# Incident/Investigation Report



Please forward this report to the District Attorney`s Office for prosecution and to APS. I completed the elder abuse form and I submitted a request for a copy of the 9-1-1 tape.

Nothing further.

**RTE - SCHARBIUS, J - 03/11/2014**
Written by: **Scharbius, Joan 110272**
Date/Time: **03/11/2014 04:21:20**

DA/VA AND APS WITH NL, 3-11, 272-JS
EV SHT TO DA/VA, 3-12, 272-JS
Ev Sht to Trina Martin/DA (pulled frm FileOnQ) 3/26/14 #2193 AP
EV SHT TO DA/VA, 4-8, 272-JS

**NL - DEEGAN, D - 03/20/2014**
Written by: **deegan, dinna 1102149**
Date/Time: **03/20/2014 12:32:00**

EPO, DV SUPP, STMNT, ELDER ABUSE RPT, BK SHTS, NOC, EV SHT, COMP REV 3/20/14 DD2149
Ev Sht, 4/8/14, 1881-MCM

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD140730025**

CONTROLLED DOCUMENT - DO NOT DUPLICATE

## Incident Information

Date/Time Reported: **07/30/2014 1900** Occurred Between: **07/30/2014 1900** & **07/30/2014 1900**

Location: **14964 CANYON 1 RD, RND CA 95471**

UCR Status: Officer: **Shanahan, Michael 1101697**

Summary: The Suspect responded to the victim`s residence in search of money and assaulted the victim and his girlfriend cohabitant with his hands and a walking stick.

Related Cases: No Associated Cases

## Charges

Statute:
**245 (A)(1) PC - (FEL) ADW NOT FIREARM**

Attempted/Completed: **Completed**

Classification: Assault: Firearm

Weapon: **Personal Weapon (hands; feet; teeth; etc.)**
Weapon: **Blunt Objects (bludgeon; club; etc.)**

Location:

Statute:
**459 PC - (FEL) BURGLARY - STRUCTURE**

Attempted/Completed: **Completed**

Classification: - Breaking & Entering: Forcible Entry

Weapon:

Location:

## Offenders

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **DETWEILER, NICHOLAS HARITOUDIS** | **12/04/91** | **22/White/Male** | **6'00"/190** |

Address: 14604 CANYON 1 RD, RIO NIDO CA 95471

Employer/School: -

## Victims

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **SMITH, SHELBY PATRICIA** | **11/16/90** | **23/White/Female** | **5'02"/140** |

Address: 14964 CANYON 1, RIO NIDO CA 95471 707-849-4485

Employer/School: -

Victim of: 245 (A)(1) PC 459 PC

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **HAMMOND, CHRISTOPHER K** | **05/20/88** | **26/White/Male** | **6'04"/170** |

Address: 14964 CANYON 1 RD, RIO NIDO CA 95471 707-213-0793

Employer/School: -

Victim of: 245 (A)(1) PC 459 PC

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD140730025**

## Others Involved

| Inv Type: | Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|---|
| **Other** | **DETWEILER, JULIA FAY** | **07/20/56** | **57/White/Female** | **5'05"/150** |

Address: 14604 CANYON 1 RD, RIO NIDO CA 95471

Employer/School: UNEMPLOYED -

## Narrative

**Initial Narrative**
Written by: **Shanahan, Michael 1101697**
Date/Time: **07/30/2014 19:31:28**

On 7/30/14 at 1900 hours, Deputy Theodore Van Bebber and I were detailed to 14964 Canyon 1, in Rio Nido, for a report of an assault that just occurred. Christopher Hammond was reporting both he and his girlfriend were assaulted in their home by a subject named "Nick". We received the following information on our MDC`s.

CHP XFER NEED AN AMBULANCE REDCOM ADV TO STAGE SUSPECT: NICK, WMA, 23YRS, 6-0, BLK HAIR, SHAVED HEAD, LSW WHI T SHIRT HE HAS LEFT ON FOOT JUST PRIOR TO THE RP CALLING SUSPECT IS A NEIGHBOR AND LIVES ON CANYON 1 UNK EXACT ADDRESS ON CANYON 1 HE DOESNT HAVE A CAR SUSPECT HIT THE RP AND RPS GIRLFRIEND WITH A STICK SUSPECT ALSO ASSAULTED THE RPS GIRLFRIEND THIS WAS A DISPUTE OVER MONEY THE SUSPECT SAYS THE RP OWES HIM UNK IF SUSPECT IS HBD OR ON DRUGS

I met one of the victim`s in this case, Christopher Hammond, and he provided the following in summary: Christopher resides at 14964 Canyon 1, apartment C, with his girlfriend, Shelby Smith. A few weeks ago Christopher sold a marijuana bong for $30 to a subject named "Nick". A few minutes ago, Nick showed up to Christopher`s residence. Christopher was on the deck outside the front door to the residence. Nick demanded his money back, but Christopher explained he didn`t have the money. Nick became upset and began punching Christopher; he attempted to defend himself. This fight moved into the interior of the residence and Christopher ended up on the ground with Nick on top of him. Christopher was punched all over his body, he specifically remember being punched in the face and mid-section. Christopher was also struck by a wooden walking stick that was existing inside the residence. At one point during the altercation, Christopher`s girlfriend, Shelby, came out of the bathroom. Shelby tried to pull Nick off of Christopher. In response to this, Nick punched Shelby and she fell backward. After this altercation, Nick grabbed a smoking pipe from the interior of the residence, as well as the walking stick and departed the location. Christopher wanted to press charges and wanted Nick arrested.

Christopher advised his head and mid-section was hurting. I observed a cut on his right shoulder and collar bone area. I observed some redness on his back. It should be noted that both Christopher and Shelby had been utilizing red dye for an art project prior to the assault and it is displayed in the photographs we took of their persons. It appeared to be blood but wasn`t.

Note: Christopher had some bruising and discoloration on the right side of his face, near his right eye. He advised this was from an unrelated and different assault by a different suspect and member of what Christopher called the "tweaker beater gang", a group of people who Christopher claims lives in the Rio Nido area, ingests methamphetamine and assaults people for unknown reasons. End of note.

Next, I spoke with Shelby Smith. She provided the following verbal statement: Shelby was inside the bathroom at her residence at the above listed location. She heard some commotion outside and eventually yelling. She could hear from the bathroom that "Nick" was inside the house and wanting money. She then heard what she believed was a physical fight. She came out of the bathroom and observed Nick punching Christopher. Nick was on top of Christopher straddling him, and was striking him in his body. Shelby tried to pull Nick off of Christopher and she was struck in the back of the head by Nick. Shelby believed Nick either used his fist or elbow to strike her. Shelby wanted to press charges.

Shelby advised her head hurt as a result of being struck by Nick and complained of pain. I observed what possibly might be a small bump on the top of her head within her hair. Shelby was seen by paramedics, but declined a transport to the hospital out of concern of the cost. She indicated she might take herself to the hospital later.

Christopher did not know Nick`s last name. He said he knew him from the area and had smoked marijuana with him in the past. He believed he lived on Canyon 1. Christopher originally thought he was a "chill dude" before today`s events. Christopher directed me to the residence 2 doors west of him, at 14641 Canyon 1, and advised he believed Nick`s family members resided there.

I responded to 14641 Canyon 1 where I made contact with Julia Detweiler who was visiting with her daughter. I asked her if she was familiar with a subject named Nick. She said her son was Nicholas "Nick" Detweiler and he was just in the area about 30 minutes prior. I explained that there was an altercation between him and Christopher and I needed to speak with him. She provided me with his address located at 14604 Canyon 1.

I responded to 14604 Canyon 1. I observed Nicholas was standing outside the residence. He was holding a large walking stick. Julia was also at the location and had walked to the scene from the nearby residence.

I spoke with Nicholas and I began to suspect he might suffer from a mental health disorder. He kept backing up from me and appeared paranoid. During the contact he spoke about how I work for the "Zionist Jewish Regime" and various females "sucking the nigger balls".

Nicholas admitted to going over to Christopher`s residence, but claimed he wanted to talk with him. He claimed he had taken the bong as "collateral" before and had paid him for it. He continually denied buying the item and said the bong was given to him as collateral. He admitted to being in an altercation with Christopher, but said he was only defending himself.

I began to question Nicholas about aspects of his claims and he became defensive, and started calling me derogatory names. He kept putting his hands behind his back and told me to arrest him. Julia was also interfering with my questioning, questioned the veracity of the victim`s claims and was clearly protective of her son. I determined probable cause existed for a violation of 245 PC and 459 PC. I placed him in handcuffs, double locked the cuffs and checked for tightness. I placed him in the rear of the patrol car. Julia told me I should not be arresting her son, but rather, I should be providing him with mental health treatment. She told me her son suffered from schizophrenia.

We collected the walking stick as evidence. It was approximately 4 feet tall and approximately 1 inch wide in a circular configuration MS#2.

I transported Nicholas to the Guerneville Sheriff`s Substation to complete paperwork. I provided Nicholas with his rights pursuant to Miranda from my pre-printed Miranda card. I asked him if he understood his rights and he stated, "Yes". I asked him if he wanted to talk with me and he stated, "No".

I began completing the paperwork. Approximately 10 minutes later Nicholas asked, "Are you done investigating?" I told him I wasn`t. He told me he wanted to provide me with a statement. I asked him if he wanted to talk with me without an attorney and he told me "Yes". He told me he planned on taking this case to trial and he wanted the evidence and his statement documented in the report.

Nicholas admitted to going to Christopher`s house to talk with him about money. He again reiterated the bong was given to him as "collateral", and he had originally paid Christopher $30, but denied buying the item. Christopher was on his outside porch and wanted Nicholas to leave. Nicholas believed Christopher owed him money. Nicholas claimed Christopher was physically pushing him and then a full physical fight ensued. He conceded he punched Christopher several times, and in the process, Nicholas broke his right hand. The fight and struggle moved into the interior of the residence. He remembered Christopher`s girlfriend coming out of the bedroom, but he denied assaulting or touching her. Nicholas claimed that Christopher utilized the stick we collected as a weapon against him. He claimed Christopher assaulted him with the stick. Nicholas was able to get away from the situation and took the stick as evidence.

I observed Nicholas had a plastic brace on his right hand. He told me he put the brace on his hand and said it was broken as a result of hitting Christopher at least 5 times. Nicholas claimed the fight was self-defense and that he was only protecting himself.

I observed a small cut on the middle of Nicholas` back. There was a scratch mark on his left shoulder. There was also a brace on his right hand.

Nicholas was transported to the county jail to be booked on the listed charges.

Case Status: Cleared by arrest/ to DA/ VCI/ refer to FACT court

**RTE - EMERY, A - 07/31/2014**
Written by: **ALLISON EMERY 1102150**
Date/Time: **07/31/2014 06:15:31**

DA/VA w/ NLs, PCI, 7/31/14, 2150-AH
EV SHT TO DA/VA, 8-5, 272-JS
Cpy of rpt synopsis only (personal info redacted) at front desk for p/u by OF-Nicholas Detweiler, 9/28/14, RV2290
Nicholas Detweiler picked up synop. rpt 9/29/14, SD2233

**NL - PITTMAN, A - 08/06/2014**
Written by: **AGNES PITTMAN 1102193**
Date/Time: **08/06/2014 05:52:46**

Comp Rev 8/6/14 #2193 AP
Ev Sht, NOC, Bkg Shts 8/8/14 #2193 AP

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD151017013**

CONTROLLED DOCUMENT - DO NOT DUPLICATE

## Incident Information

Date/Time Reported: **10/17/2015 1701** Occurred Between: **10/17/2015 1701** & **10/17/2015 1701**

Location: **14840 WILLOW RD, RND CA**

UCR Status: Officer: **Hunt, Aaron 1102267**

Summary: Victim punched in eye, requested CA

Related Cases: No Associated Cases

## Charges

Statute:
**242 PC - (MISD) BATTERY ON PERSON**

Attempted/Completed:
**Completed**

Classification: Assault: Firearm

Weapon: **Personal Weapon (hands; feet; teeth; etc.)**

Location:

## Offenders

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **DETWEILER, NICHOLAS HARITOUDIS** | **12/04/91** | **23/White/Male** | **6'00"/190** |

Address: 14604 CANYON 1 RD, RIO NIDO CA 95471

Employer/School: -

## Victims

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **SMITH, SHELBY PATRICIA** | **11/16/90** | **24/White/Female** | **5'02"/140** |

Address: 14840 WILLOW RD, RIO NIDO CA 95446 707-849-4485

Employer/School: -

Victim of: 242 PC

## Others Involved

| Inv Type: | Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|---|
| **Other** | **TIGHE, ANTHONY JAMES** | **07/18/92** | **23/White/Male** | **5'09"/175** |

Address: 14755 RIO NIDO RD, RIO NIDO 508-5159

Employer/School: -

| Inv Type: | Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|---|
| **Other** | **PEARSON, KYLE JOSEPH** | **04/06/93** | **22/White/Male** | **6'01"/150** |

Address: 6590 COVEY RD, FORESTVILLE CA 95436 707-877-1003

Employer/School: -

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD151017013**

## Narrative

**Initial Narrative**
Written by: **Hunt, Aaron 1102267**
Date/Time: **10/17/2015 17:38:46**

On Saturday, 10/17/15, at approximately 1700 hours, I was dispatched to the report of a physical fight occurring at 14840 Willow Road in Rio Nido. Upon my arrival I activated my body worn camera (BWC). The following is a synopsis of statements made by victims and involved others. For a full account of statements made, refer to my BWC footage labeled with this report number, 151017-013.

I contacted the victim who was identified as Shelby Smith. Smith was accompanied by two other subjects identified as Anthony Tighe and Kyle Pearson. Smith said she had been attacked by a former neighbor of hers, Nicolas Detweiler. Smith said Detweiler left the area prior to our arrival and was last seen headed North on Willow Road. Deputy Jaap remained with Smith while I checked the area for Detweiler. I was unable to located Detweiler in the Rio Nido area.

I returned to Smith`s location where she told me the following in summary. At approximately 1700 hours, She, Tighe and Pearson arrived at her house (14840 Willow Rd.). Smith said as she was exiting the vehicle, she observed Detweiler was approaching her position on foot. Smith said Detweiler then took off his pants and shoes leaving him in his boxers. Detweiler approached Smith`s location yelling in a threatening manner. Smith said Detweiler also held a stick in one of his hands. Smith said Detweiler started to swing at her with one of his fists. Smith said Detweiler made contact with one of these swings on her left eye. I observed the area of Smith`s left eye was noticeably swollen. When I tried to clarify with Smith if Detweiler had hit her with his hands or the stick, Smith said she did not remember. Smith said she did not fall to the ground or lose consciousness as a result of the strike. Smith said Tighe and Pearson were able to fight off Detweiler until he ultimately left after putting his pants back on. Tighe and Pearson did not want to provide statements or contribute to the criminal investigation.

I obtained a written statement from Smith who wanted to press charges against Detweiler for battery. Smith was also seeking a temporary restraining order from Detweiler. I obtained a signed citizen`s arrest form with the charge of 242 PC - Battery.

Smith said she did not know what provoked Detweiler`s attack however she claimed he suffers from an extensive history of mental illness and violent outbreaks. I took pictures of Smith`s injuries. The pictures will later be electronically attached to this report. Smith`s written statement will be booked into Sheriff`s Office evidence as item AH1. Smith`s citizen`s arrest form will be submitted to Sheriff`s Office records for attachment to this report.

I continued to search the area for Detweiler however, was unable to find him.

To D.A. for prosecution.

End of report.

**RTE - HANCOCK, K - 10/18/2015**
Written by: **Hancock, Karen 1102317**
Date/Time: **10/18/2015 05:39:18**

Partial Pkt in RP Box, 10/18/15 2317 KKH
Comp Rev to DA/VA w/NL, 10/22/15 2317 KKH
DA pkt ret for FI, prefile req to Discovery for BWC 11/20/15 #2193 AP (PKT IN CL TRAY)
Resubmitted to DA 12/1/15 1466 jl

**NL - FORTIER, S - 10/23/2015**
Written by: **Fortier, Simonne 1102381**
Date/Time: **10/23/2015 15:19:03**

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD151017013**

Noc, Cit Arr, Ev Sht 10/23/15 2381sf
Comp Rev 11/20/15 #2193 AP
Comp Rev 12/11/15 #2193 AP

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD190820003**

CONTROLLED DOCUMENT - DO NOT DUPLICATE

## Incident Information

Date/Time Reported: **08/20/2019 0719** Occurred Between: **08/20/2019 0719** & **08/20/2019 0719**

Location: **9890 MAIN ST, MONTE RIO CA**

UCR Status: Officer: **Fletcher, Donald 1101536**

Summary: Suspect stole from store and swung a knife at owner/victim when he confronted him nearby. Suspect fled from law enforcement and had to be pursued on foot. Suspect threatened to kill law enforcement, the owner, and family of law enforcement. Suspect booked into CJ for listed charges.

Related Cases: No Associated Cases

## Charges

Statute:
**245 (A)(1) PC - (FEL) ADW NOT FIREARM**
Attempted/Completed: **Completed**

Classification: Assault: Firearm
Weapon: **Knife or other cutting or stabbing instrument**

Location:

Statute:
**69 PC - (FEL) OBSTRUCT/RESIST EXECUTIVE OFFICER**
Attempted/Completed: **Completed**

Classification: Assault: Firearm
Weapon: **Personal Weapon (hands; feet; teeth; etc.)**

Location:

Statute:
**148 (A)(1) PC - OBSTRUCT/RESIST/ETC PUBLIC/PEACE OFFICER/EMERGENCY MED TECH**
Attempted/Completed: **Completed**

Classification: Other Offenses
Weapon: **Personal Weapon (hands; feet; teeth; etc.)**

Location:

## Offenders

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **DETWEILER, NICHOLAS HARITOUDIS** | **12/04/91** | **27/White/Male** | **6'01"/230** |

Address: TRANSIENT, MONTE RIO CA 95471

Employer/School: -

## Victims

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **FLETCHER, DONALD** | | **46/White/Male** | **/** |

Address: ,

Employer/School: SONOMA COUNTY SHERIFFS DEPT - 2796 VENTURA AVE . SANTA ROSA, CA 95403

Victim of: 69 PC

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD190820003**

## Victims

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **BUTTAR, RAJINDER SINGH** | **11/06/66** | **52/American Indian/Male** | **5'06"/140** |

Address: 9890 MAIN ST, MONTE RIO CA 95446 707-865-2023

Employer/School: BARTLETTS MARKET -

Victim of: 245 (A)(1) PC

## Narrative

**Initial Narrative**
Written by: **Fletcher, Donald 1101536**
Date/Time: **08/20/2019 07:36:41**

On 08-20-19, at approx. 0719 hours, I was dispatched to Bartlett`s Grocery Store located at 9890 Main Street in Monte Rio for a robbery that had just occurred.

The reporting party (Store Owner/Victim Rajinder Buttar) reported a white male adult (later positively identified as Nicholas Detwieler) waived a knife at him after he confronted him for stealing a soda (Canada Dry Ginger Ale $1.49).

I arrived in the area at approx. 0725 hours and checked the area for Detwieler without success.

I contacted Buttar at the store and learned the following information:

Detwieler entered the store purchased a $.99 Arizona soda with cash and left the store. As Detwieler exited, Buttar noticed a plastic 20oz Canada Dry Ginger Ale soda bottle in his left front pants pocket. Buttar checked the soda display rack and saw that one Ginger Ale bottle was missing from the rack and he had not sold any since stocking them.

Buttar followed Detwieler outside of the store and called out to him for taking the soda. Detwieler turned around and walked towards Buttar who then noticed the bottle of soda was on the ground. Buttar reached for the bottle and Detwieler swung a 3-inch pocket knife (blade affixed) at Buttar. Detwieler`s right hand hit Buttar`s left arm, but he did not get cut by the knife.

Buttar returned to the store with the soda and Detwieler left on foot toward Bohemain Hwy.

I collected the bottle of ginger ale as evidence (item #DF1) and took a picture of Buttar`s surveillance video of Detwieler. I sent River Deputies a photograph of Detwieler.

I left the store and searched the area for Detwieler. I turned onto Bohemain Avenue and observed Detwieler running across Bohemain Avenue toward River Blvd. I was approx. 50 yards from Detwieler when I exited my marked patrol vehicle and yelled at him to stop. Detwieler continued to run northbound from Bohemain Avenue toward 21050 RIVER BL MRO: @HIGHLAND DELL LODGE. At one point Detwieler yelled, "fuck you" as he ran northbound toward Highland Dell Lodge. I drove to River Blvd. and observed an unidentified female pedestrian pointing to the brush area west of Highland Dell Lodge. Deputy McCready arrived on scene and pursued Detwieler into the blackberry bushes. I followed and caught up to Deputy McCready and Detwieler in thick blackberry bushes. I threatened Detwieler with force if he did not comply.

Detwieler was arrested for resisting arrest and found to be in possession of a red folding knife (item #DF2). I escorted Detwieler to to my patrol vehicle while holding onto his right arm. While walking to my vehicle, Detwieler said he would "finish it" and "scrap me."

I advised Deputy McCready to put Detwieler in his patrol vehicle. During that process, Detwieler resisted arrest by bending over and pulling away from Deputy McCready and had to be taken to the ground by Deputy McCready. Based on the violent assault on

Buttar, Detwieler`s actions and statements, and fact he physically resisted Deputy McCready, I determined that he needed to be restrained in max cord to prevent injury to himself and others.

Refer to Deputy McCready`s supplemental report for further details.

Once on the ground, Detwieler physically resisted and grabbed at my hands ripping my latex gloves while we attempted to place a restraint cord on him. Monte Rio Fire Chief Steve Baxman assisted us with controlling Detwieler. Detwieler threatened to kill me and my family several times. Detwieler threatened to kill Deputies in the jail when the cuffs came off. Detwieler also threatened to kill Buttar.

