**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Tel: (818) 347-3333
Fax: (818) 347-4118
*Attorneys for Plaintiff Julia Detweiler*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiff,

v.

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.

Case No. 2:24-cv-03100-WBS-SCR

*Hon. William B. Shubb*

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS CITY OF MOUNT SHASTA AND JEREMIAH CAPURRO'S MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION [DKT. 31] AND TO DEFENDANTS NATIONAL RAILROAD PASSENGER CORPORATION AND BRUCE GARRETT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT [DKT. 32]; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT**

*[Filed concurrently with Plaintiff's Responses to Defendants' Statements of Undisputed Facts and Plaintiff's Statement of Additional Material Facts; Declaration of Benjamin S. Levine and Exhibits thereto; and Declaration of Scott DeFoe]*

Date: December 21, 2026
Time: 1:30 p.m.
Courtroom: 5

**TABLE OF CONTENTS**


I. INTRODUCTION 1

II. STATEMENT OF FACTS 2

A. Passengers Aboard Amtrak Train Report Two Incidents, and Assistant Conductor Bruce Garrett De-Escalates Each Time 2

B. An Hour and a Half After the Second Incident on the Train, Mr. Garrett Calls Mt. Shasta Police to Report that Mr. Detweiler, then Asleep, Is Agitated and Threatening Passengers 4

C. Ofc. Capurro Boards the Train Without Seeking Additional Information or Waiting for Nearby Backup 5

D. Ofc. Capurro Wakes, Confronts, and Escalates Encounter with Mr. Detweiler 7

E. Ofc. Capurro Initiates Altercation with Mr. Detweiler, Tasing Him Repeatedly and Striking Him With a Baton Over a Dozen Times Without Warning 8

F. Ofc. Capurro Fires Six Shots at Mr. Detweiler and Mr. Garrett, in Three Volleys, Including at Mr. Detweiler's Back as He Lays on the Ground 9

G. Ofc. Capurro Redirects Medical Assistance Away from Mr. Detweiler 10

H. Tactical Considerations 11

I. Training Provided to Mr. Garrett and Ofc. Capurro 13

J. Expert Opinions 14

K. Mr. Garrett sues Ofc. Capurro and Mt. Shasta for Excessive Force, Battery, Negligence, and Violation of the Tom Bane Act 17

III. LEGAL STANDARD 18

IV. OFC. CAPURRO'S USES OF LESS-LETHAL AND DEADLY FORCE WERE EXCESSIVE IN VIOLATION OF CLEARLY ESTABLISHED FOURTH AMENDMENT LAW 19

A. No Immediate Threat Justified Ofc. Capurro's Less-Lethal or Deadly Force 20

B. Ofc. Capurro Was Not Responding to a Serious Crime 27

C. Mr. Detweiler Did Not Flee, and any Resistance Did Not Support the Use of Significant Force 28

D. Ofc. Capurro Provided No Warnings Despite Warnings Being Feasible 29

E. Ofc. Capurro Failed to Consider and Account for Mr. Detweiler's Apparent Mental Illness 30

F. Other Reasonable Options Were Available 30

| | | |
|---|---|---|
| | **G. The Unlawfulness of Ofc. Capurro's Uses of Less-Lethal and Lethal Force was Clearly Established** | **31** |
| **V.** | **OFC. CAPURRO UNREASONABLY DENIED MEDICAL CARE TO MR. DETWEILER IN VIOLATION OF THE FOURTH AMENDMENT** | **35** |
| **VI.** | **OFC. CAPURRO VIOLATED MR. DETWEILER'S RIGHT TO DUE PROCESS** | **37** |
| **VII.** | **DEFENDANTS FAILED TO REASONABLY ACCOMMODATE MR. DETWEILER'S DISABILITY IN VIOLATION OF THE ADA** | **39** |
| | **A. City Defendants** | **39** |
| | **B. Amtrak Defendants** | **41** |
| **VIII.** | **DEFENDANTS WERE NEGLIGENT** | **43** |
| | **A. City Defendants** | **43** |
| | **B. Amtrak Defendants** | **46** |
| **IX.** | **DEFENDANTS ARE LIABLE FOR BATTERY** | **49** |
| | **A. City Defendants** | **49** |
| | **B. Amtrak Defendants** | **50** |
| **X.** | **OFC. CAPURRO VIOLATED THE TOM BANE ACT** | **52** |
| **XI.** | **CONCLUSION** | **53** |

# TABLE OF AUTHORITIES

## CASES


| | |
|---|---|
| *Aguilar v. Atlantic Richfield Co.*, 25 Cal. 4th 826 (2001) | 51 |
| *Alves v. Riverside County*, 2023 WL 4104185 (C.D. Cal. May 19, 2023) | 43 |
| *Alves v. County of Riverside*, 135 F.4th 1161 (9th Cir. 2025) | 49 |
| *Andrews v. City of Henderson*, 35 F.4th 710 (9th Cir. 2022) | 24, 33 |
| *Archibald v. County of San Bernardino*, 2018 WL 6017032 (C.D. Cal. Oct. 2, 2018) | 36 |
| *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) | 31 |
| *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860 (2007) | 52 |
| *Badr v. City of San Ramon*, 2022 WL 2341153 (N.D. Cal. Apr. 11, 2022) | 47, 48 |
| *Ballew v. City of Pasadena*, 642 F. Supp. 3d 1146 (C.D. Cal. 2022) | 20, 24, 33 |
| *Barnes v. Felix*, 605 U.S. 73 (2025) | 20, 23, 27, 50 |
| *Bethurum v. Krumm*, 109 Cal. App. 5 (1930) | 51 |
| *Bigbee v. Pac. Tel. & Tel. Co.*, 34 Cal. 3d 49 (1983) | 48 |
| *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) | 33 |
| *Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018) | 18, 20, 32 |
| *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004) | 34 |
| *Brewer v. Teano*, 40 Cal. App. 4th 1024 (1995) | 47 |
| *Brosseau v. Haugen*, 543 U.S. 194 (2004) | 31 |
| *Brown v. Ransweiler*, 171 Cal. App. 4th 516 (2009) | 49, 50 |
| *Brown v. USA Taekwondo*, 11 Cal. 5th 204 (2021) | 46, 48 |
| *Bryan v. McPherson*, 630 F.3d 805 (9th Cir. 2010) | 19, 22, 28, 30 |
| *Calvillo-Silva v. Home Grocery*, 19 Cal. 4th 714 (1998) | 51 |
| *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138 (2005) | 52 |
| *Clopp v. City of Sparks*, 2023 WL 2538177 (D. Nev. Mar. 16, 2023) | 39, 41 |
| *D'Braunstein v. California Highway Patrol*, 131 F.4th 764 (9th Cir. 2025) | 35, 36, 37 |
| *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) | 29, 30 |
| *Dominguez v. City of Scottsdale*, 587 F. Supp. 3d 914 (D. Ariz. 2022) | 29 |
| *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) | 32, 34 |
| *Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) | 39 |
| *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269 (1998) | 49 |
| *EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103 (9th Cir. 2010) | 40 |
| *Elliott v. Solis*, 2019 WL 2150949 (E.D. Cal. May 16, 2019) | 47 |
| *Estate of Aguirre v. County of Riverside*, 29 F.4th 624 (9th Cir. 2022) | 20, 21, 24, 34, 35 |
| *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790 (9th Cir. 2025) | 25, 26, 28 |

| | |
|---|---|
| *Estate of Nunis ex rel. Nunis v. City of Chula Vista*, 676 F. Supp. 3d 867 (S.D. Cal. 2023) | 35, 36 |
| *Estate of Soakai v. Abdelaziz*, 137 F.4th 969 (9th Cir. 2025) | 32, 37 |
| *Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002) | 37 |
| *Garcia v. City of Azusa*, 2023 WL 9420513 (C.D. Cal. Dec. 1, 2023) | 53 |
| *Garlick v. County of Kern*, 167 F. Supp. 3d 1117 (E.D. Cal. 2016) | 22, 23, 24 |
| *George v. Morris*, 736 F.3d 829 (9th Cir. 2013) | 20, 34 |
| *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011) | 25, 30 |
| *Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) | 18, 20, 26 |
| *Graham v. Connor*, 490 U.S. 386 (1989) | 19, 20 |
| *Greer v. City of Hayward*, 229 F. Supp. 3d 1091 (N.D. Cal. 2017) | 37 |
| *Grudt v. City of Los Angeles*, 2 Cal. 3d 575 (1970) | 43 |
| *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997) | 21 |
| *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013) | 21, 37 |
| *Hayes v. County of San Diego*, 57 Cal. 4th 622 (2013) | 43, 46 |
| *Hermosillo v. County of Orange*, 562 F. Supp. 3d 802 (C.D. Cal. 2021) | 22, 33 |
| *Hope v. Pelzer*, 536 U.S. 730 (2002) | 31, 35 |
| *Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992) | 18 |
| *Hoyem v. Manhattan Beach City Sch. Dist.*, 22 Cal. 3d 508 (1978) | 47 |
| *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462 (N.D.N.Y. 2017) | 42 |
| *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972 (D. Ariz. 2012) | 25, 34 |
| *Kaur v. City of Lodi*, 263 F. Supp. 3d 947 (E.D. Cal. 2017) | 38 |
| *Kosakoff v. City of San Diego*, 2010 WL 1759455 (S.D. Cal. Apr. 29, 2010) | 37 |
| *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d 872 (9th Cir. 1987) | 18 |
| *Ledesma v. City of Vallejo*, 2019 WL 932019 (E.D. Cal. Feb. 26, 2019) | 22, 23, 24, 32, 33 |
| *Leibel v. City of Buckeye*, 556 F. Supp. 3d 1042 (D. Ariz. 2021) | 39, 41 |
| *Liston v. County of Riverside*, 120 F.3d 965 (9th Cir. 1997) | 18 |
| *Lopez v. Surchia*, 112 Cal. App. 2d 314 (1952) | 51 |
| *Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017) | 27 |
| *Mattos v. Agorano*, 661 F.3d 433 (9th Cir. 2011) | 20, 32 |
| *Maxwell v. County of San Diego*, 708 F.3d 1075 (9th Cir. 2013) | 35 |
| *McLeod v. City of Redding*, 2024 WL 3011227 (E.D. Cal. June 12, 2024) | 49 |
| *Moore-Brown v. City of North Las Vegas Police Dep't*, 2022 WL 4804948 (D. Nev. Oct. 3, 2022) | 27 |
| *Moreland v. LVMPD*, 159 F.3d 365 (9th Cir. 1998) | 37 |
| *Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019) | 19, 20, 30 |
| *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) | 29, 31 |

| | |
|---|---|
| *Nev. Dep't of Corr. v. Greene*, 648 F.3d 1014 (9th Cir. 2011) | 21 |
| *Orn v. City of Tacoma*, 949 F.3d 1167 (9th Cir. 2020) | 25, 31 |
| *People v. Brown*, 245 Cal. App. 4th 140 (2016) | 43 |
| *Polanco v. Diaz*, 76 F.4th 918 (9th Cir. 2023) | 32 |
| *Pool v. City of Oakland*, 42 Cal. 3d 1051 (1986) | 47, 48 |
| *Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008) | 37, 38 |
| *Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) | 52 |
| *Rios v. City of Los Angeles*, 2022 WL 17219086 (C.D. Cal. Aug. 25, 2022) | 53 |
| *Rodriguez v. City of Modesto*, 2015 WL 1565354 (E.D. Cal. Apr. 8, 2015) | 29 |
| *Rosales v. County of San Diego*, 511 F. Supp. 3d 1070 (S.D. Cal. 2021) | 35, 36 |
| *Sanderlin v. Dwyer*, 116 F.4th 905 (9th Cir. 2024) | 18, 26 |
| *Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002) | 18 |
| *Scott v. Harris*, 550 U.S. 372 (2007) | 25 |
| *Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994) | 19 |
| *Sheehan v. City & County of San Francisco*, 743 F.3d 1211 (9th Cir. 2014) | 40, 41 |
| *Singh v. City of Phoenix*, 124 F.4th 746 (9th Cir. 2024) | 27, 28 |
| *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) | 19, 20, 28 |
| *Soderberg v. City of Los Angeles*, 2020 WL 6540511 (C.D. Cal. Sept. 30, 2020) | 27 |
| *S.T. ex rel. Niblett v. City of Ceres*, 327 F. Supp. 3d 1261 (E.D. Cal. 2018) | 38 |
| *Tabares v. City of Huntington Beach*, 988 F.3d 1119 (9th Cir. 2021) | 43, 44, 45 |
| *Tan Lam v. City of Los Banos*, 976 F.3d 986 (9th Cir. 2020) | 21, 24, 34 |
| *Tatum v. City & County of San Francisco*, 441 F.3d 1090 (9th Cir. 2006) | 35 |
| *Tennessee v. Garner*, 471 U.S. 1 (1985) | 28, 29 |
| *Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011) | 19 |
| *United States v. Lanier*, 520 U.S. 259 (1997) | 31 |
| *United States v. Sardie*, 191 F. Supp. 2d 1117 (C.D. Cal. 2000) | 21 |
| *Uzun v. City of Santa Monica*, 54 F.4th 595 (9th Cir. 2022) | 43, 49 |
| *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018) | passim |
| *Wallisa v. City of Hesperia*, 369 F. Supp. 3d 990 (C.D. Cal. 2019) | 22, 23 |
| *Waters v. Amtrak*, 456 F. Supp. 3d 666 (E.D. Pa. 2020) | 39, 41 |
| *Whitaker v. Astrue*, 2016 WL 146069 (N.D. Cal. Jan. 13, 2016) | 21 |
| *White v. Pauly*, 580 U.S. 73 (2017) | 31 |
| *Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003) | 25 |
| *Willis v. City of Fresno*, 520 F. App'x 590 (9th Cir. 2013) | 37, 38 |
| *Wray v. National Railroad Passenger Corp.*, 10 F. Supp. 2d 1036 (E.D. Wis. 1998) | 42 |

*Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) 20, 23, 24, 33
*Yount v. City of Sacramento*, 43 Cal. 4th 885 (2008) 49
*Zamani v. Carnes*, 491 F.3d 990 (9th Cir. 2007) 21
*Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017) 25, 26, 27, 34, 35

**STATUTES AND REGULATIONS**

42 U.S.C. § 1983 37
28 C.F.R. § 35.108 39
Cal. Civ. Code § 1714 46, 48
Cal. Civ. Code § 2188 42
Cal. Penal Code § 835a 43, 49

**OTHER AUTHORITIES**

Assem. Bill 392, 2019–2020 Reg. Sess. (Cal. 2020) 49
Judicial Council of Cal. Civ. Jury Instr. (CACI) No. 441 43, 49
Judicial Council of Cal. Civ. Jury Instr. (CACI) No. 1305A 49, 50
Judicial Council of Cal. Civ. Jury Instr. (CACI) No. 1305B 49
Judicial Council of Cal. Civ. Jury Instr. (CACI) No. 1320 50
Restatement (Second) of Torts § 442A 47

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Julia Detweiler herein opposes both the summary judgment motion filed by Defendants City of Mt. Shasta and Jeremiah Capurro ("City Defendants") and the summary judgment motion filed by Defendants National Railroad Passenger Corporation (doing business as "Amtrak") and Bruce Garrett ("Amtrak Defendants"). Both motions should be denied because material facts are disputed as to each claim and Defendants are not entitled to judgment.