I read Detwieler his Miranda rights and questioned him about the incident. I asked Detwieler why he pulled a knife on Buttar and he stated because he was a monkey like me. I asked Detwieler why he swung knife at Butter and he said he was gonna swing the knife at me. I asked Detwieler why he took the ginger ale and he stated he took it for myself. Detwieler stated he did not have to pay for it. Detwieler stated he was at war.

Deputy Jensen transported Buttar to our location and he postively identified Detwieler as the person from the assault. Refer to Deputy Jensen`s supplemental report for further details.

Russian River Fire arrived on scene and transported Detwieler to Sutter Hospital for medical clearance. Deputy McCready followed the ambulance to Sutter Hospital for medical clearance then booked Detwieler into CJ for the listed charges without incident.

I recontacted Buttar and he identified the knife found on Detwieler as the knife he used against him. I requested the store video surveillance be download for further review.

See attached photographs of knife, Detwieler in the store, and recovered Canada Dry ginger ale for further details.

Refer to BWC recordings for further specific details/observations.

I checked Detwieler`s criminal history and learned that he was convicted in Oregon of felony assault on public safety officer on 06-14-18. I further learned that Detwieler had history of assault and threats. Refer to criminal history for further details.

I will supplement this report after video surveillance from the store is obtained.

RECOMMENDATIONS:

To DA for prosecution of 245(A)(1) PC (ADW) for assaulting Buttar with the knife, 69 PC (Threatening Officer) for threatening myself, and 148a PC (Resist Arrest) for running from and physically resisting being secured in patrol vehicle and restrain cord.

End of report.

---

**FLUP - JENSEN, B - 08/20/2019**
Written by: **Jensen, Bryan 1101288**
Date/Time: **08/20/2019 09:13:41**

On 8/20/2019, at approximately 0751 hours, I responded to Bartlett`s Market at 9890 Main Street in Monte Rio. Dep Fletcher requested I contact the victim, Rajinder Buttar, and have him complete an infield show up.

I spoke with Buttar and read him the infield showup admonition. Buttar said he understood the admonition and agreed to come with me to complete the show up. I drove to Dep Fletcher`s location on River Blvd. where he had Nicholas Detweiler detained. As we drove up to the location Buttar immediately identified Detweiler as the suspect in this case without hestitation. I returned Buttar his store and advised Dep Fletcher of the positive ID.

Nothing further.

---

**RTE - BUTTERFIELD, R - 08/20/2019**

Written by: **Butterfield, Rene 1102409**
Date/Time: **08/20/2019 13:44:27**

PARTIAL PKT IN FOLDER 8/20/2019 RAB/2409
REPORT AND #2490 8-20-19 FLUP ADDED TO FOLDER, 8-20-19, 272-JS
DA WITH NL, 8-21-19, 272-JS
FAXED TO KAMI WALTON PAROLE AND PROBATION KLAMATH FALLS OREGON WITH NOC, FAX# 541-880-5513, 8-25-19, 272-JS
Unlocked to add weapon for offense #2 and add injuries to LEOKA to comply with UCR requirements. 9/12/19 #2387 vp

**FLUP - MCCREADY, C - 08/20/2019**
Written by: **McCready, Cody 1102490**
Date/Time: **08/20/2019 14:45:05**

On 08/20/2019 at approximately 0720 Hours, Deputy Fletcher and I were dispatched to an Armed Robbery at Bartles Market in Monte Rio. The reporting party and victim stated a white male pulled a knife on him when the reporting party confronted the male for stealing from the store. The reporting party last saw the male walking on Main Street towards Bohemian Highway.

Deputy Fletcher arrived on scene, contacted the reporting party, obtained a photo of the suspect from security camera video and sent the picture to me and other responding Deputies. The photo of the suspect showed a white male wearing a black hooded sweatshirt with black pants. I arrived on scene and began searching the area for the suspect south of Bartles Market on Bohemian Highway. A short time later I heard Deputy Fletcher say he had visual of the suspect on River Boulevard near Bohemian Highway. Deputy Fletcher then said the suspect was fleeing from him south along River Boulevard near the Russian River.

In the area of Highland Dell Resort on River Boulevard I saw a female walking across the road pointing to the bushes South of Highland Dell Resort. I exited my patrol car and could hear bushes breaking along the river. I gave a verbal command and a male matching the picture of the suspect stood up from the bushes. I ordered the male to show me his hand and to not move. Deputy Fletcher arrived to my location and the male was detained in hand cuffs. I searched the male for weapons and located a red folding knife in his right pants pocket. While Deputy Fletcher and I were walking the suspect back to the road and out patrol cars he made multiple statements about killing law enforcement and other people. His threats were direct and violent in nature.

After completing a search of the suspect incident to arrest I attempted to place him in the back seat of my patrol car. The male leaned forward and pushed the lower part of his body backwards in an obvious effort to resist being placed in the back seat of my patrol car. At this point I took the offender to the ground to maintain control of him. Due to the suspect having pulled a knife on the store clerk, his threats towards LE and his active resistance we placed the suspect in a Maximum restraint cord.

The suspect was identified as Nicholas Detwiler from an Oregon ID card. Detwiler began complaining of chest pain and trouble breathing. Russian River Fire responded and transported Detwiler to Sutter Hospital with me following. Detwiler was medically cleared by Sutter Hospital. I transported Detwiler to the Sonoma County Jail and booked him for the listed charges.

Refer to Deputy Fletcher`s report for additional information.

My department issued body worn camera was used during this event.

Nothing Further.

**NL - SCHARBIUS, J - 08/21/2019**
Written by: **Scharbius, Joan 110272**
Date/Time: **08/21/2019 00:45:07**

BKG DOCS, 8-21-19, 272-JS
COMP REV 8/26/19 RAB/2409

## Case Information

SCR-742505-1 | People vs. Detweiler, Nicholas Haritoudis

| Case Number | Court | |
|---|---|---|
| SCR-742505-1 | Criminal | |
| File Date | Case Type | Case Status |
| 11/20/2020 | Felony | Sentenced |

## Party

Plaintiff
THE PEOPLE OF THE STATE OF CALIFORNIA

Active Attorneys ▾
Lead Attorney
Sonoma County District Attorney

Defendant
Detweiler, Nicholas Haritoudis

DOB
XX/XX/XXXX

Active Attorneys ▾
Lead Attorney
PUBLIC DEFENDER
Court Appointed

## Charge

Charges
Detweiler, Nicholas Haritoudis

| | Description | Statute | Level | Date |
|---|---|---|---|---|
| 002 | BATTERY AGAINST PO | 243(c)(2) | *Felony | 10/27/2020 |

## Disposition Events

12/09/2020 Plea

Judicial Officer
Simonds, Dana Beernink

| | | |
|---|---|---|
| 002 | BATTERY AGAINST PO | *No Contest |

12/09/2020 Disposition

Judicial Officer
Simonds, Dana Beernink

| | | |
|---|---|---|
| 002 | BATTERY AGAINST PO | Found Guilty - Plea of Guilty/Nolo Contendere |

01/08/2021 1170h/Mandatory Supervision Split Sentence

| | | |
|---|---|---|
| 002 | BATTERY AGAINST PO | 1170h/Mandatory Supervision Split Sentence |

Condition - Adult

1. Mandatory Supervision, 10 months mandatory supervision, 10M, 01/08/2021, Active 01/08/2021
2. The conditions of mandatory supervision shall include:, 01/08/2021, Active 01/08/2021
3. You may not enter any jail or other county penal institution, without the consent of the Sheriff or other officer in charge., 01/08/2021, Active 01/08/2021
4. Report to Probation Department, within 2 working days of release from custody., 01/08/2021, Active 01/08/2021
5. Be of good conduct and obey all laws., 01/08/2021, Active 01/08/2021
6. No marijuana use even with a valid 215 card, 01/08/2021, Active 01/08/2021
7. Participate and complete programs of assistance, and counseling as directed by Probation Officer. Do not leave the program without prior written consent., 01/08/2021, Active 01/08/2021
8. Provide two blood and saliva samples pursuant to 296 PC, for DNA Testing, 01/08/2021, Active 01/08/2021
9. Do not possess or use any alcohol, 01/08/2021, Active 01/08/2021
10. Do not possess or use controlled substances or associated, paraphernalia without a valid prescription, 01/08/2021, Active 01/08/2021
11. Stay out of places where alcoholic beverages are the primary, item of sale (no bars or liquor stores), 01/08/2021, Active 01/08/2021
12. Submit to random chemical testing as directed either, by Probation or Law Enforcement., 01/08/2021, Active 01/08/2021
13. Do not possess any weapons, 01/08/2021, Active 01/08/2021
14. Defendant is to submit to warrantless search and seizure of, person, property, personal business or vehicle at any time of the day or night., 01/08/2021, Active 01/08/2021
15. Defendant is to submit to warrantless search and seizure of, residence anytime day or any reasonable hour of the night by any probation officer or law enforcement officer., 01/08/2021, Active 01/08/2021
16. Seek/maintain employment or enroll in educational program, 01/08/2021, Active 01/08/2021

17. Defendant is not to own, possess, have under custody or, control any firearms or ammunition or ammunition feeding devices pursuant to Federal and State Law., 01/08/2021, Active 01/08/2021

18. Restitution Reserved, 01/08/2021, Active 01/08/2021

19. Other Orders, Comply with any and all terms of treatment/medication as directed by Probation and treating psychiatrist Take all medications as prescribed. See doctor as doctor directs Peaceful contact with Deputy Brabell No fines/fees imposed, 01/08/2021, Active 01/08/2021

20. Defendant is to stay away from:, Rajinder Butter and Bartlett's Market, 01/08/2021, Active 01/08/2021

Adult Confinement

Type: *1170 Jail

Start Date: 01/08/2021

Term Type: One Third Middle Term

Term: 8 Months

Comment: Total Aggregate Term: 4 years 4 months 0 credits on this case

10/12/2021 Amended PC 1170(h) County Jail Commitment

Amend Reason
Mandatory Supervision Violated or Revoked

| | | |
|---|---|---|
| 002 | BATTERY AGAINST PO | PC 1170(h) County Jail Commitment |

Adult Confinement

Type: *1170 Jail

Start Date: 10/12/2021

Term Type: Confinement

Term: 182 Days

Credit for Time Served - Actual: 30 Days

Conduct Credit: 30 Days

Comment: Defendant to serve balance of 1170h sentence. Total CTS: 60 days

## Events and Hearings

10/29/2020 On View

Judicial Officer
Simonds, Dana Beernink

Hearing Time
1:30 PM

Result
Held

Comment
Hearing Added successfully using Integration with Justicehub

11/12/2020 Filing of Complaint

Judicial Officer
Simonds, Dana Beernink

Hearing Time
8:30 AM

Result
Held

11/20/2020 Complaint Filed

Judicial Officer
Simonds, Dana
Beernink

11/25/2020 Re: Complaint or Discharge

Judicial Officer
Simonds, Dana Beernink

Hearing Time
8:30 AM

Result
Held

11/25/2020 Defendant arraigned on Complaint by Court /Stipulation

Judicial Officer
Simonds, Dana
Beernink

12/09/2020 Plea

Judicial Officer
Simonds, Dana Beernink

Hearing Time
8:30 AM

Result
Held

12/09/2020 Tahl Waiver - Filed

Judicial Officer
Simonds, Dana
Beernink

12/09/2020 Referred to Probation for RPO re: CTS

Comment
Oral Report

12/09/2020 Fingerprint Form Filed

12/30/2020 Sentencing

Judicial Officer
Simonds, Dana Beernink

Hearing Time
9:00 AM

Result
Held and Continued

01/08/2021 Sentencing

Judicial Officer
Simonds, Dana Beernink

Hearing Time
9:00 AM

Result
Held

01/08/2021 Defendant to commence serving Jail Time

Comment
NO COMMENT

01/08/2021 Probation Report - Filed

Judicial Officer
Simonds, Dana
Beernink

05/20/2021 Defendant completed jail time and released

Comment
NO COMMENT

09/15/2021 Violation of Mandatory Supervision

Judicial Officer
Simonds, Dana Beernink

Hearing Time
1:30 PM

Result
Held

09/15/2021 Probation Report - Filed

Judicial Officer
Simonds, Dana
Beernink

09/15/2021 Mandatory Supervision Summarily Revoked

Judicial Officer
Simonds, Dana
Beernink

10/05/2021 Violation of Mandatory Supervision

Judicial Officer
Rhynes, Gloria F.

Hearing Time
10:30 AM

Result
Held

Comment
A/D

10/07/2021 Violation of Mandatory Supervision

Judicial Officer
Rhynes, Gloria F.

Hearing Time
10:30 AM

Result
Held

Comment
admit/ deny

10/12/2021 Violation of Mandatory Supervision

Judicial Officer
English, Kenneth G.

Hearing Time
10:30 AM

Result
Held

10/12/2021 Mandatory Supervision Reinstated

Judicial Officer
English, Kenneth G.

10/12/2021 Mandatory Supervision Terminated - Unsuccessful

Judicial Officer
English, Kenneth G.

10/12/2021 Defendant to commence serving Jail Time

Comment
NO COMMENT

12/13/2021 Defendant completed jail time and released

Comment
NO COMMENT

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD210913002**

CONTROLLED DOCUMENT - DO NOT DUPLICATE

## Incident Information

Date/Time Reported: **09/13/2021 0125** Occurred Between: **09/13/2021 0125** & **09/13/2021 0609**

Location: **10381 HWY 116 N APT # 13, GUERNEVILLE CA**

UCR Status: Officer: **Crachiola, Jacky 1102516**

Summary: Suspect and victim live together in victim's residence. Victim is an elder adult and the mother of the suspect. Victim reported the suspect brandish a large knife in close proximity to her body in a threatening manner which made her feel unsafe and she left the residence to seek assistance from law enforcement. Victim signed a citizens arrest and upon contacting the suspect he fled the residence and fled from us while holding the knife in his hand.

Related Cases: No Associated Cases

## Charges

Statute:
**417 (A)(1) PC - (MISD) EXHIBIT DEADLY WEAPON OTHER THAN FIREARM**
Attempted/Completed: **Completed**

Classification: Aggravated Assault: Knife/Cutting Equipment
Weapon: **Knife or other cutting or stabbing instrument**

Location:

Statute:
**1203.2 PC - (FEL) VIOLATION OF PROBATION**
Attempted/Completed: **Completed**

Classification: All Other Offenses
Weapon: **Knife or other cutting or stabbing instrument**

Location:

Statute:
**368 (B)(1) PC - (FEL) CAUSE HARM/DEATH OF ELDER /DEPENDENT ADULT**
Attempted/Completed: **Completed**

Classification: All Other Offenses
Weapon: **Knife or other cutting or stabbing instrument**

Location:

Statute:
**148 (A)(1) PC - OBSTRUCT/RESIST/ETC PUBLIC/PEACE OFFICER/EMERGENCY MED TECH**
Attempted/Completed: **Completed**

Classification: All Other Offenses
Weapon: **Knife or other cutting or stabbing instrument**

Location:

## Offenders

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **DETWEILER, NICHOLAS HARITOUDIS** | **12/04/91** | **29/White/Male** | **6'00"/160** |

Address: 10381 Hwy 116 N Apt # 13, Guerneville CA 95436 (707) 848-0372

Employer/School: NORTH VALLEY SCHOOL - 3164 CONDO CT

Offender of: 1203.2 PC 148 (A)(1) PC 368 (B)(1) PC 417 (A)(1) PC

Custody Status: **Booked**

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD210913002**

## Victims

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **DETWEILER, JULIE FAY** | **07/20/56** | **65/White/Female** | **5'10"/185** |

Address: 10381 Hwy 116 N 13 Apt # 13, Guerneville CA 95436 (707) 703-7244

Employer/School: UNEMPLOYED -

Victim of: 368 (B)(1) PC 417 (A)(1) PC

Relationship to Offender: Son - DETWEILER, NICHOLAS HARITOUDIS

## Narrative

**INITIAL NARRATIVE**
Written by: **Crachiola, Jacky 1102516**
Date/Time: **09/13/2021 06:09:52**

On 09/13/2021 at about 0127 hours, Deputy Nouguier and I were dispatched to contact Julia Detweiler at the Guerneville Sub-station in Guerneville, Ca.

We began speaking with Julia and she stated she was worried about her son, Nicolas Detweiler. Julia said he has mental health issues and she left the residence which they stay at because she did not feel safe. Julia said she tried to speak with Nicolas' probation officer about his mental status but was unable to attain any assistance. Julia asked that we go speak with him to evaluate his mental status.

As I continued to speak with Julia she began talking about an incident that occurred between her and Nicolas prior to coming to the sub-station. She told me the following in summary:

Prior to leaving her residence she was lying on her bed with the bedroom door closed. She said her and Nicolas were the only people inside of the residence. Julia said Nicolas knocked on her door and entered her room holding a folded shirt. Julia asked Nicolas, "What's up?" Nicolas replied, "Where's the marijuana?"

Nicolas then pulled the white shirt around a long bladed kitchen knife and proceeded to say people were going to get hurt, really hurt. Nicolas then referenced Julia's father and mother who are deceased. Julia then sat up in her bed and said, "I'll go to town to try and get you marijuana." Julia stated Nicolas displayed the knife in a manner which was pointed at her in close proximity to her body which left her feeling threatened and unsafe. Julia said Nicolas did not verbally threaten to kill her or harm himself.

Julia grabbed her keys, phone, and dog and left the residence to go to Safeway at which point she contacted a friend who told her to seek Law Enforcement assistance as he was concerned for her safety.

Due to Nicolas displaying a large kitchen knife in front of and in close proximity to Julia and Julia feeling unsafe and threatened, I advised her of the possibility of signing a citizen's arrest form for violation of 417 (a)(1) of the California Penal Code. Julia elected to do so and completed the form. As I continued my investigation I learned Julia was 65 years old and is considered an elder adult. Based on information provided by her regarding the incident and the fact that she felt in order to preserve her safety and well-being she needed to get out of bed and leave her residence at approximately 0100 hours, I determined that she was suffering mentally due to Nicolas' actions. Therefore I determined Nicolas was also in violation of California Penal Code 368 (b) (1) – Elder Abuse.

I had Julia complete a written statement regarding the incident and while she did I utilized various computer applications to locate information about Nicolas. While doing so I found that Nicolas has extensive violent criminal history which included threats to law enforcement. The following are the more recent incidents which involved assaults on Law Enforcement or threats against Law Enforcement;

10/26/2020 – Case # 201027017, Nicolas was in-custody and the Main Adult Detention Facility and threw an unknown liquid at a Correctional Deputy's face and scratched the Deputy's face several times during a struggle.

**08/26/2019 –** Case # 190827001, Nicolas was in-custody and threatened to throw feces on a Correctional Deputy while telling her he would cram it down her throat and if he saw her on the street he would cut her into pieces.

**08/20/2019 –** Case # 190820003, Nicolas was arrested for a violent criminal offense involving a knife and when Deputies tried to arrest him he fled from them. When finally placed into handcuffs he threatened to kill the deputies as well as the victim from the original incident.

**09/03/2016 –** Case # 160903007, Julia called Law Enforcement for a family disturbance which Nicolas was the subject of. Julia told SCSO Dispatch and responding Deputies that Nicolas wanted to "Kill some Sheriffs" and was mentally unstable. Deputies were unable to contact Nicolas during that incident due to him leaving before their arrival.

I also determined Nicolas was on Sonoma County felony probation (SCR-730506-1) with the following terms listed; be of good conduct, obey all laws, do not possess any weapons, and submit to warrantless search and seizure of person or property by law enforcement. I also determined he was in violation of those of terms when he brandished the knife at his elderly mother.

Due to Nicolas' extensive violent criminal history I requested additional deputies to assist us in contacting Nicolas at Julia's residence. Upon arrival, Julia pointed out the front door of the residence and she remained in her vehicle while Deputy Nouguier, Deputy Ebert, Deputy G. Briggs and I attempted to contact Nicolas.

I approached the front door of the apartment and knocked on the door. I announced, "Sheriff's Office" loudly. I continued on to say that we were there to speak with him and ordered him to exit the residence with his hands raised and nothing in them. I did not get a response but myself and other deputies heard a loud thud from inside of the residence. I continued to knock on the side of the apartment and announced our presence three additional times and again ordered Nicolas to come out of the residence with his hands raised and nothing in them. While I did that, Deputies on-scene could see Nicolas inside of the residence as he locked the front door and walked around inside.

I walked to the rear of the residence to observe windows in which Nicolas could try and flee from when I heard Deputy Ebert say Nicolas was coming out of the front door. I then walked around to the front of the residence as Deputy Ebert was giving Nicolas orders to raise his hands. I then heard a Deputy yell something like," knife!" "He has a knife". Then Nicolas began to run away from deputies and crossed in front of me as I was approximately 6-8 feet away from him. As Nicolas passed me I could see a long sharp metallic object in his right hand which I recognized as a knife. I then ran after Nicolas as he continued to run in the direction of multiple other apartments that appeared to be occupied. I was uncertain if there were people outside of the residence or in the parking lot as I have contacted people at that location at different times of the night in the past.

At this point during the investigation I had knowledge of Nicolas brandishing a knife within close proximity to his mother's body in a manner which she felt threatened, his extensive violent criminal history involving either utilization or possession of a knife, various assaults on Correctional Deputies, and previous threats of death toward Deputies. In order to prevent Nicolas from escaping arrest while holding a large bladed knife, and his potential to either severely injure innocent bystanders with in the vicinity or myself and other deputies, I aimed my department issue Taser at Nicolas and deployed it for one cycle of approximately five seconds. I did not observe a response from Nicolas and he continued running away from me. At that time Deputy G. Briggs deployed his Taser which appeared to be effective and Nicolas fell to the ground while still holding the knife. Due to the situation rapidly evolving and the fact that an armed suspect was actively fleeing from me toward inhabited dwellings, I had to rapidly deploy my Taser in order to prevent Nicolas from possibly harming the people in or around those residences or entering those residences and potentially harming the occupants. I was therefore unable to give a verbal warning prior to deploying my Taser.