Viewed in Plaintiff's favor as it must be at this stage, the evidence in this case shows that Mt. Shasta Police Officer Jeremiah Capurro boarded an Amtrak train on Christmas in 2023, in response to a report that a passenger on the train had displayed brass knuckles and created a disturbance. Rather than first waiting for backup that was five minutes away and asking staff what had occurred and what the current situation was, he rushed on board; saw that the subject of the call, Nicholas Detweiler, was seated and asleep; and proceed to shake him awake. Despite Mr. Detweiler soon exhibiting signs of mental illness, Ofc. Capurro confronted him aggressively, ignored his repeated requests for clarification regarding what was happening, and tased him without warning while his hands were up, and again shortly thereafter. After Mr. Detweiler attempted to stop himself from being repeatedly tased, Ofc. Capurro proceeded to beat him with a wooden baton more than a dozen times, without warning and without saying what he wanted Mr. Detweiler to do, while Mr. Garrett, a train conductor, restrained Mr. Detweiler from behind. Ofc. Capurro then drew a firearm, aimed it at Mr. Detweiler and, when Mr. Detweiler put on a pair of brass knuckles and "grabbed" Mr. Garrett, fired several shots without warning, striking Mr. Detweiler and Mr. Garrett. When Mr. Detweiler and Mr. Garrett then went to the ground, Ofc. Capurro fired two more shots, again without warning, into Mr. Detweiler's back, including after he had gone limp and did not have either hand on Mr. Garrett. The vast majority of Ofc. Capurro's conduct was contrary to his training and standard law enforcement procedures. After the shooting, Ofc. Capurro also diverted urgent medical attention away from Mr. Detweiler, based only on his assumption that Mr. Detweiler was already deceased. Under these facts, City Defendants' motion should be denied.

The evidence also shows that before Ofc. Capurro went to meet the train, Mr. Garrett had defused the situation onboard, observed that Mr. Detweiler subsequently remained in his seat without incident for more than an hour and a half, and then called 911 to misleadingly report an ongoing disturbance on the train in which, in his telling, the sleeping Mr. Detweiler was actively threatening passengers. Mr. Garrett made no attempt to set the record straight when Ofc. Capurro reached the train, he stood by while Ofc. Capurro woke and confronted Mr. Detweiler, and he physically restrained Mr. Detweiler from behind, including by holding one of Mr. Detweiler's arms behind his back, while Mr. Detweiler was made to endure Ofc. Capurro's repeated baton strikes. In light of these facts, Amtrak Defendants' motion should likewise be denied.

## II. STATEMENT OF FACTS

### A. Passengers Aboard Amtrak Train Report Two Incidents, and Assistant Conductor Bruce Garrett De-Escalates Each Time

On December 24 and 25, 2023, Nicholas Detweiler was traveling via Amtrak train from Klamath Falls, Oregon, to Emeryville, California, to visit his mother, Plaintiff Julia Detweiler, for Christmas. (Amtrak Defendants' Undisputed Fact ("AUF") 1-2, 4, 8.) Mr. Detweiler suffered from schizophrenia and bipolar disorder. (Plaintiff's Additional Material Fact ("PAMF") 1.) Before departure, Defendant Bruce Garrett, the assistant train conductor, was told by the train's conductor, Eric McNay, that another Amtrak employee had said Mr. Detweiler had previously fought with police officers. (AUF 5.)[1] Mr. Garrett proceeded to check Mr. Detweiler's ticket, verified that Mr. Detweiler's ticket was proper, and directed him to board the train. (AUF 6, 8.)

Approximately 10 minutes after the train departed, a passenger reported to Mr. Garrett that they had observed another passenger displaying brass knuckles. (AUF 14.) Based on the description he received, Mr. Garrett located Mr. Detweiler standing in a train car and identified him as potentially being the referenced individual. (AUF 14, 17.) Mr. Garrett spoke to Mr. Detweiler, who repeatedly said he was going to Emeryville. (AUF 18.) Mr. Garrett confirmed to

---

[1] Citations to Defendants' separate statements of facts in this brief incorporate Plaintiff's responses thereto, contained in Plaintiff's concurrently filed Responses to Defendants' Separate Statements of Undisputed Facts, when the cited fact is wholly or partly disputed.

Mr. Detweiler that Mr. Detweiler was indeed going to Emeryville and was "good to go," and requested that he return to his seat. (PAMF 2.) Mr. Detweiler complied and sat down in his seat. (AUF 20.) Based on his interactions with Mr. Detweiler, Mr. Garrett believed Mr. Detweiler had a mental health issue. (PAMF 3.) During this interaction, Mr. Detweiler did not verbally threaten to harm anyone, and Mr. Garrett did not see brass knuckles. (PAMF 4.) Mr. Garrett then spoke with Mr. McNay and, based on Mr. Detweiler's reported earlier display of brass knuckles, they determined to have Mr. Detweiler removed from the train. (AUF 25, 27.) Upon contacting the train's engineers and Union Pacific, the conductors were told that the train would need to proceed further south toward Mt. Shasta, California, to obtain police assistance. (AUF 28.) At this time, Mr. Garrett had no information that, while on the train, Mr. Detweiler had verbally threatened anyone, fought with anyone, or injured anyone. (PAMF 5.) He also had no information that Mr. Detweiler had ever been convicted of a crime or had ever injured anyone before. (PAMF 6.) Mr. Garrett did not form the impression that Mr. Detweiler was under the influence of drugs or alcohol. (PAMF 7.)

Approximately 10 minutes later, another passenger approached Mr. Garrett stating they saw a passenger display brass knuckles. (AUF 30.) Mr. Garrett again located Mr. Detweiler standing on the train and asked that he return to his seat. (AUF 32-33.) Mr. Garrett testified that he observed Mr. Detweiler holding brass knuckles at this time. (AUF 34.) When Mr. Garrett approached Mr. Detweiler, another Amtrak employee was standing in the aisle behind Mr. Detweiler; Mr. Garrett observed that this appeared to make Mr. Detweiler feel anxious and boxed in between the two Amtrak employees, and Mr. Garrett gestured to indicate the other employee should go away and they did. (PAMF 8.) Mr. Detweiler then returned to his seat as Mr. Garrett requested. (AUF 37.) Mr. Garrett then sat down in a seat approximately 10 rows behind Mr. Detweiler and observed for 15-20 minutes to see whether Mr. Detweiler would get up again. (AUF 38.) Mr. Detweiler remained seated and stationary. (PAMF 9.) Mr. Garrett testified that, on both occasions interacting with Mr. Detweiler on the train, he successfully de-escalated and calmed the situation, pursuant to his training; he "felt like [he] could handle" Mr. Detweiler without

assistance from other employees; and that Mr. Detweiler never refused to comply with any request he made. (PAMF 10.)

**B. An Hour and a Half After the Second Incident on the Train, Mr. Garrett Calls Mt. Shasta Police to Report that Mr. Detweiler, then Asleep, Is Agitated and Threatening Passengers**

Approximately an hour and a half later, having heard no further reports regarding Mr. Detweiler and having observed that he continued to remain in his seat and was not moving, Mr. Garrett called the Mt. Shasta Police Department to seek confirmation that law enforcement would meet the train in Mt. Shasta to remove Mr. Detweiler. (PAMF 11.) During this call, Mr. Garrett stated that he was "requesting help to get a passenger off that's agitated and … becoming possibly violent"; that the passenger was Nicholas Detweiler; that Mr. Detweiler "has a pair of brass knuckles and he is brandishing them to crew members and other passengers, and he becomes agitated"; that if Mr. Detweiler "becomes agitated" he would pull out the brass knuckles; and that Mr. Detweiler exhibited "erratic behavior." (PAMF 12.) During the call, Mr. Garrett repeatedly used the present tense and did not state that these reported issues had occurred an hour and a half earlier or that he had observed that Mr. Detweiler had remained stationary in his seat for the past hour and a half without any incident during that time. (PAMF 13.) Mr. Garrett testified that, during this call, he was describing conduct that had occurred more than an hour earlier, not conduct that was actively occurring. (PAMF 14.) During the call, Mr. Garrett also stated that he had received "reports" that Mr. Detweiler had been arrested the previous year for "assaulting a cop," without providing further detail, and that Mr. Detweiler kept the brass knuckles in the back pocket of his jeans. (PAMF 15.)

Defendant officer Jeremiah Capurro testified that, at the Mt. Shasta police station following Mr. Garrett's call, he was told by the dispatcher that an Amtrak train would be stopping to have a passenger removed who was reportedly causing a disturbance, threatening people with brass knuckles, and had previously assaulted officers. (City Defendants' Undisputed Fact ("CUF")

4.)[2] He received no other information, including the reported individual's name or description, any information that the individual had injured anyone with the brass knuckles or verbally threatened to harm anyone with them, or any details regarding the alleged prior assault on an officer, including whether any officer had been injured. (PAMF 16.)[3] He testified he was not told the individual reportedly kept the brass knuckles in his back pocket. (PAMF 17.) He testified he assumed the reported brandishing of brass knuckles had occurred just before Mr. Garrett called, and that the reported disturbance was still occurring, as he was not told this had reportedly occurred at least an hour and a half earlier. (PAMF 18.) Ofc. Capurro directed the dispatcher to contact the county sheriff's department to request additional units to respond to the train with him, and to make them aware of the train's anticipated timing. (PAMF 19.)

### C. Ofc. Capurro Boards the Train Without Seeking Additional Information or Waiting for Nearby Backup

Ofc. Capurro arrived at the train stop and called one of the sheriff's deputies who was en route and learned two deputies were 5-10 minutes away. (CUF 7-8.) He testified that his plan was to board with the deputies. (PAMF 20.) The train arrived shortly after his call and Mr. McNay stepped out to let Ofc. Capurro on. (CUF 10-11.) Ofc. Capurro asked, "Where's he at?" (PAMF 21.) Ofc. Capurro then boarded the train without waiting for backup or asking any other questions, including whether anyone was hurt, whether the reported individual had struck anyone with brass knuckles, whether he in fact had brass knuckles or where he kept them, when the reported disturbance had occurred, or whether it was still ongoing. (PAMF 22.) He testified he did not ask

---

[2] No audio recording of the dispatcher relaying the call details to Ofc. Capurro was produced in discovery (Declaration of Benjamin S. Levine ("Levine Decl.") ¶ 9), which Ofc. Capurro attributed to the call details having been told to him in person at the station rather than via radio dispatch. (Levine Decl., Ex. A, Deposition of Jeremiah Capurro ("Capurro Depo.") at 24:14-25:25.)

[3] Amtrak Defendants cite evidence purporting to establish additional criminal history for Mr. Detweiler (Amtrak Defs.' Mot. [Dkt. 32-1] at 9-10), none of which was known by Mr. Garrett or Ofc. Capurro during this incident, save for the third-hand (for Mr. Garrett) or fifth-hand (for Ofc. Capurro) representation regarding Mr. Detweiler's alleged prior assault on an officer, noted above. (AUF 66.)

such questions because he assumed the reported disturbance was still occurring. (PAMF 23.) He testified that his job was simply "to go remove [Mr. Detweiler] from the train," without asking employees or Mr. Detweiler what had happened, and that he "was not there to have a conversation." (PAMF 24.) He did not know who wanted Mr. Detweiler removed from the train. (PAMF 25.) Although a supervisor was available on call, he did not contact the supervisor before boarding, including to ask whether he should wait for the backup he believed was as near as 5 minutes away. (PAMF 26.)

Upon boarding the train, Mr. McNay advised Ofc. Capurro that the reported individual was upstairs, and directed him there, but provided no further details. (AUF 47.) Mr. Garrett was upstairs and silently led Ofc. Capurro down the aisle to where Mr. Detweiler was seated, pointed at Mr. Detweiler, and proceeded to the end of the train car. (AUF 47-48.) Ofc. Capurro did not say anything to Mr. Garrett or ask him any questions. (PAMF 27.) Mr. Detweiler was seated in the same seat he had been in for over an hour and forty-five minutes, next to the window, with a sweatshirt hood on his head, and was not moving. (PAMF 28.) He appeared to be asleep and Ofc. Capurro believed he was asleep. (PAMF 29.)[4] Upon seeing that Mr. Detweiler was sleeping and not actively committing a crime or creating a disturbance, Ofc. Capurro did not consider stopping to check whether his backup was nearby or to speak to the Amtrak employees to obtain more information. (PAMF 30.)

Numerous other passengers were in the train car, though Ofc. Capurro did not address them or direct them to exit or move away. (PAMF 31.) Ofc. Capurro also did not provide any instructions to or communicate any plan to Mr. McNay or Mr. Garrett. (PAMF 32.) Ofc. Capurro observed some bags on the aisle seat next to Mr. Detweiler, between Mr. Detweiler and himself,

---

[4] Although Ofc. Capurro would later claim he thought Mr. Detweiler could have been "faking" sleeping, immediately after the incident he told a supervisor that Mr. Detweiler had been sleeping, and that Mr. Detweiler woke after Ofc. Capurro initially shook him and he was not waking up. (Declaration of Amber Orrey ("Orrey Decl.") [Dkt. 31-6], Ex. A, at 16:53-16:59; Levine Decl., Ex. C, Deposition of David Blake at 59:11-24.) Plaintiff's expert opined that a reasonable officer in Ofc. Capurro's position would have concluded that Mr. Detweiler appeared to be asleep. (Levine Decl., Ex. D, Deposition of Scott DeFoe ("DeFoe Depo") at 28:4-25.)

and testified he was concerned they might contain a weapon, but he did not attempt to move them away or search them before waking Mr. Detweiler. (PAMF 33.)

**D. Ofc. Capurro Wakes, Confronts, and Escalates Encounter with Mr. Detweiler**

Ofc. Capurro shone a flashlight at Mr. Detweiler, tapped him on the shoulder, said “hey, bud,” and pulled the hood off of his head while shining the flashlight at his face, and Mr. Detweiler woke up and appeared startled. (PAMF 34.) Still shining the flashlight at Mr. Detweiler’s face, Ofc. Capurro said, “police department.” (PAMF 35.) Mr. Detweiler stood up slightly, held his hands up, and said, “excuse me, sir, is this the stop?” (PAMF 36.) Ofc. Capurro said “yeah, this is the stop, you’re coming off,” while Mr. Detweiler asked if it was the Emeryville stop. (PAMF 37.) Ofc. Capurro did not respond and instead drew his Taser, raised it and aimed it toward Mr. Detweiler, and told Mr. Detweiler to “keep your hands up.” (PAMF 38.) Mr. Detweiler stood up and raised his hands higher, with his empty left hand raised above his shoulders and his right hand resting on the nearby headrest, open and visibly empty. (PAMF 39.)

Ofc. Capurro continued repeating the direction to “keep your hands up” while Mr. Detweiler said, “excuse me, sir,” and requested clarification regarding what was happening. (PAMF 40.) Ofc. Capurro did not respond and instead ordered Mr. Detweiler to turn around, without explanation. (PAMF 41.) After Mr. Detweiler picked up a plastic bag from the seat to prepare to exit, Ofc. Capurro grabbed at it and said, “don’t touch anything.” (PAMF 42.)[5] Mr. Detweiler asked if Ofc. Capurro wanted him to get off the train, and Ofc. Capurro responded, “yeah, don’t touch anything,” while tugging at the bag Mr. Detweiler held without further explanation. (PAMF 43.) Mr. Detweiler asked, “would you give me a chance to grab my things?” (PAMF 44.) Ofc. Capurro again did not respond and only reiterated, “don’t touch anything,” before legging go of the bag. (PAMF 45.) At no time did Ofc. Capurro tell Mr. Detweiler he was, or would be, detained or arrested. (PAMF 46.)

---

[5] Although Ofc. Capurro testified he feared Mr. Detweiler could have a knife or firearm in the bag, he had not received any information indicating Mr. Detweiler had either of these things. (Levine Decl., Ex. A, Capurro Depo. at 49:5-25, 89:1-16.)