I order Nicolas to drop the knife which he finally did and I kicked the knife away to prevent him from obtaining it. Deputy Ebert placed Nicolas into handcuffs and I requested Fire and Medical to respond to our location. Nicolas did not complain of any injury besides the Taser prongs. While waiting for medical personnel I spoke with Nicolas. Due to the nature of the event, I read Nicolas his Miranda Rights from a pre-printed card and he said he understood them. Nicolas said he did not know if he wanted to talk to me. I then explained why we were there and the allegations made by his mother. I told Nicolas he did not have to speak with me but he continued to talk with me, he told me the following in summary:

Nicolas said he has been having problems with that man named Julia Detweiler as that person messes with his stuff. Nicolas said he was cooking food in the microwave and Julia came into the kitchen and began an argument with him and Nicolas was holding the knife at that time. Nicolas denied the incident inside of Julia's bedroom.

I asked Nicolas if he knew how old Julia was and he said, **"65** years old**".** During my conversation with Nicolas he stated that Julia was not his mother and appeared to be delusional to the fact she was his mother. Nicolas said he had been living in the apartment for approximately two weeks.

Fire and Medical personnel arrived on-scene and ultimately transported Nicolas to Sutter Hospital for medical clearance with Deputy Ebert following.

SCSO Sergeant Skerret arrived on-scene and I advised him of the circumstances surrounding my investigation and the subsequent foot pursuit and deployment of my Taser.

I photographed the knife as it was lying on the ground which I later uploaded to Evidence Upload XT. I collected the knife and asked Julia if it was the knife Nicolas brandished at her and she said she believed it was. I packaged and submitted the knife as evidence labeled JC-1.

Deputy G. Briggs collected my Taser cartridge along with his and later packaged those and submitted them as evidence, refer to his supplemental report for further information surrounding this incident as well as submission of evidence.

Due to Nicolas currently living with Julia, Nicolas' violent behavior, and Julia's request to obtain an emergency protective order, I attempted to obtain and EPO on behalf of Julia. I contact Sonoma County Superior Court Commissioner Anthony Wheeldin and advised him of the circumstances surrounding my investigation. Commissioner Wheeldin granted the EPO with standard terms and conditions. I explained the contents of the EPO and provided Julia with a copy. I faxed a copy to the Sonoma County Jail and Deputy Ebert served Nicolas with the EPO and later faxed it to SCSO Dispatch. Refer to Deputy Ebert's supplemental report for further information regarding this incident and service of the EPO.

I later scanned a copy of Julia's written statement and attached it to this report. I also submitted her statement as evidence labeled JC-2. I later downloaded my Taser per SCSO policy.

Nicolas was eventually booked into the Sonoma County Jail for multiple violations which included;

417 (a) (1) PC – Brandishing a deadly weapon

368(b) (1) PC- Elder Abuse

148(a) (a) PC – Resisting Arrest

1203.2 PC – Violation of Probation

Due to Julia's age, I completed an Elder Abuse form and submitted it to the SCSO Records department. Prior to Nicolas being transported to Sutter Hospital, Deputy Nouguier photographed Nicolas and his back where the Taser probes were located. Deputy Nouguier and I photographed each other and later uploaded all images to Evidence Upload XT.

Throughout my involvement in this incident I was equipped with a Body Worn Camera and it was recording. This report is merely a summary of the incident and is not intended to be an exact transcript of the entire investigation.

Status: Closed / Cleared by Arrest.

**SUPPLEMENT**
Written by: **Briggs, Garrett 1102767**
Date/Time: **09/13/2021 06:00:00**

On 09/13/2021 at approximately 0425 hours, I was driving a fully marked patrol vehicle and wearing my full Sonoma County Sheriff's uniform. I activated my BWC and uploaded the incident to evidence.com.

I was directed to assist Deputy Crachiola with a suspect contact. I provided security around the residence. While on scene I observed through a window, Detweiler hiding in the kitchen. Detweiler peeked his head around the corner of a wall and spotted

me outside the window. I advised Detweiler to come outside. Detweiler then went to an unknown part of the residence and I could no longer see him. I moved around the back of the house as to watch any windows that Detweiler may use to escape myself and Deputies on scene.

I heard movement towards the front of the house and relocated myself closer to the front door from the back of the house. I heard something to the effect of, knife, drop the knife and then observed Detweiler running away from Deputies on a gravel road, towards other residences. Because Detweiler had a knife is his hand was running from deputies to escape arrest, I pulled out my Taser and pursued him on foot. I saw Deputy Crachiola discharge his Taser but perceived the barbs did not have a complete connection to be effective. I discharged my Taser with success. Detweiler continued for a few steps and then fell to the ground. Once the Taser completed the 5 second cycle, I ordered Detweiler to drop the knife that was still in his hand. Detweiler complied with my commands. Detweiler was ordered to roll onto his stomach and was detained without further incident.

I collected the cartridge's and booked them into evidence. GB1- Cartridge C6205108Y, GB2-C6203DDNY.

This is a supplemental report only.

---

**SUPPLEMENT**
Written by: **Ebert, Cody 1102545**
Date/Time: **09/13/2021 07:01:00**

On 09-13-2021 at 0415 hours, I responded to 10381 Hwy. 116 North unit 13 Forestville along with Deputies G. Briggs, Crachiola and Nouguier. We were responding to the location to contact Nicolas Detweiler regarding an threatening weapon investigation being conducted by Deputy Crachiola.

I was dressed in full SCSO uniform with shoulder patches and star badge. I activated my BWC when I arrived on scene.

I maintained a position at the front of the residence while the other deputies knocked on the residence to get Detweiler to come out. Detweiler was told to come out of the residence without anything in his hands and with his hands in the air. After about 5 minutes of yelling for Detweiler to come out, I observed him exit through the front door. He was standing on the front porch and had a long sleeve shirt or sweatshirt hanging over his right arm and hand. I yelled for Detweiler to show me his hand and he did not comply. Detweiler ran down the stairs toward my direction while continuing to cover his arm and hand. I heard a deputy (unknown which one at the time) yell that Detweiler had a knife. I backed away from Detweiler as he ran past my location. I ran after Detweiler while yelling for him to drop the knife. At this point I observed an approximate 8 inch kitchen knife in Detweiler's right hand. I observed Detweiler being struck with an effective taser application and fall to the ground. When he fell to the ground the knife fell out of his hand. I placed Detweiler into handcuffs behind his back. The handcuffs were double locked and checked for proper fit. I conducted a search of Detweiler's person and did not locate any other weapons.

Detweiler was transported by ambulance to Sutter hospital for medical clearance. I followed the ambulance and stayed with Detweiler while at the hospital. Once Detweiler was medically cleared I transported him to the MADF where he was booked without further incident.

While at the MADF I provided Detweiler with a copy of the EPO and advised him of its contents.

## Case Information

SCR-749222-1 | People vs. DETWEILER, NICHOLAS HARITOUDIS

| Case Number | Court | |
|---|---|---|
| SCR-749222-1 | Criminal | |
| **File Date** | **Case Type** | **Case Status** |
| 09/14/2021 | Misdemeanor | Sentenced |

## Party

Plaintiff
THE PEOPLE OF THE STATE OF CALIFORNIA

Active Attorneys ▾
Lead Attorney
Office of the District Attorney
County of Sonoma

Defendant
Detweiler, Nicholas Haritoudis

DOB
XX/XX/XXXX

Active Attorneys ▾
Lead Attorney
PUBLIC DEFENDER
Public Defender

## Charge

Charges
Detweiler, Nicholas Haritoudis

| | Description | Statute | Level | Date |
|---|---|---|---|---|
| 001 | EXHIBIT DEADWPN:NOT F/ARM | 417(a)(1) | *Misdemeanor | 09/13/2021 |
| 002 | OBSTRUCT/ETC PUB OFCR/ETC | 148(a)(1) | *Misdemeanor | 09/13/2021 |

## Disposition Events

10/12/2021 Plea

Judicial Officer
English, Kenneth G.

| | | |
|---|---|---|
| 001 | EXHIBIT DEADWPN:NOT F/ARM | No Plea |
| 002 | OBSTRUCT/ETC PUB OFCR/ETC | *No Contest |

10/12/2021 Disposition

Judicial Officer
English, Kenneth G.

| | | |
|---|---|---|
| 001 | EXHIBIT DEADWPN:NOT F/ARM | Dismissal |
| 002 | OBSTRUCT/ETC PUB OFCR/ETC | Found Guilty - Plea of Guilty/Nolo Contendere |

10/12/2021 Conditional Sentence

| | | |
|---|---|---|
| 002 | OBSTRUCT/ETC PUB OFCR/ETC | Conditional Sentence |

Probation

Type: Conditional Sentence

Start Date: 10/12/2021

Term: 12 Months

End Date: 10/12/2022

Status

| Status | Date | Comment |
|---|---|---|
| Granted | 10/12/2021 | |

## Events and Hearings

09/14/2021 Complaint Filed

Judicial Officer
Simonds, Dana
Beernink

09/15/2021 On View

Judicial Officer
Simonds, Dana Beernink

Hearing Time
1:30 PM

Result
Held

09/15/2021 PSA Report Received

09/15/2021 Defendant advised of charges/allegations

09/15/2021 Defendant arraigned on Complaint by Court /Stipulation

Judicial Officer
Simonds, Dana
Beernink

09/15/2021 Pretrial Release Denied

Judicial Officer
Simonds, Dana
Beernink

09/15/2021 Criminal Protective Order Issued and Filed

09/15/2021 Criminal Protective Order Served

09/15/2021 Time is not waived

10/05/2021 Readiness Conference

Judicial Officer
Rhynes, Gloria F.

Hearing Time
10:30 AM

Result
Held

Comment
30th day: 10/15/21

10/07/2021 Jury Trial

Judicial Officer
Rhynes, Gloria F.

Hearing Time
10:30 AM

Result
Held

Comment
30th day: 10/15/2021

10/12/2021 Jury Trial

Judicial Officer
English, Kenneth G.

Hearing Time
10:30 AM

Result
Held

10/12/2021 Criminal Protective Order Issued and Filed

10/12/2021 Criminal Protective Order Served

10/12/2021 Criminal Protective Order Vacated/Terminated

Comment
Dated: 9/5/2021

10/12/2021 Advised of right to confront/cross examine witnesses

10/12/2021 Defendant advised against self-incrimination

10/12/2021 Defendant advised of right to jury trial

10/12/2021 Defendant understands and waives each right

10/12/2021 Defense Counsel joins in waivers

10/12/2021 Defendant knowingly and intelligently waives rights

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD230107012**

CONTROLLED DOCUMENT - DO NOT DUPLICATE

## Incident Information

Date/Time Reported: **01/07/2023 2125** Occurred: **01/07/2023 2125**

Location: **16405 HWY 116 N, GUERNEVILLE CA 95446**

UCR Status: Officer: **Powers, Anthony 1102901**

Summary: On 01/07/2023 2248 hours, deputies were dispatched to a store in the Guerneville area for a welfare check of a subject. Upon arrival the subject became aggressive and was taken into custody after a brief struggle. The subject was later booked at county jail for resisting arrest and possessing ammunition as a prohibited person.

Related Cases: No Associated Cases

## Charges

Statute:
**30305(A)(1) - PC - PROHIBITED PERSON OWN/ETC AMMUNITION/ETC**
Attempted/Completed: **COMPLETED**

Classification: WEAPON LAW VIOLATIONS Weapon: **Other**

Location:

Statute:
**148(A)(1) - PC - OBSTRUCT/RESIST/ETC PUBLIC/PEACE OFFICER/EMERGENCY MED TECH**
Attempted/Completed: **COMPLETED**

Classification: ALL OTHER OFFENSES Weapon:

Location:

## Offenders

| Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|
| **DETWEILER, NICHOLAS HARITOUDIS** | **12/04/91** | **31/White/Male** | **6'01"/205** |

Address: 10381 Hwy 116 N Apt # 13, Guerneville CA 95436 (707) 848-0372

Employer/School: NORTH VALLEY SCHOOL - 3164 CONDO CT

Offender of: 148(A)(1) 30305(A)(1)

Custody Status: **Booked**

## Organization/Business Victims or Involved

| Inv Type: | Name: |
|---|---|
| **Business Victim** | STATE OF CALIFORNIA - VICTIM - SOCIETY/GOVERNMENT CRIMES |

Address: , CA

## Others Involved

| Inv Type: | Name (Last, First Middle): | DOB: | Age/Race/Gender: | Height/Weight: |
|---|---|---|---|---|
| **Parent** | **DETWEILER, JULIA FAY** | **07/20/56** | **66/White/Female** | **5'10"/165** |

Address: 11563 Summerhome Park Rd, Forestville CA 95436 (7) 078-8786

Employer/School: -

# Incident/Investigation Report

Agency: **Sonoma County Sheriff's Office** Case #: **SD230107012**

## Narrative

**INITIAL NARRATIVE**
Written by: **Powers, Anthony 1102901**
Date/Time: **01/08/2023 03:18:00**

On 01/07/2023 at approximately 2131 hours, I was dispatched to Safeway located at 16405 Hwy 116 in Guerneville, regarding a subject later identified as Nicolas Detweiler. The reporting party, later identified as Julia Detweiler, informed dispatch that her son Nicolas was off his medication, and he said he would kill her. Although Julia claimed that Nicolas made a threat towards her, she would not elaborate any of the details and only thought Nicolas was "5150". Due to both Nicolas and Julia sharing the same last name they will both be referred to by their first names for the remainder of the report.

At Safeway deputies contacted Julia who stated that Nicolas had left the area and she only wanted a welfare check on him. Deputies searched the area, and we were unable to locate Nicolas.

At 2248 hours, an employee at Safeway (Mary Walker) informed dispatch that Nicolas entered the Safeway and he was acting strange. Deputy Malatesta and I entered the Safeway and located Nicolas at a self-check out stand. I approached Nicolas and said his name. Nicolas instantly told me to, "Get the fuck out of my face". Nicolas was exhibiting pre-assaultive indicators. Nicolas began quickly moving back and forth towards me and away from me. He took his gloves off and attempted to put his hands in his pockets, but Deputy Malatesta told him to keep his hands out of his pockets. Nicolas was clenching his teeth and repeatedly told us to, "Back the fuck up". Nicolas took a step towards me and began to raise his left arm. At that time, I believed that Nicolas was going to strike me. I put my hands on his shoulders and pulled him to the ground and Deputy Malatesta did the same. I asked Nicolas if he was injured, and he said no. I did not observe any visible injuries on Nicolas.

Deputy Malatesta placed Nicolas in handcuffs while I held his shoulders to the ground momentarily. During a transport search of Nicolas', Deputy Malatesta located eight 9mm ammunition in his front right pocket. A records search of Nicolas revealed he has a prior felony conviction and is prohibited from possessing ammunition. I later booked the 9mm ammunition into evidence as AP1 at the main office (See Deputy Malatesta's statement for further).

Based on the aforementioned facts, I believe I had probable cause to arrest Nicolas for 30305(a)(1) PC and 148(a)(1) PC.

Sgt Diehm was notified for a reportable use of force against Nicolas. I transported Nicolas to county jail. At county jail I attempted to take a photo of Nicolas' lack of injuries, and he was uncooperative.

During this incident I activated my Body Worn Camera which may be reviewed for further details.

Nothing further at this time.

**SUPPLEMENT**
Written by: **Malatesta, Lucas 1102797**
Date/Time: **01/08/2023 03:29:00**

On January 7, 2023 at 2254 hours, I arrived at the Guerneville Safeway, located at 16405 Hwy 116, to assist Deputy Powers in conducting a check the welfare on Nicolas Detweiler. I know from previous incidents, that Detweiler suffers from mental illness, and is aggressive and violent. Nicolas has also fought with Deputies during prior contacts.

Upon my arrival, Deputy Powers had already initiated contact with Nicolas, and I immediately observed that Nicolas was amped up and aggressive in his mannerism. I observed Nicolas turn and take a step in Deputy Powers direction and proclaim, "You need to get the fuck out of my face." Nicolas had what I recognized to be a "thousand-yard stare". Our attempts to start a dialogue with Nicolas were unsuccessful as he kept telling us to "back the fuck up". Nicolas was fidgety and at one point started reaching into his right front pant pocket, at which point I ordered him not to reach into his pockets. Nicolas was tense the entire confrontation and I got the feeling that he was trying to intimidate us into leaving.

As Deputy Powers attempted to calmy converse with Nicolas, I observed Nicolas suddenly step towards Deputy Powers, square his shoulders and begin to raise his left arm in a manner which I interpreted as him preparing to strike Deputy Powers. Deputy Powers and I immediately reacted to Nicolas's motion. I grabbed Nicolas by the left arm and back, while Deputy Powers grabbed Nicolas by the shoulders and pulled him down towards the floor, at the same time I used the momentum of Nicolas's movement to assist in guiding Nicolas to the floor. Nicolas ended up on his stomach face down on the floor, at which point I placed his left arm behind his back, and Deputy Powers placed his right arm behind his back. I placed Nicolas in handcuffs, ensuring the proper degree of fit.

During a search of Nicolas, I located eight loose rounds of 9mm ammunition in Nicolas's front right pants pocket.

I later spoke to Mary Walker, the security guard at Safeway, who provided the following statement for what she saw: Mary stated that She was advised by Julia earlier in the evening that Nicolas was off of his medication and was acting erratic. Mary stated she observed Nicolas in the store purchasing items, but stated he was paranoid and kept asking her why she was on the phone and who Mary was calling. Mary said she kept her distance from Nicolas until we arrived. Mary stated she saw us speaking with Nicolas, at which point she believed she saw Nicolas possibly hit one of us, and then saw us take Nicolas to the ground. Mary was not able to see anything once we took Nicolas to the ground.

BWC activated and uploaded to evidence.com.

Nothing further.

CARLA RODRIGUEZ, #183874
District Attorney, County of Sonoma
Keren S Freeberg, #310389
Deputy District Attorney
600 Administration Dr Rm 212-J
Santa Rosa, CA 95403
Telephone: (707) 565-2311
Email: districtattorney@sonoma-county.org

Attorney for the People

FILED
JAN 09 2023
Clerk of Superior Court of California, County of Sonoma
By [signature]
Deputy Clerk

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SONOMA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA<br>Plaintiff,<br><br>vs.<br><br>NICHOLAS HARITOUDIS DETWEILER<br>ID NO. 540481<br>AKA NICHOLAS HARITOUDIS DETWILER, NICOLAS HARITOUDIS DETWEILER, , NICOLAS DETWEILER, NICHOLAS HARITOUDIS DETWEILER, NICHOLAS DETWEILER HARITOUDIS, NICHOLAS DETWEITLER, NICHOLAS DETWEILE HARITOUDIAS, NICHOLAS HARITOUDIS, NICK<br><br>Defendant. | COURT CASE NO.<br><br>FELONY COMPLAINT<br>Section(s) PC30305(a)(1), PC148(a)(1)<br><br>DA CASE NO. 1024373<br><br>Appearance Date: January 10, 2023 |

The District Attorney of the County of Sonoma, State of California, hereby accuses the above named defendant of the following criminal offenses:

Count 1

On or about January 7, 2023, in the County of Sonoma, State of California, the crime of Possession Of Ammunition in violation of PC30305(a)(1), a Felony, was committed in that NICHOLAS

HARITOUDIS DETWEILER did unlawfully own, possess and have under control ammunition and reloaded ammunition. It is further alleged that the defendant is prohibited from owning or possessing a firearm pursuant to Chapter 2 and 3 of Division 9 and sections 8100 and 8103 of the Welfare and Institutions Code, having been previously convicted of the following offense(s):

| Charge | Off. Date | Disp. Date | Sent. Date | Court # | Jurisdiction | Sentence |
|---|---|---|---|---|---|---|
| ORS 163.208 Felony Assault on Peace Officer | 01-03-2018 | | 06-14-2018 | 18CR00989 | Klamath Co Oregon | 13m Prison |

Count 2

On or about January 7, 2023, in the County of Sonoma, State of California, the crime of Resist, Obstruct, Delay Of Peace Officer Or EMT in violation of PC148(a)(1), a Misdemeanor, was committed in that NICHOLAS HARITOUDIS DETWEILER did willfully and unlawfully resist, delay and obstruct Anthony Powers who was then and there a peace officer attempting to and discharging the duty of his/her office and employment.

NOTICE: Conviction for these offenses may require you to provide specimens and samples pursuant to Penal Code Section 296 if you are convicted of a felony offense or have a prior qualifying offense in your criminal background. Willful refusal to provide the specimens and samples is a crime.

NOTICE: PURSUANT TO PENAL CODE SECTION 29810(a)(1)

NOTICE: Conviction of this offense will require you to relinquish all firearms you own, possess, or have under your custody or control in the manner provided in Penal Code section 29810.

NOTICE: PURSUANT TO PENAL CODE SECTION 29810(a)(2)

NOTICE: Conviction of this offense will prohibit you from owning, purchasing, receiving, possessing, or having under your custody or control any firearms, ammunition, and ammunition feeding devices, including but not limited to magazines.