**E. Ofc. Capurro Initiates Altercation with Mr. Detweiler, Tasing Him Repeatedly and Striking Him With a Baton Over a Dozen Times Without Warning**

Mr. Detweiler stepped into the aisle, raised his hands, and took a step backward while beginning to reiterate his question, when Ofc. Capurro abruptly tased Mr. Detweiler in the abdomen without any verbal warning. (PAMF 47.) Mr. Detweiler reached for the Taser and moved it away from his abdomen—a common response from individuals being tased due to the pain—and there was a brief struggle during which additional Taser discharges can be heard and Mr. Detweiler asked Ofc. Capurro to "please keep away from me." (PAMF 48.) Mr. Garrett then grabbed Mr. Detweiler from behind by the shoulders, and Mr. Detweiler and Ofc. Capurro separated while Taser wires dangled between them and Ofc. Capurro continued discharging the Taser. (PAMF 49.) Ofc. Capurro then approached Mr. Detweiler while Mr. Detweiler was restrained from behind by Mr. Garrett and appeared to grapple with Mr. Detweiler while continuing to tase him. (PAMF 50.)[6] At no point did Ofc. Capurro issue any verbal warning that the Taser would be used. (PAMF 51.) Ofc. Capurro stated, "I need assistance now," into his radio earpiece, but did not address Mr. Garrett to clarify whether this statement was directed to him or whether he wanted him to assist. (PAMF 52.)

Mr. Garrett and Mr. Detweiler backed toward the end of the train car, with Mr. Garrett still restraining Mr. Detweiler from behind and holding Mr. Detweiler's right arm behind Mr. Detweiler's back. (PAMF 53.) Ofc. Capurro drew his wooden baton, approached Mr. Detweiler, and began jabbing and using overhand strikes with it against Mr. Detweiler, without issuing any commands or any verbal warning, or saying anything at all. (PAMF 54.) Mr. Detweiler held his left arm out to shield his body from the baton and again asked Ofc. Capurro to "please keep away from me." (PAMF 55.) Ofc. Capurro continued striking Mr. Detweiler and told him to "fucking stop," without saying what Mr. Detweiler should stop doing, while Mr. Detweiler remained

[6] Ofc. Capurro claimed that Mr. Detweiler punched him during this time, though this is not shown on Ofc. Capurro's body-worn camera video, and Mr. Garrett did not see it. (Orrey Decl., Ex. A at 01:51-01:58; Levine Decl., Ex. B, Deposition of Bruce Garrett ("Garrett Depo.") at 49:11-19.)

stationary, restrained from behind by Mr. Garrett, with his right arm behind his back and his left arm outstretched to take the baton strikes. (PAMF 56.) Ofc. Capurro testified that when he jabbed Mr. Detweiler with the baton, he did so with all of his energy, and minutes after the incident told a supervisor that he was "crushing [Mr. Detweiler's] hand" with his overhand strikes. (PAMF 57.) Mr. Detweiler asked Ofc. Capurro several times to stop striking him, and Ofc. Capurro told him to "get back," when Mr. Detweiler was already backed into the corner of the vestibule, and continued striking him with the baton. (PAMF 58.) Mr. Detweiler said, "I'm trying to get off the train with you" and asked if he could obtain his things and leave the train. (PAMF 59.) Ofc. Capurro did not respond and instead only told him to get on the ground, while Mr. Garrett continued to restrain Mr. Detweiler from behind with both hands. (PAMF 60.)

### F. Ofc. Capurro Fires Six Shots at Mr. Detweiler and Mr. Garrett, in Three Volleys, Including at Mr. Detweiler's Back as He Lays on the Ground

Ofc. Capurro then drew his firearm, aimed it at Mr. Detweiler, and told him to "get on the fucking ground." (PAMF 61.)[7] Still restrained from behind by Mr. Garrett, Mr. Detweiler removed a pair of brass knuckles and put it on his hand, while stating again that he needed to leave the train with Ofc. Capurro and asking again, "can we leave the train?" (PAMF 62.) Ofc. Capurro did not respond other than to again order Mr. Detweiler to the ground, and Mr. Detweiler reiterated his request to have someone take his bags so he could leave the train. (PAMF 63.) When Ofc. Capurro continued not to respond and continued aiming his gun at Mr. Detweiler, Mr. Detweiler turned, swung his right arm past Mr. Garrett, who was not struck, and grabbed onto Mr. Garrett. (PAMF 64.)[8]

---

[7] Plaintiff's police expert opined that it appeared Mr. Detweiler may have been unable to get on the ground due to Mr. Garrett's restraint of him from behind. (Levine Decl., Ex. D, DeFoe Depo at 30:2-25.)

[8] In deposition, Ofc. Capurro testified that, at this time during the incident, he observed Mr. Detweiler "reach[] for the brass knuckles and put them on, and then grab[] the conductor or the Amtrak employee." (Levine Decl., Ex. A, Capurro Depo. at 63:24-64:11.) Ofc. Capurro also testified that he did not see Mr. Detweiler strike Mr. Garrett before he fired. (*Id.* at 66:22-25, 73:17-19.) He did not testify that Mr. Detweiler had appeared to attempt to punch Mr. Garrett until

(footnote continued)

Without issuing a verbal warning, Ofc. Capurro then fired four shots, striking both Mr. Detweiler and Mr. Garrett. (PAMF 65.) Upon being struck, both fell to the ground together, with Mr. Detweiler's right arm partially around Mr. Garrett's upper chest area,[9] as Mr. Garrett yelled and groaned in pain from being shot. (PAMF 66.) Ofc. Capurro's Taser, which he had dropped earlier, lay illuminated on the aisle seat just in front of him though he did not reach for it. (PAMF 67.) Ofc. Capurro briefly lowered his gun, paused, then raised it again and fired a fifth shot into Mr. Detweiler's back, approximately three seconds after his fourth shot, again with no verbal warning. (PAMF 68.) During this time, a passenger who had been seated in the front row, 3-4 feet away, stood up and backed against the window in an apparent effort to avoid being struck by the men or by Ofc. Capurro's shots. (PAMF 69.) Ofc. Capurro paused again as Mr. Garrett moved out from under Mr. Detweiler, Mr. Detweiler's right hand went to the ground in front of Ofc. Capurro, and Mr. Detweiler's chest faced the ground, before Ofc. Capurro fired a sixth shot, again into Mr. Detweiler's back, while he lay on the floor with no hand on Mr. Garrett. (PAMF 70.) Ofc. Capurro's sixth shot was fired more than a second after his fifth shot, without any verbal warning. (PAMF 71.) At no time during his shots did Ofc. Capurro see Mr. Detweiler trying to strike Mr. Garrett. (PAMF 72.) At no time did Mr. Detweiler verbally threaten to harm anyone. (PAMF 73.)

### G. Ofc. Capurro Redirects Medical Assistance Away from Mr. Detweiler

Ofc. Capurro asked if Mr. Garrett was hit, and Mr. Garrett responded that he was, before Ofc. Capurro radioed to request medical assistance. (PAMF 74.) The only injuries Mr. Garrett sustained during the incident were from Ofc. Capurro's gunshots; he was not injured by Mr.

---

he was later led to do so by Amtrak Defendants' counsel. (*Id.* at 100:16-103:2.) Plaintiff's police expert opined that Ofc. Capurro's body-worn camera video does not clearly show Mr. Detweiler swing at Mr. Garrett's head or demonstrate an intent to cause serious bodily harm justifying use of deadly force. (Levine Decl., Ex. D, DeFoe Depo. at 33:3-37:1.)

[9] Although Defendants insist this was a "choke hold," Ofc. Capurro's body-worn camera video indicates that Mr. Detweiler's arm was not pressing against Mr. Garrett's neck. (Orrey Decl., Ex. A at 02:39-02:43.) Plaintiff's police expert likewise opined, based on his review of the video, that no choke hold occurred. (Levine Decl., Ex. D, DeFoe Depo. at 41:4-13, 41:18-43:8; Declaration of Scott DeFoe (DeFoe Decl. ¶ 16.) Mr. Garrett himself, when asked if he had been placed in a choke hold, clarified that he believed it was instead "some type of head restraint, head lock, something." (Levine Decl., Ex. B, Garrett Depo. at 96:23-97:6.)

Detweiler. (PAMF 75.) Ofc. Capurro handcuffed the mostly motionless Mr. Detweiler before attempting to provide medical care to Mr. Garrett. (PAMF 76.) Three minutes after Ofc. Capurro's final shot, and less than five minutes after Ofc. Capurro woke Mr. Detweiler, sheriff's deputies arrived where the men were located aboard the train. (PAMF 77.) The deputies began attempting to assist Mr. Detweiler and Mr. Garrett while Ofc. Capurro attended to Mr. Garrett, who appeared to remain alert, spoke clearly, and radioed a request that his backpack be brought with him off the train. (PAMF 78.) Ofc. Capurro then escorted Mr. Garrett downstairs and off the train, where he told a fire department official that "the bullets were bouncing off of the metal in there" and that he believed Mr. Garrett's gunshot wounds were "a ricochet or something." (PAMF 79.) He walked Mr. Garrett over to a nearby ambulance, and an ambulance worker inside who was preparing to wheel out a gurney said, "I need to go check out that other guy," referring to Mr. Detweiler. (PAMF 80.) Ofc. Capurro responded, "Do you need to do that right now? Can you just get [Mr. Garrett] to the hospital? The other guy is deceased." (PAMF 81.)[10] When a nearby sheriff's deputy offered to drive Mr. Garrett to the hospital herself so that Mr. Detweiler could go in the ambulance, Ofc. Capurro interjected, repeated, "the other guy is deceased," and further insisted that the ambulance take Mr. Garrett and not Mr. Detweiler. (PAMF 82.) The sheriff's deputy and ambulance worker acquiesced, and Mr. Garrett boarded the ambulance. (PAMF 83.) Ofc. Capurro testified that he did not do anything to try to save Mr. Detweiler's life and did not do anything to ensure Mr. Detweiler received medical care after getting Mr. Garrett to the ambulance. (PAMF 84.) Mr. Detweiler died at the scene. (PAMF 85.)

### H. Tactical Considerations

Ofc. Capurro knew that information from 911 calls may be inaccurate and understood that one role of officers when going to a scene is to investigate and determine what is going on. (PAMF 86.) He knew that by asking questions, officers may learn valuable information beyond or different than what was dispatched, and that having additional or current information is helpful in

---

[10] Ofc. Capurro testified that he "just assumed" Mr. Detweiler was dead. (Levine Decl., Ex. A, Capurro Depo. at 75:2-4.)

developing a tactical plan. (PAMF 87.) He testified it would have been helpful to know that when he was boarding, Mr. Detweiler had been in his seat, stationary and asleep, for over an hour and a half, that there had been no incidents during that time, that Mr. Detweiler had never verbally threatened or attempted to harm anyone with brass knuckles aboard the train, and that the brass knuckles were believed to be in Mr. Detweiler's back pocket. (PAMF 88.) He testified that, had he known there was no ongoing disturbance and that Mr. Detweiler had been stationary in his seat for an hour and a half, he would have waited for backup. (PAMF 89.) He testified that, had he boarded the train with backup, he likely would never have used deadly force, and Plaintiff's expert so opined as well. (PAMF 90.)

Ofc. Capurro testified his plan was to remove Mr. Detweiler from the train before telling him he was being detained or arrested. (PAMF 91.) Before boarding the train, he considered that Mr. Detweiler might not cooperate. (PAMF 92.) He testified that his plan to get Mr. Detweiler off the train, without backup or further information, was to escort Mr. Detweiler off without handcuffs. (PAMF 93.) He testified that, after Mr. Detweiler did not comply with all his commands, he changed his plan and decided that he would handcuff Mr. Detweiler, then escort him off train. (PAMF 94.) He testified he never considered telling Mr. Detweiler he was there because Mr. Detweiler had been asked to leave the train, or that Ofc. Capurro would escort him off and discuss further with him outside. (PAMF 95.) He never told Mr. Detweiler he wanted to handcuff him or to put his hands behind his back. (PAMF 96.) After the incident, his supervisors told him he should have waited for backup before boarding the train and confronting Mr. Detweiler. (PAMF 97.)

Ofc. Capurro further testified that, when he was tasing Mr. Detweiler, he did not consider creating distance between himself and Mr. Detweiler to attempt to de-escalate. (PAMF 98.) He testified that, when he shot, he did so to protect Mr. Garrett. (PAMF 99.) He also testified that when he shot, he knew Mr. Garrett was near Mr. Detweiler and that another occupied train car was behind them. (PAMF 100.) And he testified that before he fired, he knew Mr. Garrett could be struck either in the background or by ricochet, which City Defendants' police expert testified was obvious. (PAMF 101.) Despite this, Ofc. Capurro also testified that, had he known Mr. Garrett

was at risk of being struck, he would not have shot and would instead have come up with another option. (PAMF 102.)

**I. Training Provided to Mr. Garrett and Ofc. Capurro**

Mr. Garrett was trained by Amtrak to attempt to de-escalate situations with individuals who may have mental health issues or be under the influence. (PAMF 103.) He was also trained on Amtrak's service standards manual which provides that Amtrak customers should only be removed or restrained when other methods, including a firm request, have failed. (PAMF 104.) Amtrak's service standards also provide that involuntary removal of customers is "extremely serious" and should only be done when a customer "refuses to refrain" from conduct that endangers their own life or jeopardizes the safety and comfort of others. (PAMF 105.)

Ofc. Capurro received training at the police academy and from the Mt. Shasta Police Department, including regarding tactics, de-escalation, dealing with individuals with potential mental health issues or mental illness, and use of force. (PAMF 106.) He was trained on the tactical advantages of having multiple officers present, including that this makes suspects less likely to use force and provides officers with more strategic options, such as by having a "contact" officer to address the subject and go hands-on if necessary, and a "cover" officer to be ready to use other force options if necessary. (PAMF 107.) He was trained that proper tactics are important for everyone's safety, including officers, the public, and the subject. (PAMF 108.) He was trained, when responding to a call, to contact reporting parties to gather additional information when feasible, including the subject's current location, recent conduct, the location of any known weapons, and the specific nature of any reported crimes. (PAMF 109.) He was trained to wait for assistance when feasible before contacting subjects who are reportedly armed and potentially violent. (PAMF 110.)

Ofc. Capurro was also trained to speak in a calm voice to attempt to de-escalate tense situations when feasible. (PAMF 111.) He was trained that tactics and techniques that can assist in decreasing a situation's intensity and in gaining voluntary compliance include exercise of self-control, effective communication, and scene assessment and management. (PAMF 112.) Officers are trained that de-escalation may minimize or eliminate the need for force. (PAMF 113.) Ofc.

Capurro was also trained to give commands that are clear and understandable, and to give individuals an opportunity to comply with commands when feasible. (PAMF 114.)

Ofc. Capurro was also trained on the use of takedowns and control holds. (PAMF 115.) He was trained that when using the baton, he must justify each strike, and that baton strikes could break bones. (PAMF 116.)

Ofc. Capurro was trained that officers may only use deadly force to confront an imminent threat of death or serious bodily injury, meaning the subject must have the ability, opportunity, and apparent intent to immediately cause death or serious bodily injury. (PAMF 117.) He was trained that deadly force should be used only when no other reasonable options are available. (PAMF 118.) He was trained that fear of future harm is insufficient to justify deadly force, no matter how great the fear or how likely the harm. (PAMF 119.) He was trained that when using deadly force, officers must justify each shot, and must assess between shots and continuously evaluate the threat the subject poses to determine whether deadly force is, or continues to be, justified. (PAMF 120.) He was trained to give a verbal warning before using deadly force when feasible. (PAMF 121.) Officers are trained that deadly force is not appropriate even if someone is assaultive, but not engaged in life-threatening conduct, and that only life-threatening action may justify deadly force. (PAMF 122.) Ofc. Capurro was also trained to consider his background or backdrop before using deadly force, to ensure bystanders are not struck, and that bullets can ricochet. (PAMF 123.)

**J. Expert Opinions**

City Defendants' and Plaintiff's police experts both opined it is important for officers to gather information when they get to a scene if possible. (PAMF 124.) City Defendants' own expert testified that an officer in Ofc. Capurro's position should wait for additional assistance, gather information, assess the situation, and plan the contact with the subject before approaching. (PAMF 125.) He testified that if an officer in Ofc. Capurro's position was unsure whether immediate intervention was necessary or whether he could instead wait for backup, he would question the reporting party regarding the situation, including the suspect's behavior at the time and the location of any reported weapons, pursuant to the officer's training. (PAMF 126.) He

testified that Ofc. Capurro could have done so here and that, had Ofc. Capurro learned there was no active threat aboard the train, it would have been prudent to wait for backup before boarding. (PAMF 127.) City Defendants' expert opined that Ofc. Capurro's contact with, detention of, and attempted arrest of Mr. Detweiler were contrary to training and department policy due to his failure to first gather information and wait for backup. (PAMF 128.)