MARSY'S LAW

Information contained in the reports being distributed as discovery in this case may contain confidential information protected by Marsy's Law and the amendments to the State of California Constitution Section 28. Any victim(s) in any above referenced charge(s) is entitled to be safe and free from intimidation, harassment, and abuse. The defendant(s), defense counsel, and any other person acting on behalf of the defendant(s) is admonished not to use any information contained in the reports to locate or harass any victim or the victim(s)s' family and to not disclose any information that is otherwise privileged and confidential by law. Additionally, it is a violation of Penal Code Section 1054.2(a)(3) to disclose the address and telephone number of a victim or witness to a defendant, defendant's family member, or anyone else. Note exceptions provided in Penal Code Section 1054.2(a)(1) and (2).

Discovery Request: Pursuant to Penal Code Section 1054.5(b), the People are hereby informally requesting that defense counsel provide discovery to the people as required by Penal Code Section 1054.3.

Complainant therefore prays that a warrant issue and that said defendant be dealt with according to law. I declare under penalty of perjury under the laws of the State of California, based on information and belief, that the foregoing is true and correct.

**FACTORS IN AGGRAVATION**

It is further alleged as to the above offenses, enhancements and special allegations, the following sentencing factors in aggravation relating to the crime and relating to the defendant apply:

**(a) Factors relating to the crime**

**(1)** The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness.

**(2)** The defendant was armed with or used a weapon at the time of the commission of the crime.

**(3)** The victim was particularly vulnerable.

**(4)** The defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission.

**(5)** The defendant induced a minor to commit or assist in the commission of the crime.

**(6)** The defendant threatened witnesses, unlawfully prevented or dissuaded witnesses from testifying, suborned perjury, or in any other way illegally interfered with the judicial process.

**(7)** The defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed.

**(8)** The manner in which the crime was carried out indicates planning, sophistication, or professionalism.

**(9)** The crime involved an attempted or actual taking or damage of great monetary value.

**(10)** The crime involved a large quantity of contraband.

**(11)** The defendant took advantage of a position of trust or confidence to commit the offense.

**(12)** The crime constitutes a hate crime under section 422.55 and:

**(A)** No hate crime enhancements under section 422.75 are imposed; and

**(B)** The crime is not subject to sentencing under section 1170.8.

**(b) Factors relating to the defendant**

**(1)** The defendant has engaged in violent conduct that indicates a serious danger to society.

**(2)** The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness.

**(3)** The defendant has served a prior term in prison or county jail under section 1170(h).

**(4)** The defendant was on probation, mandatory supervision, postrelease community supervision, or parole when the crime was committed.

**(5)** The defendant's prior performance on probation, mandatory supervision, postrelease community supervision, or parole was unsatisfactory.

Dated: January 9, 2023

CARLA RODRIGUEZ
DISTRICT ATTORNEY

By: K. Freeberg

Keren S Freeberg
Deputy District Attorney

*****IN CUSTODY*****

[ ] It appearing that the offense(s) of ______________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

in the complaint has been committed and there is sufficient cause to believe the defendant guilty, I order that he be held to answer to the Superior Court. It is further ordered that he ______________________________, be committed to the Sheriff of the County of Sonoma, and be held in custody until bail is posted in the amount of ($__________________) ____________________________________________ dollars.

*****OUT OF CUSTODY*****

[ ] It appearing that the offense(s) of ______________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

in the complaint has been committed and there is sufficient cause to believe the defendant guilty, I order that he be held to answer to the Superior Court. The defendant remains released as follows:

[ ] Own Recognizance
[ ] Supervised Own Recognizance
[ ] Cited to Appear
[ ] Cash Bail in the amount of $_____________ having been posted
[ ] Bail Bond #_________________________ in the amount of $________________
remains in full force and effect.

SUPERIOR COURT OF CALIFORNIA COUNTY OF SONOMA

_______________________________
**Judge of the Superior Court**

**Dated** ___________________________

# CRIMINAL CASE SUMMARY
## CASE NO. SCR-759529-1

**People vs. Detweiler, Nicholas Haritoudis**

| | |
|---|---|
| Location: | **Criminal** |
| Judicial Officer: | **LaForge, Robert M** |
| DMV Court Code: | **49100 Superior Court, Criminal** |
| Filed on: | **01/09/2023** |
| Case Number History: | **PBK-1024373**<br>**SCY-230107012-1** |

### CASE INFORMATION

| Offense | Statute | Deg | Date |
|---|---|---|---|
| Jurisdiction: **County of Sonoma** | | | |
| 001. FELON W/AMMO (ORIGINAL Complaint)<br>Arrest: 01/07/2023 | 30305(a)(1) | F | 01/07/2023 |
| 002. OBSTRUCT/ETC PUB OFCR/ETC (ORIGINAL Complaint)<br>Arrest: 01/07/2023 | 148(a)(1) | M | 01/07/2023 |

Case Type: **Felony**

Case Flags: **Firearm Prohibition Advisement Required**
**Active Warrant on Case**
**Arraignment Req**

**Statistical Closures**
03/30/2023 Conviction - Plea of Guilty/Nolo Contendere

| DATE | CASE ASSIGNMENT |
|---|---|

**Current Case Assignment**

| | |
|---|---|
| Case Number | SCR-759529-1 |
| Court | Criminal |
| Date Assigned | 01/09/2023 |
| Judicial Officer | LaForge, Robert M |
| DMV Court Code | 49100 Superior Court. Criminal |

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|

02/09/2024

**In Chambers Minutes** (5:00 PM) (Judicial Officer: LaForge, Robert M :Location: Courtroom 9)
Resource: Location Courtroom 9

**MINUTES**

Notice of Death Filed

**Amended Sentence** (Judicial Officer: LaForge. Robert M) Reason: Sentence Modified
001. FELON W/AMMO (ORIGINAL Complaint)
Formal Probation
Supervision
Type: Formal Probation
Start Date: 03/30/2023
Term: 24 Months
End Date: *02/09/2024*
Status: Terminated Unsuccessfully (InActive)
Status Date: 02/09/2024
Comment (With credit for time served of 15 days (83 actual + 82 conduct))

Held;
Journal Entry Details:
*Recall Warrant Defendant Deceased;*
*Held*

02/09/2024

**Amended Sentence** (Judicial Officer: LaForge. Robert M) Reason: Sentence Modified
001. FELON W/AMMO (ORIGINAL Complaint)
Formal Probation

Supervision
Type: Formal Probation
Start Date: 03/30/2023
Term: 24 Months
End Date: *02/09/2024*
Status: Terminated Unsuccessfully (InActive)
Status Date: 02/09/2024
Comment (With credit for time served of 15 days (83 actual + 82 conduct))

02/09/2024 Notice of Death Filed

02/07/2024 Notice of Death - Received

05/26/2023 Probation request to Summarily Revoke Probation & Issue Benc (Judicial Officer: LaForge, Robert M )

05/26/2023 Warrant Issued

05/26/2023 **Bond Setting**
No Bail

03/30/2023 **Sentencing** (9:00 AM) (Judicial Officer: LaForge, Robert M ;Location: Courtroom 9)
Resource: Court Reporter Chalk, Robyn
Resource: Courtroom Clerk Albright, Cathleen
Resource: Location Courtroom 9

**MINUTES**
**Disposition** (Judicial Officer: LaForge, Robert M)
002. OBSTRUCT/ETC PUB OFCR/ETC (ORIGINAL Complaint)
Dismissal
Charge #: 002 Allegation:

**Sentence** (Judicial Officer: LaForge, Robert M)
001. FELON W/AMMO (ORIGINAL Complaint)
Formal Probation
Supervision
Type: Formal Probation
Start Date: 03/30/2023
Term: 24 Months
End Date: 03/30/2025
Status: Summarily Revoked ()
Status Date: 05/26/2023
Condition

1. Defendant is to participate and complete programs of, assistance and counseling as directed by Probation Officer, jail; regarding risk factors, 03/30/2023, Active 03/30/2023
2. Provide two blood and saliva samples pursuant to 296 PC. for DNA Testing, 03/30/2023, Active 03/30/2023
3. Defendant is to submit to warrantless search and seizure of, person, property, personal business or vehicle at any time of the day or night.. 03/30/2023, Active 03/30/2023
4. Defendant is to submit to warrantless search and seizure of, residence anytime day or any reasonable hour of the night by any probation officer or law enforcement officer.. 03/30/2023, Active 03/30/2023
5. Including any and all electronic devices. , passwords, phones, computer, etc, 03/30/2023, Active 03/30/2023
6. Submit to random chemical testing as directed either, by Probation or Law Enforcement.. 03/30/2023, Active 03/30/2023
7. Do not possess or use any alcohol, 03/30/2023, Active

03/30/2023
8. Do not possess or use controlled substances or associated, paraphernalia without a valid prescription, 03/30/2023, Active 03/30/2023
9. Stay out of places where alcohol is the primary item of sale, 03/30/2023, Active 03/30/2023
10. Seek/maintain employment or enroll in educational program, 03/30/2023, Active 03/30/2023
11. Defendant is not to own, possess, have under custody or, control any firearms or ammunition pursuant to Federal and State Law., 03/30/2023, Active 03/30/2023
12. Do not possess any weapons, 03/30/2023, Active 03/30/2023
13. Be of good conduct and obey all laws., 03/30/2023, Active 03/30/2023
14. Defendant ordered to report to Probation Department, by: today if (released) before 5 pm, 03/30/2023, Active 03/30/2023
15. Report to Probation Department, within 2 working days of release from custody., 03/30/2023, Active 03/30/2023
16. Pay restitution fine of, STAYED, Inability to pay, $300.00, 03/30/2023, Active 03/30/2023
17. Restitution fine per 1202.44 PC, suspended unless, Probation is revoked., $300.00, 03/30/2023, Active 03/30/2023
18. Pay $40 Court Security Fee per 1465.8 PC, STAYED, Inability to pay, 03/30/2023, Active 03/30/2023
19. Pay $30 Criminal Conviction Fee per 70373 GC, STAYED; inability to pay, 03/30/2023, Active 03/30/2023
20. Defendant is to stay away from:, 10381 Hwy 116, Forestville, CA, 03/30/2023, Active 03/30/2023
21. Participate and complete all treatment recommended, by the Sonoma County Behavioral Health staff/Probation Officer, 03/30/2023, Active 03/30/2023
22. Consent to the sharing of information, including, but not limited to, medical and psychological records, progress reports, and/or medication evaluations between Sonoma County Behavioral Health and the Sonoma County Probation Department, 03/30/2023, Active 03/30/2023
23. Attend all scheduled appointments with Sonoma County, Behavioral Health, 03/30/2023, Active 03/30/2023
24. Take all medications as prescribed by a psychiatrist/, medical doctor in a prescribed manner, 03/30/2023, Active 03/30/2023

Comment (With credit for time served of 15 days (83 actual + 82 conduct))

Probation Report - Filed (Judicial Officer: LaForge, Robert M )

Prohibited Persons Relinquishment Form Findings Filed

Held:

Journal Entry Details:

*Deputy District Attorney Robert Waner is present. Defendant is present in custody Defense counsel appearing: T. Somers Probation Officer Sierra Grohl is present. gives oral report to court. Probation Report Filed Court has read and reviewed reports and other documents. Defendant waives farmal arraignment. No legal cause why judgment should not be pronounced Defendant having been convicted, Court pronounces sentence. Defendant sentenced Imposition of sentence suspended Balance of counts dismissed Prop 63 - Filed Defendant released from custody:*

*Held*

| | | |
|---|---|---|
| *Parties Present:* | *Plaintiff* | *THE PEOPLE OF THE STATE OF CALIFORNIA* |
| | *Conflict Counsel* | *SOMERS, THEODORE PETER* |
| | *Attorney* | *Office of the District Attorney County of Sonoma* |
| | *Defendant* | *Detweiler, Nicholas Haritoudis* |

03/30/2023 Prohibited Persons Relinquishment Form Findings Filed

03/30/2023 Probation Report - Filed (Judicial Officer: LaForge, Robert M )

03/30/2023 **Sentence** (Judicial Officer: LaForge, Robert M)
001. FELON W/AMMO (ORIGINAL Complaint)
Formal Probation
Supervision
Type: Formal Probation
Start Date: 03/30/2023
Term: 24 Months
End Date: 03/30/2025
Status: Summarily Revoked ()
Status Date: 05/26/2023
Condition

1. Defendant is to participate and complete programs of, assistance and counseling as directed by Probation Officer, jail; regarding risk factors, 03/30/2023, Active 03/30/2023
2. Provide two blood and saliva samples pursuant to 296 PC. for DNA Testing, 03/30/2023, Active 03/30/2023
3. Defendant is to submit to warrantless search and seizure of, person, property, personal business or vehicle at any time of the day or night., 03/30/2023, Active 03/30/2023
4. Defendant is to submit to warrantless search and seizure of, residence anytime day or any reasonable hour of the night by any probation officer or law enforcement officer., 03/30/2023, Active 03/30/2023
5. Including any and all electronic devices, , passwords, phones, computer, etc, 03/30/2023, Active 03/30/2023
6. Submit to random chemical testing as directed either, by Probation or Law Enforcement., 03/30/2023, Active 03/30/2023
7. Do not possess or use any alcohol. 03/30/2023, Active 03/30/2023
8. Do not possess or use controlled substances or associated, paraphernalia without a valid prescription. 03/30/2023, Active 03/30/2023
9. Stay out of places where alcohol is the primary item of sale, 03/30/2023, Active 03/30/2023
10. Seek/maintain employment or enroll in educational program, 03/30/2023, Active 03/30/2023
11. Defendant is not to own, possess, have under custody or, control any firearms or ammunition pursuant to Federal and State Law., 03/30/2023, Active 03/30/2023
12. Do not possess any weapons, 03/30/2023, Active 03/30/2023
13. Be of good conduct and obey all laws., 03/30/2023, Active 03/30/2023
14. Defendant ordered to report to Probation Department, by: today if (released) before 5 pm, 03/30/2023, Active 03/30/2023
15. Report to Probation Department. within 2 working days of release from custody., 03/30/2023, Active 03/30/2023
16. Pay restitution fine of, STAYED. Inability to pay. $300.00. 03/30/2023, Active 03/30/2023
17. Restitution fine per 1202.44 PC, suspended unless. Probation is revoked.. $300.00, 03/30/2023, Active 03/30/2023
18. Pay $40 Court Security Fee per 1465.8 PC, STAYED, Inability to pay, 03/30/2023, Active 03/30/2023
19. Pay $30 Criminal Conviction Fee per 70373 GC, STAYED; inability to pay, 03/30/2023, Active 03/30/2023
20. Defendant is to stay away from:, 10381 Hwy 116, Forestville, CA, 03/30/2023, Active 03/30/2023
21. Participate and complete all treatment recommended, by the Sonoma County Behavioral Health staff/Probation Officer, 03/30/2023, Active 03/30/2023
22. Consent to the sharing of information, including, but not limited to, medical and psychological records, progress reports, and/or medication evaluations between Sonoma County Behavioral Health and the Sonoma County Probation Department, 03/30/2023, Active 03/30/2023

23. Attend all scheduled appointments with Sonoma County, Behavioral Health, 03/30/2023, Active 03/30/2023
24. Take all medications as prescribed by a psychiatrist/, medical doctor in a prescribed manner, 03/30/2023, Active 03/30/2023
Comment (With credit for time served of 15 days (83 actual + 82 conduct))

03/30/2023 **Disposition** (Judicial Officer: LaForge, Robert M)
002. OBSTRUCT/ETC PUB OFCR/ETC (ORIGINAL Complaint)
Dismissal
Charge #: 002 Allegation:

03/30/2023 Advisement of Flash Incarceration & Waiver Agreement Recvd

03/02/2023 Fingerprint Form Filed

03/02/2023 **PC 1368 Mental Competency Hearing** (8:30 AM) (Judicial Officer: LaForge, Robert M ;Location: Courtroom 9)
Resource: Court Reporter Murray, Michelle
Resource: Courtroom Clerk King, Alice
Resource: Location Courtroom 9

**MINUTES**
Criminal Proceedings Reinstated
Fingerprint Form Filed
Tahl Waiver - Filed (Judicial Officer: LaForge, Robert M )
Party: Defendant Detweiler, Nicholas Haritoudis
Referred to Probation for RPO re: Presentence
*modified*
Referred to Probation for RPO re: Proposition 63
**Plea** (Judicial Officer: LaForge, Robert M)
001. FELON W/AMMO (ORIGINAL Complaint)
*Guilty
Charge #: 001 Allegation:

002. OBSTRUCT/ETC PUB OFCR/ETC (ORIGINAL Complaint)
No Plea
Charge #: 002 Allegation:

**Disposition** (Judicial Officer: LaForge, Robert M)
001. FELON W/AMMO (ORIGINAL Complaint)
Found Guilty - Plea of Guilty/Nolo Contendere
Charge #: 001 Allegation:

Held;
Journal Entry Details:
*Deputy District Attorney Keren Freeberg is present. Defendant present in custody Defense counsel appearing: T. Somers Defendant found mentally competent Defendant pleads Guilty to Count 1 Defendant stipulates to factual basis for plea Court finds factual basis for plea Plea per 1192.5PC Does not waive time 20th day is 3/30/23 Mr. Somers would like to be present for presentence interview :*
*Held*

**SCHEDULED HEARINGS**
**Sentencing** (03/30/2023 at 9:00 AM) (Judicial Officer: LaForge, Robert M ;Location: Courtroom 9)
Resource: Court Reporter Chalk, Robyn
Resource: Courtroom Clerk Albright, Cathleen

Resource: Location Courtroom 9
*Held*
*Parties Present:* *Plaintiff* *THE PEOPLE OF THE STATE OF CALIFORNIA*
*Conflict Counsel* *SOMERS, THEODORE PETER*
*Attorney* *Office of the District Attorney County of Sonoma*
*Defendant* *Detweiler, Nicholas Haritoudis*

03/02/2023 **Disposition** (Judicial Officer: LaForge, Robert M)
001. FELON W/AMMO (ORIGINAL Complaint)
Found Guilty - Plea of Guilty/Nolo Contendere
Charge #: 001 Allegation:

03/02/2023 **Plea** (Judicial Officer: LaForge, Robert M)
001. FELON W/AMMO (ORIGINAL Complaint)
*Guilty
Charge #: 001 Allegation:

002. OBSTRUCT/ETC PUB OFCR/ETC (ORIGINAL Complaint)
No Plea
Charge #: 002 Allegation:

03/02/2023 Referred to Probation for RPO re: Proposition 63

03/02/2023 Referred to Probation for RPO re: Presentence
*modified*

03/02/2023 Tahl Waiver - Filed (Judicial Officer: LaForge, Robert M )
Party: Defendant Detweiler, Nicholas Haritoudis

03/02/2023 Criminal Proceedings Reinstated

01/26/2023 **Arraignment** (8:30 AM) (Judicial Officer: LaForge, Robert M :Location: Courtroom 9)
Resource: Court Reporter Murray, Michelle
Resource: Courtroom Clerk Chester, Lola K.
Resource: Location Courtroom 9

**MINUTES**

Doctor appointed to examine defendant (Judicial Officer: LaForge, Robert M )
*Dr. Broadman 1368. referral attached*
Party: Defendant Detweiler, Nicholas Haritoudis
Criminal Proceedings Suspended (Judicial Officer: LaForge, Robert M )
Party: Defendant Detweiler, Nicholas Haritoudis
Held;
Journal Entry Details:
*Deputy District Attorney Robert Waner is present. Defendant is present in custody Deputy Public Defender Kimberly Fitzgerald is present. In chambers held Bail set $100,000 Court declares a doubt Dr. Broadman appointed to examine defendant Report due 2/17/2023; appointment per 1368 Criminal proceedings suspended;*
*Held*
*Parties Present:* *Plaintiff* *THE PEOPLE OF THE STATE OF CALIFORNIA*
*Attorney* *Office of the District Attorney County of Sonoma*
*Deputy Public Defender* *PUBLIC DEFENDER*
*Defendant* *Detweiler, Nicholas Haritoudis*

01/26/2023 Criminal Proceedings Suspended (Judicial Officer: LaForge, Robert M )
Party: Defendant Detweiler, Nicholas Haritoudis

01/26/2023 Doctor appointed to examine defendant (Judicial Officer: LaForge, Robert M )
*Dr. Broadman 1368. referral attached*
Party: Defendant Detweiler, Nicholas Haritoudis

01/19/2023 **Arraignment** (8:30 AM) (Judicial Officer: LaForge, Robert M ;Location: Courtroom 9)
*PTR - JMHCP*
Resource: Court Reporter Murray, Michelle
Resource: Courtroom Clerk King, Alice
Resource: Location Courtroom 9

**MINUTES**
Held;
Journal Entry Details:
*Deputy District Attorney Christopher White is present. Defendant present in custody Deputy Public Defender Kimberly Fitzgerald is present. Pre Trial Release denied ;*
*Held*

**SCHEDULED HEARINGS**

**Arraignment** (01/26/2023 at 8:30 AM) (Judicial Officer: LaForge, Robert M ;Location: Courtroom 9)
Resource: Court Reporter Murray, Michelle
Resource: Courtroom Clerk Chester, Lola K.
Resource: Location Courtroom 9
*Held*

| | | |
|---|---|---|
| *Parties Present:* | *Plaintiff* | *THE PEOPLE OF THE STATE OF CALIFORNIA* |
| | *Attorney* | *Office of the District Attorney County of Sonoma* |
| | *Deputy Public Defender* | *PUBLIC DEFENDER* |
| | *Defendant* | *Detweiler, Nicholas Haritoudis* |

01/11/2023 **Arraignment** (8:30 AM) (Judicial Officer: Fredricks, Josh M ;Location: Courtroom 9)
*Appearance of defendant*
Resource: Court Reporter Chalk, Robyn
Resource: Courtroom Clerk King, Alice
Resource: Location Courtroom 9