Plaintiff's expert agreed and opined that Ofc. Capurro's tactics were inappropriate in not waiting for backup, interviewing anyone, formulating or communicating a tactical plan, or removing Mr. Detweiler's bags before approaching and waking Mr. Detweiler, given the information he had indicating Mr. Detweiler could potentially pose a threat, and also in allowing nearby passengers to remain on train and failing to communicate to Mr. Garrett or others what he wanted them to do, which should have been not to get involved and to get out of the way. (PAMF 129.) He opined that a reasonable officer in Ofc. Capurro's position would have done these things and would have used de-escalation tactics, including words and distance, to address an individual who initially was not complying with all commands, pursuant to department policy. (PAMF 130.) Plaintiff's expert opined that had these been done, deadly force likely would never have been used. (PAMF 131.) He opined that, among other benefits, having multiple officers present when confronting Mr. Detweiler would have meant they could have controlled his hands, such that Mr. Detweiler could never have put brass knuckles on. (PAMF 132.)

Plaintiff's expert opined that Ofc. Capurro escalated the encounter in violation of his training, rather than de-escalating, including by shining his flashlight at Mr. Detweiler, shaking him awake, and not explaining why he was there or anything else. (PAMF 133.) He opined that Mr. Detweiler appeared confused as to why he could not grab his bag, believing he was supposed to exit the train, and Ofc. Capurro improperly failed to explain this and thereby further contributed to the situation escalating unnecessarily. (PAMF 134.)

Plaintiff's expert opined that a reasonable officer in Ofc. Capurro's position would have considered that Mr. Detweiler may have been mentally ill based on the call information and Mr. Detweiler's actions and statements. (PAMF 135.) He opined that, based in part on Mr. Detweiler's apparent mental illness, a reasonable officer would have explained his requests to Mr. Detweiler

and the reason for them, would have told Mr. Detweiler he was being detained or arrested, would have slowed the pace of the encounter, and would have avoided unnecessary confrontation, but that Ofc. Capurro failed to do these things. (PAMF 136.) He opined that, based in part on Mr. Detweiler's apparent mental illness, Ofc. Capurro did not afford him reasonable time to comply with his commands, and that issuing verbal warnings that he would use force unless Mr. Detweiler complied was particularly important in light of this. (PAMF 137.)

Plaintiff's expert opined that none of the force used was appropriate, including the taser, baton strikes, and each of the three volleys of shots. (PAMF 138.) He opined that a reasonable officer would have provided verbal warnings before using each form of force and reasonable opportunity to comply. (PAMF 139.) He opined that use of baton strikes require that the subject demonstrate assaultive or pre-assaultive behavior at the time of the strikes, and that Ofc. Capurro's baton strikes were inappropriate due to Mr. Detweiler's minimal level of resistance at that time. (PAMF 140.) He also opined Ofc. Capurro had the opportunity to provide a verbal warning that deadly force would be used before the first volley when Mr. Detweiler was putting on the brass knuckles, and that a reasonable officer would have said that if Mr. Detweiler attempted to use them or strike someone he would shoot. (PAMF 141.) Plaintiff's expert opined that firing the first volley was inappropriate both because of a lack of an immediate threat of death or serious injury by Mr. Detweiler at the time of the shots and due to risks to others from backdrop and crowded train. (PAMF 142.) He opined that firing the second volley at Mr. Detweiler's back was inappropriate because Mr. Detweiler did not appear to have Mr. Garrett in a chokehold or be otherwise applying pressure to Mr. Garrett's throat, and because even if Mr. Detweiler had his arm around Mr. Garrett's neck, it would not constitute an immediate threat of serious bodily injury justifying deadly force. (PAMF 143.) And he opined that firing the third volley at Mr. Detweiler's back was further inappropriate because Mr. Detweiler was chest-down on the ground, clearly not harming or preparing to harm anyone, and had already been shot repeatedly. (PAMF 144.)

Plaintiff's expert was not retained to express opinions regarding Amtrak or Mr. Garrett or the propriety of their conduct, which are outside of the scope of his expert opinions, and he has rendered no such opinions in this case. (PAMF 145.)

### K. Mr. Garrett sues Ofc. Capurro and Mt. Shasta for Excessive Force, Battery, Negligence, and Violation of the Tom Bane Act

Based on this incident, Mr. Garrett sued Ofc. Capurro and the City of Mt. Shasta for excessive force under the Fourth Amendment, battery, negligence, and violation of the Tom Bane Act. (PAMF 146.) In his complaint, Mr. Garrett alleged that:

- Mr. Detweiler was sleeping when Ofc. Capurro approached him;
- Ofc. Capurro woke Mr. Detweiler and "escalated the situation" by "issuing conflicting orders in a hostile manner";
- Ofc. Capurro "did not issue appropriate commands" to Mr. Garrett or Mr. Detweiler before shooting;
- Ofc. Capurro "did not employ tactics to de-escalate the situation," "failed to approach and speak to [Mr. Detweiler] in a non-threatening manner, and failed to give [Mr. Detweiler] the opportunity to consent to and cooperate with instructions";
- Ofc. Capurro was capable of "neutralizing and/or effectuating the seizure of [Mr. Detweiler] using any of a variety of readily available less intrusive means and strategies" short of deadly force;
- "The force used by [Ofc. Capurro] was unnecessary, excessive, and unreasonable under the totality of the circumstances";
- Ofc. Capurro "failed to investigate or appropriately consider or assess whether [Mr. Detweiler] was mentally ill and/or experiencing a mental crisis, despite readily apparent indications that he was";
- Ofc. Capurro "inten[ded] to use excessive force against [Mr. Detweiler]"; and
- It was "feasible" for Ofc. Capurro to "give a verbal warning or adequate commands prior to shooting."

(PAMF 147.) Mr. Garrett's lawsuit was subsequently dismissed following a settlement. (PAMF 148.)

## III. LEGAL STANDARD

At summary judgment, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmovant. *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d 872, 875 (9th Cir. 1987). Even where key facts are undisputed, summary judgment should be denied if reasonable minds could differ on what inferences to draw. *Id.* This applies to video evidence that is ambiguous or susceptible to multiple interpretations. *Sanderlin v. Dwyer*, 116 F.4th 905, 915 (9th Cir. 2024) (denying summary judgment, explaining that "the reasonableness of the force used … turns on 'how the jury interprets the video footage'"); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage."). Even entirely circumstantial evidence is sufficient to create a triable issue of fact. *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992).

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions," summary judgment "in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) ("We have held repeatedly that the reasonableness of force used is ordinarily a question … for the jury."); *Bonivert v. City of Clarkston*, 883 F.3d 865, 880 (9th Cir. 2018) ("The Supreme Court has cautioned that attempting to decide excessive force cases at summary judgment requires courts to 'slosh [their] way through the factbound morass of 'reasonableness,'' with predictably messy results."). "Deadly force cases pose a particularly difficult problem because the officer defendant[s]" are often "the only surviving eyewitness[es]." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 2014) (en banc) (alteration adopted). Accordingly, courts "must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify," *id.* at 795, and "must carefully examine all the evidence." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

## IV. OFC. CAPURRO'S USES OF LESS-LETHAL AND DEADLY FORCE WERE EXCESSIVE IN VIOLATION OF CLEARLY ESTABLISHED FOURTH AMENDMENT LAW

Fourth Amendment claims for excessive force are judged by "whether the officers' actions [we]re 'objectionably reasonable'" given "the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The Court must "balance the amount of force applied against the need for that force." *Bryan v. McPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010) (cleaned up). "[A]ll force—lethal and non-lethal—must be justified by the need for the specific level of force employed." *Id.* at 825 (applying *Graham* factors to use of intermediate force). Government interest factors weighed against the "nature and quality of the intrusion" include "(1) the severity of the crime," "(2) whether the suspect poses an immediate threat," and "(3) whether he is actively resisting" or "attempting to evade arrest." *Id.* at 396. Additional factors include (4) "whether proper warnings were given," (5) "whether the suspect has exhibited signs of mental illness," *Vos*, 892 F.3d at 1033-34 & n.9; *Nehad v. Browder*, 929 F.3d 1125, 1137-38 (9th Cir. 2019), and (6) the availability of alternative methods to effectuate an arrest or overcome resistance, *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc).

The inquiry is "highly fact-intensive" and involves "no *per se* rules." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). Although courts "recognize that 'police officers are often forced to make split-second judgments,'" "[n]ot all errors in perception or judgment … are reasonable." *Id.* at 1124 (quoting *Graham*, 490 U.S. at 397). While courts "do not judge the reasonableness of an officer's actions 'with the 20/20 vision of hindsight,' nor does the Constitution forgive an officer's every mistake." *Id.* (quoting *Graham*, 490 U.S. at 396). Although "the situation at the precise time of the shooting will often be what matters most," "the 'totality of the circumstances' inquiry into a use of force has no time limit" and "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Barnes v. Felix*, 605 U.S. 73, 80 (2025). "Only information known to the officer at the time" is relevant. *Nehad*, 929 F.3d at 1132.

"The intrusiveness of … deadly force is unmatched," *Graham*, 490 U.S. at 397, "because, once deceased, an individual [cannot] have his guilt and punishment determined." *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (cleaned up). A taser used in drive-stun mode causes "extreme pain." *Mattos v. Agorano*, 661 F.3d 433, 446 (9th Cir. 2011) (en banc). Baton strikes "are regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests." *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011); *see id* at 1162 (explaining that baton strikes are "known to cause serious pain and to lead in some cases to serious physiological consequences"); (Levine Decl., Ex. C, Blake Depo. at 34:5-7). "[I]ntermediate force is the most severe force authorized short of deadly force," *Smith*, 394 F.3d at 702, and presents a "significant risk of injury." (Levine Decl., Ex. C, Blake Depo. at 74:11-13.)

**A. No Immediate Threat Justified Ofc. Capurro's Less-Lethal or Deadly Force**

"[T]he most important *Graham* factor is whether the suspect posed an immediate threat" of injury at the time force was used. *Mattos*, 661 F.3d at 441 (cleaned up). Use of a taser in drive-stun mode requires an "immediate threat" of harm. *Bonivert*, 883 F.3d at 880 (quoting *Mattos*, 661 F.3d at 445-46); *see Bonivert*, 883 F.3d at 881 (holding jury could find use of taser in drive-stun mode unreasonable where, prior to deployment, plaintiff "did not threaten or advance toward the officers" and "posed no immediate threat to the officers"); *Mattos*, 661 F.3d at 444-45 (same where, prior to deployment, plaintiff was "uncooperative and … agitated" but had not "verbally threaten[ed] the officers" and "was not physically threatening"). Baton strikes likewise require an immediate threat of harm. *See Ballew v. City of Pasadena*, 642 F. Supp. 3d 1146, 1181 (C.D. Cal. 2022) (collecting cases).

Use of deadly force is reasonable only if an officer has probable cause to believe the suspect poses an immediate threat of death or serious bodily harm to himself or others at the time deadly force is used. *See Gonzalez*, 747 F.3d at 793; *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). An officer's "desire to resolve quickly a potentially dangerous situation" does not justify deadly force. *Id.* Nor does "[t]he mere fact that a suspect possesses a weapon." *Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013); *see Harris v. Roderick*, 126 F.3d 1189, 1204 (9th

Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."). Rather, the circumstances must be such that a reasonable officer would believe the suspect would immediately use the weapon to inflict death or serious bodily harm if deadly force were not used at that time. *See Aguirre*, 29 F.4th at 628 (deadly force not justified where, on plaintiffs' facts, subject holding "bat-like object" was not facing officer, "coming 'on the attack,'" or approaching bystanders); *Hayes*, 736 F.3d at 1233-34 (no immediate threat where decedent moved toward officers with knife in home but was not charging and was given no command regarding the knife). Even where a suspect injures an officer with a weapon—which did not occur here—use of subsequent force is unreasonable if the suspect no longer poses an immediate threat. *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1002 (9th Cir. 2020) (collecting cases).

*Less-lethal force:*[11] At the time Ofc. Capurro initially tased Mr. Detweiler, Mr. Detweiler objectively posed no immediate threat of harm. He had been aggressively woken from sleep by Ofc. Capurro moments earlier, but nevertheless responded politely to Ofc. Capurro, saying "excuse me, sir," and asking whether the train had reached his stop. He largely raised both hands, in substantial compliance with Ofc. Capurro's commands, and moved out slightly from under the low-hanging overhead baggage compartment in order to do so and following Ofc. Capurro's statement, "you're coming off," before calmly asking for clarification regarding what was occurring. His hands were visibly empty except for the handle of a plastic bag, and when Ofc. Capurro grabbed onto the bag, Mr. Detweiler calmly asked whether Ofc. Capurro would allow him to leave the train with his belongings. Mr. Detweiler then took a step away from Ofc. Capurro in the aisle while holding both hands up and to the side, his palms visible to Ofc. Capurro, in

---

[11] City Defendants do not address the propriety of Ofc. Capurro's deployments of the Taser or his baton strikes in their motion, and do not request summary judgment for any claim as to those uses of less-lethal force. (*See* City Defs.' Mot.) Any argument that City Defendants are entitled to summary judgment as to these uses of force, whether under Plaintiff's Fourth Amendment or state law claims, including on the basis of qualified immunity, is therefore waived. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *Whitaker v. Astrue*, 2016 WL 146069, at *2 n.1 (N.D. Cal. Jan. 13, 2016) (citing *Nev. Dep't of Corr. v. Greene*, 648 F.3d 1014, 1020 (9th Cir. 2011)); *United States v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000).

compliance with Ofc. Capurro's repeated commands to "keep your hands up," when Ofc. Capurro immediately tased him in the abdomen without warning. Under these circumstances, a reasonable jury could easily conclude Mr. Detweiler posed no immediate threat of harm when Ofc. Capurro first deployed the Taser. *See Wallisa v. City of Hesperia*, 369 F. Supp. 3d 990, 1005-06 (C.D. Cal. 2019) (denying summary judgment where officers used force including Taser in drive-stun mode against individual suspected of violent crime, holding jury could find no immediate threat when officers had not seen him with a weapon, he was unable to flee, he was not near bystanders, and evidence indicated he was not attempting to use force against officers at the time); *Ledesma v. City of Vallejo*, No. 2:17-cv-00106-MCE-CKD, 2019 WL 932019, at *2, 5-6 (E.D. Cal. Feb. 26, 2019) (denying summary judgment where officers tased plaintiff from behind before repeatedly striking him with baton, where officers claimed plaintiff failed to comply with commands to get on the ground, but where plaintiff's evidence indicated he was not resisting arrest and parties disputed whether subject "assum[ed] a fighting posture"); *Hermosillo v. County of Orange*, 562 F. Supp. 3d 802, 812 (C.D. Cal. 2021) (denying summary judgment for Taser deployment where evidence indicated subject "was walking towards the officers, with his hands in the air, and not holding any weapon" at time of deployment); *see also Bryan*, 630 F.3d at 832 (holding officer's use of Taser on unarmed, non-fleeing suspect was excessive force); *Garlick v. County of Kern*, 167 F. Supp. 3d 1117, 1148 (E.D. Cal. 2016) (holding genuine dispute of fact existed regarding threat where, before officer's use of force, subject "was nonviolent, not fleeing, [and] did not assault any officer").