**MINUTES**
PSA Report Referral
*JMHCP*
Held;
Journal Entry Details:
*Deputy District Attorney Keren Freeberg is present. Defendant not present in custody - refusal Deputy Public Defender Kimberly Fitzgerald is present. ;*
*Held*

**SCHEDULED HEARINGS**

**Arraignment** (01/19/2023 at 8:30 AM) (Judicial Officer: LaForge, Robert M ;Location: Courtroom 9)
*PTR - JMHCP*
Resource: Court Reporter Murray, Michelle
Resource: Courtroom Clerk King, Alice
Resource: Location Courtroom 9
*Held*

01/11/2023 PSA Report Referral
*JMHCP*

01/10/2023 **On View** (8:30 AM) (Judicial Officer: Fredricks, Josh M ;Location: Courtroom 9)
Resource: Court Reporter Chalk, Robyn
Resource: Courtroom Clerk King, Alice

Resource: Location Courtroom 9

**MINUTES**
Held;
Journal Entry Details:
*Deputy District Attorney Keren Freeberg is present. Defendant not present in custody - refusal*
*Bail set $22,500 ;*
*Held*

**SCHEDULED HEARINGS**

**Arraignment** (01/11/2023 at 8:30 AM) (Judicial Officer: Fredricks, Josh M ;Location: Courtroom 9)
*Appearance of defendant*
Resource: Court Reporter Chalk, Robyn
Resource: Courtroom Clerk King, Alice
Resource: Location Courtroom 9
*Held*

| | | |
|---|---|---|
| 01/10/2023 | **Bond Setting**<br>Bail Set<br>Any | $22,500.00 |
| 01/09/2023 | Complaint Filed (Judicial Officer: LaForge, Robert M ) | |
| 01/09/2023 | Pre-arraignment Release Denied (Judicial Officer: Chester, Daniel )<br>*Next Hearing Date: N/A* | |
| 01/09/2023 | PSA Report Filed (Judicial Officer: Chester, Daniel ) | |
| 01/08/2023 | **Bond Setting**<br>Jail Bail Setting<br>Any | $20,000.00 |

# Klamath County District Attorney's Office: Offer of Negotiation

Date: **January 4, 2018**

State of Oregon vs Nicholas Detweiler

Attorney for Defendant:

Klamath Co Court Case No. 18CR00989
DA Case No. 0100285
Attorney for State: Andrew Kartchner

The State's following offer of negotiation is a sentencing recommendation that does not bind the court:

| Count # Crime As Charged | | | |
|---|---|---|---|
| 1 Unlawful Use of a Weapon, ORS 166 220(1)(a), C | ☒ Guilty | ☐ Dismissal | ☐ Other |
| 3 Assaulting a Public Safety Officer, ORS 163 208, C | ☒ Guilty | ☐ Dismissal | ☐ Other |
| 4 Menacing, ORS 163 190, A | ☐ Guilty | ☒ Dismissal | ☐ Other |
| 5 Disorderly Conduct in the Second Degree, ORS 166 025, B | ☐ Guilty | ☒ Dismissal | ☐ Other |
| 6 Criminal Mischief in the Second Degree, ORS 164 354, | ☐ Guilty | ☒ Dismissal | ☐ Other |
| Any related violation/traffic citations, if any | | | |

Count # 1 Charge. **Unlawful Use of a Weapon** ORS **166.220(1)(a)**

**DISCHARGE**

Count # 2 Charge: **Assaulting a Public Safety Officer** ORS **163.208**

Grid Block **6D** Sanction Units (if not default)

**Special Factors**

- ☐ 137.700 (M11) Mandatory Min
- ☐ 137 712 Exception(s) to 137.700 (M11)
- ☐ Dispositional Departure, because:
- ☐ Optional Probation, because:
- ☐ Other.
- ☐ 137.717 Presumptive Sentence
- ☐ M57 Presumptive Sentence

13 MONTHS DEPARTMENT OF CORRECTIONS

Notes: Stipulated Grid block 6D (Bucholz) Credit for time served. Eligible for programs.

18CR03899: Dismiss count 1, discharge on counts 2 and 3.

This offer expires at the close of business, June 5.

18CR00989
AGNP
Agreement – Negotiated Plea
9356299

**MONETARY & MISCELLANEOUS**

☒ Fines and statutory assessments $ 1000 (minimum $60 state obligation stated below)

| | | | |
|---|---|---|---|
| *Violation* | *$ 60 (state obligation)* | Misdemeanor | $60 (state obligation) |
| *Felony* | *$ 60 (state obligation)* | DUII | $ 255 surcharge |
| *Ch 163* | *$ 500* | Meth Deliver | $ 500 |
| *Meth Man.* | *$1,000* | Bench Prob | $ 100 |

☒ Attorney Fees $ 500 (credit for any previously imposed attorney fees on this case)

☒ If no probation, Defendant stipulates to forfeiture of evidence

**RESTITUTION (amount as requested by victim)**

| Victim Name | Joint & Several with Co-Defendant (if any): | Co-Def's Case # | Amount |
|---|---|---|---|
| Quin O'Hara | | | TBD |
| Franchesca Maria O'Sullivan | | | TBD |
| Bill Warner | | | TBD |
| Walmart | | | $34.03 |

**PPS**

| |
|---|
| 2 YEARS |

Verified Correct Copy of Original 2018

If Defendant has more than one open case, all offers are contingent upon one another. Defendant must accept all terms of all offers at the time of plea entry. Any and all individual offers are revoked if the defendant does not accept all terms and offers

Unless otherwise noted, in writing, this offer expires if court sets a trial, defense files motion(s), or defense fails to accept within sixty days of the date of this offer or Defendant commits another crime or violates any release terms of this case

Per ORS 135 390(3), if the plea of guilty or no contest is withdrawn under ORS 135.365 or the judgment of conviction is subsequently reversed, vacated or set aside, the court shall reinstate charges that are dismissed pursuant to this agreement The Defense shall provide the court with a written waiver of the statute of limitations and any statutory or constitutional speedy trial or double jeopardy rights, applicable to the dismissed charges

| | | | |
|---|---|---|---|
| Attorney for State: | Andrew Kartchner (Printed) | /s/ Andrew Kartchner (Signature) | May 23, 2018 (Date) |
| Attorney for Def: | J. Guest (Printed) | [signature] (Signature) | 6-7-18 (Date) |

By signing below, Defendant is satisfied with the defense attorney's representation and efforts and understands and agrees to the terms of this Offer of Negotiation

| | | | |
|---|---|---|---|
| Defendant. | Nicholas Detweiler (Printed) | Nicholas Haritoudis (Signature) | 6-7-18 (Date) |
| | Street Address | City | State & Zip |

Verified Correct Copy of Original 6/7/2018.

FILED
STATE OF OREGON
KLAMATH CIRCUIT COURT
2019 JUN -7 AM 11:05
CLERK OF THE COURT
BY

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**
**FOR THE COUNTY OF** KLAMATH

| | | |
|---|---|---|
| STATE OF OREGON, Plaintiff, | ) | **Case No.** 18CR 00989 |
| v. | ) | **Citation No.** ______ |
| Nicholas Detweiler Haritoudis, Defendant. | ) | **PETITION TO PLEAD GUILTY/ NO CONTEST/CONDITIONAL GUILTY PLEA** |

***I am the defendant in this case, and my initials and signature below indicate that I have read or have had read to me, understand, and affirm all of the following:***

1. My full true name is Nicholas Haritoudis, but I also am known as N. Detweiler.
2. I am 26 years old. I have gone to school through GED. Within the past 2 days, I ☐ (have taken) ☑ (have not taken) alcohol, medication, or a drug (whether prescribed for me, over-the-counter, or illegal) that could affect my ability to make decisions. My ability to make decisions is not affected by injury, illness, or disability.
3. ☑ My lawyer's name is Josh Guest. ☐ I choose not to have a lawyer (see *Waiver of Counsel*).
4. I have told my lawyer everything I know about the charge(s) against me. My lawyer has talked with me about the charge(s), possible defenses, and legal challenges I may have in this case. ☑ I am satisfied with the advice and help my lawyer gave me.
5. I know I have the following rights at trial: (1) to have a jury trial or, if I choose not to have a jury trial, the right to have a trial by a judge; (2) to see, hear, and question all people who testify against me; (3) to remain silent about all facts of the case; (4) to call witnesses and enter evidence; (5) to testify; (6) to have the jury told, if I do not testify, that it cannot hold that decision against me; and (7) to require the district attorney to prove my guilt and all sentence enhancement facts to a jury or court beyond a reasonable doubt.
6. I understand that I give up all of the rights listed in paragraph #5 above when I plead either "Guilty" or "No Contest." I understand that I also give up: (1) any defenses I may have to the charge(s); (2) objections to the consideration of evidence concerning my guilt; and (3) challenges to the accusatory instrument.
7. I understand that a plea of "Guilty" or "No Contest" will result in a final conviction for the charge(s) listed in paragraph #8 below. I understand that if I plead "Guilty" or "No Contest," the judge may impose the same punishment as if I pleaded "Not Guilty," had a trial, and was convicted.
8. I want to plead:

☒ Guilty ☑ No Contest
**Count #** 1: Unlawful Use of a Weapon, ☐ Violation / ☐ Misdemeanor / ☑ Felony, Grid Block: [illegible],
Presumptive Sentence: ______, Post-Prison Supervision: ______, Maximum Sentence: 5 yrs,
Maximum Fine: $125,000, Minimum Sentence: ______, Mandatory Fine: ______.

☐ Guilty ☑ No Contest
**Count #** 2: Assaulting a Public Safety Officer ☐ Violation / ☐ Misdemeanor / ☑ Felony, Grid Block: 6D,
Presumptive Sentence: ______, Post-Prison Supervision: ______, Maximum Sentence: 5 yrs.,
Maximum Fine: $125,000, Minimum Sentence: ______, Mandatory Fine: ______.

☐ Guilty ☐ No Contest
**Count #** ___: ______, ☐ Violation / ☐ Misdemeanor / ☐ Felony, Grid Block: ___,
Presumptive Sentence: ______, Post-Prison Supervision: ______, Maximum Sentence: ______,
Maximum Fine: ______, Minimum Sentence: ______, Mandatory Fine: ______.

18CR00989
PTNC
Petition - No Contest Plea
9352214



**Initials** NH

Verified Correct Copy of Original 6/7/2018.

☐ Guilty ☐ No Contest

**Count #** ____: ________________________, ☐ Violation / ☐ Misdemeanor / ☐ Felony, Grid Block: ____, Presumptive Sentence: __________, Post-Prison Supervision: __________, Maximum Sentence: ___________, Maximum Fine: _______________, Minimum Sentence: ______________, Mandatory Fine: ______________.

☐ See attached sheet for additional counts.

If there are multiple charges or I am already serving a sentence, I understand that the judge may order me to serve the sentences at the same time (concurrently) or one after the other (consecutively) unless prohibited by ORS 137.123(5).

9. I agree that my criminal history is accurately reflected on the attached sheet provided by the district attorney. I have noted any convictions with which I disagree on that form. I understand that the judge may use this information to determine and/or enhance my sentence.

10. I understand that, in addition to other fines, the judge may order me to pay ☐ restitution or a ☐ compensatory fine to the victim ☐ totaling $__________, or ☐ an amount to be determined by the judge.

11. I understand that any sentence imposed in this case can be added to any other prison or jail sentence that I have not finished serving.

12. ☐ I understand that the conviction(s) for these charges will result in special sentencing provisions marked on Attachment #1.

13. In addition to the sentence imposed, I understand that there may be other significant consequences if I enter a "Guilty" or "No Contest" plea, including, but not limited to:

- ☐ Deportation/removal, exclusion from future entry into the United States, or denial of naturalization, if I am not a United States citizen;
- ☐ Revocation of my probation or parole, which may require me to serve any sentence(s) imposed or executed in any such case(s) consecutively to the sentence that is imposed in this case;
- ☐ Registration and reporting as a sex offender;
- ☐ Providing a DNA sample;
- ☐ Suspension, revocation, or permanent loss of my driving privileges (see Attachment #1);
- ☐ Test for HIV or other communicable diseases;
- ☐ Prohibition from leaving the state without first requesting transfer of supervision under the provisions of the Interstate Compact for Adult Offender Supervision;
- ☐ Forfeiture of any firearm or deadly weapon that was possessed, used, or available for use during the crime;
- ☐ Loss of my right to possess, receive, ship, or transport any firearm or firearm ammunition if I am convicted of an offense involving domestic violence, as defined by ORS 135.230. This conviction may negatively affect my ability to be employed in law enforcement or serve in the Armed Forces of the United States.

14. Other than what is contained in this plea petition, I affirm that no one has promised me anything to enter my plea of "Guilty" or "No Contest." I also affirm that no one has threatened me or forced me to enter this plea.

15. ☑ I understand that the district attorney agrees to make the following recommendation to the court about my sentence and/or other pending charges: Attached

I understand that the court is not bound by any plea agreement I have made with the district attorney unless made pursuant to ORS 135.432(2) (court approved plea agreement). This recommendation ☐ (is) ☑ (is not) made pursuant to ORS 135.432(2). This recommendation ☐ (is) ☑ (is not) made pursuant to ORS 135.405(5) (early disposition program). I understand that if this agreement includes recommendations to be made at

sentencing, these recommendations may depend upon my true criminal history. I understand that the district attorney will not be bound by this agreement if I willfully fail to appear for sentencing. ***I acknowledge that everything that has been agreed to is included in this document or incorporated by reference.***

16. ☐ I understand that I may be asked to relate the circumstances surrounding the criminal activity that is the subject of this plea to a pre-sentence investigation writer.

17. ☐ **I PLEAD "GUILTY"** because in ______________ County, Oregon, I did the following: ______

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

18. ☑ **I PLEAD "NO CONTEST"** because I understand that a jury or judge could find me guilty of the charge(s). I prefer to accept the plea offer or plead to the charge.

19. ☐ I am entering a **CONDITIONAL PLEA** pursuant to ORS 135.335(3) and reserve for appeal the following pretrial rulings: ______________________________________________

______________________________________________________________________

______________________________________________________________________

20. **APPEAL RIGHTS:** Unless this is a conditional plea, I understand the right to appeal my conviction is limited and that I may appeal only if I can make a colorable showing that the sentence exceeds the maximum allowed by law or is unconstitutionally cruel and unusual. If I am financially eligible for court-appointed counsel, I may apply to the court to appoint an attorney to represent me on appeal, to request a transcript of this proceeding, and to have my trial attorney give the Office of Public Defense Services the information necessary to pursue my appeal. I know that I must serve and file the notice of appeal not later than **30 days** after the judgment of conviction is entered in the register, and I may ask my attorney to help me do this. Copies of the notice of appeal must be served on the district attorney, the trial court transcript coordinator (if a transcript is required), and the clerk of the trial court. The original notice and proof of its service must be filed with the clerk of the court to which I am appealing.

21. ☐ I agree that if I withdraw or if a court later reverses, vacates, or sets aside my plea of "Guilty" or "No Contest" in this case, the court will reinstate any charge(s) that were dismissed in return for my plea and the district attorney no longer will be bound by any promises made to me in exchange for my plea. If the court reinstates the charge(s), I waive the statute of limitations and any statutory or constitutional speedy trial or double jeopardy rights applicable to the dismissed charges.

22. I am signing this plea petition and entering this plea voluntarily, intelligently, and knowingly with full understanding of all matters set forth in the charging instrument and in this petition.

23. I declare that:

☑ I can read, speak, and understand English.

☐ This form was read to me by (print name): ______________________________

______________ ______________________________
Date Reader's Signature

☐ This form was sight translated to me by (print name): ______________________

______________ ______________________________
Date Translator's Signature

6-7-18 Nicholas Haritoudis
**Date** **Defendant's Signature**

______________________________________________________________________
Mailing Address City State Zip



Verified Correct Copy of Original 6/7/2018

Verified Correct Copy of Original 6/7/2018.

**CERTIFICATE OF COUNSEL**

***I am the attorney for the defendant in this proceeding and I certify that:***

1. I have fully explained to my client the named offenses and lesser-included offenses contained in the charging instrument, and the possible defenses that may apply in this case.
2. I have personally examined the attached *Petition to Plead Guilty/No Contest*, explained all its provisions to my client, and discussed fully with my client all matters described and referred to in the petition.
3. I have explained to my client the maximum penalty and other consequences of entering a guilty or no contest plea, including possible immigration consequences.
4. To the best of my knowledge and belief, my client's decision to enter this plea is made voluntarily, intelligently, and knowingly.
5. I have told my client that if he or she is eligible for court-appointed counsel and wishes to pursue an appeal, I will transmit the information necessary to perfect the appeal to the Office of Public Defense Services.

6-07-2018 — Date

[signature] — Attorney's Signature

144874 — OSB No.

Case No. 18CR00989

**FINDINGS**

The court makes the following findings regarding the defendant's plea of ☐ Guilty ☐ No Contest:

☐ Defendant's plea is made voluntarily, intelligently, and knowingly.

☐ Other: ______________________________

______________________________

______________________________

**ORDER**

DEFENDANT'S PLEA PETITION IS HEREBY ACCEPTED.

______________ Date

______________ Circuit Court Judge

______________ Print, Type, or Stamp Name of Judge

_Verified Correct Copy of Original 2/22/2023._

FILED
STATE OF OREGON
KLAMATH CIRCUIT COURT
2023 FEB 17 AM 11:38
CLERK OF THE COURT

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

| | |
|---|---|
| STATE OF OREGON,<br>Plaintiff,<br>vs.<br>NICHOLAS DETWEILER HARITOUDIS,<br>Defendant. | Case No. **23CR08735** **Judge: Kersey, Alycia Edgewo**<br>Police No. KFP 22-2548<br>DA Case No. 0117742<br>AFFIDAVIT FOR ARREST WARRANT (PROBABLE CAUSE) |

I, Cameron Hansen, a Deputy District Attorney for Klamath County, being first duly sworn depose and say:

The accompanying accusatory instrument is based upon information set forth in the attached copy of a police report and incorporated herein.

I have reviewed the report and believe that the report contains information which will establish probable cause and show facts constituting the crimes of:

Count 1. Theft in the Second Degree, ORS 164.045

I believe that the defendant is the person who committed the aforementioned crime(s).





23CR08735
AFAW
Affidavit – Arrest Warrant
16377177

_Verified Correct Copy of Original 2/22/2023._

Based upon the information within I move the Court for a Warrant of Arrest of the Defendant herein.

DATED this 16th day of February, 2023.

/s/ Cameron Hansen
OSB # 220056

SUBSCRIBED AND SWORN to before me this 17th day of February, 2023

[signature]

NOTARY PUBLIC FOR OREGON
My Commission Expires: May 10, 2026

OFFICIAL STAMP
COLLEEN D. CRIST
NOTARY PUBLIC – OREGON
COMMISSION NO. 1023733
MY COMMISSION EXPIRES MAY 10, 2026

Verified Correct Copy of Original 2/22/2023.

**KLAMATH FALLS POLICE DEPARTMENT**
2501 SHASTA WAY
KLAMATH FALLS, OR 97601
(541) 883-5336

# INCIDENT REPORT

| CASE NUMBER | SUPPLEMENT NUMBER |
|---|---|
| 2202548 | |
| CASE TYPE | CAD EVENT NUMBER |
| THEFT | 2210010090 |
| REPORTING OFFICER | REPORT DATE |
| 58872 - ROBINSON, THURMAN | 10/01/2022 |

## INCIDENT

| LOCATION | | | | OCCURRED | DATE | TIME | DAY |
|---|---|---|---|---|---|---|---|
| PINE ST / N 7TH ST , KLAMATH FALLS, OR 97601 | | | | ON OR FROM | 10/01/2022 | 12:03 | SAT |
| PREMISE NAME | | | JURISDICTION KFPD | TO | 10/01/2022 | 12:03 | SAT |
| BEAT 1 | | | | REPORTED | 10/01/2022 | 12:03 | SAT |

NATURE OF INCIDENT

- ☐ ALCOHOL RELATED ☐ SENIOR CITIZEN ☐ HATE / BIAS ☐ ARSON ☐ CHILD ABUSE
- ☐ GANG RELATED ☐ OFFICER ASSAULT ☐ DRUG RELATED ☐ DOMESTIC VIOLENCE ☐ JUVENILE

RELATED CASE NUMBERS

## SYNOPSIS

On Saturday, October 1st, 2022, Talisa Lewis reported her wallet was stolen along with $148, from her seat on the Basin Transit Services bus.

## ADDITIONAL INFORMATION

| | |
|---|---|
| ☒ CANVAS NEIGHBORHOOD | ☐ OFFICER PURSUIT |
| ☒ EVIDENCE SEARCH | ☐ OFFICER INITIATED |
| ☐ CNP CHRONIC NUISANCE PROP | ☒ ELEA ENHANCED LE AREA |
| RESPONSE TO FORCE | |

## STATUS

| CASE STATUS | CASE STATUS DATE | DISPOSITION | DISPOSITION DATE | APPROVAL | APPROVAL DATE |
|---|---|---|---|---|---|
| INACTIVE | 10/02/2022 | INA | 10/02/2022 | 44243 - FOREMAN, JOSEPH E | 10/15/2022 |

_Verified Correct Copy of Original 2/22/2023._

FILED
STATE OF OREGON
KLAMATH CIRCUIT COURT
2023 FEB 17 AM 11:38
CLERK OF THE COURT

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

| | |
|---|---|
| STATE OF OREGON, Plaintiff, | Case No. **23CR08735** **Judge: Kersey, Alycia Edgewo** |
| vs. | Police No. KFP 22-2548 |
| NICHOLAS DETWEILER HARITOUDIS, Defendant. | DA Case No. 0117742<br>Arresting Officer: Robinson |
| | INFORMATION |

The defendant is accused by this Accusatory Instrument of the offenses of:

THEFT IN THE SECOND DEGREE
COUNT 1 (164.045)
Class A Misdemeanor
The defendant, Nicholas Detweiler Haritoudis, on or about October 1, 2022, in Klamath County, Oregon, did unlawfully and intentionally commit theft of a wallet, of the total value of one hundred dollars or more, the property of Talisa Maize Lewis.