Given that Ofc. Capurro's initial use of the Taser was abrupt and without warning, Mr. Detweiler's reaction of attempting to fend it away from himself was normal and foreseeable, as a matter of common sense and as Plaintiff's police expert opined. In this context and concurrent with Mr. Detweiler's request to Ofc. Capurro to "please keep away from me," this reaction was not objectively threatening. A jury could readily conclude that a reasonable officer would view it simply as an attempt to prevent Ofc. Capurro from causing him further pain, which Mr. Detweiler by then knew Ofc. Capurro might do without warning, rather than an attempt to harm Ofc. Capurro or others. *See Young*, 655 F.3d at 1164 (recognizing "that an officer's 'provocative

conduct' can trigger an individual's 'limited right to offer reasonable resistance'" where an officer unexpectedly pepper sprayed a suspect on he sat on a curb); *Garlick*, 167 F. Supp. 3d at 1148 (applying principle to K-9 dog bite and holding jury could conclude bite prompted only "reasonable defensive responses" by subject in his "attempts to get the dog to stop biting him") (quoting *Young*, 655 F.3d at 1164). Ofc. Capurro then separated from Mr. Detweiler before approaching him again and tasing him two more times, in the leg or in the lower back, while Mr. Detweiler was being restrained from behind by Mr. Garrett. A reasonable jury could conclude that any threat Mr. Detweiler posed at that time was not sufficient to justify further Taser deployments against him. *See Wallisa*, 369 F. Supp. 3d at 1005-06; *Ledesma*, 2019 WL 932019, at *5-6. A reasonable jury could also conclude that, to the extent a reasonable officer would view Mr. Detweiler's conduct at threatening during this time, this was a product of Ofc. Capurro's own aggressive and escalatory conduct toward Mr. Detweiler since the beginning of the encounter, further mitigating the justification for further force. *See Barnes*, 605 U.S. at 80; *Young*, 655 F.3d at 1164; *Garlick*, 167 F. Supp. 3d at 1148.

When Mr. Detweiler then separated from Ofc. Capurro, restrained from behind by Mr. Garrett and not holding any weapon, Ofc. Capurro removed his baton and began to strike Mr. Detweiler at least 13 or 14 times. During this period, Mr. Detweiler's right hand was to his side or behind him, pinned in that position by Mr. Garrett, and his visibly empty left hand was outstretched toward Ofc. Capurro in what was plainly an effort to shield himself from the baton strikes. During this period Mr. Detweiler did not advance toward Ofc. Capurro, turn toward Mr. Garrett, or appear to attempt to strike either of them. Instead, while Ofc. Capurro was striking him with the baton, Mr. Detweiler repeated his request to Ofc. Capurro to "please keep away from me," asked Ofc. Capurro to "stop" at least four times, and explained, "I'm trying to get off the train with you." A jury could conclude that a reasonable officer in Ofc. Capurro's position would not believe that Mr. Detweiler posed any immediate threat of harm whatsoever during this period, let alone an immediate threat justifying more than a dozen baton strikes. *See Ledesma*, 2019 WL 932019, at *5-6; *Garlick*, 167 F. Supp. 3d at 1149-50 (denying summary judgment for officers who repeatedly beat subject with baton, holding jury could conclude "that rather than an actual

immediate threat to the officers, [the subject's] efforts, if any, to move away from the officers' baton strikes or his noncompliance by inaction could be considered a reasonable defensive response," creating a genuine dispute regarding whether any threat justified the baton strikes); *Ballew*, 642 F. Supp. 3d at 1179 (rejecting officers' contention that plaintiff "engaged in unpredictable conduct that was an escalating concern for officer safety" justifying baton strikes, based on disputed facts). A jury could so conclude even if it credited Ofc. Capurro's claim that Mr. Detweiler had previously punched him in response to his repeated prior uses of the Taser, *see Young*, 655 F.3d at 1164; *Garlick*, 167 F. Supp. 3d at 1148-50, as even "a suspect's previous violent conduct does not justify nontrivial force where the suspect poses no *immediate* safety threat." *Andrews v. City of Henderson*, 35 F.4th 710, 719 (9th Cir. 2022).

Deadly force: After Mr. Detweiler swung once, and Mr. Garrett visibly was not struck, Ofc. Capurro opened fire. During Ofc. Capurro's first volley, in which he fired four shots, Mr. Detweiler was not swinging at Mr. Garrett, and did not appear to be swinging, and the two began sliding to the ground together. The already-completed swing did not establish that Mr. Detweiler posed an immediate threat of death or serious injury to Mr. Garrett, as was necessary to justify the use of deadly force, when there were no indications that Mr. Detweiler was striking or attempting to strike Mr. Garrett thereafter. *See Tan Lam*, 976 F.3d at 998-99 (no immediate threat even after decedent stabbed officer where officer had opportunity to determine decedent was no longer attempting to attack); *Estate of Aguirre*, 29 F.4th at 628 (denying summary judgment where conflicting evidence created genuine dispute regarding whether decedent was facing officer with weapon "and coming 'on the attack'" as officer claimed when he fired). This is particularly so given Ofc. Capurro's own testimony that what he saw was Mr. Detweiler "reach[] for the brass knuckles and put them on, and *then grab[]* the conductor or the Amtrak employee." (Levine Decl., Ex. A, Capurro Depo. at 63:24-64:11 (emphasis added).)[12] That Ofc. Capurro's initial volley

---

[12] This testimony, together with that of Plaintiff's expert regarding what appeared to occur during this moment, creates a genuine dispute as to whether Mr. Detweiler "swung at Garrett's head" as City Defendants claim. (City Defs.' Mot. at 15.) Ofc. Capurro's body-worn camera video
(footnote continued)

struck Mr. Garrett multiple times is further evidence that any threat Mr. Detweiler posed could not justify deadly force. *See Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 996 (D. Ariz. 2012) (denying summary judgment where officer shooting man holding child created a "certainty that [the child] would fall to the ground" and "a substantial risk that she would be shot," such that the case was one "in which 'the 'solution' could be worse than the problem'") (quoting *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011)); *cf. Wilkins v. City of Oakland*, 350 F.3d 949, 955-56 (9th Cir. 2003) (denying summary judgment where officers shot fellow officer while he was attempting arrest based on claimed mistaken belief that he was not a police officer, and holding that reasonableness of claimed mistake regarding target of deadly force was fact issue for jury).

When officers fire multiple volleys of shots, each volley must be separately justified, and courts closely scrutinize each to determine whether the circumstances at the time of that volley is justified by the requisite threat. *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790, 800-01 (9th Cir. 2025) (en banc) (explaining that even a "brief[]" pause may allow officers to adequately reassess and determine that a suspect who previously posed an immediate threat of death or serious bodily injury may no longer pose such a threat after already being shot); *Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017); *see Hernandez*, 139 F.4th at 806 (Nelson, J., concurring) (Ninth Circuit considered pauses of 2.53 seconds and 1.36 seconds between shots to each establish separate volleys requiring separate threat analyses). "Even when … an officer is initially justified in using lethal force, []he cannot unnecessarily create a sense of urgency by continuing to fire after the immediate threat has ended." *Hernandez*, 139 F.4th at 801 n.5. "[A] duty to stop firing arises if an objectively reasonable officer would view the suspect as clearly incapacitated," and "whether a threat perceptibly ended is a factual determination that is ordinarily ill-suited for summary judgment." *Id.* (citing *Gonzalez*, 747 F.3d at 794 n.1).

---

is ambiguous on this point, such that it does not "blatantly contradict[]" Ofc. Capurro's deposition testimony and therefore does not defeat Plaintiff's showing that a genuine dispute of material fact exists. *Orn v. City of Tacoma*, 949 F.3d 1167, 1171 (9th Cir. 2020) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

After Capurro's first volley, he paused as Detweiler and Garrett fell to the ground together, before firing a fifth shot at Detweiler's back. Besides briefly putting his hand against the wall while falling down, Detweiler visibly was not moving at all and clearly was not swinging at Garrett or attempting to do so prior to the fifth shot. Although Detweiler's arm was around the front of Garrett as the two fell, and City Defendants contend he had Garrett in a "choke hold," the Capurro's body-worn camera video is equally or more consistent with Detweiler's arm being at Garrett's upper chest rather than his neck. At the summary judgment stage, this ambiguity in the video must be construed in Plaintiff's favor. *Sanderlin*, 116 F.4th at 915; *Vos*, 892 F.3d at 1028. Just prior to Capurro's fifth shot, Garrett audibly and clearly yelled an expletive and "ow!" from having been struck twice by Capurro's first volley, showing that there was not pressure being applied to his neck. Considering these details, and drawing permissible inferences from them in Plaintiff's favor, a reasonable jury could conclude Detweiler did not appear to pose an immediate threat of death or serious injury to Garrett at the time of Capurro's fifth shot. "[T]erminating a threat doesn't necessarily mean terminating the suspect," and a suspect who "is on the ground and appears wounded ... may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting." *Zion*, 874 F.3d at 1076. Ofc. Capurro failed to do so here, and a jury could readily find his decision to shoot again unreasonable.

After Capurro's fifth shot, he paused again as Garrett climbed out from underneath Detweiler, who was by then visibly limp and still not moving, and Detweiler's right hand slid to the ground in front of Capurro and Detweiler's chest turned down to the ground. After pausing and watching Garrett separate from Detweiler, Capurro fired a sixth shot, again at Detweiler's back. No reasonable jury could conclude Detweiler posed any immediate threat of death or serious injury to anyone at this time when he was obviously incapacitated and grievously injured, having already been shot repeatedly, and lay chest-down on the ground. *See id.* (holding that when decedent armed with knife was shot, "lying on the ground," and "making no threatening gestures," a jury "could find that [he] was no longer an immediate threat, and that [the officer] should have held his fire unless and until [the decedent] showed signs of danger or flight"); *Moore-Brown v. City of North Las Vegas Police Dep't*, 2022 WL 4804948, at *2, 6 (D. Nev. Oct. 3, 2022) (denying

summary judgment where officers fired at decedent after he undisputedly put officer in "choke hold" but then released officer before being shot). Viewing the evidence in the light most favorable to Plaintiff, a jury could conclude that no immediate threat justified any of Ofc. Capurro's shots, and that any threat from Mr. Detweiler diminished dramatically with each successive volley.

**B. Ofc. Capurro Was Not Responding to a Serious Crime**

The "severity of the crime" factor relates to the initial crime prompting a police response. *Barnes*, 605 U.S. at 80 (describing factor as "'severity of the crime' prompting the stop"); *see Vos*, 892 F.3d at 1031 & n.6; *Soderberg v. City of Los Angeles*, 2020 WL 6540511, at *9 n.11 (C.D. Cal. Sept. 30, 2020) (citing *Lowry v. City of San Diego*, 858 F.3d 1248, 1257-58 (9th Cir. 2017) (en banc)). Although Ofc. Capurro was told that Mr. Detweiler possessed brass knuckles, a crime, he had no information that Mr. Detweiler had attempted to use the brass knuckles against anyone, had verbally threatened to do so or to otherwise harm anyone, or had ever injured anybody. Accordingly, the severity of the reported crime to which Ofc. Capurro was responding does not support a conclusion that any of his subsequent escalating uses of force were unreasonable. Moreover, this is not a case where the encounter commenced following a crime that was just committed, mitigating this factor's weight. *See Singh v. City of Phoenix*, 124 F.4th 746, 752 (9th Cir. 2024) ("Even when a suspect has … committed a serious crime, … a jury could discount the severity of the suspect's purported crimes when the suspect is … not engaged in felonious conduct when the officer arrives.") (cleaned up). As the evidence demonstrates, even if Ofc. Capurro believed there was an active situation aboard the train, based in part on his failure to gather information, upon boarding he quickly observed that this was not the case and that Mr. Detweiler was in fact asleep in his seat, confirming that Mr. Detweiler was not engaged in criminal conduct. *See id.*

C. **Mr. Detweiler Did Not Flee, and any Resistance Did Not Support the Use of Significant Force**

"Resistance" is not "a binary state," "either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is

physically assaulting the officer." *Bryan*, 630 F.3d at 830. The Ninth Circuit has recognized that even where an individual "continually ignored" commands to show his hands and remain outside his home and "physically resisted" officers, his level of resistance "provided little support for a use of significant force." *Id.* (quoting *Smith*, 394 F.3d at 703). It has likewise found that an individual's erratic behavior and "failure to comply" was "a far cry from actively struggling with an officer" and did not support use of significant force. *Id.* Further, a "suspect's interest in his own life' prohibits an officer from using lethal force simply because the suspect has resisted arrest." *Hernandez*, 139 F.4th at 799 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

When Ofc. Capurro tased Mr. Detweiler, Mr. Detweiler was minimally resisting if at all. By that time, he had repeatedly put his hands up and, although he did not drop the bag (after Ofc. Capurro said "don't touch anything"—not "drop the bag" Mr. Detweiler was already holding or anything similar) or turn around, he nevertheless made clear that he intended to cooperate with Ofc. Capurro in his goal to have Mr. Detweiler leave the train, and only asked if he could be allowed to bring his belongings with him. Nor did Mr. Detweiler's single step backward constitute flight, as a reasonable jury could conclude he was simply attempting to create a small amount of space given the close quarters and the fact that Ofc. Capurro was already aiming a Taser at him.

When Ofc. Capurro struck Mr. Detweiler with the baton over a dozen times, Mr. Detweiler was not resisting or fleeing but instead was being restrained from behind by Mr. Garrett, in the small vestibule, and only held his single free arm out to take Ofc. Capurro's baton strikes. Moreover, at this time, Ofc. Capurro had not issued any relevant commands with which Mr. Detweiler failed or refused to comply; Ofc. Capurro was not saying anything at all to him during this period and also had never told him he was being detained or arrested. *See Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (explaining that "the officers never attempted to place Nelson or his associates under arrest, so we need consider only whether the degree of force employed may be justified by a failure to comply with orders given by the officers," and that orders issued after a use of force could not establish a "failure to comply with orders"); *Dominguez v. City of Scottsdale*, 587 F. Supp. 3d 914, 930-31 (D. Ariz. 2022) (explaining that in part because plaintiff "was not told why he was pulled over" and "was not under arrest or warned

he could be placed under arrest," his failure to exit vehicle did not constitute meaningful resistance). Likewise, Mr. Detweiler's failure to get on the ground when directed to do so does not in itself constitute significant resistance against Ofc. Capurro, when he was being restrained from behind by Mr. Garrett and may have consequently been unable to do so. Accordingly, this factor provides little support for Ofc. Capurro's escalating uses of force.

### D. Ofc. Capurro Provided No Warnings Despite Warnings Being Feasible

"Before using deadly force," officers "must, 'where feasible,' issue a warning." *Aguirre*, 29 F.4th at 628 (quoting *Garner*, 471 U.S. at 11-12). Officers should also issue warnings before using less-lethal force. *Deorle v. Rutherford*, 272 F.3d 1272, 1283-85 (9th Cir. 2001); *Rodriguez v. City of Modesto*, No. 1:10–CV–01370–LJO–MJS, 2015 WL 1565354, at *18 (E.D. Cal. Apr. 8, 2015); (DeFoe Decl. ¶ 11). Here, Ofc. Capurro never warned Mr. Detweiler that he would use any force against him before doing so, despite such warnings being feasible. A warning was clearly feasible before the initial tasing, when Mr. Detweiler had his hands raised and visibly empty and had taken a step back from Ofc. Capurro. Warnings were clearly feasible before Ofc. Capurro withdrew his baton and began striking Mr. Detweiler repeatedly with it while Mr. Detweiler was being restrained from behind by Mr. Garrett. A warning that deadly force would be used if Mr. Detweiler attempted to use the brass knuckles was feasible when Mr. Detweiler was putting on the brass knuckles. And, before each subsequent volley, warnings that additional force would be used if Mr. Detweiler did not let go of Mr. Garrett, or take some other unstated action that Ofc. Capurro wanted, were also feasible.

### E. Ofc. Capurro Failed to Consider and Account for Mr. Detweiler's Apparent Mental Illness

Where someone displays "indications of mental illness," "the government's interest in using deadly force [i]s diminished." *Vos*, 892 F.3d at 1034; *see Glenn*, 673 F.3d at 875; *Deorle*, 272 F.3d at 1282-83. As the Ninth Circuit has explained:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense.