All of the above-described conduct being contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon.

The state further alleges the above listed offenses are of the same or similar character, and/or are all based on the same act or transaction, and/or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

DATED: Thursday, February 16, 2023
Ellen F. Rosenblum
Attorney General, Interim Klamath County District Attorney



Klamath County District Attorney's Office
316 Main Street, Room 135, Klamath Falls, OR 97601 (541) 883-5147

23CR08735
IF
Information
16377171

_Verified Correct Copy of Original 2/22/2023._

Paul D Bostwick, OSB #: 173092
Deputy District Attorney

IDENTIFIERS: W/M Ht: 6'01 Wt: 230 Hair: BLN Eyes: BRO DOB: 12/04/1991 SID #: 21013056

Address: 1040 California Ave, Klamath Falls, OR 97601

By this pleading, we are requesting that you provide the State with the following information within your possession or control: (ORS 135.835)

1. The names and addresses and dates of birth of all persons including the defendant, who you intend to call as witnesses at the trial, any oral statements of such persons other than the defendant;

2. Any reports or statements of experts made in connection with the particular case, including results of physical or mental examination and of scientific tests, experiments or comparisons, which the defendant intends to offer in evidence at the trial;

3. Any books, papers, documents, photographs, or tangible objects which the defendant intends to offer in evidence at the trial.

Please make the above information available at least 10 days prior to trial.

Regarding your discovery:

A. If your defendant is charged with DUII (with an intoxilyzer) or DWS, we will introduce documents relative to the intoxilyzer or the suspension notice. You can examine these documents by personally appearing and requesting examination at our office with 24 hours prior notification.

B. Our case file is open to your personal inspection at all reasonable times, with 24 hour notification. It contains the relevant discovery information and a list of names and addresses of witnesses. If the case is a traffic crime or infraction, the State intends to call, among others, the officer who signed the citation.

C. Police officers listed as witnesses may maintain a personal notebook which might contain additional information which is not in our files. You can inspect these notes by contacting the officer at the police office.

D. If for any reason you desire further information not available through this receipt, you should request the court to supervise the discovery proceeding as provided in ORS 135.845

E. If you have a case where audio/video disc or digital photographs have been made and you want a copy of them, please request that the discovery secretary order a copy for you. Please make your request at least 10 days prior to trial.



Klamath County District Attorney's Office
316 Main Street, Room 135, Klamath Falls, OR 97601 (541) 883-5147

_Verified Correct Copy of Original 2/22/2023._

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

| | |
|---|---|
| STATE OF OREGON,<br>Plaintiff,<br>vs.<br>NICHOLAS DETWEILER HARITOUDIS,<br>Defendant. | Case No. 23CR08735<br>Judge: Kersey, Alycia Edgewo<br>Police No. KFP 22-2548<br>DA Case No. 0117742<br>ARREST WARRANT (PROBABLE CAUSE)<br>Location: Oregon |

IN THE NAME OF THE STATE OF OREGON. To any peace officer in the State of Oregon:

YOU ARE COMMANDED to arrest the above-named defendant forthwith and bring the said Defendant before me, or, in case of my absence or inability to act, before the nearest most accessible magistrate in this county, or if no magistrate is available, to deliver said Defendant into the custody of the Jailer of this county, to answer for the charge(s):

Count 1. Theft in the Second Degree, ORS 164.045

THE ARRESTING OFFICER IS AUTHORIZED to enter premises that the officer has probable cause to believe that defendant is present without giving notice of authority and purpose.

**BAIL/SECURITY: $** cite





23CR08735
PPWT
Warrant – Proposed
16377187

_Verified Correct Copy of Original 2/22/2023._

IT IS SO ORDERED.

2/22/2023 3:08:37 PM

Marci W. Adkisson

Circuit Court Judge Marci W. Adkisson

| | |
|---|---|
| ☐ | WILL EXTRADITE |
| ☐ | WILL EXTRADITE FROM ADJACENT STATES ONLY; NO BAIL/SECURITY |
| ☐ | ENTER INTO L.E.D.S. ONLY |
| ☒ | CITATION IN LIEU OF ARREST |

**RETURN OF SERVICE**

The undersigned peace officer hereby returns this warrant having arrested the defendant on ______________________, and having the defendant now in custody before the Court.

____________________________________

Arresting Officer

Arresting Agency Case #: KFP/22-2548
DA No: 0117742

IDENTIFIERS: **Detweiler Haritoudis, Nicholas**
W/M Ht: 6'01 Wt: 230 Hair: BLN Eyes: BRO DOB: 12/04/1991
SID:21013056 OLN: B030073
Address : 1040 California Ave, Klamath Falls, OR 97601

Victim(s): Talisa Maize Lewis

# EXHIBIT "E"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--o0o--

| | | |
|---|---|---|
| JULIA DETWILER, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.: 2:24-cv-03100-SCR |
| CITY OF MT. SHASTA, et al., | ) | |
| Defendants. | ) | |

--o0o--

Videotaped Deposition Of

JULIA DETWEILER

Friday, April 17, 2026

--o0o--

CERTIFIED TRANSCRIPT

26-172
Stenographically Reported By:
DEBORAH FUQUA, CSR #12948

APPEARANCES

For the Plaintiff:

LAW OFFICES OF DALE K. GALIPO
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818-347-8888
By: BENJAMIN S. LEVINE, Attorney at Law
blevine@galipolaw.com

For Defendants City of Mt. Shasta and Jeremiah Capurro:

ANGELO, KILDAY & KILDUFF, LLP
601 University Avenue, Suite 150
Sacramento, California 95825
916-564-6100
By: DERICK E. KONZ, Attorney at Law
dkonz@akk-law.com

For Defendants Amtrak and Bruce Garrett (appearing via Zoom):

SIMS LAW FIRM, LLP
19712 MacArthur Boulevard, Suite 120
Irvine, California 92612
949-253-7900
By: MICHAEL E. MURPHY, Attorney at Law
mmurphy@sms-law.com

The Videographer:

VINNY BEZERRA
VALLEY VIDEO
916-833-3597
info@vlvpro.com

INDEX OF EXAMINATION

Page Number
EXAMINATION BY MR. KONZ ............ 6
EXAMINATION BY MR. MURPHY .......... 240
FURTHER EXAMINATION BY MR. KONZ .... 314
FURTHER EXAMINATION BY MR. MURPHY .. 334

--o0o--

Page Number
Deponent's Signature Page ................... 340
Deponent's Changes or Corrections ........... 341
Reporter's Certificate ...................... 342
Deponent's Review Letter .................... 343
Disposition of Original Transcript Letter ... 344

--o0o--

BE IT REMEMBERED THAT, pursuant to Notice of Taking Deposition, and on Friday, April 17th, 2026, commencing at the hour of 10:05 o'clock a.m. thereof, at 1410 Neotomas Avenue, Santa Rosa, California, before me, DEBORAH FUQUA, a Certified Shorthand Reporter of the State of California, personally appeared

JULIA DETWEILER,

called as a witness by the defendants, having been by me first duly sworn, was examined and testified as hereinafter set forth.

--o0o--

THE VIDEOGRAPHER: Good morning. We are on the record at 10:05 a.m. The date is April 17th of 2026. We are located at 1410 Neotomas Avenue, Santa Rosa, California. We are here in the matter of Julia Detweiler versus City of Mt. Shasta, filed in the United States District Court, Eastern District of California, Case Number 2:24-cv-03100-SCR. This is the deposition of Julia Detweiler. 10:05

My name is Vinny Bezerra, the videographer, with Valley Legal Video located in Sacramento, California. 10:06

Would our counsel please identify 10:06

themselves and whom they represent?

MR. LEVINE: Benjamin Levine, counsel for plaintiff. 10:06

MR. KONZ: Derick Konz for the City of Mt. Shasta and Officer Capurro. 10:06

MR. MURPHY: Mike Murphy for Bruce Garrett and Amtrak. 10:06

THE VIDEOGRAPHER: Will the court reporter please introduce herself and swear in the witness. 10:07

THE REPORTER: Good morning. My name's Deborah Fuqua. I am a California certified shorthand reporter, License Number 12948, and I'm your deposition officer for today. 10:07

Will you please raise your right hand. 10:07

(Witness sworn) 10:07

EXAMINATION BY MR. KONZ 10:07

MR. KONZ: Q. Okay. Good morning, Ms. Detweiler. My name's Derick Konz, and we're here for your deposition in the federal civil case that you filed against the City of Mt. Shasta, Officer Capurro, Bruce Garrett, and Amtrak. Do you understand you filed this -- a federal civil lawsuit against those people related to the death of your son? 10:07

A. Yes, I do. 10:07

MR. KONZ: Q. You never heard of this? 14:14
A. No. 14:14
Q. Okay. Do you recall in 2016 -- he's about 24, right -- calling the police on Nick? 14:14
A. Who called the police? 14:14
Q. You. 14:14
A. What does it say? 14:14
Q. Well, I'm curious to know what you remember before I tell you. 14:14
A. I don't remember. 14:14
Q. You don't remember calling the police on Nick when he was about 23, 24 years old, 25? 14:14
MR. LEVINE: Asked and answered. 14:14
THE WITNESS: I don't remember. 14:14
MR. KONZ: Q. Do you recall him breaking down your door? 14:14
A. To my apartment? Yes. 14:14
Q. Okay. 14:14
Q. Do you recall him saying that he wanted to kill some sheriffs? 14:15
MR. LEVINE: Assumes facts. 14:15
THE WITNESS: No, I don't. 14:15
MR. KONZ: Q. Do you recall him breaking down your door and having a knife? 14:15
MR. LEVINE: Assumes facts. 14:15

THE WITNESS: I don't remember a knife, but I remember that he broke my door down. He was upset because he didn't know where I was for like two, three weeks. 14:15
MR. KONZ: Q. So you don't recall him threatening to harm law enforcement? 14:15
MR. LEVINE: Asked and answered. 14:15
THE WITNESS: No, because I would have been part of that, had knowledge of that. No. 14:15
MR. KONZ: Q. Okay. But you do recall him breaking your door down? 14:16
MR. LEVINE: Asked and answered. 14:16
MR. KONZ: Q. Right? 14:16
A. Correct. 14:16
Q. And do you recall him having a knife? 14:16
MR. LEVINE: Asked and answered. 14:16
THE WITNESS: I don't remember any knife. 14:16
MR. KONZ: Q. How did he break the door down? Was it -- is -- well, first of all, is it the front door to the house or your bedroom door? 14:16
A. No, he was upset at -- it was my bedroom. 14:16
MR. LEVINE: He's just asking which door. 14:16
MR. KONZ: Q. The bedroom door? 14:16
A. Mm-hmm. 14:16
Q. Was it locked? 14:16

A. No. We didn't lock those. 14:16
Q. Did he -- how did he break the door down? 14:16
Did he kick it in? What did he do?
MR. LEVINE: Lacks foundation. 14:16
THE WITNESS: He just hit it and broke it, 14:16
and that was that.
MR. KONZ: Q. And that prompted you to 14:16
call the police?
MR. LEVINE: Lacks foundation, assumes 14:16
facts.
THE WITNESS: That was destroying 14:16
property.
MR. KONZ: Q. Did you feel like he was 14:16
threatening to you?
A. No. 14:17
MR. LEVINE: Vague, misstates testimony. 14:17
MR. KONZ: Q. Did you feel like your 14:17
physical well-being was in danger?
A. No. I was upset about a hundred-year-old 14:17
door.
Q. Well, why wouldn't you just work that out 14:17
with Nick rather than call the police?
MR. LEVINE: Vague, argumentative, calls 14:17
for speculation.
MR. KONZ: Q. You're sure he wasn't 14:17

threatening you?

MR. LEVINE: Asked and answered. 14:17

THE WITNESS: No, I don't remember him threatening me. 14:17

MR. KONZ: Q. Okay. Do you remember an incident -- and just, if you don't know, you don't know. You -- I don't think you were there for this. But I'm just curious how much you know about your son's history. 14:17

2017. Okay? He's 25 years old. He's living in Klamath Falls. Does that sound right? 14:18

A. Probably. 14:18

Q. Okay. And he was arrested for shoplifting. Do you remember ever hearing anything about that? 14:18

A. A roll of paper towels. 14:18

Q. And then when the police came, he ran from them. Did you ever hear about that allegation? 14:18

MR. LEVINE: Assumes facts. 14:18

THE WITNESS: I don't know the circumstance of any of this. 14:18

MR. KONZ: Q. This is -- are you hearing this for the first time? 14:18

A. I know that there was a thing with Walmart and a thing of paper towels and them trying to 14:18

charge us like 300 bucks or something for the paper towels, one role of paper towels.

MR. KONZ: Q. Do you know he was convicted of evading an officer and for shoplifting? 14:19

MR. LEVINE: Assume facts. 14:19

MR. KONZ: Q. Are you aware of that? 14:19

A. Not really, no. 14:19

Q. Are you aware that one of the allegations was that he told the officer that he was going to rip his face off? 14:19

MR. LEVINE: Assumes facts. 14:19

THE WITNESS: No, I'm not aware. 14:19

MR. KONZ: Q. Did you follow this case at all? 14:19

MR. LEVINE: Vague. 14:19

THE WITNESS: No. 14:19

MR. KONZ: Q. Okay. Are you aware that your daughter applied for a restraining order against your son? 14:19

A. Yes, I know some that she did. 14:19

Q. How many times did she apply for a restraining order against him, as far as you know? 14:19

A. I think once. I'm not terribly sure if that's accurate. 14:20

Q. Was that in 2018, approximately? 14:20
MR. LEVINE: Lacks foundation. 14:20
THE WITNESS: I think so. Somewhere in there. 14:20
MR. KONZ: Q. Did you support that? 14:20
MR. LEVINE: Vague. 14:20
THE WITNESS: That was her decision, and I didn't see why there would be strict -- she would need to get a restraining order when they lived in two different states. But maybe I'm wrong. 14:20
Q. My question was did you support that? Did you think that that was a good idea? 14:20
MR. LEVINE: Same objection. 14:20
THE WITNESS: I didn't really see there was a reason for it when he lived one state away. He wasn't in her backyard. He never really went to visit her. He didn't show up in town to see her. 14:20
MR. KONZ: Q. Okay. 14:21
A. I mean, people try to get restraining orders that need restraining orders that can't get restraining orders, and -- 14:21
MR. LEVINE: I think you answered it, Julia. 14:21
MR. KONZ: Q. You don't think that -- I mean, I'll just tell you. Your daughter, in the 14:21

Q. No, you are confused, because you haven't -- 15:03
A. No, I'm not. 15:03
Q. You don't understand my question. The question is -- 15:03
A. Have you laid your son to rest? 15:03
MR. LEVINE: Guys, guys. 15:03
THE WITNESS: Have you buried your son without a funeral? 15:03
MR. LEVINE: Julia, Julia, Julia. 15:03
THE WITNESS: Have you? 15:03
MR. LEVINE: Julia, please. Just listen to the question. And if you don't remember the answer -- 15:03
THE WITNESS: I don't remember. I don't recall, and I don't know. 15:03
MR. KONZ: Q. You don't re- -- okay. Okay. 15:03
A. Because I don't know what we're talking about. 15:03
Q. Well, all I'm saying is I have some information that, in 2023, you called the police and said that Nick tried to kill you. In 2023, did Nick threaten to kill you? 15:03
MR. LEVINE: Assumes facts. 15:04

THE WITNESS: I know there was an incident, and I don't know if I mixed that up with this -- 15:04
MR. KONZ: Q. Just a yes-or-no question. 15:04
A. -- on my answers. That's why I'm 15:04
trying to -- 15:04
Q. In 2023, did Nick threaten to kill you? 15:04
A. Possibly, yes. 15:04
Q. Okay. And did you report that to the police? 15:04
A. If he did, I would have. 15:04
MR. LEVINE: Don't speculate. 15:04
MR. KONZ: Q. Okay. And how did that occur? Were you guys at home together? What were the -- what's the context behind this threat? 15:04
MR. LEVINE: Lacks foundation, calls for speculation. 15:04
THE WITNESS: I think he might have went off because of the situation of getting arrested on E, which he -- probably that had to do with him basically, on E, of -- if this was July -- 15:04
MR. KONZ: Q. Ma'am, I'm asking about your memory. I don't -- it doesn't matter what's in those documents. I'm just asking what you recall. 15:04

A. I do have a memory. 15:05
Q. Okay. So you have a memory, in 2023, of him threatening to kill you? 15:05
A. Wait a minute. I'm trying to find the date on this. 15:05
Q. Can I have those? Can we take those away? This is just causing -- 15:05
(Reporter interruption) 15:05
MR. KONZ: Q. In 2023, did your son threaten kill you? 15:05
A. Possible, yes. 15:05
Q. Do you have a specific recollection of that? 15:05
A. Not clearly because I think I'm mixed up on dates of incidences, so I can't speculate. I -- I don't -- 15:05
Q. Do you have any -- what -- do you have any recollection at all that you can tell me about him threatening to kill you, like, where you were, exactly what he said, anything? 15:05
MR. LEVINE: Assumes facts. 15:05
THE WITNESS: I know that he was a little bit off that day. And I know that, you know, I think he might have been angry on the prior incident of him getting arrested. I haven't read 15:06

through the other report.

And I haven't read through this report, so I think I'm a little confused in what I might have testified on the other report. So that's all I'm I saying. 15:06

MR. KONZ: Q. You don't have any particular details that you remember about him threatening you in 2023 that, regardless what's in the papers, that you have in your memory? 15:06

MR. LEVINE: Asked and answered. 15:06

MR. KONZ: Q. Do you have any particular memory of that? And if so, what do you recall? 15:06

MR. LEVINE: Same objection. 15:06

THE WITNESS: I think it was an incident of him coming to my bedroom. And I think I left to go get him mental health again. 15:06

MR. KONZ: Q. You don't recall calling the police? 15:06

A. I don't know if I called them or not or if I went there in person. 15:07

Q. Do you recall talking to a security guard at Safeway in 2023 about Nick? 15:07

A. Yes, I do. 15:07

Q. Okay. And what do you recall telling the security guard? 15:07

A. I think I told her that Nick was acting off and that I needed to get him down to mental health and that I was -- I was going to try to -- try to get the police to take him in for mental health. 15:07

Q. Did you call any mental health professional? 15:07

MR. LEVINE: Vague. 15:07

THE WITNESS: It was late in the evening. I don't think there's any mental health. 15:07

MR. KONZ: Q. Did you try? 15:07

A. No. I think I went to law enforcement -- talked to law enforcement. 15:08

Q. Okay. Did you call -- did you call Nick's doctor? 15:08

A. No, I did not. 15:08

Q. Well, when you called law and enforcement and tell them someone's threatened to kill you, what were you expecting law enforcement to do with Nick? 15:08

MR. LEVINE: Calls for speculation. 15:08

THE WITNESS: I think the plan was that we were going to take him in to mental health. 15:08

MR. KONZ: Q. Did you tell law enforcement, "Please don't take him to jail. Take 15:08

him into mental health"?
A. Yeah. That was our plan, that he was going to go to mental health. 15:08
Q. Did you tell the police that? 15:08
A. That was their plan, that they were going to take him in to mental health. They were going to pick him up and take him in to mental health. 15:08
Q. Did they tell you that? 15:08
A. Yes, that's exactly what they told me. 15:08
Q. Did you ask them to do that? 15:09
A. Yes, I did. 15:09
Q. Okay. And do you know if that happened? 15:09
MR. LEVINE: Lacks foundation. 15:09
THE WITNESS: No. He got arrested, I think, because there were two bullets in his bag. 15:09
MR. KONZ: Q. Okay. 15:09
A. So therefore he had an arrest instead of mental health. 15:09
Q. Do you know where he went? Do you know if they took him to jail? 15:09
A. Yes, they would have taken him to jail. He had two bullets in his bag. 15:09
Q. Did you go visit him in jail? 15:09
A. I believe so, yes. 15:09
Q. How long after the arrest? 15:09

STATE OF CALIFORNIA )
) ss.
COUNTY OF MARIN )

I, DEBORAH FUQUA, a Certified Shorthand Reporter of the State of California, do hereby certify that

JULIA DETWEILER,

the witness in the foregoing deposition, was by me duly sworn to testify the truth in the within entitled cause; that said testimony of said witness was reported by me, a disinterested person, and thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings; that the witness herein was notified that the transcript will be available for signature and, pursuant to Federal Rule 30(e) of the Code of Civil Procedure, said witness has 30 days from the date of notification to review the transcript and submit any changes.

I further certify that I am not an attorney for any of the parties in the foregoing deposition, nor in any way interested in the outcome of the cause named in said caption.

Dated the 21st day of May, 2026.