> In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end.

*Deorle*, 272 F.3d at 1282-83. When officers have reason to believe an individual is mentally ill, "they 'should make a greater effort to take control of the situation through less intrusive means'" before resorting to deadly force. *Vos*, 892 F.3d at 1034, n.9 (quoting *Bryan*, 630 F.3d at 829) (alterations adopted).

Ofc. Capurro failed to recognize or consider that Mr. Detweiler appeared to be mentally ill and to handle the encounter accordingly. This is despite the fact that Mr. Garrett was able to recognize this through his own interactions with Mr. Detweiler, and Plaintiff's expert has opined a reasonable officer would have recognized this based on what Ofc. Capurro saw and heard. The appropriate course in addressing a person in Mr. Detweiler's position with apparent mental illness was to speak calmly and not escalate, and to acknowledge and respond to Mr. Detweiler's express efforts to cooperate with his goal of having Mr. Detweiler exit the train, but Ofc. Capurro did the opposite, including by quickly resorting to various force options and ultimately deadly force, all without warning.

**F. Other Reasonable Options Were Available**

Officers also must "consider what other tactics if any were available" to effect an arrest, including "less intrusive methods." *Bryan*, 630 F.3d at 831 & n.15 (cleaned up); *see Nehad*, 929 F.3d at 1135. Numerous alternative methods were available to Ofc. Capurro before using any force against Mr. Detweiler. Contrary to his training, he failed to wait for nearby backup or request any information before boarding the train besides Mr. Detweiler's location. Before and once on the train, he failed to provide direction to the conductors or other passengers, including to move away. He failed to search or move the bags next to Mr. Detweiler that he claimed he feared contained weapons. He abruptly woke Mr. Detweiler by shining a light in his face and pulling the hood off of his head, then spoke to him aggressively and ignored nearly all of his questions and attempts to work with Ofc. Capurro to get off of the train with his things. After repeatedly striking Mr. Detweiler with his baton, his Taser was within reach before him, but he did not grab it if he believed Mr. Detweiler remained a threat after his first volley, when Mr. Detweiler lay on the

ground with Mr. Garrett, and Ofc. Capurro instead continued firing, into Mr. Detweiler's back. Just like Plaintiff's expert opined and Ofc. Capurro himself largely conceded, had Ofc. Capurro "altered [his] tactics to bring them in compliance with [his] own training," it "would have minimized the degree of force applied or eliminated the need for force altogether." *See Nelson*, 685 F.3d at 882.

### G. The Unlawfulness of Ofc. Capurro's Uses of Less-Lethal and Lethal Force was Clearly Established

Qualified immunity does not apply where official "violate[s] clearly established … constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017). The touchstone is whether "officers [had] fair notice of the illegality of their conduct" at the time, *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020); *see Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002), and "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Pauly*, 580 U.S. at 79 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). Although fair notice ordinarily requires "cases relevant to the situation [officers] confronted," *Brosseau*, 543 U.S. at 200, it does "not require a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see Hope*, 536 U.S. at 740 (qualified immunity should be denied even "despite notable factual distinctions …, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights"); *id.* at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). "After all, if qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their reasonable violations of the Fourth Amendment." *Bonivert*, 883 F.3d at 872-73.

A plaintiff need not rely on a single case, as the governing constitutional rule may be clearly established by multiple decisions "[c]onsidered together." *Estate of Soakai v. Abdelaziz*, 137 F.4th 969, 985 (9th Cir. 2025); *see Polanco v. Diaz*, 76 F.4th 918, 930 n.8 (9th Cir. 2023) ("We routinely rely on the intersection of multiple cases when holding that a constitutional right has been clearly established."). "[I]n the absence of binding precedent, a court should look to

whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of … district courts." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003). An officer's training on use of force can also provide notice that force is unreasonable. *Id.* at 1062.

The unlawfulness of abruptly tasing Mr. Detweiler as Ofc. Capurro did was clearly established. In *Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018), the Ninth Circuit held that as of 2012, it was already clearly established "that use of a taser in drive-stun mode on a person who 'actively resisted arrest,' but posed no 'immediate threat to the safety of the officers or others,' constituted excessive force." *Id.* at 880 (quoting *Mattos*, 661 F.3d at 445-46). In *Mattos*, on which *Bonivert* relied, an officer tased a driver after pulling her over when "she became upset and proceeded to become increasingly agitated and uncooperative as the incident evolved" but did not "verbally threaten the officers" and "was not physically threatening" them. 664 F.3d at 444. The *Mattos* court held that a jury could find this use of force unreasonable. *Id.* at 445-46. Viewing the evidence in the light most favorable to Plaintiff, as the Court must at the summary judgment stage, Mr. Detweiler posed no immediate safety threat when his hands were up, visibly empty of any weapons, and he took one step away from Ofc. Capurro. Unlike in *Bonivert*, he had not "actively resisted [any] arrest." It was clearly established that tasing him under these circumstances was excessive. *See also Ledesma*, 2019 WL 932019, *6 (denying qualified immunity on excessive force claim where, under plaintiffs' facts, officers responding to domestic dispute ordered plaintiff out of his vehicle and the officer pointed a gun at him when he did not exit immediately, officers tased plaintiff from behind and began striking him repeatedly with baton as he used his arms to protect his head from the blows); *Hermosillo*, 562 F. Supp. 3d at 813 (holding unlawfulness of Taser was clearly established by prior Ninth Circuit decisions demonstrating that tasing an individual who is stationary, had complied with officers' commands, and did not pose an immediate threat is unreasonable).

The unlawfulness of Ofc. Capurro's repeated baton strikes without warning was also clearly established. Although Ofc. Capurro claims Mr. Detweiler punched him in response to being repeatedly tased without warning, City Defendants do not contend that Mr. Detweiler was

acting violently when Ofc. Capurro began striking him and continued to do so thereafter. Nor was Mr. Detweiler resisting anything when Ofc. Capurro began or continued striking him with the baton, except only for him holding out his arm to take the strikes. Existing law established that repeated baton strikes could not be used under these circumstances. *See Ballew*, 642 F. Supp. 3d at 1186-91 (holding unlawfulness of officer's repeated use of baton strikes against individual suspected of minor offense, without warning, while subject was not threatening or actively resisting officers was clearly established by Ninth Circuit precedent including *Blankenhorn v. City of Orange*, 485 F.3d 463, 477-80 (9th Cir. 2007), and *Young*, 655 F.3d at 1164-65, even despite factual differences); *Ledesma*, 2019 WL 932019, *6 (rejecting defense argument that "there is no precedent holding that an officer violates clearly established law by using a baton to subdue an individual who is advancing on him to fight" because premise turned on disputed facts, and denying qualified immunity regarding reasonableness of baton strikes); *Andrews*, 35 F.4th at 719-20 (explaining that conclusion that governing law was clearly established "is further buttressed by our precedent clearly establishing that a suspect's previous violent conduct does not justify non-trivial force where the suspect poses no *immediate* safety threat," and collecting cases, including "where the officers [knew] that a suspect was armed").

The unlawfulness of Ofc. Capurro's uses of deadly force was also clearly established. Ofc. Capurro testified that he fired his first volley in response to seeing Mr. Detweiler "grab" Mr. Garrett. Mr. Garrett was not injured by Mr. Detweiler, only by Ofc. Capurro. It was clearly established at the time that deadly force may not be used against even someone who previously harmed others where they do not pose an immediate threat of death or serious injury at the time of the shots, and where shooting creates an inordinate risk of injuring bystanders. *See Tan Lam*, 976 F.3d at 998-99; *Hulstedt*, 884 F. Supp. 2d at 1002-03 (holding that as of 2008, "it was clearly established … that before using force officers had to consider whether that force could harm parties other than the intended targets") (citing *Boyd v. Benton Cnty.*, 374 F.3d 773, 779 (9th Cir. 2004)); *see also Estate of Aguirre*, 29 F.4th at 629 (denying qualified immunity where genuine disputes existed as to whether decedent posed immediate threat at time of shots); *George*, 736 F.3d at 832-33 (unreasonable to use deadly force in response to domestic disturbance when

decedent was armed with deadly weapon but was not aiming it at time of shots). That Ofc. Capurro violated his training in shooting, including by failing to issue a verbal warning, to account for his background, or to first attempt to de-escalate, further shows the unlawfulness of shooting was clearly established. *Drummond*, 343 F.3d at 1062.

Ofc. Capurro's second volley was even more clearly unlawful. As the Ninth Circuit has explained, even if an individual initially poses an immediate threat justifying deadly force, continuing to shoot him once he falls and no longer poses an immediate threat of death or serious injury, even if he is holding a weapon and has just attempted to use it against officers, "violate[s] long-settled Fourth Amendment law." *Zion*, 874 F.3d at 1076 ("[C]ontinued force against a suspect who has been brought to the ground can violate the Fourth Amendment."). At most, whether the unlawfulness of the second volley was clearly established turns on disputed facts, and because a jury could conclude that Mr. Detweiler did not have Mr. Garrett in a chokehold and was not immediately life-threatening despite holding onto him when Ofc. Capurro fired a fifth shot, into his back, qualified immunity must be denied. *Id.* ("If a jury were to find that Higgins shot … after Zion no longer posed an immediate threat, Higgins would have been 'on notice that his conduct would be clearly unlawful.'"). *Id.*

Ofc. Capurro's final volley was obviously unconstitutional and no similar case law is necessary to establish its unlawful nature. *Hope*, 536 U.S. at 740-41; *Estate of Aguirre*, 29 F.4th at 629. Any officer would know that continuing to shoot after Mr. Detweiler had gone to the ground after being repeatedly shot and had visibly gone limp, with neither hand on Mr. Garrett, and after Mr. Garrett had already mostly moved out from underneath Mr. Detweiler was unreasonable. Even it were not obvious, it would be clearly established under *Zion* and the decisions upon which it relied. Qualified immunity should be denied.

## V. <u>OFC. CAPURRO UNREASONABLY DENIED MEDICAL CARE TO MR. DETWEILER IN VIOLATION OF THE FOURTH AMENDMENT</u>

"[F]or persons who are detained by police in the course of an arrest, the Fourth Amendment's prohibition on the use of excessive force [also] protects against the deprivation of necessary medical care." *D'Braunstein v. Cal. Highway Patrol*, 131 F.4th 764, 769 (9th Cir. 2025)

(citing *Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090, 1098-99 (9th Cir. 2006)). This requires "'objectively reasonable post-arrest care,' which means that police officers must 'seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital.'" *Id.* (quoting *Tatum*, 441 F.3d at 1099). However, even where officers summon medical care, they violate the Fourth Amendment when they unreasonably interfere with emergency medical personnel's ability to reach or treat the arrestee thereafter. *Estate of Nunis ex rel. Nunis v. City of Chula Vista*, 676 F. Supp. 3d 867, 883-84 (S.D. Cal. 2023) (holding a jury could determine "that medical assistance was … unnecessarily and unreasonably delayed" in violation of Fourth Amendment); *Rosales v. Cnty. of San Diego*, 511 F. Supp. 3d 1070, 1091-92 (S.D. Cal. 2021); *cf. Maxwell v. County of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (applying rule in Fourteenth Amendment context to affirm denial of summary judgment where officers affirmatively prevented ambulance from leaving scene to bring gunshot wound victim to hospital); *see also D'Braunstein*, 131 F.4th at 768-69 (explaining that under both "the Fourth and Fourteenth Amendments, the standards [for denial of medical care] both turn on objective reasonableness"). This rule applies even where the medical care is summoned for the benefit of a third party. *Rosales*, 511 F. Supp. 3d at 1091-92.

Ofc. Capurro's body-worn camera footage shows that although he called for medical assistance after shooting Mr. Garrett and Mr. Detweiler, he unreasonably interfered with Mr. Detweiler's ability to receive emergency medical treatment. When he escorted Mr. Garrett off of the train, he had already told Mr. Garrett that his wounds appeared not to be severe that he was "going to make it," and Mr. Garrett appeared calm, was speaking, and was alert enough to radio Mr. McNay to request that his backpack be brought off of the train with him. Nevertheless, outside of the train, a sheriff's deputy twice told Ofc. Capurro that she could drive Mr. Garrett to the hospital herself so that Mr. Detweiler could be brought there in the one ambulance that had arrived. Ofc. Capurro disregarded or ignored the deputy the first time, and expressly refused the second time. And the second time, an ambulance worker was preparing to wheel a gurney off of the ambulance to take it to Mr. Detweiler, but Ofc. Capurro insisted that she not do so and that she

take Mr. Garrett instead. He did this in part by repeatedly representing to the ambulance worker that Mr. Detweiler was already "deceased," even though he had not verified that and testified in deposition that he only assumed that was the case. As a result, Mr. Detweiler was never taken to a hospital and died at the scene. Under these circumstances, a jury could conclude that Ofc. Capurro unreasonably diverted urgent medical care away from Mr. Detweiler in violation of the Fourth Amendment. Summary judgment must therefore be denied for this claim. *See Estate of Nunis*, 676 F. Supp. 3d at 883-84; *Rosales*, 511 F. Supp. 3d at 1091-92.

Ofc. Capurro has not claimed qualified immunity for Plaintiff's denial of medical care claim (City Defs.' Mot. at 19), unlike for Plaintiff's excessive force and due process claims, waiving that defense for the medical care claim. *Archibald v. County of San Bernardino*, 2018 WL 6017032, at *7 (C.D. Cal. Oct. 2, 2018) (motion's failure to argue "that the law was not clearly established" "waive[s] the second prong" of qualified immunity). Even if it were not waived, the right was clearly established. *See D'Braunstein*, 131 F.4th at 771 (holding "it is clearly established that officers must seek to provide an injured detainee or arrestee with objectively reasonable medical care in the face of medical necessity creating a substantial and obvious risk of serious harm," and collecting cases dating to 2006); *cf. Estate of Soakai*, 137 F.4th at 985-86 (holding that as of June 2022, existing law clearly established "that an officer's inaction—such as failing to provide aid—can violate the Due Process Clause if the officer previously put another in danger, even if the officer's earlier danger-creating conduct served legitimate law enforcement objectives").

## VI. OFC. CAPURRO VIOLATED MR. DETWEILER'S RIGHT TO DUE PROCESS

Official action violates due process when it "shocks the conscience." *Hayes*, 736 F.3d at 1230. Where "deliberation is practical" before using force, only "deliberate indifference" must be shown. *Id.* In situations "that escalate so quickly" the officer cannot deliberate, plaintiffs must show "a purpose to harm unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "Deliberate indifference" applies where officers can evaluate the threat an individual poses, *see Willis v. City of Fresno*, 520 F. App'x 590, 592 (9th Cir. 2013); *Kosakoff v. City of San Diego*, 2010 WL 1759455, at *11-12 (S.D. Cal. Apr. 29, 2010), or where

officers use force following a standoff with time to create a plan, *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 (6th Cir. 2002). "Purpose to harm" applies where unforeseen changes, or clear, immediate, deadly threats allow only split seconds to make decisions. *E.g.*, *Hayes*, 736 F.3d at 1230; *Moreland v. LVMPD*, 159 F.3d 365, 372 (9th Cir. 1998). "It is the intent to inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983." *Porter*, 546 F.3d at 1140. Where pertinent facts are disputed, only the jury can determine which standard applies. *Greer v. City of Hayward*, 229 F. Supp. 3d 1091 (N.D. Cal. 2017).