DEBORAH FUQUA
CSR NO. 12948

# EXHIBIT “F”

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--o0o--

JULIA DETWILER, )
)
Plaintiff, )
)
vs. ) Case No.:
) 2:24-cv-03100-SCR
CITY OF MT. SHASTA, et al., )
)
Defendants. )
)

--o0o--

Videotaped Deposition Of

STAMATIA HARITOUDIS

Thursday, April 16, 2026

--o0o--

CERTIFIED TRANSCRIPT

26-169
Stenographically Reported By:
DEBORAH FUQUA, CSR #12948

APPEARANCES

For the Plaintiff:

LAW OFFICES OF DALE K. GALIPO
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818-347-8888
By: BENJAMIN S. LEVINE, Attorney at Law
blevine@galipolaw.com

For Defendants City of Mt. Shasta and Jeremiah Capurro:

ANGELO, KILDAY & KILDUFF, LLP
601 University Avenue, Suite 150
Sacramento, California 95825
916-564-6100
By: DERICK E. KONZ, Attorney at Law
dkonz@akk-law.com

For Defendants Amtrak and Bruce Garrett (appearing via Zoom):

SIMS LAW FIRM, LLP
19712 MacArthur Boulevard, Suite 120
Irvine, California 92612
949-253-7900
By: MICHAEL E. MURPHY, Attorney at Law
mmurphy@sms-law.com

The Videographer:

VINNY BEZERRA
VALLEY VIDEO
916-833-3597
info@vlvpro.com

BE IT REMEMBERED THAT, pursuant to Subpoena, and on Thursday, April 16th, 2026, commencing at the hour of 11:05 o'clock a.m. thereof, at 1410 Neotomas Avenue, Santa Rosa, California, before me, DEBORAH FUQUA, a Certified Shorthand Reporter of the State of California, personally appeared

STAMATIA HARITOUDIS,

called as a witness by the defendants, having been by me first duly sworn, was examined and testified as hereinafter set forth.

--o0o--

THE VIDEOGRAPHER: Good morning. We are on the record at 11:05 a.m. The date is April 16th of 2026. We are located at 1410 Neotomas Avenue in Santa Rosa, California. We are here in the matter of Julia Detweiler versus City of Mt. Shasta, filed in the United States District Court, Eastern District of California, Case Number 2:24-cv-03100-SCR. This is the deposition of Stamatia Haritoudis. 11:05

My name is Vinny Bezerra, Valley Legal Video, located in Sacramento, California. 11:06

Would all counsel please identify themselves and whom they represent. 11:06

MR. LEVINE: Benjamin Levine, Law Office of Dale K. Galipo, counsel for plaintiff. 11:06

MR. KONZ: Derick Konz for defendants City of Mt. Shasta and Officer Capurro. 11:06

MR. MURPHY: And Mike Murphy for defendants Amtrak and Garrett. 11:06

THE VIDEOGRAPHER: Will the court reporter please introduce yourself and swear in the witness. 11:06

THE REPORTER: Good morning. My name is Deborah Fuqua. I am a California certified shorthand reporter, License Number 12948, and I am your deposition officer for today. 11:06

Would you please raise your right hand. 11:06

(Witness sworn) 11:06

EXAMINATION BY MR. KONZ 11:06

MR. KONZ: Q. Okay. Well, good morning -- 11:06

A. Good morning. 11:06

Q. -- Stamatia? 11:06

A. Stamatia. 11:07

Q. -- Stamatia. Okay. My name's Derick. I'm the attorney for the City of Mt. Shasta and Officer Capurro. Your attorney is here and also the attorney for the defendants that are also being sued, Amtrak and Bruce Garrett. He's on Zoom. 11:07

that Frank was the instigator of that incident.

Q. Okay. Any other times you recall calling the police because of Nick? 12:42

A. Not -- not off the top of my memory. Those are the big things that I can recall. 12:42

MR. KONZ: I want to admit this. This is going to be Exhibit B. 12:42

(Haritoudis Exhibit B marked for identification) 12:42 12:42

MR. MURPHY: Can you describe what it is? 12:42

MR. KONZ: Oh, yeah. Sorry, Mike. This is the 2018 restraining order. 12:42

MR. MURPHY: Thank you. 12:42

MR. KONZ: You got it. 12:42

Q. Okay. So ma'am, I'll represent to you that this is a court document I've obtained. It's a 2018 domestic violence restraining order. And the Bates stamp at the bottom right is MSPD-189 is the first page, and the last page is MSPD-225. 12:42

First of all, do you recognize this? 12:43

A. It's been a while, but this is my handwriting. 12:43

Q. Okay. What is it? What is this? 12:43

A. My daughter and I were living with housing insecurity in 2018. And my mom opened her home to 12:43

us.
MR. LEVINE: He's asking what is the document. 12:43
MR. KONZ: Q. What is this document? 12:43
A. It's a restraining order I filed on my brother. 12:43
Q. Okay. It says on there "Domestic Violence Temporary Order," correct? 12:43
A. Yes. 12:43
Q. Okay. And the purpose -- just tell me if this is your understanding -- of a restraining order is to have a judge order that Nick cannot be around you. Is that -- was that your understanding of what a restraining order is? 12:43
A. Yes, yes. 12:44
MR. LEVINE: Calls for -- 12:44
Hang on. 12:44
Calls for a legal opinion. 12:44
MR. KONZ: Q. Is that why you applied for a restraining order, because you did not want Nick to be around you? 12:44
A. Not exactly. 12:44
Q. Okay. So why did you apply for this restraining order? 12:44
A. Because my daughter and I were living 12:44

temporarily -- when I was moving off of the Russian River, we temporarily lived with my mother for one year at her apartment in Guerneville. And I did not want Nicholas at the home while I was living there.

Q. Why? 12:44

A. Because of a few prior incidences, the ones we spoke about. 12:45

Q. Because -- is it -- you did not want Nick to be at the home with you because of these prior incidents because you were afraid of him? 12:45

MR. LEVINE: Leading. 12:45

THE WITNESS: No. I think it was more that I was a mother and it was an abundance of caution. And I put myself and my daughter first. And I -- like, my mom and I discussed it. She didn't want me to do this. Nick was going to go to his home in Oregon. But I just -- I had said I really didn't want Nick around. 12:45

Like, after I had moved out of her home, I didn't really need this anymore. But at the time, she had opened her doors to me, and -- I don't know. Me and Nick hadn't lived together for some time. 12:45

Q. You weren't afraid of him? 12:45

A. I didn't want him -- 12:45
Q. Just answer that question. Were you afraid of him? 12:46
MR. LEVINE: Vague. 12:46
THE WITNESS: That is vague. I don't think I was afraid of him. I just didn't want him around. Like, I thought -- I didn't want him showing up and, you know, like, me living there, me not being able to go somewhere else. 12:46
MR. KONZ: Q. What were you afraid he was going do? 12:46
MR. LEVINE: Misstates testimony. 12:46
THE WITNESS: I guess I didn't want my -- 12:46
MR. LEVINE: Leading. 12:46
Sorry. 12:46
THE WITNESS: I didn't want my daughter exposed to his mental illnesses. 12:46
MR. KONZ: Q. Were you -- were you concerned that he was going to hurt you? 12:46
A. No. 12:46
Q. Were you concerned he was going to hurt your daughter? 12:46
A. No. 12:46
Q. Okay. So you -- you weren't afraid of him; you weren't concerned he was going to hurt 12:46

you; you weren't concerned he was going to hurt your daughter. But you filed a domestic violence restraining order to keep him away from you?

A. Yes, while I was living at my mom's home. I did not want him showing up and me not being able to go elsewhere -- 12:46

Q. Why couldn't you go elsewhere? 12:47

A. -- with his mental health issues. 12:47

Q. I don't understand that. 12:47

A. I was living at my mom's, helping her for a year. And I was looking for an apartment on the Russian River. And I decided to leave the Russian River area. I had spent eight years out there, and I was ready for a new chapter. 12:47

So I don't know. I was in a place where I was like, literally moving our life somewhere else, like, looking at schools for her, looking at extracurriculars for her, trying to decide do I want to go to Healdsburg, or is that going to turn into another Guerneville where it's isolated? And -- yeah. 12:47

Q. What does that to have do -- I'm confused, though. Just try to help me understand. 12:47

A. Right. 12:47

Q. What does that have to do with wanting a 12:48

court order that Nick cannot be around you or your daughter? How are they connected?

A. Right. 12:48

Q. I'm confused. 12:48

A. It's -- it's not confusing. I was living at her home, and I did not want my brother showing up there while I was living there because of his mental health issues. 12:48

Q. What were you afraid he was going to do? Or I'll put this another way. What about his mental health issues, how were his mental health issues manifesting into something that made you not want to be around him? 12:48

A. Well, at this time, for example, this address here is to Oregon State Prison, where he served 11 months. And I think that's probably what triggered this. 12:48

Q. That he was in prison -- 12:48

A. For 11 months. 12:48

Q. -- for 11 months, at this point had gotten out -- 12:48

A. I don't think he had gotten out at this point. He was served there. 12:49

Q. But he was about to get out? 12:49

A. I don't believe so. 12:49

Q. Then why would you need a restraining order against somebody that's locked in prison? 12:49
A. Because I believed at the time the date of when he would be released was uncertain and seeing that, you know, we don't -- we've never had somebody go to prison for 11 months in our family and he had made a poor choice that led him there, I did not want my brother around when I was staying at my mother's. 12:49
Q. Simply because he was a convicted felon? 12:49
A. Yes. 12:49
Q. You weren't afraid of him? 12:49
MR. LEVINE: I'm going to inter- -- that's asked and answered. I was going to interpose an objection to the previous question that it lacks foundation and calls for speculation, but it's been answered already. 12:49
THE WITNESS: Yes, I did not want Nick around a seven-year-old little girl. That's it, at the time. 12:49
MR. KONZ: Q. Okay. So you -- you want -- is it -- would it are fair to say you wanted to sort of cut Nick out of your life? 12:50
MR. LEVINE: Misstates testimony. 12:50
THE WITNESS: No, no. I always -- even 12:50

though we had this active restraining order, Nick and I spoke on the phone. And I would go to his home when it was vacant, and -- no.

I -- like I said, I think this address was probably triggering for me to file and the fact that I had a seven year old and I was worried about me and her being stably housed and not to having deal with his mental stuff. 12:50

Q. Okay. You just didn't -- really, you just didn't want him coming to the house where you lived? Is that what was behind this? 12:50

A. Yes. 12:50

Q. Okay. So if you go to -- bottom right corner, right? Turn to Page 192. 12:50

Are you there? 12:51

A. Yes. 12:51

Q. Okay. See Category 7, says "Stay-away Order"? 12:51

A. Yes. 12:51

Q. Do you see that? 12:51

A. Yes. 12:51

Q. And this is -- this is actually what you submitted to the Court, right? There's no dispute about that? 12:51

A. Yes. 12:51

Q. Is that true? 12:51
Okay. Under Number 7, Stay-away Order, there's a check mark that's on that. You marked that box, right? 12:51
A. Yes. 12:51
Q. Okay. And then it says, "I asked the the Court to order the person in Number 2" -- that's Nick. 12:51
A. Mm-hmm. 12:51
Q. -- "to stay 150 yards away from," and you wrote or you at least checked the box of "Me"? 12:51
A. Yes. 12:51
Q. So you didn't -- it's not that you didn't want him to come to the house. It's that you didn't even want him to be near you. You you didn't want him to come near you at the grocery store -- 12:51
MR. LEVINE: Misstates -- 12:51
MR. KONZ: Q. -- for example; is that -- is that accurate? 12:51
MR. LEVINE: Sorry, didn't mean to interrupt you. I was going to say that it misstates the evidence, and it's argumentative. 12:51
MR. KONZ: Q. Why did you -- if all you wanted was him not to bother you at the house, then 12:52

why did you mark the box that you wanted him to stay away from, not just my home, but me? Why did you mark that?

A. I think at the time -- which I have marked every box and put the maximum yardage available that the court person probably advised me, I think I probably just wrote this as egregious as possible. 12:52

Q. Even though this isn't actually accurate? 12:52

A. Correct. 12:52

Q. Okay. And you filed this with the Court? 12:52

A. Yes. 12:52

Q. And as a result of this, a restraining order was issued -- 12:52

A. Yes. 12:52

Q. -- as far as you know, correct? 12:52

A. Yes. 12:52

MR. LEVINE: I'm going to, I'm sorry, interpose a belated objection as to the question about -- to being accurate as that being a vague question. It was a couple questions ago by now. 12:52

MR. KONZ: Q. Okay. You also marked the box -- you didn't want him near -- within 150 yards of your job, right? 12:52

A. Yes. 12:53

Q. But you're saying that's not actually -- you didn't really care about that. You just marked that just to exaggerate? 12:53

A. I did not have -- 12:53

MR. LEVINE: Hang on. 12:53

Misstates testimony. 12:53

You can answer 12:53

THE WITNESS: I did not have a job at the time, so I marked every box. 12:53

MR. KONZ: Q. Okay. If you turn to the Page 195 of this. 12:53

A. Mm-hmm. Yes. 12:53

Q. Okay. And this -- is this your writing? You filled this out? 12:53

A. Yes. 12:53

Q. Okay. And if you look at Category 27, it says, "Describe abuse"? 12:54

A. Yes. 12:54

Q. And then you go down to Number 3. It says, "Did the person in Number 2," Nick? 12:54

A. Yes. 12:54

Q. "Use or threaten to use a gun or any other weapon?" You marked "yes"? 12:54

A. Yes. 12:54

Q. You did, right? 12:54

A. Yes. 12:54

Q. Okay. And then you -- and you wrote this, right, "Multiple occasions, mine and my daughter's lives plus severe harm with knives"? 12:54

A. Yes. 12:54

Q. So you wrote that? 12:54

A. Yes. 12:54

Q. And this is saying Nick, on multiple occasions, has threatened you and your daughter's lives with severe harm -- 12:54

A. Yes. 12:54

Q. -- with knives? 12:54

MR. LEVINE: Hang on. Hang on. Let him finish the question. 12:54

MR. KONZ: Q. Would you agree that's what this says? 12:54

MR. LEVINE: Hang on. 12:54

Objection, misstates evidence. 12:55

THE WITNESS: Yes, it says that. 12:55

MR. KONZ: Q. Okay. But earlier you told me he'd never threatened your life. 12:55

A. So the occasions when we were arguing, when I was pregnant and he did not have a knife, but he said that statement after I had said some mean things to him as well, that was probably what 12:55

STATE OF CALIFORNIA )
) ss.
COUNTY OF MARIN )

I, DEBORAH FUQUA, a Certified Shorthand Reporter of the State of California, do hereby certify that

STAMATIA HARITOUDIS,

the witness in the foregoing deposition, was by me duly sworn to testify the truth in the within entitled cause; that said testimony of said witness was reported by me, a disinterested person, and thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings; that the witness herein was notified that the transcript will be available for signature and, pursuant to Federal Rule 30(e) of the Code of Civil Procedure, said witness has 30 days from the date of notification to review the transcript and submit any changes.

I further certify that I am not an attorney for any of the parties in the foregoing deposition, nor in any way interested in the outcome of the cause named in said caption.

Dated the 13th day of May, 2026.

DEBORAH FUQUA
CSR NO. 12948

# EXHIBIT “G”

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

JULIA DETWILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiffs,

vs. Case No. 2:24-cv-03100-WBS-SCR

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE DEPOSITION OF RICKY WITT

WEDNESDAY, JULY 15, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 28294

APPEARANCES (Remote)

FOR THE PLAINTIFFS:

LAW OFFICES OF DALE K. GALIPO
BY: BENJAMIN LEVINE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
blevine@galipolaw.com

FOR THE DEFENDANTS CITY OF MT. SHASTA and JEREMIAH CAPURRO:

ANGELO, KILDAY & KILDUFF, LLP Attorneys at Law
BY: ISABELLE CARMICHAEL, ESQ.
601 University Avenue, Suite 150
Sacramento, CA 95825
916.564.6100
icarmichael@akk-law.com

FOR THE DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION:

SIMS LAW FIRM, LLP
BY: MIKE MURPHY, ESQ.
19712 MacArthur Boulevard, Suite 120
Irvine, California 92612
949.253-7900
mmurphy@sms-law.com

--oOo--

--oOo--

BE IT REMEMBERED, that set on Wednesday, the 15th day of July, 2026, commencing at the hour of 9:02 a.m., thereof, RICKY WITT, appeared remotely in Philadelphia, Pennsylvania, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the oath was administered by the Certified Shorthand Reporter.)

EXAMINATION

BY MR. LEVINE:

Q. Good morning, Mr. Witt.
A. Good morning.
Q. Could you start by just, please, stating and spelling your name for the record?
A. Sure. Ricky Witt. R-I-C-K-Y, W-I-T-T.
Q. Mr. Witt, have you had your deposition taken before?
A. No.
Q. All right. And have you ever testified in court before?
A. No.
Q. So, since you have not had your deposition

fine, just let me know. All right?

A. Okay.

Q. The only caveat to that is if I ask a question, I'll need your answer before we take a break.

Does that make sense?

A. Yes, sir.

Q. All right. Is there any reason why you cannot give your best testimony today?

A. No.

Q. Do you understand you have been designated by Amtrak as the person most knowledgeable regarding Amtrak's standard procedures and training provided to train conductors, regarding subjects, including passenger removal, requests for police assistance aboard trains, and interactions with passengers who have disabilities?

A. I do.

Q. Have you reviewed a list of categories for which you have been designated as the person most knowledgeable in this case by Amtrak?

A. Yes.

Q. All right. And I'm just going to share my screen really quickly here. Can you see this document here that I'm showing on my screen?

A. I can see it.

A. No.

Q. Are you in sort of a more overseeing role or administrative role for the Amtrak training?

A. Correct.

Q. In other words, you design training programs to be implemented by individual instructors?

A. Not necessarily. I don't design the programs. I'm the senior director, so we have a design team that works with the subject matter experts to design the materials.

Q. Okay. When those programs are designed by the design team, do you then review and approve them before they're made official?

A. That -- that is part of my role, yes. For some programs, not all.

Q. Okay. So I'm going to switch gears and move into some of the subjects that we went over before, that you've been designated as person most knowledgeable for, starting with the first one, which covers Amtrak's standard procedures and conductor training regarding removal of passengers from trains. Okay?

A. Okay.

Q. Does Amtrak have standard procedures in place regarding the removal of customers from trains?

A. Yes.

Q. Are those standard procedures reflected in written policies?
A. Yes, they are.
Q. What are those written policies?
A. They would be written in the service standards manual.
Q. Would it be fair to say that the service standards manual is the -- if Amtrak had a policy manual for its conductors, that would be it?
A. That's part of it, yes. That's fair to say.
Q. Are there other places where the standard procedures are reduced to writing that are applicable to the way conductors do their jobs, at least as applied to these categories that you've been designated for?
A. The code of ethics would also be a document that conductors would have to be familiar with, and conduct themselves accordingly when they're on Amtrak property. That's for all employees.
Q. Okay. Are there --
(Simultaneous speakers.)
A. There's also --
Q. I'm sorry.
A. I'm sorry. There's also the GCOR, operating rules, that conductors must be familiar with to do their jobs safely, as well.

your understanding is, as you sit here right now?

A. There's a various list. The conductor is ultimately always in charge of the train and the safety of the passengers and employees that are aboard that train. So there's circumstances for passenger safety, if that's threatened.

If there's any type of incident on the train, the conductor is responsible for and makes the sort of judgment call to make everyone safe. So there's a variety of reasons why someone would be removed from a train.

Q. Is the list -- I know you don't have the list in front of you -- but is that list intended to be exclusive?

A. Can you rephrase that? "Exclusive" of what?

Q. Sure. In other words, is that intended to be a complete list of the reasons why a conductor may be allowed, under the standard procedures, to remove a customer from the train?

A. I don't believe so. It's a complete list. And I believe the language is limited -- not limited, but sort of gives these are the defined reasons why a customer could be removed from a train.

Q. Do conductors have discretion, generally, to determine when and whether a customer should be removed

use their best judgments in situations. So firearms, weapons, knives, nunchucks, whatever sort of weapon would be considered here.

Q. Do you see anywhere in this section of the service standards manual that states that these provisions apply not just to firearms situations, but to any situations involving weapons?

A. At the very top there, No. 2: "Firearms, anything else, or other weapons."

Q. Right. I'm sorry. I can rephrase. I was referring to the subsections 1 and 2 on page 1-32: "Threatening situation and non-threatening situation."

Do you see any language in the policy here or in the service standards manual that, in your view, makes clear that those provisions apply to scenarios involving weapons besides guns?

MR. MURPHY: You're talking with just reference to the service standards, putting aside all training and everything else, Ben?

MR. LEVINE: Yes. I'm just focussing on the service standards manual in my question.

THE WITNESS: For that section, no.

BY MR. LEVINE:

Q. Okay. Are there other written materials that make clear that that type of distinction does not apply,

be removed when other methods, including a firm request to that customer, have failed."

So in this case, it's circumstantial.

Q. I'm just scrolling up a bit here.

You pointed to this subsection B here. Under the same conditions for section of carriage, there's a subsection: "Non-exclusive list of grounds on which Amtrak can have customers removed from the train"; correct?

A. Correct.

Q. One of those is -- you mentioned fare, not paying the fare, which is the first bullet here; correct?

A. Correct.

Q. Do you see the third bullet where it says: "A customer whose conduct is objectionable"?

A. Yes.

Q. Okay. And then do you see the fifth bullet where it says: "Customers who pose a health, safety, or security hazard to other customers or employees"?

A. Correct.

Q. And then, immediately below that: "Customers who refuse to comply with safety or security rules."

Do you see that?

A. Yes.

Q. This subsection (f) we went over before, regarding removal of customers from the train applies for those scenarios, too; correct?

MR. MURPHY: Incomplete hypothetical.

THE WITNESS: Yes. It would apply to those scenarios, as well.

BY MR. LEVINE:

Q. It's in the same section after all; right?

A. Yes.

Q. And then there's this other subsection (g) that you mentioned before, down here, "Involuntary removal."

Do you see that?

A. Yes.

Q. And it says here: "Involuntary removal of a customer or customers from an Amtrak train is an extremely serious action that should only be taken when the customer refuses to refrain from conduct that might endanger their own lives or jeopardize the safety and comfort of others."

Do you see that?