Ofc. Capurro had time to deliberate before using deadly force. A jury could conclude that an officer in his position, believing that Mr. Detweiler had brass knuckles on his person, and faced with indications that Mr. Detweiler was mentally ill, would anticipate that aggressively confronting Mr. Detweiler, escalating the encounter with him, and using escalating forms of force against him without warning while ignoring his attempts to cooperate and leave the train could lead him to act out in desperation. *Cf. Lennox v. City of Sacramento*, No. 2:21-cv-02075-DAD-CSK, 2024 WL 3845378, at *25 (E.D. Cal. Aug. 16, 2024) ("[A] trier of fact could also find that defendants … had time to deliberate regarding their use of force because they had predicted in advance that the decedent would run toward the door and preemptively stepped up in that direction to prevent him from doing so."). Ofc. Capurro also had the opportunity to have backup assist him in peacefully getting Mr. Detweiler off of the train but elected not to do so. There was no need for a "snap judgment." *Willis*, 520 F. App'x at 592; *see Lennox*, 2024 WL 3845378, at *26 & n.21 (applying deliberate indifference standard based on "genuine dispute as to whether deliberation was feasible," and denying qualified immunity based on disputes regarding whether shooting man who ran toward officers with knife constituted deliberate indifference).

Even under the purpose-to-harm standard, a jury could conclude Ofc. Capurro's fifth and sixth shots violated due process. At the time of the fifth shot, Mr. Detweiler had already been shot repeatedly, and was holding onto Mr. Garrett but did not reasonably appear to be harming him. A jury could conclude that at this time, Ofc. Capurro fired out of spite rather than based on any honest belief in its necessity. This is even truer for the final shot, when Mr. Detweiler was going

limp and did not have either hand on Mr. Garrett, who was very clearly moving out from under Mr. Detweiler. The unlawfulness of continuing to use deadly force in these circumstances was also clearly established. *See S.T. ex rel. Niblett v. City of Ceres*, 327 F. Supp. 3d 1261, 1277, 1281 (E.D. Cal. 2018) (holding reasonable jury could conclude firing a third volley of shots "when Decedent was already on the ground" evinced a purpose to harm because it "could find that there was no legitimate law enforcement purpose" for shooting at the time) (citing *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)); *Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 972-73 (E.D. Cal. 2017) (holding reasonable jury could find purpose to harm if, in resolving disputed facts, it "concludes the Officer Defendants shot a non-dangerous, non-fleeing, possibly mentally ill, suspected misdemeanant numerous times after that person may have said 'don't shoot'").

## VII. DEFENDANTS FAILED TO REASONABLY ACCOMMODATE MR. DETWEILER'S DISABILITY IN VIOLATION OF THE ADA

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Leibel v. City of Buckeye*, 556 F. Supp. 3d 1042, 1074 (D. Ariz. 2021). "To prove that a public program or service violated Title II of the ADA, a plaintiff must show: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). Title II's "regulations expressly state that the definitions of 'disability' and 'substantially limits' must be 'construed broadly in favor of expansive coverage.'" *Clopp v. City of Sparks*, 2023 WL 2538177, at *9 (D. Nev. Mar. 16, 2023) (quoting 28 C.F.R. §§ 35.108(a)(2)(i), (d)(1)(i)). The second and third elements' use of the disjunctive "or" means that a person "otherwise discriminated against" may prevail even without a formal exclusion or denial of benefits. *Waters v. Amtrak*, 456 F. Supp. 3d 666, 670-71 (E.D. Pa. 2020).

"Several mental and emotional disorders—including … bipolar disorder[] and schizophrenia—are enumerated in the Title II regulation as disabilities that 'at a minimum' substantially limit brain function" and therefore constitute qualifying disabilities. *Id.* (quoting 28 C.F.R. § § 35.108(d)(2)(iii)(K)). Plaintiff's evidence shows that Mr. Detweiler suffered from both of these disorders, and therefore at minimum creates a triable issue on the first element. (PAMF 1.)

**A. City Defendants**

A Title II claim based on an arrest may lie against a municipality "where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Sheehan v. City & County of S.F.*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd on other grounds*, 575 U.S. 600, 611-17 (2015). "In a Title II claim grounded in a public entity's alleged failure to provide a reasonable accommodation …, the plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation." *Id.* at 1232-33. "[T]he reasonableness of an accommodation is ordinarily a question of fact." *Id.* at 1233 (citing *EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010)).

Plaintiff's evidence shows that numerous reasonable accommodations were readily available during this incident. Ofc. Capurro could have asked basic questions or waited for backup before rushing onto the train and waking Mr. Detweiler, or could have done these things after boarding upon observing Mr. Detweiler asleep in his seat. Had he done so, Mr. Garrett would have told him Mr. Detweiler had been seated, stationary, and asleep for over an hour and forty-five minutes, with no reported incident during that time. Ofc. Capurro believed Mr. Detweiler was asleep, and backup was as near as five minutes away. Even after he did wake Mr. Detweiler up, he could have used the basic strategies on which he was trained to attempt to de-escalate the situation instead of affirmatively escalating it, including speaking to Mr. Detweiler slowly and calmly; explaining himself, what he wanted from Mr. Detweiler, and why; and not abruptly pointing weapons at Mr. Detweiler. Ofc. Capurro himself acknowledged he was trained to do these things,

and Plaintiff's expert explained that these are standard police practices when confronting someone who may be mentally ill.

In *Vos*, 892 F.3d 1024, the Ninth Circuit addressed parents' claims that police officers failed to reasonably accommodate a schizophrenic arrestee in their handling of the encounter prior to using deadly force. *Id.* at 1028-30, 1036-37. There, the Ninth Circuit held that a triable issue existed as to whether the defendant city discriminated against the decedent by reason of his disability, based on the defendant officers' failure to utilize the available "time and [] opportunity to assess the situation and potentially employ" accommodations including "de-escalation, communication, or specialized help" when confronting the decedent prior to shooting him when he ran toward them with scissors. *Id.* The same reasoning applies here, and even more so given that Mr. Detweiler never rushed toward Ofc. Capurro with any weapon or forced any confrontation on his own, and was not holding or brandishing any weapon when Ofc. Capurro abruptly woke him up, shone a flashlight in his eyes, immediately began issuing commands without explanation, and ignored Mr. Detweiler's clarifying questions. *See also Sheehan*, 743 F.3d at 1233 (holding on similar grounds that city was not entitled to judgment on ADA claim where officers forced entry into decedent's room rather than "engag[ing] in non-threatening communications and us[ing] the passage of time to defuse the situation rather than precipitating a deadly confrontation"); *Clopp*, 2023 WL 2538177, at *9-11 (holding material disputes regarding availability and potential efficacy of plaintiff's proffered reasonable accommodations that were not used before officers fatally shot decedent—including time, distance, and others—precluded summary judgment).

Although City Defendants argue that Ofc. Capurro faced an "exigent situation" and that Mr. Detweiler posed a "direct threat," this improperly shifts the timeframe to be analyzed backward, after Ofc. Capurro had already himself escalated the encounter with Mr. Detweiler. When accommodation was first required, Mr. Detweiler was not armed or violent, but rather was asleep and stationary. He did not produce brass knuckles until after Ofc. Capurro had already repeatedly tased him without warning, repeatedly beaten him with a baton without warning, and drawn his firearm. Even looking to the period after Ofc. Capurro had escalated the encounter and began using weapons against Mr. Detweiler, exigent circumstances "inform the reasonableness

analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment," but do not bar an ADA claim. *Leibel*, 556 F. Supp. 3d at 1074. A jury could easily conclude any exigent circumstances were of Ofc. Capurro's own creation. Summary judgment should be denied for City Defendants.

**B. Amtrak Defendants**

"When a public entity like Amtrak is sued under Title II, [it] is vicariously liable for the acts of its employees" such as Mr. Garrett. *Waters*, 456 F. Supp. 3d at 670-71.

Although Amtrak Defendants argue that they did not deny Mr. Detweiler equal access because of a disability, this is disputed. Title II's "by reason of" requirement is satisfied where the defendant's motive was discriminatory *or* the effect of its action was discriminatory based on disability. *Wray v. Nat'l R.R. Passenger Corp.*, 10 F. Supp. 2d 1036, 1039-41 (E.D. Wis. 1998). A jury could conclude that Mr. Garrett's decision to call law enforcement and wrongly represent that Mr. Detweiler was actively creating a disturbance and threatening passengers aboard the train when Mr. Garrett knew Mr. Detweiler had in fact been seated and asleep for more than an hour and a half was driven by Mr. Detweiler's disability-linked behavior, including Mr. Garrett's vague statement in his call to police that he thought Mr. Detweiler was "creepy," and his repeated references to "Dracula" when describing Mr. Detweiler in this action. (*See* AUF 7, 34.) It could also find that Mr. Garrett's call, including through his representation that there was an ongoing disturbance, foreseeably caused harm to Mr. Detweiler. *See Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 484-86 (N.D.N.Y. 2017) (denying summary judgment for municipal transit authority and bus driver who called police requesting removal of cognitively and physically disabled passenger due to his refusal to sit down, holding that driver's express request for removal of passenger made it foreseeable that responding officers would use force to effect removal).

A jury could also consider that Mr. Garrett's decision to remove Mr. Detweiler was contrary to Amtrak's service standards, on which Mr. Garrett was trained. Those provide that involuntary removal is only appropriate when other methods including a firm request have failed, and when a customer "refuses to refrain" from dangerous conduct. By Mr. Garrett's own admission, Mr. Detweiler complied with every direction Mr. Garrett gave him and never refused

any request Mr. Garrett made. A jury could conclude that Civil Code § 2188 does not apply for the same reasons, as Mr. Detweiler never "refuse[d] … to conform to any" requirement that was put to him. At a minimum, a jury could conclude that Amtrak Defendants could have reasonably accommodated Mr. Detweiler's mental illness—which Mr. Garrett acknowledged he recognized—by telling him that he was required to forfeit the brass knuckles as a condition of carriage, or by saying anything to him about the brass knuckles at all, before providing at-best misleading information to police and having them remove Mr. Detweiler from the train.

Because a jury could conclude Amtrak Defendants denied services to Mr. Detweiler or discriminated against him based on a disability, summary judgment should be denied for this claim.

## VIII. DEFENDANTS WERE NEGLIGENT

### A. City Defendants

California negligence law is "broader" than Fourth Amendment law and places added emphasis on officers' tactics and decisions preceding his uses of force. *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125-26 (9th Cir. 2021) (quoting *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 639 (2013)). "In California, an officer's pre-shooting decisions can make his later use of force unreasonable under the totality of the circumstances." *Id.* This principle also applies to non-lethal force. *Alves v. Riverside County*, 2023 WL 4104185, at *13-14 (C.D. Cal. May 19, 2023) (citing *Uzun v. City of Santa Monica*, 54 F.4th 595, 596-98 (9th Cir. 2022) (Mem.)). Pre-force decisions that can render later uses of force unreasonable include an officer's "fail[ure] to deescalate the situation per P.O.S.T. regarding potentially mentally ill individuals," *Tabares*, 988 F.3d at 1128, or to adhere to "a safety rule promulgated by his employer, regardless of its substance," *id.* (quoting *Grudt v. City of Los Angeles*, 2 Cal. 3d 575, 588 (1970)); *see also People v. Brown*, 245 Cal. App. 4th 140, 171 (2016) ("[O]fficer training and tactics can potentially be relevant for purposes of tort liability."). California negligence law also prohibits using deadly force unless the officer reasonably believes the subject "has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury" at the time deadly force is

used Pen. Code § 835a(c)(1)(A), (e)(2); *see* Cal. Civ. Jury Instr. 441 ("Negligent Use of Deadly Force by Peace Officer").

A jury could easily conclude that Ofc. Capurro's overall course of conduct, including his pre-shooting tactics and conduct, were negligent. Overwhelming evidence shows that he hastily boarded the train without waiting for the backup he knew was a mere five minutes away, and without asking any questions regarding what the current circumstances were aboard the train. This was flatly contrary to his training, and his supervisors and City Defendants' own expert (as well as Plaintiff's) concluded this was improper. Ofc. Capurro brashly testified that it was *not his job to ask questions*, despite admitting he had been trained to do just that and that a key responsibility of police officers in responding to a call for service is to investigate, and he was "not there to have a conversation." He himself admitted that, had he boarded the train with backup, deadly force, and likely other weapons as well, would never have been used, and Plaintiff's expert agreed.

Once on the train, Ofc. Capurro saw that Mr. Detweiler appeared to be asleep, which provided him further opportunity to obtain information and wait for backup, but he still did not do so. He claimed he feared the bags next to Mr. Detweiler could contain weapons (had he taken a moment to ask the conductors, he would have learned the brass knuckles were actually believed to be in Mr. Detweiler's back pocket), but he proceeded to shake Mr. Detweiler awake without first moving or searching those bags, which he had no reason not to do. He then acted aggressively toward Mr. Detweiler, unreasonably failing to determine that Mr. Detweiler could be mentally ill, and escalating the encounter rather than de-escalating, which was contrary to his training for dealing with individuals generally but in particular for those with potential mental illness. *See Tabares*, 988 F.3d at 1128. He escalated in many ways including by shining a flashlight in Mr. Detweiler's face; not communicating what was happening, his plan to have Mr. Detweiler exit the train to be detained, or why he was simultaneously asking him to exit the train and not bring his belongings; and not responding at all to Mr. Detweiler's repeated requests for explanations throughout the encounter or to be allowed to leave the train as requested.

All of this stands in remarkable contradiction to Mr. Garrett's approach during his earlier encounters with Mr. Detweiler; despite not being trained as a police officer, and not having

received the significant training on de-escalation, recognizing signs of mental illness, and interacting with mentally ill individuals that Ofc. Capurro received, Mr. Garrett was quickly and easily able to gain Mr. Detweiler's compliance on multiple occasions by using the very techniques Ofc. Capurro had been taught to use but disregarded, including by speaking calmly, explaining his requests clearly, and adopting a non-confrontational demeanor. He was also able to recognize Mr. Detweiler's apparent mental illness based on many of the same indicators that Ofc. Capurro observed whereas Ofc. Capurro either could not or would not. The stark contrast in these two approaches, and the predictable contrast in their results, further demonstrate Ofc. Capurro's negligence.

Ofc. Capurro was further negligent in tasing Mr. Detweiler repeatedly and without warning, in particular when Mr. Detweiler stepped away from him with his hands up, and in repeatedly striking Mr. Detweiler hard with the baton without warning, despite having given him no commands at all at that time that he could be violating. A jury could conclude that a reasonable officer would understand that a mentally ill individual in Mr. Detweiler's position might not understand why he was being struck and could foreseeably act in desperation in response.

Accordingly, even if any of Ofc. Capurro's three volleys of shots "were reasonable in isolation"—which they were not—his "pre-shooting decisions [would] render his behavior unreasonable under the totality of the circumstances." *Tabares*, 988 F.3d at 1126. But his shots were also unreasonable in the moment for the reasons explained above: Viewing the facts in the light most favorable to Plaintiff, he fired his first volley after Mr. Detweiler had swung and grabbed Mr. Garrett, and had not struck him (and Ofc. Capurro saw no strike), such that any threat Mr. Detweiler posed at that time was not an immediate threat of death or serious injury and could be dealt with through other means. His first volley was further negligent in that, although he claimed his purpose was to protect Mr. Garrett, he shot Mr. Garrett twice, and Mr. Garrett otherwise sustained no injuries. Ofc. Capurro himself testified that, had he believed that Mr. Garrett could be struck if he fired—which he in fact admitted he believed—he would not have shot and would instead have used alternate tactics to subdue Mr. Detweiler. The second volley was even less reasonable, when Mr. Detweiler and Mr. Garrett lay on the ground and Mr. Detweiler

was not swinging toward anyone and posed no immediate threat of death or serious injury. And the third volley was less reasonable still, given that Mr. Detweiler had already visibly gone limp, did not have either hand on Mr. Garrett, and Mr. Garrett had already moved out from under Mr. Detweiler. Because a jury could find Ofc. Capurro's overall course of conduct negligent, as well as each of his individual uses of force, summary judgment must be denied.

**B. Amtrak Defendants**

Plaintiff's negligence claim against Mr. Garrett (for whose tortious conduct Amtrak is vicariously liable) rests on two separate theories: (1) Mr. Garrett's negligent phone call to the police department during which he misrepresented key details, creating the false impression that there was an active disturbance aboard the train, and (2) his negligent use of force in restraining Mr. Detweiler. Each is entitled to go before a jury.

A negligence claim requires showing "that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213 (2021) (citation and internal quotation marks omitted); *Hayes*, 57 Cal. 4th at 629. Under California law, "[e]veryone is responsible ... for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person." Civ. Code § 1714. Section 1714 "establishes the default rule that each person has a duty 'to exercise, in his or her activities, reasonable care for the safety of others.'" *Brown*, 11 Cal. 5th at 214 (citation omitted).

<u>*Call to Police*</u>: Mr. Garrett's call to the police department was negligent in that even though he knew Mr. Detweiler had been stationary in his assigned seat for more than an hour and a half, without any incident during that time, he nonetheless reported that staff needed assistance with a passenger "*that's* agitated and … *becoming* possibly violent" and who "*is* brandishing" brass knuckles. He declined to note that these things actually had purportedly occurred more tan an hour and a half earlier and that the current situation on the train was completely calm, despite testifying that he was aware that was the case. A duty under § 1714 attached because Mr. Garrett's affirmative conduct "created a risk of harm" to Mr. Detweiler and was "responsible for making [his] position worse." *Brown*, 11 Cal. 5th at 214. A jury could find that representing a dormant

situation to police as an active, potentially violent emergency breached the standard of ordinary care.

A jury could also credit the significant evidence indicating that Mr. Garrett's call proximately caused harm to Mr. Detweiler. Even when a third party causes the challenged harm, "a negligent defendant is liable for injuries brought about by an intervening cause of independent origin if the 'intervening cause ... was foreseeable by the defendant or, if not foreseeable, if it caused injury of a type which was foreseeable.'" *Pool v. City of Oakland*, 42 Cal. 3d 1051, 1064 (1986) (citation omitted, alteration adopted); *accord Hoyem v. Manhattan Beach City Sch. Dist.*, 22 Cal. 3d 508, 521 (1978); *see Brewer v. Teano*, 40 Cal. App. 4th 1024, 1030-31 (1995) (explaining that California has adopted the Restatement (Second) of Torts section 442A, which provides that "where the negligent conduct of the actor creates or increases the foreseeable risk of harm through intervention of another force and is a substantial factor in causing that harm, it is not a superseding cause"). "[W]hat is required to be foreseeable is the general character of the event or harm ... not its precise nature or manner of occurrence." *Pool*, 42 Cal. 3d at 1063.

*Pool* is on point. There, a grocer reported to police an "unsupported suspicion" that a customer had passed a counterfeit bill; the police arrested him and caused him emotional injury. 42 Cal. 3d at 1056-58. The California Supreme Court held that "being arrested by the police is one of the foreseeable consequences of reporting a transaction as illegal," and that "accusing an innocent customer of felonious conduct and calling in the police could foreseeably lead to a police investigation, escalation of the conflict, and arrest." *Id.* at 1064. "Foreseeability … is a question of fact for the jury." *Id.* at 1063. *Pool*'s logic applies here because a jury could conclude that presenting incorrect information to police that an active, threatening, and potentially violent situation was then occurring aboard the train could foreseeably cause police to rush aboard without investigating, and Ofc. Capurro's failure to do so, while also negligent, does not relieve Mr. Garrett of liability. *See id.* at 1063 (rejecting similar argument); *see also Badr v. City of San Ramon*, 2022 WL 2341153, at *3 (N.D. Cal. Apr. 11, 2022) (denying motion and explaining that a police encounter is "a foreseeable consequence of [an] allegedly negligent report" made by a reporting party); *Elliott v. Solis*, No. 17-cv-1217 (LJO), 2019 WL 2150949, at *6 (E.D. Cal. May

16, 2019) (noting that whether injuries to student driver, who was stopped and detained by law enforcement after vehicle license plate was reported stolen, resulted from excessive force "may be a superseding intervening event," but that "[t]his, however, is a question of causation, and it is a highly factual one").

Ofc. Capurro testified that Mr. Garrett's report caused him to believe there was an ongoing disturbance aboard the train, in turn leading him to board without waiting for nearby backup, and that had he known this was not the case he would have waited, boarded with multiple officers, and most likely detained Mr. Detweiler without using "tools" or deadly force. Plaintiff's expert agreed. Because a report regarding an actively armed and potentially violent passenger could foreseeably prompt an aggressive police response, an injury to the reported person is undoubtedly the "general character" of harm a reasonable person would foresee. *Badr*, 2022 WL 2341153, at *3 (quoting *Bigbee v. Pac. Tel. & Tel. Co.*, 34 Cal. 3d 49, 57-58 (1983)). These details create a triable issue as to causation, precluding summary judgment.

<u>*Forcible Restraint*</u>: A jury could likewise find Mr. Garrett negligent in his forceful restraint of Mr. Detweiler, including while Mr. Detweiler was being actively beaten by Ofc. Capurro. The same duty of care under § 1714 that applied to Mr. Garrett's call to police applied to his physical conduct toward Mr. Detweiler during the incident. *See Brown*, 11 Cal. 5th at 214. A jury could readily conclude that Mr. Garrett failed to exercise "reasonable care for [Mr. Detweiler's] safety" when he restrained a man who had just been repeatedly Tased without warning, whose repeated requests to be allowed to leave the train went unanswered, and who had separated from Ofc. Capurro when Ofc. Capurro, again without warning, drew his baton and began forcibly striking him over a dozen times. Even if a jury could conclude that Mr. Garrett's initial restraint was reasonable to separate Mr. Detweiler and Ofc. Capurro from one another, it could certainly conclude that Mr. Garrett's continued restraint ceased to be reasonable once Ofc. Capurro began beating Mr. Detweiler while he was restrained, and that it became progressively less reasonable as

the beating went on.[13] Because these are quintessential factual questions that must be resolved by a jury, summary judgment must be denied.

## IX. DEFENDANTS ARE LIABLE FOR BATTERY

### A. City Defendants

"To maintain a state law battery claim against a police officer, 'a plaintiff must prove that the officer's use of force was unreasonable.'" *McLeod v. City of Redding*, No. 2:22-cv-00585 WBS JDP, 2024 WL 3011227, at *8 (E.D. Cal. June 12, 2024) (quoting *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009)). "This requires the same 'totality of the circumstances' inquiry applied to negligence claims" under California law, which, for claims challenging use of deadly force, includes the officer's tactics and conduct leading up to his uses of force. *Id.* (collecting cases). In *McLeod*, the Court also pointed to CACI 1305B, California's standard jury instructions for battery claims against police officers based on deadly force, *id.*, which uses language identical to the language in CACI 441, California's standard jury instructions for negligence claims against police officers based on deadly force. *See* Cal. Civ. Jury Instr. 441.[14] Accordingly, as to Ofc. Capurro's uses of deadly force, summary judgment for City Defendants should be denied for this claim for the same reasons as for Plaintiff's negligence claim.

Battery claims challenging non-deadly force likewise require a showing of unreasonable force but focus somewhat less on the officer's pre-force tactics and conduct, and utilize the same or a similar standard as the Fourth Amendment. *See* Cal. Civ. Jury Instr. 1305A ("Battery by Law

---

[13] Although Amtrak Defendants emphasize Plaintiff's police expert's deposition statement that he was "not critical" of Mr. Garrett's conduct, Plaintiff's expert repeatedly clarified that he in fact had no opinions whatsoever regarding Mr. Garrett, in part because that was outside of the scope of his retention. (PAMF 145; *see* AUF 84.)

[14] City Defendants contend the Fourth Amendment standard applies to California battery claims. Not so, as California's model jury instructions show, at least for claims challenging the use of deadly force. Those instructions are derived from Penal Code section 835a, which governs the use of deadly force by police officers and was significantly amended in 2020. *See* Cal. Civ. Jury Instr. 1305B, Sources and Authority; Assem. Bill 392, 2019-2020 Reg. Sess. (Cal. 2020). The cases City Defendants cite for this proposition rely on pre-2020 authorities and do not account for this amendment. *See Alves v. Cnty. of Riverside*, 135 F.4th 1161, 1166 n.3 (9th Cir. 2025) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272-73 (1998)); *Uzun*, 54 F.4th at 596 (Mem.) (citing *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008)).

Enforcement Officer (Nondeadly Force)"); *Brown*, 171 Cal. App. 4th at 527; *but see Barnes*, 605 U.S. at 80 (explaining that the Fourth Amendment's "'totality of the circumstances' inquiry into a use of force has no time limit" and "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones"). Accordingly, a jury could easily find Ofc. Capurro's uses of the Taser and baton strikes against Mr. Detweiler to be unreasonable for the same reasons as for Plaintiff's Fourth Amendment claim for excessive force. The evidence shows that Mr. Detweiler did not reasonably appear to pose an immediate threat and was minimally resisting when Ofc. Capurro abruptly tased him for the first time without warning, when his hands were raised and visibly empty and he had taken a step away from Ofc. Capurro while attempting to clarify Ofc. Capurro's requests and asking if he could bring his bags off of the train with him. It also shows that he likewise did not reasonably appear to pose any immediate threat when Ofc. Capurro began striking him over a dozen times with his baton, while Mr. Detweiler was restrained from behind by Mr. Garrett, with his right harm pinned behind his back, in the confined space of the vestibule, and only held his left hand out to attempt to shield himself, and was not actively resisting. Summary judgment should be denied for this claim.

**B. Amtrak Defendants**

Civil battery requires an intentional touching that harms or offends, without consent, causing injury, damage, or loss. *Brown*, 171 Cal. App. 4th at 526-27. Amtrak Defendants concede the touching, and the evidence shows Mr. Garrett grabbed Mr. Detweiler from behind, pinned his right arm behind his back, and restrained him with both hands even as Ofc. Detweiler used escalating force against him.

Amtrak Defendants argue that intent to harm or offend is required and Mr. Garrett did not intend to harm or offend Mr. Detweiler. California's standard tort jury instruction on intent, CACI 1320, provides that a defendant acts intentionally if he "was substantially certain" that a particular result would occur from his conduct. Cal. Civ. Jury Instr. 1320. A jury could readily conclude that, when Mr. Garrett restrained Mr. Detweiler from him behind, observed Ofc. Capurro draw his baton and proceed to begin striking Mr. Detweiler repeatedly, including with high overhand strikes that were clearly visible to Mr. Garrett, anyone in his position would have been

substantially certain that continued restraint of Mr. Detweiler was both offensive and harmful to Mr. Detweiler, given that it prevented him from moving away and avoiding Ofc. Capurro's blows, even as Mr. Garrett heard Mr. Detweiler plead with Ofc. Capurro to stop.[15] A person cannot knowingly hold another to be beaten and colorably disclaim any intent to bring about the resulting harm. A material factual issue therefore exists as to whether Mr. Garrett had the requisite intent, which must be resolved by a jury.

Amtrak Defendants' self-defense and defense-of-others arguments likewise depend on disputed facts that a jury must resolve. A person may use only "'necessary force' to protect or defend oneself or one's property from 'wrongful injury'"; the force must be "no more than 'that which reasonably appears necessary … to prevent the impending injury.'" *Calvillo-Silva v. Home Grocery*, 19 Cal. 4th 714, 730 (1998), *disapproved on other grounds in Aguilar v. Atlantic Richfield Co.*, 25 Cal.4th 826, 853 n.19 (2001). "[I]f force is applied in excess of that which is justified, the actor remains subject to liability for the damages resulting from the excessive use of force," and "the question of what force was reasonable and justified is peculiarly one for determination by the trier of fact." *Id.* at 731. The burden of these affirmative defenses rests with the defendant. *See Lopez v. Surchia*, 112 Cal. App. 2d 314, 318-19 (1952); *Bethurum v. Krumm*, 109 Cal. App. 5, 7 (1930).

For the same reasons that a jury could conclude Mr. Garrett was "substantially certain" that his restraint of Mr. Detweiler was or would be harmful or offensive to Mr. Detweiler, a jury could decline to accept that Mr. Garrett's restraint was no greater than what reasonably appeared necessary to prevent harm to himself or others. Mr. Detweiler had not attempted to harm Mr. Garrett at all, so the self-defense claim is shaky at best. Amtrak Defendants' assertion that Mr. Garrett witnessed Mr. Detweiler "assault Officer Capurro with enough force to make Garrett reasonably fear for [their] safety" is belied by Mr. Garrett's own deposition statements, in which

---

[15] This continued restraint of Mr. Detweiler, even in the face of repeated baton strikes by Ofc. Capurro, could lead a jury to conclude that at a certain point it amounted to malice and thereby award punitive damages, meriting denial of Amtrak Defendants' request for summary judgment regarding same.

he testified that he did not see Mr. Detweiler strike Ofc. Capurro. And the unreasonable nature of Mr. Garrett's restraint became more and more apparent with each baton blow he made Mr. Detweiler endure, as he held Mr. Detweiler while Ofc. Capurro continued striking Mr. Detweiler as hard as he could.

Even setting aside Mr. Garrett's own direct battery, he may also be held liable as a joint tortfeasor for Ofc. Capurro's battery against Mr. Detweiler because he gave substantial assistance to it. California imposes liability on one who "aids and abets the commission of an intentional tort if the person [] knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act." *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 879 (2007) (quoting *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005)). Although "[m]ere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting," *id.*, Mr. Garrett's conduct rises beyond that. He did not merely watch Ofc. Capurro beat Mr. Detweiler, but rather physically pinned Mr. Detweiler in place, holding one of Mr. Detweiler's arms behind his back, while Ofc. Capurro repeatedly struck him. A jury could readily conclude Mr. Garrett thereby gave "substantial assistance" to Ofc. Capurro's battery. *Id.*

Summary judgment should be denied for this claim.

## X. OFC. CAPURRO VIOLATED THE TOM BANE ACT

Under the Bane Act, beyond showing a civil rights violation, plaintiffs must only show the defendant acted with specific intent to violate an individual's rights. *See B.B. v. County of Los Angeles*, 25 Cal.App.5th 115, 129-33 (2018) (requisite showing of "threats, intimidation, or coercion" need not be independent from "coercion" inherent in underlying civil rights violation), *rev'd on other grounds*, 10 Cal.5th 1 (2020); *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018). A "reckless disregard for a person's constitutional rights is evidence of specific intent to deprive [him] of those rights." *Id.* at 1045.

For the same reasons explained above, a jury could conclude Ofc. Capurro recklessly disregarded Mr. Detweiler's right to be free from excessive force when he abruptly tased Mr. Detweiler in the abdomen without warning, when Mr. Detweiler had his hands up and had taken a

step back from Ofc. Capurro; when he beat Mr. Detweiler with a baton over a dozen times, without issuing any warning or any relevant commands to Mr. Detweiler, when Mr. Detweiler was restrained from behind and was not resisting except by holding out his arm to shield his body from the blows; and when he fired six shots at Mr. Detweiler, striking him and Mr. Garrett repeatedly, and in particular the fifth and sixth shots, which were fired into Mr. Detweiler's back when Mr. Detweiler was on the ground, already struck, and the sixth shot was fired when he was not holding Mr. Garrett, who had already mainly crawled out from underneath Mr. Detweiler who obviously posed no threat at that time. These factors show Defendants "at least recklessly disregarded whether" the force was "more than necessary under the circumstances." *Rios v. City of Los Angeles*, 2:21-cv-05341-RGK-MAA, 2022 WL 17219086, at *4 (C.D. Cal. Aug. 25, 2022); *see Garcia v. City of Azusa*, CV 22-3457-MWF (JPRx), 2023 WL 9420513, at *8 (C.D. Cal. Dec. 1, 2023).

## XI. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions.

DATED: October 30, 2026 LAW OFFICES OF DALE K. GALIPO

By /s/ Benjamin S. Levine
Dale K. Galipo
Benjamin S. Levine
*Attorneys for Plaintiff Julia Detweiler*