A. Yes.

Q. Is that an accurate statement of Amtrak's standard procedures regarding involuntary removal of customers from trains?

A. Yes. And I probably should say that this

particular section on how our conductors are handling situations when law enforcement is not there, whenever law enforcement shows up to a scene, when conductors are calling for law enforcement, for whatever various reasons they deem necessary, the law enforcement becomes the authority figure on that train.

So when we're removing customers, these are the guidelines for scenarios that are listed here, depending on the situation.

Q. And when you say scenarios where law enforcement is not available on the train, do you mean -- do these standards apply to situations where conductors are summoning law enforcement for removal, but law enforcement has just not arrived yet?

MR. MURPHY: Incomplete hypothetical.

THE WITNESS: Yes. And so when you see: "Involuntary removal of passenger," this would refer to if law enforcement was not there, conductors are having an issue with someone on the train, do they leave -- or ask that person to get off if they're smoking at a staff stop, or unmanned station stop?

It would be subject to conductors sort of throwing people off the train. We don't allow that. That's an extreme circumstance.

BY MR. LEVINE:

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 30th day of July, 2026.

______________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT "H"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

JULIA DETWILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiffs,

vs. Case No. 2:24-cv-03100-WBS-SCR

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.
_______________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE DEPOSITION OF DOUG CALCAGNO

WEDNESDAY, JULY 15, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 28294

APPEARANCES (Remote)

FOR THE PLAINTIFFS:

LAW OFFICES OF DALE K. GALIPO
BY: BENJAMIN LEVINE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
blevine@galipolaw.com

FOR THE DEFENDANTS CITY OF MT. SHASTA and JEREMIAH CAPURRO:

ANGELO, KILDAY & KILDUFF, LLP Attorneys at Law
BY: ISABELLE CARMICHAEL, ESQ.
601 University Avenue, Suite 150
Sacramento, CA 95825
916.564.6100
icarmichael@akk-law.com

FOR THE DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION:

SIMS LAW FIRM, LLP
BY: MIKE MURPHY, ESQ.
19712 MacArthur Boulevard, Suite 120
Irvine, California 92612
949.253-7900
mmurphy@sms-law.com

--oOo--

--oOo--

BE IT REMEMBERED, that set on Wednesday, the 15th day of July, 2026, commencing at the hour of 12:32 p.m., thereof, DOUG CALCAGNO, appeared remotely in Sacramento, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the oath was administered by the Certified Shorthand Reporter.)

EXAMINATION

BY MR. LEVINE:

Q. Good afternoon.
A. Good afternoon.
Q. Could you please start by stating and spelling your name for the record?
A. Yes. Doug Calcagno, D-O-U-G, C-A-L-C-A-G-N-O.
Q. Have you ever had your deposition taken before?
A. I have had a deposition before, yes.
Q. Was it just one time or more than once?
A. Oh, I can recall at least once.
Q. Do you recall how long ago that was, approximately?
A. Approximately a year ago.

Go ahead.

BY MR. LEVINE:

Q. You can go ahead.

A. Okay. So the physical restraint, it's vague, in particular. And I believe it's vague because we don't particularly want our staff physically involving themselves, unless they are in defense of themselves or defense of others. It's protection of our passengers and crew.

Q. And when you say, "it's vague," by "it," do you mean the rules or restrictions regarding when conductors can and cannot use physical force against customers?

A. Yes.

Q. Okay. And so you're saying that it's intentionally vague, in order to attempt to minimize the situations or reduce the situations where conductors use force against customers?

A. I think that it gives the conductors some discretion, but it is relayed that we do not want them physically engaging, short of defense of self or others.

Q. And we were talking, now, about the service standards, these ideas being reduced to written policies. But are those principles -- the ones you just described regarding limitations on the use of force by conductors against customers, are those principles the

same that conductors are trained on, as well?

A. The training in particular that I'm called particularly -- where I feel I'm the expert in is the de-confliction portion of it. More than just reading the manual, we have a few-hour class that discusses scenarios where the de-confliction ends, and situations where conductors or frontline staff are involved in possible physical altercations, and how to "de-conflict that," using their words.

Q. Based on this training that's provided by Amtrak, what does the term "de-confliction" mean?

A. It's de-confliction of confrontations or possible unruly customers or people that are not cooperating.

Q. As a law enforcement officer, I imagine you're probably familiar with the term "de-escalation"?

A. Yes.

Q. In your mind, based on your law enforcement training on the one hand and the Amtrak training you're familiar with, including this de-confliction training that you mentioned, in your mind, are those two terms synonymous?

A. To me, they are, yes.

Q. Okay. So, in other words, de-confliction is Amtrak -- the word Amtrak uses for de-escalation, in

Is one of the reasons -- according to Amtrak's standard procedures and training provided to conductors, is one of the reasons why conductors are expected to de-escalate or de-conflict situations with customers, is to avoid the potential for physical force to be used against those customers?

MR. MURPHY: Incomplete hypothetical, and may misstate expectations.

Go ahead.

THE WITNESS: Specifically, as it relates to the service manual, I would have to double-check the exact verbiage. I can speak specifically on the conflict resolution training, that it's designed to be a protective process for everyone involved, whether the conductor, primarily, which was the basis for the creation of the de-escalation training or de-confliction training, to the passengers.

BY MR. LEVINE:

Q. Okay. Are there specific techniques that conductors are trained on to de-escalate or de-conflict to customers who may be presenting issues aboard the train?

A. Yes.

Q. Are you able to share some of those techniques?

A. I can give a couple of examples. I would have

to, you know, have the screen up to discuss it, because there are quite a few slides that designate. But, yes, it's showing empathy. Asking specific questions. Not saying no, but giving other options. Examples like that on how to communicate with -- with the involved parties.

Q. This specific training that you've been discussing, the de-confliction training, does it address at all de-escalating or de-conflicting situations with customers who are or may have or may be mentally disabled or intellectually disabled in some way?

A. We -- we discuss that may be part of a conflict and, if they can recognize it, at the end of the day, it's the actions of the individuals involved that might be creating a hazard that is probably more important. But recognize the part of the training.

Q. And besides the actual recognition of the fact that somebody may have some sort of intellectual or cognitive disability or emotional disability, as part of the de-escalation or de-confliction training, are conductors actually trained that there's anything different they should do, in terms of trying to de-conflict a situation, if they believe or have some reason to believe that the person may be -- may have a disability like that?

MR. MURPHY: Incomplete hypothetical.

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 30th day of July, 2026.

________________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT "I"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

| | | |
|---|---|---|
| JULIA DETWILER, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | 2-24-CV-03100-SCR |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF MT. SHASTA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

--oOo--

VIDEOCONFERENCE DEPOSITION

OF

SCOTT A. DeFOE

--oOo--

WEDNESDAY, AUGUST 19, 2026

--oOo--

CERTIFIED TRANSCRIPT

26-357
Stenographically Reported By:
KELLEY JORDAN, CSR 6780

APPEARANCES VIA ZOOM

For the Plaintiff:

LAW OFFICES OF DALE K. GALIPO
BY: BENJAMIN S. LEVINE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
blevine@galipolaw.com

For the Defendants CITY OF MT. SHASTA and JEREMIAH CAPURRO:

ANGELO KILDAY & KILDUFF, LLP
BY: DERICK E. KONZ, ESQ.
Also Present: ISABELLE CARMICHAEL, ESQ.
601 University Avenue, Suite 150
Sacramento, California 95825
916.564.6100
dkonz@akk-law.com

For the Defendants AMTRAK and BRUCE GARRETT:

SIMS LAW FIRM, LLP
BY: MICHAEL E. MURPHY, ESQ.
19712 MacArthur Boulevard, Suite 120
Irvine, California 92612
949.253.7900
mmurphy@sms-law.com

--oOo--

INDEX OF EXAMINATION

| | Page |
|---|---|
| By Mr. Konz | 5 |
| By Mr. Murphy | 125 |

---oOo---

| | |
|---|---|
| Deponent's Signature page | 137 |
| Reporter's Certificate | 138 |
| Disposition of Original Transcript letter | 139 |

---oOo---

## INDEX OF EXHIBITS

| Defendants' | Description | Page |
|---|---|---|
| Exhibit A | Report of Scott DeFoe | 7 |

---oOo---

BE IT REMEMBERED that on Wednesday, the 19th day of August, 2026, commencing at the hour of 9:06 a.m. thereof, before me, KELLEY JORDAN, a Certified Shorthand Reporter of the State of California, with the office of D&B Deposition Reporters, 601 University Avenue, Suite 148, Sacramento, California, the following proceedings took place via Zoom videoconference:

---o0o---

THE COURT REPORTER: Good morning. My name is Kelley Jordan. I am a California certified shorthand reporter, License No. 6780.

Will you please raise your right hand.

SCOTT A. DeFoe,

called as a witness by the Defendants, who, being by me first duly sworn, was thereupon examined and interrogated as hereinafter set forth.

EXAMINATION

BY MR. KONZ:

Q. Okay. Mr. DeFoe, my name's Derick Konz. I'm an attorney for the City of Mt. Shasta and Officer Capurro. And I understand you --

(Reporter interruption.)

(Off-the-record discussion.)

(Isabella Carmichael joined the deposition via Zoom.)

Q. BY MR. KONZ: So Mr. DeFoe, I understand you have been retained by Mr. Galipo and the plaintiff to provide police practices opinions in this case; is that right?

A. Yes.

Q. Okay. What -- what do you -- what's your -- in your opinion, what's your role in this case? What is -- what's your job? What have you been hired to do?

A. To review the materials that are listed on my Rule 26 report, beginning on page 2 through 3, to look at any relevant POSTs, which is Peace Officer Standards and Training, learning domains, and then to formulate objective opinions in the case on my review of the material, based on the officers, actually, and specifically, call for service, the -- was there a tactical plan? The use of any de-escalation in this matter; the utilization of deployment of less-than-lethal-force options in this case; the Taser 7 and/or the baton; ultimately, the use of lethal force including all six rounds that were fired and --

(Reporter interruption.)

THE WITNESS: From three volleys,

received and reviewed. I don't know if there are additional materials that I will receive prior to trial or after this deposition, but I just reserve the right to be able to review those materials and, if necessary, supplement my report, which I would advise counsel when doing so.

Q. Okay. And the materials you have reviewed thus far that you base your opinions on, you list those on -- I guess it looks like pages 2 and 3 of your report. Is that accurate?

A. Yes, sir, that's correct.

Q. Okay. And you're -- you're aware that -- well, I guess this would just be yes or no, back to the question -- the question I first asked.

All of the opinions that you have today, that you plan to express at trial, unless you receive new information, are in this report; is that true?

A. Correct, or you may ask me questions outside of the report that I may provide today, but my ultimate opinions are in the report.

Q. Okay. And then another requirement of Rule 26 is that you've included all the facts or data that you considered in forming these opinions. Have you done that in the report?

A. Yes. It's based on my review of all the

just want to make sure.

You don't have an issue with Officer Capurro demanding that Detweiler, like, leave his bag alone and keep his hands free; right? You think that's an okay -- that was an okay tactic?

A. Well, sure. I mean, a better tactic, as I just stated, are let me get the bags away from the seat. I don't know what's in them; so I'm not going to give you access to something, especially when you're sleeping. Before I wake you up, let me just get that stuff away from you. I don't know what's in it; so I'm going to get that away before I shine a light on you and before I startle you. I want those bags away from you to prevent access.

But to answer your question, being that he didn't do that, which would have been reasonable, yeah, I don't -- yes, I don't want him grabbing a bag of any sort or anything. I believe he does so, because he believes he's obviously leaving the train, but nonetheless, an explanation would have been better because, once again, Detweiler seemed confused as to why he couldn't grab his bag and then became, you know, the tugging of the bag between the two of them.

So -- but yes, I don't want him -- I want nothing in his hands. I want his hands restrained, and

in.

MR. KONZ: Okay. Mr. DeFoe, I don't think I have any more questions, but there is a co-defendant in the case -- that's Amtrak -- and their counsel is here, Mr. Murphy; so he may have some questions. So I'm going to pass it over to him.

MR. MURPHY: Yes, please.

EXAMINATION

BY MR. MURPHY:

Q. I introduced myself earlier off the record. I represent Bruce Garrett and Amtrak. Nice to meet you.

A. Yes, sir.

Q. So your principal area of expertise is police practices; true?

A. Police practices, use of force, premises liability, negligent security, foreseeability.

Q. Okay. And did you -- have you ever worked for any railroads?

A. Worked, no. I've just worked -- just the LA Metro side of it on trains and buses, just as an ancillary off duty or on duty, basically, but just like a moonlighting, pick up overtime, as a sergeant for probably five or six years.

Q. Okay. But you've never been employed by any railroads; true?

A. That's correct.
Q. And have you -- have you ever reviewed any railroad's rules for conductors?
A. I believe I have -- I have two or three defense cases on railroads in Pennsylvania defending the railroads; so I believe in the course of that I have reviewed some of those on -- but I'm not a hundred percent confident if they were actually -- it was more on the security part of it. There was some premises liability issues that occurred, and I was retained by the defense in defending those actions.
Q. Did you ever -- strike that. Did you review any -- well, strike that.
Were any of those cases where you were retained on behalf of Amtrak?
A. They weren't -- I don't believe they were Amtrak, but they were rail -- they were railroad cases and they were really on the foreseeability. I didn't believe it met the -- you know, that there was any issue with the risk and vulnerability associated with the security at the rails, and I testified and wrote reports based on the fact I thought the security measures were reasonable that were put in place in the rails that I was involved in in Pennsylvania.
Q. Okay. Did you look at any conductor rules or

standards in this matter?
A. No. I'm not critical of anything Mr. Garrett did in this matter.
Q. Are you critical of anything that Amtrak did?
A. Not at all.
Q. Do you have any opinions at all about what Garrett or Amtrak did in this matter?
A. Well, just that Capurro should have not -- should have interviewed him, should have interviewed someone there to find out what transpired, should have advised him not to get involved, should have properly evacuated the portion of the train that would have involved Mr. Detweiler to insure that everyone was safe.
I'm not critical of Amtrak for not doing that. I'm critical of Capurro for not taking those steps and speaking to Mr. Garrett or someone regarding, you know, where he's located, what he's done, and all the other factors that I think were critically important in this case that did not transpire.
But I believe Mr. Garrett was trying to help out when he was shot. I think he was trying to assist the officer. I don't have any fault of him being shot. I have the fault of Officer Capurro firing his weapon and not the result of him firing his weapon.
Q. All right. So is it true that you have no

adverse opinions about Amtrak or Garrett in this case?

A. Not a single opinion.

Q. Okay.

A. Are you waiting for my response?

Q. No. I heard you say, "Not a single opinion." That eliminates a lot of questions. So I'm going through my -- I'm going through my outline.

Do you have any -- so you have absolutely no opinions as it relates to Garrett or Amtrak, other than what you've already testified to, in terms of what you deem as -- as Officer Capurro's failure to handle Garrett differently in terms of interviewing, tactical plan, telling him to stay away, that kind of thing?

A. Correct. That was not really my scope from plaintiff's counsel. It was specifically on the actions of Officer Capurro. I did not find any -- based on what I know, on what I've read, that my criticisms are of Officer Capurro and not of Mr. Garrett or anything involving Amtrak.

Q. Okay. Do you have any information, from any source whatsoever, about Mr. Detweiler's prior involvement with police officers before this interaction?

A. No.

Q. If -- if you were to learn that Mr. Detweiler

# REPORTER'S CERTIFICATE

State of California )
) ss.
County of Humboldt )

I, KELLEY JORDAN, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That I am a disinterested person herein; that the witness, SCOTT A. DeFOE, named in the foregoing deposition, was by me duly sworn via Zoom videoconference to testify the truth, the whole truth, and nothing but the truth; that the deposition was reported in shorthand by me, KELLEY JORDAN, a Certified Shorthand Reporter of the State of California, and thereafter transcribed using computer-aided transcription and is a true and correct record of the testimony so given.

IN WITNESS WHEREOF, I hereby certify this transcript at my office in the County of Humboldt, State of California, this 4th day of September, 2026.

Kelley De Young

KELLEY JORDAN, CSR NO. 6780
Certified Shorthand Reporter of
the State of California

June 25, 2026

Scott A. DeFoe
08.19.2026
A
KJ, CSR 6780

Mr. Dale K. Galipo, Esq.
Mr. Benjamin S. Levine, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367

**Federal Rules of Civil Procedure 26 (a) (2) (B) Report**

**JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased, Plaintiff,**
**vs.**
**CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive, Defendants.**
**Case No. 2:24-cv-03100-WBS-SCR**

Dear Mr. Galipo,
Thank-you for retaining me to analyze and render opinions regarding the December 25, 2023, Officer-Involved Shooting incident involving Mount Shasta Police Department Police Officer Jeremiah Capurro, No. 1103, that resulted in the death of Mr. Nicholas Detweiler. Pursuant to the requirements of Rule 26, I have studied reports, Body-Worn Camera video recording, Mount Shasta Police Department documents, Transcriptions of Digitally Recorded Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case. Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

**Materials Reviewed:**

1. Complaint for Damages, Case No. 2:24-at-01414.

2. Taser 7, (X400IE9AH), Log, 2023-12-27-1422, (MSPD 000001-19).

3. Photographs, (MSPD 000020-80).

4. Officer Jeremiah Capurro, BWC Video, AXON Body 4, D01A1245j, (23-22), 12/25/23.

5. Audio-Recordings:
- Incident Report, (MSPD Audio 001).
- Request for Assistance, (MSPD Audio 002).
- Local Law Enforcement Assistance, (MSPD Audio 003).
- Request for Assistance, (MSPD Audio 004).
- Train Dispatch, (MSPD Audio 005).
- Request for Additional Assistance, (MSPD Audio 006).
- Request for CHP Assistance, (MSPD Audio 007).
- Request for Medical, (MSPD Audio 008).
- Weed PD Asking if Assistance is Needed, (MSPD Audio 009).
- Call to Medical, (MSPD Audio 010).
- Status Update, (MSPD Audio 011).
- Supervisor Notification, (MSPD Audio 012).
- Request for Additional Ambulance, (MSPD Audio 013).
- Request for Update, (MSPD Audio 014).
- Chief Notification, (MSPD Audio 015).
- Confirmation of Information, (MSPD Audio 016).
- Confirmation of Officers on Scene, (MSPD Audio 017).
- Status of Conductor, (MSPD Audio 018).

6. Transcript of Officer Capurro, Interview #1 & 2, IA Case No. 2312M-0505, (MSPD 000091-120).

7. Transcript of Bruce Garrett, Interview #1 & 2 (GAR 000013-14).

8. Final Report, Administrative Investigation, Confidential, Case No. 22312M-0505, (MSPD 000132-150).

9. Mt. Shasta Police Department, Policy Manual, Use of Force, (MSPD 000367-377).

10. Mt. Shasta Police Department, Policy Manual, Policy, Officer-Involved Shooting and Deaths, (MSPD 000378-386).

11. Mt. Shasta Police Department, Policy Manual, Policy, Firearms, (MSPD 000387-396).

12. Mt. Shasta Police Department, Policy Manual, (MSPD 000418-1145).

13. Deposition Transcript of Jeremiah Capurro taken on March 27, 2026.

14. Deposition Transcript of Bruce Garrett taken on December 17, 2025.

15. Bruce Garrett Complaint for Damages, Case No. 2:25-cv-00420-DAD-CKD.

**California POST Basic Learning Domains as Follows:**

1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #15: "Laws of Arrest.
5. #20: "Use of Force."
6. #21: "Patrol Techniques."
7. #23: "Crimes in Progress."
8. #33: "Arrest and Control."
9. #34: "First Aid, CPR, and AED."
10. #35: "Firearms/Chemical Agents."
11. #37: "People with Disabilities."

**Summary**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

## Opinion Number 2

It is my opinion, to a reasonable degree of professional certainty, that Police Officer Jeremiah Capurro failed to formulate, communicate, and implement a reasonable tactical plan before initiating contact with Mr. Nicholas Detweiler on December 25, 2023. There were additional law enforcement officers that were responding to assist with this call for service, en route, and minutes away. This was particularly important given the rail car setting. In addition, upon his arrival Police Officer Jeremiah Capurro failed to obtain or request additional information from train staff regarding Mr. Nicholas Detweiler or the current circumstances aboard the train, failed to wait for backup before boarding the train, and failed to formulate a tactical plan or communicate any plan or direction to train staff.

In addition, it is my opinion that Police Officer Jeremiah Capurro unnecessarily initiated physical contact with a possibly mentally ill individual who was not actively threatening anyone at the time of the initial contact. Mr. Nicholas Detweiler was seated on the train and appeared to be sleeping. There was no rush. Police Officers are taught time and distance. Mr. Nicholas Detweiler agreed to get off the train and grabbed his bag that contained his belongings at which time Police Officer Jeremiah unnecessarily escalated the situation by grabbing the bag. In addition, Police Officer Jeremiah Capurro unnecessarily escalated the situation by prematurely unholstering his Taser 7 and pointing it at Mr. Nicholas Detweiler. In addition, it is my opinion that Police Officer Jeremiah Capurro's actions created a foreseeable and unnecessary escalation of the encounter. In addition, it is my opinion that Police Officer Jeremiah Capurro's failure to provide any instruction to train staff, including any instruction to Bruce Garrett to step out of the way, resulted in Bruce Garrett's intervention into the encounter and in Bruce Garrett ultimately being shot by Police Officer Jeremiah Capurro.

In addition, it is my opinion that Police Officer Jeremiah Capurro failed to warn Mr. Nicholas Detweiler that he was going to fire his Taser 7 and give him a reasonable opportunity to comply.

Mt. Shasta Police Department, Policy No. 304, Conducted Energy Device, (MSPD 000487-491), provides:

304.4 VERBAL AND VISUAL WARNINGS:

A verbal warning of the intended use of the TASER device should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances. The purpose of the warning is to: