**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Tel: (818) 347-3333
Fax: (818) 347-4118
*Attorneys for Plaintiff Julia Detweiler*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiff,

v.

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.

Case No. 2:24-cv-03100-WBS-SCR

*Hon. William B. Shubb*

**PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENTS OF UNDISPUTED FACTS; PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Date: December 21, 2026
Time: 1:30 p.m.
Courtroom: 5

## I. PLAINTIFF'S RESPONSES TO DEFENDANTS CITY OF MOUNT SHASTA AND JEREMIAH CAPURRO'S ("CITY DEFENDANTS") SEPARATE STATEMENT OF UNDISPUTED FACTS AND SUPPORTING EVIDENCE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 1. Jeremiah Capurro ("Officer Capurro") was working as a sworn police officer for the City of Mt. Shasta ("City") on the night of December 24, 2023.<br><br>Evidence: Declaration of Jeremiah Capurro ("Capurro Decl.") at ¶ 1. | Undisputed. |
| 2. He was in full uniform.<br><br>Evidence: Capurro Decl. at ¶ 2. | Undisputed. |
| 3. Officer Capurro was the only patrol officer on-duty in the City during this shift.<br><br>Evidence: Capurro Decl. at ¶ 3. | Undisputed. |
| 4. At approximately midnight, he was in the police department dispatch center and was advised of the following by the dispatcher: (1) Amtrak train staff had just called and reported that a passenger was threatening people with brass knuckles on the train; (2) the train was would be making a stop in the City to have the passenger removed (or according to the Amtrak employee, "extracted") and requested that Mt. Shasta Police Department remove him; and (3) the passenger had a history of assaulting police officers.<br><br>Evidence: Capurro Decl. at ¶ 4; Declaration of Amber Orrey ("Orrey Decl.") at Exhibits B and C (Dispatch Audio); Deposition of Bruce Garrett ("Garrett depo") at 18:1-14; 21:23-22:18; 25:8-26:20; 35:10-16, 59:4-60:8, 90:24-91:11, 91:24-93:7; Deposition of Jeremiah Capurro ("Capurro depo") at 24:9-25:3, 27:1-6, 28:13-19. | Undisputed, except to the extent it implies Ofc. Capurro ever verified the report regarding the passenger's alleged prior assault on an officer, which he did not.<br><br>Declaration of Benjamin S. Levine ("Levine Decl."), Ex. A, Deposition of Jeremiah Capurro ("Capurro Depo.") at 45:21-17. |
| 5. According to Plaintiff's police practices expert, possession of brass knuckles in California can be charged as a felony and they are considered a deadly weapon if used to attempt to strike someone.<br><br>Evidence: Deposition of Scott DeFoe ("DeFoe depo") at 37:14-38:7; Capurro Decl. at ¶ 5 | Disputed. In the cited portion of Mr. DeFoe's deposition, he testified that if brass knuckles are used and they "caused … injury to the subject," the user could be charged with assault with a deadly weapon under P.C. 245. |
| 6. Officer Capurro left the dispatch center and parked his patrol car at the location where the | Undisputed. |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| train was expected to stop (Lake Street where it intersects the train tracks).<br><br>Evidence: Capurro depo at 28:20-22; Capurro Decl. at ¶ 6. | |
| 7. As he waited for the train, he contacted a Siskiyou County Sheriff's Deputy to request that they assist and asked for their location.<br><br>Evidence: Capurro depo at 29:11-31:6; Capurro Decl. at ¶ 7 | Disputed to extent it implies that assistance from sheriff's deputies had not already been requested. Before leaving the police station, Ofc. Capurro had the dispatcher contact the sheriff's department to request assistance at the train and to provide them with the train's estimated time of arrival.<br><br>Levine Decl., Ex. A, Capurro Depo. at 29:4-20. |
| 8. He estimated that assistance was at least five minutes away.<br><br>Evidence: Capurro depo at 29:11-31:6; Capurro Decl. at ¶ 8. | Undisputed. |
| 9. While he was on the phone, he heard the train in the distance and very shortly after, it arrived.<br><br>Evidence: Capurro depo at 32:15-33:5, 34:1-3; Capurro Decl. at ¶ 9. | Undisputed. |
| 10. The train stopped, blocking Lake Street, a door opened, and an Amtrak employee met Officer Capurro at the door.<br><br>Evidence: Capurro depo at 34:4-7; Capurro Decl. at ¶ 10; Exhibit A (Body-Worn Camera Video) at 00:26:25 | Undisputed. |
| 11. The employee showed Officer Capurro onto the train and walked him to the passenger that they wanted removed ("Detweiler").<br><br>Evidence: Capurro depo at 39:11-16; Capurro Decl. at ¶ 11; Exhibit A at 00:26:37 | Disputed that a single Amtrak employee did both of these things. Conductor Eric McNay let Ofc. Capurro onto the train and directed him upstairs, and once upstairs Assistant Conductor Bruce Garrett walked him to where Mr. Detweiler was seated.<br><br>Levine Decl., Ex. B, Deposition of Bruce Garrett ("Garrett Depo.") at 48:19-49:22. |
| 12. Detweiler was sitting in his seat in the upstairs level of Car 11.<br><br>Evidence: Garrett depo at 93:8-9; Capurro Decl. at ¶ 12; Exhibit A at 00:27:06 | Undisputed. |
| 13. The aisle was approximately 2-3 feet wide and the lighting was dim. | Disputed that the lighting was particularly dim. Ofc. Capurro's body-worn camera video shows |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Capurro Decl. at ¶ 13; Exhibit A | that the interior of the train car could be seen clearly, with overhead lighting in the aisle, and before waking Mr. Detweiler Ofc. Capurro also turned on his flashlight and shined it at Mr. Detweiler.<br><br>Declaration of Amber Orrey ("Orrey Decl.") [Dkt. 31-6], Ex. A, at 00:48-01:05.[1] |
| 14. Officer Capurro intended to detain Detweiler, escort him off the train, and then investigate the possibility of arrest for possession of brass knuckles.<br><br>Evidence: Capurro depo at 39:24-40:18; Capurro Decl. at ¶ 14 | Undisputed that these were Ofc. Capurro's subjective intentions. Disputed to the extent they suggest that Ofc. Capurro ever communicated any of these intentions to Mr. Detweiler or anyone else until after the incident, which he did not.<br><br>Levine Decl., Ex. A, Capurro Depo. at 40:5-23, 90:24-91:16.<br><br>Levine Decl., Ex. C, Deposition of David Blake ("Blake Depo.") at 36:25-37:4.<br><br>Orrey Decl., Ex. A, at 00:48-04:00. |
| 15. Detweiler appeared to be either sleeping or pretending to be asleep.<br><br>Evidence: Capurro depo at 39:17-19; Capurro Decl. at ¶ 15; Exhibit A at 00:27:05 | Disputed that Mr. Detweiler was pretending to be asleep or that Ofc. Capurro believed that was the case. Immediately after the incident, Ofc. Capurro told a supervisor that when he got on the train, Mr. Detweiler "was sleeping," that Ofc. Capurro shook Mr. Detweiler but Mr. Detweiler was "not waking up," and indicated Mr. Detweiler only woke up after being shaken further.<br><br>Orrey Decl., Ex. A, at 16:53-17:00.<br><br>Levine Decl., Ex. C, Blake Depo. at 42:2-12. |
| 16. He had a plastic bag filled with objects unknown to Officer Capurro in the seat next to him.<br><br>Evidence: Capurro Decl. at ¶ 16; Exhibit A at 00:27:05 | Undisputed, except to the extent it implies Ofc. Capurro could not determine the contents of the bag. The bag was on the seat between Mr. Detweiler and Ofc. Capurro, just in front of Ofc. Capurro and readily accessible to him, and Mr. Detweiler was asleep. |

[1] Times in video and audio files cited by Plaintiff refer to the runtime of the video or audio file itself, rather than to any overlaid timestamp.

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Orrey Decl., Ex. A, at 01:00-01:07, 16:53-17:00. |
| 17. He had on black gloves and a hood pulled over his head partially obscuring his face.<br><br>Evidence: Capurro Decl. at ¶ 17; Exhibit A at 00:27:08 | Undisputed. |
| 18. Officer Capurro shined a flashlight on him, said, "hey bud," tapped him on the shoulder, pulled his hood back, and said, "hey, how's it going?"<br><br>Evidence: Capurro Decl. at ¶ 18; Exhibit A at 00:27:05-00:27:13 | Undisputed. |
| 19. Detweiler appeared startled and immediately stood up.<br><br>Evidence: Capurro Decl. at ¶ 19; Exhibit A at 00:27:13 | Undisputed. |
| 20. Officer Capurro said, "hey, police department."<br><br>Evidence: Capurro Decl. at ¶20; Exhibit A at 00:27:05-00:27:14 | Undisputed. |
| 21. Detweiler responded, "is this the stop?"<br><br>Evidence: Capurro Decl. at ¶ 21; Exhibit A at 00:27:17 | Disputed only in that it omits that Mr. Detweiler first said, "excuse me, sir."<br><br>Orrey Decl., Ex. A, at 01:08-01:13. |
| 22. Officer Capurro responded, "yeah this is the stop, you're coming off' and told him "keep your hands up" four times.<br><br>Evidence: Capurro Decl. at ¶ 22; Exhibit A at 00:27:17-00:27:29 | Disputed to the extent it implies the statement, "you're coming off," could be heard or understood by Mr. Detweiler, who at the same time asked, "is this the Emeryville stop?"<br><br>Orrey Decl., Ex. A, at 01:13-01:17.<br><br>Further disputed to the extent Ofc. Capurro's repeated direction to Mr. Detweiler to keep his hands up implied Mr. Detweiler's hands were not already raised, or mostly raised, and visibly empty, which they were.<br><br>Orrey Decl., Ex. A, at 01:13-01:25. |
| 23. Officer Capurro pointed his taser at Detweiler's midsection.<br><br>Evidence: Capurro Decl. at ¶ 23; Exhibit A at 00:27:29 | Undisputed. |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 24. Detweiler did not keep both hands up.<br><br>Evidence: Capurro Decl. at ¶ 24; Exhibit A at 00:27:17-00:27:29 | Disputed. Mr. Detweiler's left hand was fully raised continuously, even before being directed to raise his hands. Additionally, upon first being told to keep his hands up, Mr. Detweiler raised his right hand from a lowered position, near the tray table of the seat next to him, up to a position on top of the headrest next to him.<br><br>Orrey Decl., Ex. A, at 01:13-01:25. |
| 25. Officer Capurro told Detweiler two times, "turn around," intending to handcuff him and remove him from the train.<br><br>Evidence: Capurro Decl. at ¶ 25; Exhibit A at 00:27:29-00:27:31 | Undisputed that these were Ofc. Capurro's subjective intentions. Disputed to the extent they suggest that Ofc. Capurro ever communicated any of these intentions to Mr. Detweiler or anyone else until after the incident, which he did not.<br><br>Levine Decl., Ex. A, Capurro Depo. at 40:5-23, 90:24-91:16.<br><br>Levine Decl., Ex. C, Deposition of David Blake ("Blake Depo.") at 36:25-37:4.<br><br>Orrey Decl., Ex. A, at 01:23-04:00. |
| 26. Detweiler did not turn around.<br><br>Evidence: Capurro Decl. at ¶ 26; Exhibit A at 00:27:29-00:27:32 | Undisputed. |
| 27. Detweiler grabbed the plastic bag that was on his seat.<br><br>Evidence: Capurro Decl. at ¶ 27; Exhibit A at 00:27:31-00:27:33 | Undisputed that he grabbed the bag by the handle. |
| 28. Officer Capurro told him six times, "don't touch anything."<br><br>Evidence: Capurro Decl. at ¶ 28; Exhibit A at 00:27:32-00:27:46 | Undisputed. |
| 29. Detweiler did not put the bag down.<br><br>Evidence: Capurro Decl. at ¶ 29; Exhibit A 00:27:35- 00:27:46 | Disputed. Mr. Detweiler dropped the bag seconds later, immediately after being tased by Ofc. Capurro, which was also concurrent with Ofc. Capurro saying "don't touch anything."<br><br>Orrey Decl., Ex. A, at 01:39-01:43.<br><br>Further disputed to the extent it implies Mr. Detweiler had been told to put the bag down, as opposed to "don't touch anything," which was |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| | the only direction given at this time and was given while he was already holding it.<br><br>Orrey Decl., Ex. A, at 01:28-01:43. |
| 30. Officer Capurro attempted to take it from him, but Detweiler pulled it away.<br><br>Evidence: Capurro Decl. at ¶ 30; Exhibit A 00:27:29- 00:27:31 | Disputed that Mr. Detweiler pulled the bag away from Ofc. Capurro. Ofc. Capurro's body-worn camera video appears to show him let go of the bag on his own in order to free his hand and use it to grab Mr. Detweiler's left arm.<br><br>Orrey Decl., Ex. A, at 01:37-01:39. |
| 31. Plaintiff's own retained police practices expert (Scott DeFoe) opines that it was appropriate for Officer Capurro to attempt to prevent Detweiler from accessing the bag and to attempt to restrain his hands before exiting the train ("I don't want him - I want nothing in his hands. I want his hands restrained, and that's what the objective should have been.").<br><br>Evidence: DeFoe depo at 75:1-76:1 | Undisputed, except that it omits that Mr. DeFoe opined that a reasonable officer in Ofc. Capurro's position would have removed the bag before waking Mr. Detweiler up or, having failed to do so, would have explained that Mr. Detweiler could not grab his bag and why, in light of the fact that Ofc. Capurro had already been told him he would be exiting the train.<br><br>Levine Decl., Ex. D, Deposition of Scott DeFoe ("DeFoe Depo.") at 68:15-19, 75:2-23, 90:24-91:16. |
| 32. Mr. DeFoe also opines that it would be a felony to "try to disarm a police officer and take any of his less lethal force options."<br><br>Evidence: DeFoe depo at 55:16-55:19 | Undisputed, except that it omits that Mr. DeFoe also opined that it is well known that one potential result of using a Taser against someone in drive-stun mode is that it will cause them to flail or attempt to grab the Taser to "try[] to stop the pain associated with being Tased."<br><br>Levine Decl., Ex. D, DeFoe Depo at 84:23-86:5. |
| 33. Detweiler, still holding the bag, moved into the aisle away from Officer Capurro and in the direction of the Amtrak train conductor ("Garrett") who was approximately ten feet away.<br><br>Evidence: Garrett depo at 37:11-13, 63:14-25; Capurro Decl. at ¶ 31; Exhibit A at 00:27:43-00:27:46 | Undisputed, except regarding the distance between Mr. Detweiler and Mr. Garrett at this time, which Ofc. Capurro's body-worn camera video shows was closer to approximately 15-20 feet.<br><br>Orrey Decl., Ex. A, at 01:36-01:41. |
| 34. Officer Capurro attempted to tase Detweiler.<br><br>Evidence: Capurro Decl. at ¶ 32; Exhibit A at 00:27:46 | Disputed as to "attempted"; Ofc. Capurro did in fact tase Mr. Detweiler.<br><br>Orrey Decl., Ex. A, at 01:36-01:41. |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Levine Decl., Ex. D, DeFoe Depo at 84:23-86:5 (explaining Mr. Detweiler's reaction and how it was indicative of the pain caused by being shocked by a Taser in drive-stun mode) |
| 35. Detweiler grabbed the taser and the two struggled over it.<br><br>Evidence: Capurro Decl. at ¶ 33; Exhibit A at 00:27:46-00:27:53; Exhibit G (Still frame from BWC video of Detweiler grabbing the taser)> | Undisputed, except to the extent that "the two struggled over it" implies Mr. Detweiler attempted to retain control over the Taser beyond attempting to prevent himself from being tased further. Ofc. Capurro's body-worn camera shows that Mr. Detweiler let go of the Taser directly upon Ofc. Capurro firing the Taser probes upward. Mr. Garrett also testified that after hearing the Taser being discharged, he saw Mr. Detweiler backing away from Ofc. Capurro.<br><br>Orrey Decl., Ex. A, at 01:41-01:48.<br><br>Levine Decl., Ex. B, Garrett Depo. at 40:9-12. |
| 36. During the struggle, Officer Capurro was able to point it at the ceiling and discharge it in an attempt to prevent it from being used.<br><br>Evidence: Capurro depo at 51:2-9; Capurro Decl. at ¶ 34; Exhibit A at 00:27:46-00:27:53; Exhibit E (Photos of Taser Probes in the Ceiling) | Undisputed, except to the extent that "the struggle" implies Mr. Detweiler attempted to retain control over the Taser beyond attempting to prevent himself from being tased further. Ofc. Capurro's body-worn camera shows that Mr. Detweiler let go of the Taser directly upon Ofc. Capurro firing the Taser probes upward. Mr. Garrett also testified that after hearing the Taser being discharged, he saw Mr. Detweiler backing away from Ofc. Capurro.<br><br>Orrey Decl., Ex. A, at 01:41-01:48.<br><br>Levine Decl., Ex. B, Garrett Depo. at 40:9-12. |
| 37. Garrett grabbed Detweiler from behind and tried to "help pull [Detweiler] off of the officer" because he "felt a sense of duty to interject and try and help the situation" and because he thought Detweiler was "possibly ... getting the upper hand."<br><br>Evidence: Garrett depo at 61:22-62:12, 87:21-88:4; Capurro depo at 52:23-53:3; Capurro Decl. at ¶ 35; Exhibit A at 00:27:53-00:27:57 | Disputed as to "possibly … getting the upper hand," which is not stated in the cited evidence.<br><br>Further disputed as Mr. Garrett also testified that he could not remember what he did at this time.<br><br>Levine Decl., Ex. B, Garrett Depo. at 88:5-16. |
| 38. According to Garrett, Detweiler was "fighting with the officer" and "attacking the officer." | Disputed. Mr. Garrett testified that, up until the time Ofc. Capurro was striking Mr. Detweiler |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Garrett depo at 61:22-62:12, 87:21-88:4 | with the baton, which was after Ofc. Capurro's discharges of the Taser, he could not say whether he had seen Mr. Detweiler kick or punch Ofc. Capurro because his view was obscured.<br><br>Levine Decl., Ex. B, Garrett Depo. at 54:4-17, 88:19-25.<br><br>Further disputed in that these are subjective characterizations by Mr. Garrett and the product of his inability to see what was occurring, noted above. The cited testimony shows he did not testify that Mr. Detweiler was in fact "attacking the officer," only that he "felt" this was the case. |
| 39. Officer Capurro was able to create a couple feet of distance from Detweiler and discharged his taser at him.<br><br>Evidence: Capurro Decl. at ¶ 36; Exhibit A at 00:27:53-00:27:57 | Undisputed. |
| 40. Garrett was attempting to hold Detweiler and said, "I need assistance, I need assistance now."<br><br>Evidence: Exhibit A at 00:27:56-00:27:58 | Disputed that Mr. Garrett said this. The cited portion of Ofc. Capurro's body-worn camera video shows that Ofc. Capurro said it, not Mr. Garrett. Mr. Garrett's voice is distinct and can be heard later in the video after being shot by Ofc. Capurro.<br><br>Further disputed as to "attempting" to the extent it implies Mr. Garrett was not in fact holding Mr. Detweiler, which he was beginning just after Ofc. Capurro's first taser discharge until Ofc. Capurro shot him and Mr. Detweiler.<br><br>Orrey Decl., Ex. A, at 01:46-02:39.<br><br>Levine Decl., Ex. B, Garrett Depo. at 62:13-63:13. |
| 41. Officer Capurro attempted to go hands- on with Detweiler and Detweiler punched him at least twice in the face.<br><br>Evidence: Capurro depo at 54:22-55:19; Capurro Decl. at ¶ 37; Exhibit A 00:27:58-00:28:02; Exhibit D (Photos of Officer Capurro); Exhibit K (Still frame from BWC | Disputed. Ofc. Capurro's body-worn camera video does not show Mr. Detweiler punch him, nor did Mr. Garrett see this occur.<br><br>Orrey Decl., Ex. A, at 01:51-02:00.<br><br>Levine Decl., Ex. B, Garrett Depo. at 38:3-5, |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| video of blood on Officer Capurro's hands) | 49:11-19. |
| 42. Officer Capurro felt dazed and thought he was on the verge of blacking out.<br><br>Evidence: Capurro Decl. at ¶ 38 | Disputed that this was the result of being punched by Mr. Detweiler. Ofc. Capurro's body-worn camera video does not show Mr. Detweiler punch him, nor did Mr. Garrett see this occur.<br><br>Orrey Decl., Ex. A, at 01:51-02:00.<br><br>Levine Decl., Ex. B, Garrett Depo. at 38:3-5, 49:11-19. |
| 43. After the incident, he went to the hospital emergency room and was told that he suffered a concussion.<br><br>Evidence: Capurro Decl. at ¶ 39 | Disputed that this was the result of being punched by Mr. Detweiler. Ofc. Capurro's body-worn camera video does not show Mr. Detweiler punch him, nor did Mr. Garrett see this occur.<br><br>Orrey Decl., Ex. A, at 01:51-02:00.<br><br>Levine Decl., Ex. B, Garrett Depo. at 38:3-5, 49:11-19. |
| 44. Officer Capurro transitioned to his baton.<br><br>Evidence: Capurro depo at 58:10-21; Capurro Decl. at ¶ 40; Exhibit A at 00:28:04 | Undisputed. |
| 45. Another passenger was seated a couple feet away.<br><br>Evidence: Garrett depo at 94:6-95:5; Capurro Decl. at ¶ 41; Exhibit A at 00:28:03-00:28:22 | Undisputed. |
| 46. Officer Capurro struck and jabbed Detweiler at least ten times with his baton with "medium force" due to the narrow confines of the train.<br><br>Evidence: Capurro depo at 59:5-61:3; Capurro Decl. at ¶ 42; Exhibit A at 00:28:05-00:28:21 | Disputed as to "medium force." Ofc. Capurro testified that when he jabbed Mr. Detweiler with the baton, he did so with all of his energy, and minutes after the incident told a supervisor that he was "crushing [Mr. Detweiler's] hand" with his overhand baton strikes.<br><br>Levine Decl., Ex. A, Capurro Depo. at 81:13-16.<br><br>Levine Decl., Ex. C, Blake Depo. at 59:25-60:8.<br><br>Orrey Decl., Ex. A, at 17:51-17:57.<br><br>Further disputed as to the number of strikes and jabs. Ofc. Capurro's body-worn camera video |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | shows that the number was at least 13-14.<br><br>Orrey Decl., Ex. A, at 01:58-02:20. |
| 47. Detweiler remained standing within about a foot of Garrett and showed no obvious sign of injury.<br><br>Evidence: Capurro Decl. at ¶ 43; Exhibit A at 00:28:20-00:28:30 | Disputed. During Ofc. Capurro's baton strikes, Mr. Detweiler repeatedly pled with Ofc. Capurro to stop striking him and was audibly in pain.<br><br>Orrey Decl., Ex. A, at 01:58-02:20. |
| 48. Officer Capurro ordered him to get on the ground three times.<br><br>Evidence: Capurro Decl. at ¶ 44; Exhibit A at 00:28:18-00:28:25 | Undisputed. |
| 49. Detweiler did not get on the ground and instead told Officer Capurro that he wanted to get off the train and asked Officer Capurro to grab his things which were now behind Officer Capurro.<br><br>Evidence: Capurro Decl. at ¶ 45; Exhibit A at 00:28:20-00:28:28 | Disputed to the extent it implies Mr. Detweiler was able to get on the ground while being restrained from behind by Mr. Garrett, and while standing in the narrow confines of the vestibule with Mr. Garrett, as are shown on Ofc. Capurro's body-worn camera video. Plaintiff's police expert, Scott DeFoe, testified that it appeared from the body-worn camera video that Mr. Detweiler may have been unable to do so due to Mr. Garrett's restraint of him.<br><br>Orrey Decl., Ex. A, at 02:02-02:22.<br><br>Levine Decl., Ex. D, DeFoe Depo at 30:2-25. |
| 50. Officer Capurro unholstered his handgun and pointed it at Detweiler.<br><br>Evidence: Capurro Decl. at ¶ 46; Exhibit A at 00:28:25-00:28:40 | Undisputed. |
| 51. While holding Detweiler at gun-point, Officer Capurro gave him four more commands to get on the ground.<br><br>Evidence: Capurro Decl. at ¶ 47; Exhibit A at 00:28:26-00:28:40 | Undisputed. |
| 52. Detweiler did not get on the ground.<br><br>Evidence: Capurro Decl. at ¶ 48; Exhibit A at 00:28:18-00:28:40 | Disputed to the extent it implies Mr. Detweiler was able to get on the ground while being restrained from behind by Mr. Garrett, and while standing in the narrow confines of the vestibule with Mr. Garrett, as are shown on Ofc. Capurro's body-worn camera video. Plaintiff's police expert, Scott DeFoe, testified that it appeared from the body-worn camera |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | video that Mr. Detweiler may have been unable to do so due to Mr. Garrett's restraint of him.<br><br>Orrey Decl., Ex. A, at 02:02-02:34.<br><br>Levine Decl., Ex. D, DeFoe Depo at 30:2-25. |
| 53. While at gun-point and being ordered to get on the ground, Detweiler put brass knuckles on his right hand.<br><br>Evidence: Capurro depo at 102:21-23; Capurro Decl. at ¶ 49; Exhibit A at 00:28:28-00:28:37; Exhibit H (Still frames from BWC video of Detweiler putting on brass knuckles); Exhibit L (Still frames from BWC video showing brass knuckles near Detweiler's body) | Undisputed. |
| 54. Officer Capurro briefly removed his left hand from his handgun to operate his radio and radioed, "one at gunpoint."<br><br>Evidence: Capurro Decl. at ¶ 50; Exhibit A at 00:28:40-00:28:42 | Undisputed. |
| 55. At that moment, Detweiler, who was approximately one foot away from Garrett, turned around "with a look of rage in his eyes" and swung a right-hand punch at Garrett's head ("he started swinging on me")."<br><br>Evidence: Garrett depo at 96:4-19; Capurro depo at 102:24-103:2; Capurro Decl. at ¶ 51; Exhibit A at 00:28:42-00:28:43; Exhibit I (Still frames from BWC video of Detweiler punching Garrett). | Disputed. In deposition, Ofc. Capurro testified that, at this time during the incident, he observed Mr. Detweiler "reach[] for the brass knuckles and put them on, and then grab[] the conductor or the Amtrak employee." Ofc. Capurro also testified that he did not see Mr. Detweiler strike Mr. Garrett before he fired.<br><br>Levine Decl., Ex. A, Capurro Depo at 63:24-64:11, 66:22-25, 73:17-19. |
| 56. Officer Capurro immediately fired four shots within approximately 1-2 seconds.<br><br>Evidence: Capurro Decl. at ¶ 52; Exhibit A at 00:28:43-00:28:45 | Undisputed. |
| 57. According to Plaintiff's police practices expert, deadly force is appropriate on a subject who was going to punch someone in the head with brass knuckles ("if Capurro knew that he swung at him with brass knuckles on and he reasonably believed he was going to be punching him in the head with brass knuckles, then he could articulate there was an imminent threat of great bodily injury or death and the shooting would be reasonable"). | Undisputed that in his deposition, Mr. DeFoe stated what is quoted in the parenthetical, but disputed as to City Defendants' characterization of it. As the quoted statement clarifies, Mr. DeFoe's testimony was that if Ofc. Capurro *knew* that Mr. Detweiler swung (i.e., in the past) at Mr. Garrett with brass knuckles *and* reasonably believed Mr. Detweiler *would be* (i.e., in the future) punching him in the head with them, shooting at that time would be |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: DeFoe depo at 36:1-6. | reasonable. He clarified this shortly thereafter in the deposition, testifying that if an officer "*was about to* strike someone in the head with brass knuckles," then shooting at that time would be reasonable. He did not testify that an already-completed swing could justify using deadly force absent knowledge that another swing would occur after unless deadly force was used.<br><br>Levine Decl., Ex. D, DeFoe Depo at 37:2-13 (emphasis added). |
| 58. Detweiler and Garrett went to the ground and Detweiler had Garrett in a choke hold with his right arm around Garrett's neck.<br><br>Evidence: Capurro depo at 104:8-19; Capurro Decl. at ¶ 53; Exhibit A at 00:28:45-00:28:49; Exhibit J (Still frames from BWC video of Garrett in a choke hold) | Disputed that Mr. Detweiler had Mr. Garrett in a choke hold. Ofc. Capurro's body-worn camera video indicates that Mr. Detweiler's arm was not pressing against Mr. Garrett's neck. Plaintiff's police expert likewise opined, based on his review of the video, that no choke hold occurred. Mr. Garrett himself, when asked by City Defendants' counsel if he had been placed in a choke hold, clarified that he believed it was instead "some type of head restraint, head lock, something."<br><br>Orrey Decl., Ex. A, at 02:39-02:43.<br><br>Levine Decl., Ex. D, DeFoe Depo at 41:4-13, 41:18-43:8.<br><br>Declaration of Scott DeFoe ("DeFoe Decl.") ¶ 16.<br><br>Levine Decl., Ex. B, Garrett Depo at 96:23-97:6. |
| 59. Officer Capurro fired two additional shots at Detweiler in approximately 1-2 seconds.<br><br>Evidence: Capurro Decl. at ¶ 54; Exhibit A at 00:28:48-00:28:49 | Disputed. As shown on Ofc. Capurro's body-worn camera video and as Defendants' police expert testified, Ofc. Capurro paused approximately 3 seconds between his fourth and fifth shots, then paused again for more than 1 second between his fifth and sixth shots. Plaintiff's expert opined that due to these pauses, Ofc. Capurro's fifth and sixth shots each amounted to a separate volley, providing the opportunity for Ofc. Capurro to reassess.<br><br>Orrey Decl., Ex. A, at 02:39-02:45. |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Levine Decl., Ex. C, Blake Depo. at 58:6-14.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 39:2-40:10.<br><br>DeFoe Decl. ¶¶ 15, 17. |
| 60. Officer Capurro wiped blood from his face where he had been punched.<br><br>Evidence: Capurro Decl. at ¶ 55; Exhibit A at 00:29:18-00:29:21; Exhibit K (Still frame from BWC video of blood on Officer Capurro's hands) | Disputed that Ofc. Capurro was punched or that this was the reason blood was on his face. Ofc. Capurro's body-worn camera video does not show Mr. Detweiler punch him, nor did Mr. Garrett see this occur.<br><br>Orrey Decl., Ex. A, at 01:51-02:00.<br><br>Levine Decl., Ex. B, Garrett Depo. at 38:3-5, 49:11-19. |
| 61. Officer Capurro radioed, "shots fired" and "I need medical."<br><br>Evidence: Capurro Decl. at ¶ 56; Exhibit A at 00:28:51-00:29:07 | Undisputed, except to the extent "I need medical" implies Ofc. Capurro secured medical assistance for Mr. Detweiler. Although an ambulance worker arrived and was preparing to go attend to Mr. Detweiler, Ofc. Capurro explicitly directed the ambulance worker not to do so and represented that Mr. Detweiler was already deceased based only on his assumption that this was the case, and rebuffed a sheriff's deputy's offer to drive Mr. Garrett to the hospital herself so that the ambulance could be used to transport Mr. Detweiler.<br><br>Orrey Decl., Ex. A, at 15:53-16:28.<br><br>Levine Decl., Ex. A, Capurro Depo. 72:24-75:4, 75:12-15, 109:4-20. |
| 62. He put Detweiler in handcuffs, inspected his wounds, and then tended to Garrett who was also shot.<br><br>Evidence: Capurro Decl. at ¶ 57; Exhibit A at 00:29:27-00:31:48 | Undisputed. |
| 63. First responders arrived and provided medical aid to Detweiler, who passed away.<br><br>Evidence: Capurro Decl. at ¶ 58; Exhibit A at 00:31:49 | Disputed to the extent it implies that medical care was not delayed or denied to Mr. Detweiler. Although an ambulance worker arrived and was preparing to go attend to Mr. Detweiler, Ofc. Capurro explicitly directed the ambulance worker not to do so and represented |

| CITY DEFENDANTS' UNDISPUTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | that Mr. Detweiler was already deceased based only on his assumption that this was the case, and rebuffed a sheriff's deputy's offer to drive Mr. Garrett to the hospital herself so that the ambulance could be used to transport Mr. Detweiler.<br><br>Orrey Decl., Ex. A, at 15:53-16:28.<br><br>Levine Decl., Ex. A, Capurro Depo. 72:24-75:4, 75:12-15, 109:4-20. |

## II. PLAINTIFF'S RESPONSES TO DEFENDANTS NATIONAL RAILROAD PASSENGER CORPORATION AND BRUCE GARRETT'S ("AMTRAK DEFENDANTS") STATEMENT OF UNDISPUTED FACTS AND SUPPORTING EVIDENCE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 1. Plaintiff's lawsuit arises from a City of Mt. Shasta Police Department shooting on December 25, 2023, aboard Amtrak Train 11 at approximately 12:28 a.m. in the City of Mt. Shasta.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 3 through 4. | Undisputed. |
| 2. Decedent and the relief train crew, including Garrett, boarded the train at Klamath Falls at approximately 10:13 p.m. on December 24, 2023.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 8 through 9. | Undisputed. |
| 3. Garrett served as the assistant conductor aboard the train, with duties that included checking passengers' tickets.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 9 through 10. | Undisputed. |
| 4. Decedent was the only passenger who boarded the train at Klamath Falls.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 10 through 11. | Undisputed. |
| 5. During the job briefing, an Amtrak station agent told Garrett that Decedent had been acting strangely and had a history of police issues.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 12 through 13. | Disputed that a station agent told Mr. Garrett that Mr. Detweiler had a history of police issues. Mr. Garrett testified that he heard this thirdhand, from conductor Eric McNay, who in turn had been told this by a station agent.<br><br>Levine Decl., Ex. B, Garrett Depo. at 90:24-91:11. |
| 6. Garrett went to the lobby and asked to see Decedent's ticket.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, line 14. | Undisputed. |
| 7. Decedent stood, raised his left arm in what Garrett described as a "Dracula pose," and asked, "Why are you talking to me."<br><br>Evidence: Declaration of Bruce Garrett at pg. | Undisputed. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 2, lines 14 through 16. | |
| 8. Decedent produced a valid ticket for travel from Klamath Falls to Emeryville, so Garrett issued him a boarding pass.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 16 through 17. | Undisputed. |
| 9. Garrett thought that Decedent was a bit "weird" and probably just a "meth head," but Decedent's conduct did not cause Garrett enough concern at that time to deny him boarding.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 17 through 19. | Disputed that Mr. Garrett thought Mr. Detweiler was a "meth head." He testified that he did not form the impression that Mr. Detweiler was under the influence of any drugs or alcohol.<br><br>Levine Decl., Ex. B, Garrett Depo. at 23:17-20. |
| 10. During the boarding process, Decedent walked in the wrong direction toward the head end of the train, so Garrett directed him to the correct coach car.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 20 through 21. | Undisputed. |
| 11. Decedent carried no luggage other than a couple of plastic Walmart-type bags.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 21 through 22. | Undisputed. |
| 12. Amtrak assigned him to Car 11, Seat 9, approximately four rows behind the front vestibule connecting Car 11 to Car 12.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 22 through 23. | Undisputed. |
| 13. The train's next stop was Dunsmuir, approximately two hours and twenty minutes away.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, line 24. | Undisputed. |
| 14. Within five minutes of departing, a passenger informed Garrett that a passenger matching Decedent's description had brandished brass knuckles on his hand menacingly in the café car.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 25 through 26. | Disputed as to time. Mr. Garrett testified this occurred within ten minutes of departing, not five.<br><br>Levine Decl., Ex. B, Garrett Depo. at 17:25-18:10.<br><br>Further disputed as to the subjective "menacing[]" characterization. Mr. Garrett testified only that this passenger had said that |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | the other passenger had "pulled out a pair of brass knuckles, and was kind of motioning with his hands and making sure that everybody saw that he had them."<br><br>Levine Decl., Ex. B, Garrett Depo. at 17:25-18:10. |
| 15. California law criminalizes the possession of metal knuckles.<br><br>Evidence: Cal. Penal Code § 21810. | Undisputed. |
| 16. When Garrett went to investigate, other passengers told him that the person brandished brass knuckles then went to the coach cars.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, lines 26 through 27. | Disputed. Mr. Garrett never said this in his deposition when asked, and instead said that upon hearing from the initial passenger he directly "proceeded forward in the train to go locate this individual," "walked up into car 11, and [] saw him standing toward the front of car 11," with no mention of additional reports by other passengers during this time.<br><br>Levine Decl., Ex. B, Garrett Depo. at 17:25-19:6. |
| 17. Garrett found Decedent in the vestibule area connecting cars 11 and 12.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, line 28. | Undisputed. |
| 18. Decedent told Garrett that he was trying to go to Emeryville.<br><br>Evidence: Declaration of Bruce Garrett at pg. 2, line 28, through pg. 3, line 1. | Undisputed. |
| 19. Garrett reassured Decedent that the train was traveling to Emeryville.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 1 through 2. | Undisputed. |
| 20. Garrett calmed Decedent, who returned to his seat.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, line 2. | Undisputed. |
| 21. The trip from Klamath Falls to Emeryville aboard Amtrak Train 11 lasts approximately ten hours.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 2 through 3. | Undisputed. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 22. Cellphone reception becomes spotty approximately 10 minutes out of Klamath Falls until the train gets near Mt. Shasta.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 4 through 5. | Undisputed. |
| 23. If a public safety issue arises en route from Klamath Falls to Mt. Shasta, Garrett calls his engineers on his low power radio pack-set, and the engineers use the powerful locomotive radio to call Union Pacific's ("UP") dispatcher.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 5 through 7. | Undisputed. |
| 24. UP's dispatcher then calls UP's Response Management Communication Center ("RMCC"), and RMCC calls local law enforcement/emergency personnel.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 7 through 9. | Undisputed. |
| 25. When Train 11 entered a siding at Worden, Garrett spoke with his conductor.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, line 10. | Undisputed. |
| 26. The Worden siding lies approximately 13 to 14 rail miles south of the Klamath Falls Amtrak Station.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 10 through 11. | Undisputed. |
| 27. Garrett and his conductor discussed that brass knuckles are a deadly weapon and that they faced a long trip through the darkness, so they decided to remove Decedent from the train.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 11 through 13. | Undisputed. |
| 28. While the train remained in the Worden siding, RMCC advised that no local authorities were available and recommended taking Decedent to Dunsmuir or Mt. Shasta, which is just north of Dunsmuir.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 14 through 16. | Undisputed. |
| 29. Garrett and his conductor agreed, planned to walk through the train more often, and | Undisputed. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| continued to monitor Decedent.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 16 through 17. | |
| 30. Approximately three minutes after Train 11 departed the Worden siding, a female passenger told Garrett that a man in Car 12 was menacing people with brass knuckles.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 18 through 19. | Disputed as to "menacing." Mr. Garrett testified only that this passenger had said that the other passenger had "pulled out a pair of brass knuckles, and was kind of motioning with his hands and making sure that everybody saw that he had them."<br><br>Levine Decl., Ex. B, Garrett Depo. at 24:19-24.<br><br>Further disputed as to whether Mr. Garrett knew the passenger was female. When asked to describe this passenger in his deposition, he testified he could recall no details regarding what they looked like.<br><br>Levine Decl., Ex. B, Garrett Depo. at 58:14-24. |
| 31. Garrett walked from the café car through Car 11 to Car 12 with a male dining car attendant.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 19 through 20. | Undisputed. |
| 32. Garrett saw Decedent in Car 12 through the end door window.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 20 through 21. | Undisputed. |
| 33. Garrett approached Decedent, reminded him that they had just talked, and asked him to return to his seat in Car 11.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 21 through 22. | Undisputed. |
| 34. Decedent pulled out the brass knuckles and stood in a "Dracula" like pose.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 22 through 23. | Disputed. During his deposition, Mr. Garrett was asked about this interaction and provided a lengthy and detailed response, in which he stated that he saw the brass knuckles but not that Mr. Detweiler had pulled them out at that time, or that he ever struck a "'Dracula' like pose."<br><br>Levine Decl., Ex. B, Garrett Depo. at 24:19-27:23. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 35. The dining car attendant who accompanied Garrett with a crowbar told Decedent to put the brass knuckles away.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 23 through 24. | Disputed. During his deposition, Mr. Garrett was asked about this interaction and provided a lengthy and detailed response, in which he never mentioned a crowbar or the other Amtrak employee saying anything to Mr. Detweiler.<br><br>Levine Decl., Ex. B, Garrett Depo. at 24:19-27:23. |
| 36. Garrett directed the dining car attendant to stand down and relied on his 8.5 years of training and experience as an Amtrak conductor to successfully deescalate the encounter.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, lines 24 through 26. | Undisputed. |
| 37. Garrett convinced Decedent to return to his seat and sit down.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, line 27. | Undisputed. |
| 38. Garrett stayed in Car 11 near the stairs in the middle of the car to watch Detweiler for 15 minutes, during which Decedent stayed in his seat.<br><br>Evidence: Declaration of Bruce Garrett at pg. 3, line 27, through pg. 4, line 1. | Disputed as to 15 minutes. Mr. Garrett testified it was up to 20 minutes.<br><br>Levine Decl., Ex. B, Garrett Depo. at 27:14-28:10.<br><br>Further disputed as to Mr. Garrett's location. He testified that he sat down in a seat approximately 10 rows behind Mr. Detweiler.<br><br>Levine Decl., Ex. B, Garrett Depo. at 27:14-28:10. |
| 39. Garrett then went to the dining car for water and talked to his conductor again.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, line 1. | Undisputed. |
| 40. They now definitely did not want Decedent walking around with brass knuckles and wanted him removed from the train.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 1 through 3. | Disputed to the extent it implies Mr. Detweiler ever walked around on the train with brass knuckles at any time during the approximately one hour and 45 or 50 minutes that passed from when Mr. Garrett directed him back to his seat the second time and when the train arrived in Mt. Shasta. During this period, Mr. Detweiler did not get up and there were no complaints from passengers regarding him. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Levine Decl., Ex. B, Garrett Depo. at 28:23-29:14, 34:4-15. |
| 41. At approximately midnight, Garrett coordinated with dispatching railroad UP's RMCC regarding the train's expected arrival time in Mt. Shasta for local law enforcement's removal of Decedent from the train.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 4 through 6. | Undisputed. |
| 42. After a couple of hours, Garrett had not yet heard back from UP's dispatcher or RMCC so he decided to call the Mt. Shasta police department as the train got closer to Mt. Shasta.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 6 through 7. | Undisputed. |
| 43. Garrett asked for Mt. Shasta Police Department's removal of Decedent from the train at Lake Street.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 8 through 9. | Undisputed. |
| 44. Garrett provided Decedent's name, information about Decedent's rumored prior police incidents, and information about Decedent's brass knuckles.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 9 through 10. | Disputed to extent it implies this was the only information Mr. Garrett provided during the call. He also stated that he was "requesting help to get a passenger off that's agitated and … becoming possibly violent" and that Mr. Detweiler "has a pair of brass knuckles and he is brandishing them to crew members and other passengers, and he becomes agitated."<br>He repeatedly used the present tense and did not state that these reported issues had occurred an hour and a half earlier or that he had observed that Mr. Detweiler had remained stationary in his seat for the past hour and a half without any incident during that time.<br><br>Orrey Decl., Ex. B. |
| 45. As Train 11 approached Lake Street, Garrett went downstairs, locked the door to the lower-level passenger seating area, and positioned himself near the upper-level stairs.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 11 through 12. | Disputed. When asked during his deposition, Mr. Garrett expressly denied having locked any doors.<br><br>Levine Decl., Ex. B, Garrett Depo. at 47:12-19. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 46. The conductor remained on the lower level and gave the locomotive engineers the car count needed to stop Car 11 at Lake Street.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 12 through 14. | Undisputed. |
| 47. After the train stopped, the conductor met Officer Capurro at the door and directed him upstairs. Garrett then walked past Decedent, pointed him out to Officer Capurro, and continued to the vestibule between Cars 11 and 12 so Officer Capurro could remove Decedent.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 14 through 16. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. Deposition of Jeremiah Capurro taken on March 27, 2026 at pg. 39, lines 3 through 16; attached as Exhibit B to the Deposition of Michael E. Murphy. | Undisputed. |
| 48. Garrett stood in the vestibule between Cars 11 and 12 after pointing out Decedent to Officer Capurro.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 17 through 18. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. | Undisputed. |
| 49. Garrett disabled the automatic door-opening mechanism to prevent Decedent from entering Car 12, where other passengers were located.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 18 through 19. | Undisputed. |
| 50. Garrett's conductor remained in the middle of Car 11 near the stairs after Officer Capurro followed Garrett to Decedent's seat.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 19 through 20. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. | Undisputed. |
| 51. Officer Capurro told Decedent that he needed to leave the train and instructed him to keep his hands raised and not touch anything. | Disputed that Ofc. Capurro told Mr. Detweiler that he needed to leave the train. Although at one point Ofc. Capurro said "you're coming off," this was said while Mr. Detweiler was |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Declaration of Bruce Garrett at pg. 4, lines 21 through 22. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. | asking another question, and he did not respond to Mr. Detweiler's repeated requests throughout the encounter to be allowed to leave the train.<br><br>Orrey Decl., Ex. A, at 01:04-02:37. |
| 52. Decedent stood up suddenly and moved into the aisle where he faced off with Officer Capurro, placing himself between Officer Capurro and Garrett, who had moved to the front of the railcar into the vestibule area after pointing out Decedent to Officer Capurro.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 22 through 25. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. | Disputed as to this characterization. Mr. Detweiler spent some time asking questions of Ofc. Capurro before stepping into the aisle and backing away from Ofc. Capurro when Ofc. Capurro pointed a Taser at him.<br><br>Orrey Decl., Ex. A, at 01:04-01:43. |
| 53. Decedent ignored Officer Capurro's commands and reached for a bag on the adjacent seat. Officer Capurro attempted to take the bag while again ordering Decedent to keep his hands raised, but Decedent continued to resist.<br><br>Evidence: Declaration of Bruce Garrett at pg. 4, lines 26 through 28. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. Deposition of Jeremiah Capurro taken on March 27, 2026 at pg. 102, lines 11 through 17; attached as Exhibit B to the Deposition of Michael E. Murphy. | Disputed. Mr. Detweiler's left hand was fully raised continuously, even before being directed to raise his hands. He kept it raised in compliance with Ofc. Capurro's command. Additionally, upon first being told to keep his hands up, Mr. Detweiler raised his right hand from a lowered position, near the tray table of the seat next to him, up to a position on top of the headrest next to him. Further, Mr. Detweiler reaching for his bag, upon being told that this was his stop and that he would be getting off, occurred before Ofc. Capurro ever directed him not to touch anything and so did not amount to ignoring any command that had been issued. After Ofc. Capurro told him not to touch anything, Mr. Detweiler asked whether Ofc. Capurro wanted him to get off of the train, and when Ofc. Capurro responded that he did, Mr. Detweiler asked to be allowed to take his things with him to comply with that direction.<br><br>Orrey Decl., Ex. A, at 01:13-01:36. |
| 54. Decedent continued to ignore Officer Capurro's requests, prompting Officer Capurro to draw his taser.<br><br>Evidence: Declaration of Bruce Garrett at pg. 5, lines 1 through 2. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. Deposition of Jeremiah Capurro taken on | Disputed. Ofc. Capurro had already drawn his Taser after saying "keep your hands up" the second time, which Mr. Detweiler was doing, before Ofc. Capurro made any other requests of Mr. Detweiler, including to not touch anything.<br><br>Orrey Decl., Ex. A, at 01:13-01:20. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| March 27, 2026 at pg. 48, lines 11 through 12; attached as Exhibit B to the Deposition of Michael E. Murphy. | |
| 55. Decedent grabbed the taser, and the ensuing struggle discharged it into the ceiling and rendered it useless.<br><br>Evidence: Declaration of Bruce Garrett at pg. 5, lines 2 through 3. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. Deposition of Jeremiah Capurro taken on March 27, 2026 at pg. 51, lines 2 through 9; and pg. 105, lines 6 through 9; attached as Exhibit B to the Deposition of Michael E. Murphy. | Disputed that the Taser being discharged into the ceiling rendered it useless. Ofc. Capurro continued to use it in drive-stun mode to tase Mr. Detweiler thereafter.<br><br>Orrey Decl., Ex. A, at 01:40-01:58.<br><br>Levine Decl., Ex. A, Capurro Depo. at 12:1-13, 54:17-23. |
| 56. Officer Capurro next deployed his baton, but Decedent continued to resist and fight while Garrett stood a few feet away in the vestibule.<br><br>Evidence: Declaration of Bruce Garrett at pg. 5, lines 3 through 4. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. Deposition of Jeremiah Capurro taken on March 27, 2026 at pg. 58, lines 10 through 14; attached as Exhibit B to the Deposition of Michael E. Murphy. | Disputed. Ofc. Capurro's body-worn camera video clearly shows that Mr. Detweiler was not fighting at all during this time and only held his left arm out to take the baton strikes while Mr. Garrett restrained him from behind, including by holding Mr. Detweiler's right arm behind his back, and while Mr. Detweiler pled with Ofc. Capurro to stop striking him and asked to be allowed to leave the train.<br><br>Orrey Decl., Ex. A, at 01:58-02:16. |
| 57. During the altercation, Decedent struck Officer Capurro twice in the face with enough force that it disabled his earpiece and Officer Capurro was feeling on the verge of blacking out.<br><br>Evidence: Declaration of Bruce Garrett at pg. 5, lines 4 through 5. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. Deposition of Jeremiah Capurro taken on March 27, 2026 at pg. 6, lines 14 to 25; and pg. 31, line 3 through 6; attached as Exhibit B to the Deposition of Michael E. Murphy. Statement of Officer Capurro at MSPD000143; attached as Exhibit C to the Declaration of Michael E. Murphy. | Disputed. Ofc. Capurro's body-worn camera video does not show Mr. Detweiler punch him, nor did Mr. Garrett see this occur.<br><br>Orrey Decl., Ex. A, at 01:51-02:00.<br><br>Levine Decl., Ex. B, Garrett Depo. at 38:3-5, 49:11-19. |
| 58. During the fight, Decedent backed away from Officer Capurro into the Car 11 | Disputed. It was Mr. Garrett who pulled Mr. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| vestibule, where Garrett had already been standing, backing Garrett up farther against the vestibule door.<br><br>Evidence: Declaration of Bruce Garrett at pg. 5, lines 6 through 7. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. | Detweiler there, as Mr. Garrett testified.<br><br>Levine Decl., Ex. B, Garrett Depo. at 57:17-23. |
| 59. Garrett attempted to restrain Decedent from behind to protect himself, the passengers, and Officer Capurro, but Decedent broke Garrett's grip and continued resisting arrest.<br><br>Evidence: Declaration of Bruce Garrett at pg. 5, lines 7 through 9. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. | Disputed that Mr. Detweiler broke Mr. Garrett's grip or resisted arrest. Ofc. Capurro's body-worn camera shows Mr. Garrett maintaining a grip on Mr. Detweiler and restraining him from behind throughout the period while Ofc. Capurro was striking him with the baton. Additionally, Ofc. Capurro never told Mr. Detweiler that he was under arrest.<br><br>Orrey Decl., Ex. A, at 01:58-02:16.<br><br>Levine Decl., Ex. A, Capurro Depo. at 40:19-23. |
| 60. Decedent placed the brass knuckles on his right fist while facing Officer Capurro, who had drawn his service weapon and pointed it at Decedent.<br><br>Evidence: Declaration of Bruce Garrett at pg. 5, lines 9 through 10. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. Deposition of Jeremiah Capurro taken on March 27, 2026 at pg. 102, lines 7 through 10; and pg. 102, lines 21 through 23; attached as Exhibit B to the Deposition of Michael E. Murphy. | Undisputed. |
| 61. Garrett reached out in an unsuccessful attempt to hold Decedent's arm against the wall, but Decedent again broke free, turned, and threw a brass-knuckle-clad punch at Garrett with his right fist.<br><br>Evidence: Declaration of Bruce Garrett at pg. 5, lines 10 through 12. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. Deposition of Jeremiah Capurro taken on March 27, 2026 at pg. 102, line 24 through pg. 103, line 2; and pg. 103, lines 10 through 16; | Disputed. In deposition, Ofc. Capurro testified that, at this time during the incident, he observed Mr. Detweiler "reach[] for the brass knuckles and put them on, and then grab[] the conductor or the Amtrak employee." Ofc. Capurro also testified that he did not see Mr. Detweiler strike Mr. Garrett before he fired.<br><br>Levine Decl., Ex. A, Capurro Depo at 63:24-64:11, 66:22-25, 73:17-19. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| attached as Exhibit B to the Deposition of Michael E. Murphy. | |
| 62. Officer Capurro immediately fired four shots in response, but Decedent continued to choke Garrett even after both men fell to the floor.<br><br>Evidence: Declaration of Bruce Garrett at pg. 5, lines 12 through 14. Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. Deposition of Jeremiah Capurro taken on March 27, 2026 at pg. 103, lines 17 through pg. 104, line 19; attached as Exhibit B to the Deposition of Michael E. Murphy. | Disputed that Mr. Detweiler choked Mr. Garrett. Ofc. Capurro's body-worn camera video indicates that Mr. Detweiler's arm was not pressing against Mr. Garrett's neck. Plaintiff's police expert likewise opined, based on his review of the video, that no choke hold occurred. Mr. Garrett himself, when asked by City Defendants' counsel if he had been placed in a choke hold, clarified that he believed it was instead "some type of head restraint, head lock, something."<br><br>Orrey Decl., Ex. A, at 02:39-02:43.<br><br>Levine Decl., Ex. D, DeFoe Depo at 41:4-13, 41:18-43:8.<br><br>Declaration of Scott DeFoe ("DeFoe Decl.") ¶ 16.<br><br>Levine Decl., Ex. B, Garrett Depo at 96:23-97:6. |
| 63. Officer Capurro fired two more shots before Decedent released Garrett.<br><br>Evidence: Body Worn Camera Footage of incident; attached as Exhibit A to the Declaration of Michael E. Murphy. Deposition of Jeremiah Capurro taken on March 27, 2026 at pg. 103, line 23 through pg. 104, line 3; attached as Exhibit B to the Deposition of Michael E. Murphy. | Disputed. Ofc. Capurro's body-worn camera video shows that after his fifth shot, Mr. Detweiler was not holding onto Mr. Garrett, and that Ofc. Capurro fired his sixth shot after Mr. Garrett had already moved out from under Mr. Detweiler.<br><br>Orrey Decl., Ex. A, at 02:42-02:45. |
| 64. The gunfire struck Garrett twice in his sides.<br><br>Evidence: Declaration of Bruce Garrett at pg. 5, lines 14 through 15. Deposition of Jeremiah Capurro taken on March 27, 2026 at pg. 38, lines 16 through 19; attached as Exhibit B to the Deposition of Michael E. Murphy. | Undisputed. |
| 65. Surgeons removed one projectile during emergency surgery, but the other shattered and remained in Garrett's body.<br><br>Evidence: Declaration of Bruce Garrett at pg. | Undisputed. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 5, lines 14 through 15. | |
| 66. Decedent had an extensive criminal history in the States of California, Oregon, and Illinois.<br><br>Evidence: Criminal Records pertaining to Decedent; attached as Exhibit D to the Declaration of Michael E. Murphy. | Undisputed for purposes of this motion but irrelevant. None of this purported criminal history was known to any defendant during the incident, except that Mr. Garrett had heard third-hand, and Ofc. Capurro had heard fifth-hand, that Mr. Detweiler had allegedly fought with an officer the previous year.<br><br>Levine Decl., Ex. A, Capurro Depo. at 24:9-25, 110:10-16.<br><br>Levine Decl., Ex. B, Garrett Depo. at 90:24-91:11, 97:17-23. |
| 67. His criminal history included multiple convictions for burglary, assault with a deadly weapon, robbery, interference with a peace officer, resisting arrest, assault on a peace officer, battery on a peace officer, and multiple convictions for resisting arrest.<br><br>Evidence: Criminal Records pertaining to Decedent; attached as Exhibit D to the Declaration of Michael E. Murphy. | Undisputed for purposes of this motion but irrelevant. None of this purported criminal history was known to any defendant during the incident, except that Mr. Garrett had heard third-hand, and Ofc. Capurro had heard fifth-hand, that Mr. Detweiler had allegedly fought with an officer the previous year.<br><br>Levine Decl., Ex. A, Capurro Depo. at 24:9-25, 110:10-16.<br><br>Levine Decl., Ex. B, Garrett Depo. at 90:24-91:11, 97:17-23. |
| 68. At the time of the incident, Decedent was on active felony supervised probation for possession of ammunition by a convicted felon and had a felony no-bail arrest warrant for a violation of his probation.<br><br>Evidence: Criminal Records pertaining to Decedent; attached as Exhibit D to the Declaration of Michael E. Murphy. | Undisputed for purposes of this motion but irrelevant. None of this purported criminal history was known to any defendant during the incident, except that Mr. Garrett had heard third-hand, and Ofc. Capurro had heard fifth-hand, that Mr. Detweiler had allegedly fought with an officer the previous year.<br><br>Levine Decl., Ex. A, Capurro Depo. at 24:9-25, 110:10-16.<br><br>Levine Decl., Ex. B, Garrett Depo. at 90:24-91:11, 97:17-23. |
| 69. Notably, even Decedent's mother, Plaintiff herein, called the police twice due to Decedent threatening her.<br><br>Evidence: Deposition of Julia Detweiler taken April 17, 2026, pg. 181, line 3, through pg. | Disputed. In the cited deposition testimony, Plaintiff repeatedly and expressly denied that Mr. Detweiler had threatened her.<br><br>Irrelevant in any event. None of this purported criminal history was known to any defendant |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 184, line 4; and pg. 209, line 21, through pg. 214, line 15; attached as Exhibit E to the Declaration of Michael E. Murphy. | during the incident, except that Mr. Garrett had heard third-hand, and Ofc. Capurro had heard fifth-hand, that Mr. Detweiler had allegedly fought with an officer the previous year.<br><br>Levine Decl., Ex. A, Capurro Depo. at 24:9-25, 110:10-16.<br><br>Levine Decl., Ex. B, Garrett Depo. at 90:24-91:11, 97:17-23. |
| 70. Decedent's sister also called the police on him after Decedent threatened her and her daughter with a knife, and she filed a restraining order against him.<br><br>Evidence: Deposition of Stamatia Haritoudis taken on April 16, 2026, pg. 69, line 15, through pg. 80, line 19, and Exhibit B to her deposition; attached as Exhibit F to the Declaration of Michael E. Murphy. Deposition of Julia Detweiler taken April 17, 2026, pg. 185, line 18, through pg. 186, line 4; attached as Exhibit E to the Declaration of Michael E. Murphy. | Disputed. In the cited deposition testimony, Mr. Detweiler's sister expressly denied that he had threatened her.<br><br>Irrelevant in any event. None of this purported criminal history was known to any defendant during the incident, except that Mr. Garrett had heard third-hand, and Ofc. Capurro had heard fifth-hand, that Mr. Detweiler had allegedly fought with an officer the previous year.<br><br>Levine Decl., Ex. A, Capurro Depo. at 24:9-25, 110:10-16.<br><br>Levine Decl., Ex. B, Garrett Depo. at 90:24-91:11, 97:17-23. |
| 71. At the time of the incident, Garrett held federal conductor certification under 49 C.F.R. pt. 242.<br><br>Evidence: Declaration of Fred Mattison at pg. 3, lines 15, through 19. | Undisputed. |
| 72. Conductors direct train operations and protect passenger safety.<br><br>Evidence: Deposition of Ricky Witt, taken on July 15, 2026, at pg. 25, lines 2 through 11; attached as Exhibit G to the Declaration of Michael Murphy. | Undisputed. |
| 73. Amtrak's Police Department trains conductors in deescalation techniques.<br><br>Evidence: Deposition of Douglas Calcagno, taken on July 15, 2026, at pg. 52, lines 19 through 23; pg. 53, lines 6 to 15; pg. 21, lines 21 through pg. 22, line 14; attached as Exhibit H to the Declaration of Michael Murphy. | Undisputed. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 74. Amtrak's rules and California law authorize Amtrak conductors to remove passengers who present a safety risk to themselves or others.<br><br>Evidence: Deposition of Ricky Witt, taken on July 15, 2026, at pg. 6, lines 10 through 17; pg. 22, line 23 through pg. 23, line 3; pg. 38, lines 4 through 9; pg. 57, line 15 through pg. 59, line 9; attached as Exhibit G to the Declaration of Michael E. Murphy. Cal. Civ. Code §§ 2186, 2188. | Disputed that presenting a safety risk alone authorizes involuntary removal under Amtrak's rules. Mr. Garrett acknowledged in deposition that Amtrak's rules emphasize that removal of a passenger "is an extremely serious action that should only be taken when the customer *refuses to refrain* from conduct that might endanger their own lives or jeopardize the safety and comfort of others." Mr. Garrett also testified that Mr. Detweiler never refused any request that Mr. Garrett made of him.<br><br>Levine Decl., Ex. B, Garrett Depo. at 81:12-83:13. |
| 75. Plaintiff's Complaint seeks damages against Officer Capurro, the City of Mt. Shasta, Garrett, and Amtrak.<br><br>Evidence: Document 1, Plaintiff's Complaint, generally. | Undisputed. |
| 76. Plaintiff asserts three claims against Amtrak and Garrett: the Fifth Claim for Relief under the Americans with Disabilities Act ("ADA"); the Sixth Claim for Relief for battery; and the Seventh Claim for Relief for negligence.<br><br>Evidence: Document 1, Plaintiff's Complaint, pg. 15, line 1, through pg. 16, line 10; and pg. 16, line 11, through pg. 18, line 3; and pg. 18, line 4, through pg. 20, line 1. | Undisputed. |
| 77. Plaintiff bases her negligence and battery theories against Garrett on his alleged restraint of Decedent during the altercation with Officer Capurro.<br><br>Evidence: Document 1, Plaintiff's Complaint, pg. 18, lines 17 through 22. | Disputed that Plaintiff's negligence claim against Mr. Garrett is limited to the physical restraint of Mr. Detweiler. After Plaintiff's complaint was filed, Plaintiff learned in discovery that Mr. Garrett had also represented to the Mt. Shasta Police Department that Mr. Detweiler was presenting an ongoing disturbance aboard the train at the time he called, despite Mr. Detweiler having remained seated without any disturbance for more than an hour and a half by that time, and that Mr. Capurro claimed he relied on this representation and based thereon assumed there was an active disturbance aboard the train when he arrived, causing him to board immediately and confront Mr. Detweiler without backup. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| | Orrey Decl., Ex. B.<br><br>Levine Decl., Ex. A, Capurro Depo. 27:14-18, 28:8-12, 34:11-21, 35:22-23, 86:24-87:5.<br><br>Through discovery responses, Plaintiff repeatedly and expressly made clear to Amtrak Defendants that this forms part of her negligence theory against Mr. Garrett.<br><br>Levine Decl., Ex. E. |
| 78. As to Amtrak, the Complaint alleges that Amtrak is vicariously liable for Garrett's acts and "for negligently improperly training him with regard to situations involving police officers on Amtrak trains, with regard to addressing disturbances on trains and involving passengers, and with regard to the use of physical restraint and other force against passengers."<br><br>Evidence: Document 1, Plaintiff's Complaint, pg. 18, lines 17 through 22. | Undisputed. |
| 79. The Complaint bases its ADA theory against Amtrak and Garrett on Amtrak's alleged failure to train Garrett to "respond and interact peacefully with individuals who have mental health impairments and/or are experiencing mental health crises" and on Garrett's alleged "failing to follow procedures for dealing with individuals with mental impairments and/or who are experiencing mental health crises."<br><br>Evidence: Document 1, Plaintiff's Complaint at pg. 15, line 20 through pg. 26, line 1. | Undisputed. |
| 80. Plaintiff designated Scott DeFoe as her sole liability expert.<br><br>Evidence: Deposition of Scott A. DeFoe taken on August 19, 2026, pg. 6, lines 4 through 8; attached as Exhibit I to the Declaration of Michael E. Murphy. | Undisputed for purposes of this motion. |
| 81. DeFoe offers opinions concerning police and security practices, including use of force, premises liability, and foreseeability, and he has testified and prepared reports in railroad cases. | Undisputed. |

| AMTRAK DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Deposition of Scott A. DeFoe taken on August 19, 2026, pg. 125, line 13 to pg. 126, line 24; attached as Exhibit I to the Declaration of Michael E. Murphy. | |
| 82. DeFoe reviewed Garrett's interview transcripts, Garrett's deposition transcript, and Plaintiff's Complaint.<br><br>Evidence: Deposition of Scott A. DeFoe taken on August 19, 2026, pg. 8, lines 7-11, Exhibit A (Report) to Deposition at pgs. 2-3; attached as Exhibit I to the Declaration of Michael E. Murphy. | Undisputed. |
| 83. He opined that Officer Capurro boarded the train without first debriefing train personnel or developing and communicating a tactical plan; DeFoe attributed those failures to Officer Capurro, not to Garrett or Amtrak.<br><br>Evidence: Deposition of Scott A. DeFoe taken on August 19, 2026, pg. 75, lines 2 through 19; Exhibit A at pg. 12, par. 1; attached as Exhibit I to the Declaration of Michael E. Murphy. | Undisputed, except to the extent that it implies Mr. DeFoe offered any opinions at all regarding any acts or omissions by Mr. Garrett or Amtrak, which Mr. DeFoe expressly disclaimed.<br><br>Levine Decl., Ex. D, DeFoe Depo at 6:4-23, 127:6-128:19, 134:13-18.<br><br>DeFoe Decl. ¶¶ 5-6. |
| 84. DeFoe identifies no fault by Amtrak or Garrett, describes Garrett as "trying to help," attributes responsibility solely to Officer Capurro, and intends to offer no adverse opinion about Amtrak or Garrett at trial.<br><br>Evidence: Deposition of Scott A. DeFoe taken on August 19, 2026, pg. 126, line 25 through pg. 128, line 2; attached as Exhibit I to the Declaration of Michael E. Murphy. | Undisputed, except to the extent that it implies Mr. DeFoe offered any opinions at all regarding any acts or omissions by Mr. Garrett or Amtrak, which Mr. DeFoe expressly disclaimed.<br><br>Levine Decl., Ex. D, DeFoe Depo at 6:4-23, 127:6-128:19, 134:13-18.<br><br>DeFoe Decl. ¶¶ 5-6. |

## III. PLAINTIFF'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| 1. Mr. Detweiler suffered from schizophrenia and bipolar disorder. | Levine Decl., Ex. E, Supp. Response No. 1.<br><br>Levine Decl., Ex. F. |
| 2. Mr. Garrett confirmed to Mr. Detweiler that Mr. Detweiler was indeed going to Emeryville and was "good to go," and requested that Mr. Detweiler return to his seat. | Levine Decl., Ex. B, Garrett Depo. at 18:15-19:6, 20:5-8, 20:13-21:6. |
| 3. Based on his interactions with Mr. Detweiler, Mr. Garrett believed Mr. Detweiler had a mental health issue. | Levine Decl., Ex. B, Garrett Depo. at 20:9-12. |
| 4. During this interaction, Mr. Detweiler did not verbally threaten to harm anyone, and Mr. Garrett did not see brass knuckles. | Levine Decl., Ex. B, Garrett Depo. at 19:7-13, 19:18-22. |
| 5. When the conductors determined to have Mr. Detweiler removed from the train, Mr. Garrett had no information that, while on the train, Mr. Detweiler had verbally threatened anyone, fought with anyone, or injured anyone. | Levine Decl., Ex. B, Garrett Depo. at 19:7-10, 19:18-20:4. |
| 6. Mr. Garrett also had no information that Mr. Detweiler had ever been convicted of a crime or had ever injured anyone before. | Levine Decl., Ex. B, Garrett Depo. at 97:17-24. |
| 7. Mr. Garrett did not form the impression that Mr. Detweiler was under the influence of drugs or alcohol. | Levine Decl., Ex. B, Garrett Depo. at 23:17-20. |
| 8. When Mr. Garrett approached Mr. Detweiler on the train the second time, another Amtrak employee was standing in the aisle behind Mr. Detweiler; Mr. Garrett observed that this appeared to make Mr. Detweiler feel anxious and boxed in between the two Amtrak employees, and Mr. Garrett gestured to indicate the other employee should go away and they did. | Levine Decl., Ex. B, Garrett Depo. at 24:19-27:13. |
| 9. Mr. Detweiler remained seated and stationary after sitting down the second | Levine Decl., Ex. B, Garrett Depo. at 27:5-23, 28:7-18, 29:3-14, 33:9-34:3. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| time at Mr. Garrett's request. | |
| 10. Mr. Garrett testified that, on both occasions interacting with Mr. Detweiler on the train, he successfully de-escalated and calmed the situation, pursuant to his training; he "felt like [he] could handle" Mr. Detweiler without assistance from other employees; and that Mr. Detweiler never refused to comply with any request he made. | Levine Decl., Ex. B, Garrett Depo. at 13:16-14:14, 26:9-20, 79:4-6, 81:24-83:13. |
| 11. Approximately an hour and a half later, having heard no further reports regarding Mr. Detweiler and having observed that he continued to remain in his seat and was not moving, Mr. Garrett called the Mt. Shasta Police Department to seek confirmation that law enforcement would meet the train in Mt. Shasta to remove Mr. Detweiler. | Levine Decl., Ex. B, Garrett Depo. at 27:14-28:10, 29:3-14, 29:22-30:25, 33:9-34:3, 44:3-45:21.<br><br>Orrey Decl., Ex. B, 911 call recording. |
| 12. During this call, Mr. Garrett stated that he was "requesting help to get a passenger off that's agitated and … becoming possibly violent"; that the passenger was Nicholas Detweiler; that Mr. Detweiler "has a pair of brass knuckles and he is brandishing them to crew members and other passengers, and he becomes agitated"; that if Mr. Detweiler "becomes agitated" he would pull out the brass knuckles; and that Mr. Detweiler exhibited "erratic behavior." | Orrey Decl., Ex. B, 911 call recording. |
| 13. During the call, Mr. Garrett repeatedly used the present tense and did not state that these reported issues had occurred an hour and a half earlier or that he had observed that Mr. Detweiler had remained stationary in his seat for the past hour and a half without any incident during that time. | Orrey Decl., Ex. B, 911 call recording. |
| 14. Mr. Garrett testified that, during this call, he was describing conduct that had occurred more than an hour earlier, not conduct that was actively occurring. | Levine Decl., Ex. B, Garrett Depo. at 45:22-46:2. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| 15. During the call, Mr. Garrett also stated that he had received "reports" that Mr. Detweiler had been arrested the previous year for "assaulting a cop," without providing further detail, and that Mr. Detweiler kept the brass knuckles in the back pocket of his jeans. | Orrey Decl., Ex. B, 911 call recording. |
| 16. Ofc. Capurro received no other information, including the reported individual's name or description, any information that the individual had injured anyone with the brass knuckles or verbally threatened to harm anyone with them, or any details regarding the alleged prior assault on an officer, including whether any officer had been injured. | Levine Decl., Ex. A, Capurro Depo. at 24:9-25, 26:9-25, 27:7-13, 28:8-12, 86:24-87:5, 89:13-16, 110:10-16. |
| 17. He testified he was not told the individual reportedly kept the brass knuckles in his back pocket. | Levine Decl., Ex. A, Capurro Depo. at 46:22-47:8. |
| 18. He testified he assumed the reported brandishing of brass knuckles had occurred just before Mr. Garrett called, and that the reported disturbance was still occurring, as he was not told this had reportedly occurred at least an hour and a half earlier. | Levine Decl., Ex. A, Capurro Depo. at 27:14-18, 28:8-12, 34:11-21, 35:22-23, 86:24-87:5. |
| 19. Ofc. Capurro directed the dispatcher to contact the county sheriff's department to request additional units to respond to the train with him, and to make them aware of the train's anticipated timing. | Levine Decl., Ex. A, Capurro Depo. at 29:18-24. |
| 20. He testified that his plan was to board with the deputies. | Levine Decl., Ex. A, Capurro Depo. at 29:4-7. |
| 21. Ofc. Capurro asked, "Where's he at?" | Orrey Decl., Ex. A, at 00:31-00:39. |
| 22. Ofc. Capurro then boarded the train without waiting for backup or asking any other questions, including whether anyone was hurt, whether the reported individual had struck anyone with brass knuckles, whether he in fact had brass knuckles or where he kept them, when the reported disturbance had occurred, or whether it | Orrey Decl., Ex. A, at 00:31-00:41.<br><br>Levine Decl., Ex. A, Capurro Depo. at 34:11-35:5, 37:14-19. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| was still ongoing. | |
| 23. He testified he did not ask such questions because he assumed the reported disturbance was still occurring. | Levine Decl., Ex. A, Capurro Depo. at 34:11-35:23. |
| 24. He testified that his job was simply "to go remove [Mr. Detweiler] from the train," without asking employees or Mr. Detweiler what had happened, and that he "was not there to have a conversation." | Levine Decl., Ex. A, Capurro Depo. at 87:22-88:8. |
| 25. He did not know who wanted Mr. Detweiler removed from the train. | Levine Decl., Ex. A, Capurro Depo. at 87:22-88:3. |
| 26. Although a supervisor was available on call, he did not contact the supervisor before boarding, including to ask whether he should wait for the backup he believed was as near as 5 minutes away. | Levine Decl., Ex. A, Capurro Depo. at 33:11-25.<br><br>Orrey Decl., Ex. A, at 00:00-00:41. |
| 27. Ofc. Capurro did not say anything to Mr. Garrett or ask him any questions. | Levine Decl., Ex. A, Capurro Depo. at 38:1-6, 39:8-10.<br><br>Orrey Decl., Ex. A, at 00:49-01:06. |
| 28. Mr. Detweiler was seated in the same seat he had been in for over an hour and forty-five minutes, next to the window, with a sweatshirt hood on his head, and was not moving. | Levine Decl., Ex. A, Capurro Depo. at 43:21-24.<br><br>Levine Decl., Ex. B, Garrett Depo. at 29:10-14.<br><br>Orrey Decl., Ex. A, at 00:57-01:06. |
| 29. He appeared to be asleep and Ofc. Capurro believed he was asleep. | Orrey Decl., Ex. A, at 00:59-01:07, 16:53-16:59.<br><br>Levine Decl., Ex. A, Capurro Depo. at 39:17-23.<br><br>Levine Decl., Ex. C, Blake Depo. at 42:2-12, 59:11-24.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 28:4-25. |
| 30. Upon seeing that Mr. Detweiler was sleeping and not actively committing a crime or creating a disturbance, Ofc. Capurro did not consider stopping to check whether his backup was nearby or to speak to the Amtrak employees to obtain more information. | Levine Decl., Ex. A, Capurro Depo. at 86:2-15.<br><br>Orrey Decl., Ex. A, at 16:53-16:59.<br><br>Levine Decl., Ex. C, Blake Depo. at 59:11-24. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| 31. Numerous other passengers were in the train car, though Ofc. Capurro did not address them or direct them to exit or move away. | Orrey Decl., Ex. A, at 00:59-02:54.<br><br>Levine Decl., Ex. A, Capurro Depo. at 65:13-24.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 43:13-17, 47:20-24. |
| 32. Ofc. Capurro also did not provide any instructions to or communicate any plan to Mr. McNay or Mr. Garrett. | Orrey Decl., Ex. A, at 00:31-02:54.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 47:20-25, 76:25-77:3. |
| 33. Ofc. Capurro observed some bags on the aisle seat next to Mr. Detweiler, between Mr. Detweiler and himself, and testified he was concerned they might contain a weapon, but he did not attempt to move them away or search them before waking Mr. Detweiler. | Orrey Decl., Ex. A, at 01:01-01:08.<br><br>Levine Decl., Ex. A, Capurro Depo. at 49:8-22.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 68:15-19, 75:2-14. |
| 34. Ofc. Capurro shone a flashlight at Mr. Detweiler, tapped him on the shoulder, said "hey, bud," and pulled the hood off of his head while shining the flashlight at his face, and Mr. Detweiler woke up and appeared startled. | Orrey Decl., Ex. A, at 01:01-01:11. |
| 35. Still shining the flashlight at Mr. Detweiler's face, Ofc. Capurro said, "police department." | Orrey Decl., Ex. A, at 01:08-01:11. |
| 36. Mr. Detweiler stood up slightly, held his hands up, and said, "excuse me, sir, is this the stop?" | Orrey Decl., Ex. A, at 01:10-01:13. |
| 37. Ofc. Capurro said "yeah, this is the stop, you're coming off," while Mr. Detweiler asked if it was the Emeryville stop. | Orrey Decl., Ex. A, at 01:12-01:16. |
| 38. Ofc. Capurro did not respond and instead drew his Taser, raised it and aimed it toward Mr. Detweiler, and told Mr. Detweiler to "keep your hands up." | Orrey Decl., Ex. A, at 01:15-01:19. |
| 39. Mr. Detweiler stood up and raised his hands higher, with his empty left hand raised above his shoulders and his right hand resting on the nearby headrest, open | Orrey Decl., Ex. A, at 01:17-01:21. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| and visibly empty. | |
| 40. Ofc. Capurro continued repeating the direction to "keep your hands up" while Mr. Detweiler said, "excuse me, sir," and requested clarification regarding what was happening. | Orrey Decl., Ex. A, at 01:18-01:25. |
| 41. Ofc. Capurro did not respond and instead ordered Mr. Detweiler to turn around, without explanation. | Orrey Decl., Ex. A, at 01:22-01:26. |
| 42. After Mr. Detweiler picked up a plastic bag from the seat to prepare to exit, Ofc. Capurro grabbed at it and said, "don't touch anything." | Orrey Decl., Ex. A, at 01:26-01:32. |
| 43. Mr. Detweiler asked if Ofc. Capurro wanted him to get off the train, and Ofc. Capurro responded, "yeah, don't touch anything," while tugging at the bag Mr. Detweiler held without further explanation. | Orrey Decl., Ex. A, at 01:30-01:38. |
| 44. Mr. Detweiler asked, "would you give me a chance to grab my things?" | Orrey Decl., Ex. A, at 01:33-01:36. |
| 45. Ofc. Capurro again did not respond and only reiterated, "don't touch anything," before legging go of the bag. | Orrey Decl., Ex. A, at 01:35-01:39. |
| 46. At no time did Ofc. Capurro tell Mr. Detweiler he was, or would be, detained or arrested. | Orrey Decl., Ex. A, at 01:01-04:46.<br><br>Levine Decl., Ex. A, Capurro Depo. at 40:5-8, 40:19-23. |
| 47. Mr. Detweiler stepped into the aisle, raised his hands, and took a step backward while beginning to reiterate his question, when Ofc. Capurro abruptly tased Mr. Detweiler in the abdomen without any verbal warning. | Orrey Decl., Ex. A, at 01:39-01:42. |
| 48. Mr. Detweiler reached for the Taser and moved it away from his abdomen—a common response from individuals being tased due to the pain—and there was a brief struggle during which additional Taser discharges can be heard and Mr. Detweiler asked Ofc. Capurro to "please | Orrey Decl., Ex. A, at 01:41-01:49.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 54:8-16, 84:10-85:7, 85:15-86:5. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| keep away from me." | |
| 49. Mr. Garrett then grabbed Mr. Detweiler from behind by the shoulders, and Mr. Detweiler and Ofc. Capurro separated while Taser wires dangled between them and Ofc. Capurro continued discharging the Taser. | Orrey Decl., Ex. A, at 01:48-01:53.<br><br>Levine Decl., Ex. A, Capurro Depo. at 57:17-23.<br><br>Levine Decl., Ex. B, Garrett Depo. at 62:4-12. |
| 50. Ofc. Capurro then approached Mr. Detweiler while Mr. Detweiler was restrained from behind by Mr. Garrett and appeared to grapple with Mr. Detweiler while continuing to tase him. | Orrey Decl., Ex. A, at 01:52-01:58. |
| 51. At no point did Ofc. Capurro issue any verbal warning that the Taser would be used. | Orrey Decl., Ex. A, at 01:13-01:58.<br><br>Levine Decl., Ex. A, Capurro Depo. at 54:12-15.<br><br>DeFoe Decl. ¶ 11. |
| 52. Ofc. Capurro stated, "I need assistance now," into his radio earpiece, but did not address Mr. Garrett to clarify whether this statement was directed to him or whether he wanted him to assist. | Orrey Decl., Ex. A, at 01:50-02:45.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 65:4-18, 80:13-81:18. |
| 53. Mr. Garrett and Mr. Detweiler backed toward the end of the train car, with Mr. Garrett still restraining Mr. Detweiler from behind and holding Mr. Detweiler's right arm behind Mr. Detweiler's back. | Orrey Decl., Ex. A, at 01:48-02:06.<br><br>Levine Decl., Ex. C, Blake Depo. at 54:8-12. |
| 54. Ofc. Capurro drew his wooden baton, approached Mr. Detweiler, and began jabbing and using overhand strikes with it against Mr. Detweiler, without issuing any commands or any verbal warning, or saying anything at all. | Orrey Decl., Ex. A, at 01:58-02:04.<br><br>DeFoe Decl. ¶ 11. |
| 55. Mr. Detweiler held his left arm out to shield his body from the baton and again asked Ofc. Capurro to "please keep away from me." | Orrey Decl., Ex. A, at 01:58-02:07. |
| 56. Ofc. Capurro continued striking Mr. Detweiler and told him to "fucking stop," without saying what Mr. Detweiler should stop doing, while Mr. Detweiler remained | Orrey Decl., Ex. A, at 02:05-02:13. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| stationary, restrained from behind by Mr. Garrett, with his right arm behind his back and his left arm outstretched to take the baton strikes. | |
| 57. Ofc. Capurro testified that when he jabbed Mr. Detweiler with the baton, he did so with all of his energy, and minutes after the incident told a supervisor that he was "crushing [Mr. Detweiler's] hand" with his overhand strikes. | Levine Decl., Ex. A, Capurro Depo. at 81:13-16<br><br>Levine Decl., Ex. C, Blake Depo. at 59:25-60:8.<br><br>Orrey Decl., Ex. A, at 17:51-17:57. |
| 58. Mr. Detweiler asked Ofc. Capurro several times to stop striking him, and Ofc. Capurro told him to "get back," when Mr. Detweiler was already backed into the corner of the vestibule, and continued striking him with the baton. | Orrey Decl., Ex. A, at 02:07-02:13. |
| 59. Mr. Detweiler said, "I'm trying to get off the train with you" and asked if he could obtain his things and leave the train. | Orrey Decl., Ex. A, at 02:12-02:20. |
| 60. Ofc. Capurro did not respond and instead only told him to get on the ground, while Mr. Garrett continued to restrain Mr. Detweiler from behind with both hands. | Orrey Decl., Ex. A, at 02:12-02:25. |
| 61. Ofc. Capurro then drew his firearm, aimed it at Mr. Detweiler, and told him to "get on the fucking ground." | Orrey Decl., Ex. A, at 02:19-02:26. |
| 62. Still restrained from behind by Mr. Garrett, Mr. Detweiler removed a pair of brass knuckles and put it on his hand, while stating again that he needed to leave the train with Ofc. Capurro and asking again, "can we leave the train?" | Orrey Decl., Ex. A, at 02:24-02:33. |
| 63. Ofc. Capurro did not respond other than to again order Mr. Detweiler to the ground, and Mr. Detweiler reiterated his request to have someone take his bags so he could leave the train. | Orrey Decl., Ex. A, at 02:29-02:37. |
| 64. When Ofc. Capurro continued not to respond and continued aiming his gun at Mr. Detweiler, Mr. Detweiler turned, swung his right arm past Mr. Garrett, who was not struck, and grabbed onto Mr. | Orrey Decl., Ex. A, at 02:33-02:39.<br><br>Levine Decl., Ex. A, Capurro Depo. at 63:24-64:11, 66:22-25, 73:17-19. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| Garrett. | Levine Decl., Ex. B, Garrett Depo. at 42:22-24, 64:10-14, 101:3-6.<br><br>Levine Decl., Ec. C, Blake Depo. at 47:21-48:1. |
| 65. Without issuing a verbal warning, Ofc. Capurro then fired four shots, striking both Mr. Detweiler and Mr. Garrett. | Orrey Decl., Ex. A, at 02:38-02:41.<br><br>Levine Decl., Ex. A, Capurro Depo. at 69:5-10, 79:24-80:3.<br><br>Levine Decl., Ex. B, Garrett Depo. at 9:9-15.<br><br>Levine Decl., Ex. G<br><br>DeFoe Decl. ¶ 11. |
| 66. Upon being struck, both fell to the ground together, with Mr. Detweiler's right arm partially around Mr. Garrett's upper chest area, as Mr. Garrett yelled and groaned in pain from being shot. | Orrey Decl., Ex. A, at 02:39-02:43. |
| 67. Ofc. Capurro's Taser, which he had dropped earlier, lay illuminated on the aisle seat just in front of him though he did not reach for it. | Orrey Decl., Ex. A, at 02:18-02:43. |
| 68. Ofc. Capurro briefly lowered his gun, paused, then raised it again and fired a fifth shot into Mr. Detweiler's back, approximately three seconds after his fourth shot, again with no verbal warning. | Orrey Decl., Ex. A, at 02:40-02:43.<br><br>Levine Decl., Ex. C, Blake Depo. at 56:5-57:5, 58:10-14.<br><br>DeFoe Decl. ¶ 11. |
| 69. During this time, a passenger who had been seated in the front row, 3-4 feet away, stood up and backed against the window in an apparent effort to avoid being struck by the men or by Ofc. Capurro's shots. | Orrey Decl., Ex. A, at 01:58-02:44.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 43:9-17. |
| 70. Ofc. Capurro paused again as Mr. Garrett moved out from under Mr. Detweiler, Mr. Detweiler's right hand went to the ground in front of Ofc. Capurro, and Mr. Detweiler's chest faced the ground, before Ofc. Capurro fired a sixth shot, again into Mr. Detweiler's back, while he lay on the floor with no hand on Mr. Garrett. | Orrey Decl., Ex. A, at 02:43-02:45. |
| 71. Ofc. Capurro's sixth shot was fired more | Orrey Decl., Ex. A, at 02:43-02:45. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| than a second after his fifth shot, without any verbal warning. | Levine Decl., Ex. C, Blake Depo. at 58:10-14.<br><br>DeFoe Decl. ¶ 11. |
| 72. At no time during his shots did Ofc. Capurro see Mr. Detweiler trying to strike Mr. Garrett. | Levine Decl., Ex. A, Capurro Depo. at 73:20-24. |
| 73. At no time did Mr. Detweiler verbally threaten to harm anyone. | Orrey Decl., Ex. A, at 01:01-02:45.<br><br>Levine Decl., Ex. A, Capurro Depo. at 27:7-13, 47:13-15, 89:13-16.<br><br>Levine Decl., Ex. B, Garrett Depo. at 13:3-8, 19:7-10, 19:18-22.<br><br>DeFoe Decl. ¶ 17(a). |
| 74. Ofc. Capurro asked if Mr. Garrett was hit, and Mr. Garrett responded that he was, before Ofc. Capurro radioed to request medical assistance. | Orrey Decl., Ex. A, at 02:45-03:04. |
| 75. The only injuries Mr. Garrett sustained during the incident were from Ofc. Capurro's gunshots; he was not injured by Mr. Detweiler. | Levine Decl., Ex. B, Garrett Depo. at 42:22-24, 64:10-14, 101:3-6. |
| 76. Ofc. Capurro handcuffed the mostly motionless Mr. Detweiler before attempting to provide medical care to Mr. Garrett. | Orrey Decl., Ex. A, at 03:19-05:55. |
| 77. Three minutes after Ofc. Capurro's final shot, and less than five minutes after Ofc. Capurro woke Mr. Detweiler, sheriff's deputies arrived where the men were located aboard the train. | Orrey Decl., Ex. A, at 01:04-05:42. |
| 78. The deputies began attempting to assist Mr. Detweiler and Mr. Garrett while Ofc. Capurro attended to Mr. Garrett, who appeared to remain alert, spoke clearly, and radioed a request that his backpack be brought with him off the train. | Orrey Decl., Ex. A, at 05:42-12:45. |
| 79. Ofc. Capurro then escorted Mr. Garrett downstairs and off the train, where he told a fire department official that "the bullets were bouncing off of the metal in there" | Orrey Decl., Ex. A, at 12:45-15:29. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| and that he believed Mr. Garrett's gunshot wounds were "a ricochet or something." | |
| 80. He walked Mr. Garrett over to a nearby ambulance, and an ambulance worker inside who was preparing to wheel out a gurney said, "I need to go check out that other guy," referring to Mr. Detweiler. | Orrey Decl., Ex. A, at 15:10-16:10. |
| 81. Ofc. Capurro responded, "Do you need to do that right now? Can you just get [Mr. Garrett] to the hospital? The other guy is deceased." | Orrey Decl., Ex. A, at 16:10-19. |
| 82. When a nearby sheriff's deputy offered to drive Mr. Garrett to the hospital herself so that Mr. Detweiler could go in the ambulance, Ofc. Capurro interjected, repeated, "the other guy is deceased," and further insisted that the ambulance take Mr. Garrett and not Mr. Detweiler. | Orrey Decl., Ex. A, at 14:58-15:07, 16:19-16:28. |
| 83. The sheriff's deputy and ambulance worker acquiesced, and Mr. Garrett boarded the ambulance. | Orrey Decl., Ex. A, at 16:19-16:28. |
| 84. Ofc. Capurro testified that he did not do anything to try to save Mr. Detweiler's life and did not do anything to ensure Mr. Detweiler received medical care after getting Mr. Garrett to the ambulance. | Levine Decl., Ex. A, Capurro Depo. at 75:12-15, 109:4-20. |
| 85. Mr. Detweiler died at the scene. | Levine Decl., Ex. H. |
| 86. Ofc. Capurro knew that information from 911 calls may be inaccurate and understood that one role of officers when going to a scene is to investigate and determine what is going on. | Levine Decl., Ex. A, Capurro Depo. at 35:24-36:6. |
| 87. He knew that by asking questions, officers may learn valuable information beyond or different than what was dispatched, and that having additional or current information is helpful in developing a tactical plan. | Levine Decl., Ex. A, Capurro Depo. at 36:7-15, 113:21-24. |
| 88. He testified it would have been helpful to know that when he was boarding, Mr. Detweiler had been in his seat, stationary | Levine Decl., Ex. A, Capurro Depo. at 35:6-18, 47:1-5. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| and asleep, for over an hour and a half, that there had been no incidents during that time, that Mr. Detweiler had never verbally threatened or attempted to harm anyone with brass knuckles aboard the train, and that the brass knuckles were believed to be in Mr. Detweiler's back pocket. | |
| 89. He testified that, had he known there was no ongoing disturbance and that Mr. Detweiler had been stationary in his seat for an hour and a half, he would have waited for backup. | Levine Decl., Ex. A, Capurro Depo. at 110:18-111:13. |
| 90. He testified that, had he boarded the train with backup, he likely would never have used deadly force, and Plaintiff's expert so opined as well. | Levine Decl., Ex. A, Capurro Depo. at 112:18-113:8.<br><br>Levine Decl., Ex. C, Blake Depo. at 67:23-68:1, 68:14-18.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 64:4-18, 66:9-15. |
| 91. Ofc. Capurro testified his plan was to remove Mr. Detweiler from the train before telling him he was being detained or arrested. | Levine Decl., Ex. A, Capurro Depo. at 40:5-18. |
| 92. Before boarding the train, he considered that Mr. Detweiler might not cooperate. | Levine Decl., Ex. A, Capurro Depo. at 108:23-109:3. |
| 93. He testified that his plan to get Mr. Detweiler off the train, without backup or further information, was to escort Mr. Detweiler off without handcuffs. | Levine Decl., Ex. A, Capurro Depo. at 88:22-89:4, 107:7-18. |
| 94. He testified that, after Mr. Detweiler did not comply with all his commands, he changed his plan and decided that he would handcuff Mr. Detweiler, then escort him off train. | Levine Decl., Ex. A, Capurro Depo. at 88:22-89:12. |
| 95. He testified he never considered telling Mr. Detweiler he was there because Mr. Detweiler had been asked to leave the train, or that Ofc. Capurro would escort him off and discuss further with him outside. | Levine Decl., Ex. A, Capurro Depo. at 90:24-91:5. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| 96. He never told Mr. Detweiler he wanted to handcuff him or to put his hands behind his back. | Levine Decl., Ex. A, Capurro Depo. at 91:11-16.<br><br>Orrey Decl., Ex. A, at 01:01-02:45. |
| 97. After the incident, his supervisors told him he should have waited for backup before boarding the train and confronting Mr. Detweiler. | Levine Decl., Ex. A, Capurro Depo. at 99:6-9. |
| 98. Ofc. Capurro further testified that, when he was tasing Mr. Detweiler, he did not consider creating distance between himself and Mr. Detweiler to attempt to de-escalate. | Levine Decl., Ex. A, Capurro Depo. at 57:4-6. |
| 99. He testified that, when he shot, he did so to protect Mr. Garrett. | Levine Decl., Ex. A, Capurro Depo. at 79:18-23. |
| 100. He also testified that when he shot, he knew Mr. Garrett was near Mr. Detweiler and that another occupied train car was behind them. | Levine Decl., Ex. A, Capurro Depo. at 65:5-9, 68:20-69:1. |
| 101. And he testified that before he fired, he knew Mr. Garrett could be struck either in the background or by ricochet, which City Defendants' police expert testified was obvious. | Levine Decl., Ex. A, Capurro Depo. at 76:3-7.<br><br>Levine Decl., Ex. C, Blake Depo. at 64:21-65:1. |
| 102. Despite this, Ofc. Capurro also testified that, had he known Mr. Garrett was at risk of being struck, he would not have shot and would instead have come up with another option. | Levine Decl., Ex. A, Capurro Depo. at 92:17-20, 93:11-17.<br><br>Levine Decl., Ex. C, Blake Depo. at 67:23-68:1. |
| 103. Mr. Garrett was trained by Amtrak to attempt to de-escalate situations with individuals who may have mental health issues or be under the influence. | Levine Decl., Ex. B, Garrett Depo. at 16:19-25. |
| 104. He was also trained on Amtrak's service standards manual, which provides that Amtrak customers should only be removed or restrained when other methods, including a firm request, have failed. | Levine Decl., Ex. B, Garrett Depo. at 75:23-76:7, 77:17-81:1. |
| 105. Amtrak's service standards also provide that involuntary removal of customers is "extremely serious" and | Levine Decl., Ex. B, Garrett Depo. at 81:12-23. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
| --- | --- |
| should only be done when a customer "refuses to refrain" from conduct that endangers their own life or jeopardizes the safety and comfort of others. | |
| 106. Ofc. Capurro received training at the police academy and from the Mt. Shasta Police Department, including regarding tactics, de-escalation, dealing with individuals with potential mental health issues or mental illness, and use of force. | Levine Decl., Ex. A, Capurro Depo. at 14:19-15:16, 15:23-16:4, 16:11-25, 17:12-22. |
| 107. He was trained on the tactical advantages of having multiple officers present, including that this makes suspects less likely to use force and provides officers with more strategic options, such as by having a "contact" officer to address the subject and go hands-on if necessary, and a "cover" officer to be ready to use other force options if necessary. | Levine Decl., Ex. A, Capurro Depo. at 32:1-14.<br><br>Levine Decl., Ex. C, Blake Depo. at 27:10-28:7, 73:6-12.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 130:1-131:12. |
| 108. He was trained that proper tactics are important for everyone's safety, including officers, the public, and the subject. | Levine Decl., Ex. A, Capurro Depo. at 15:11-6. |
| 109. He was trained, when responding to a call, to contact reporting parties to gather additional information when feasible, including the subject's current location, recent conduct, the location of any known weapons, and the specific nature of any reported crimes. | Levine Decl., Ex. C, Blake Depo. at 23:10-24:23, 28:8-12. |
| 110. He was trained to wait for assistance when feasible before contacting subjects who are reportedly armed and potentially violent. | Levine Decl., Ex. C, Blake Depo. at 26:10-15. |
| 111. Ofc. Capurro was also trained to speak in a calm voice to attempt to de-escalate tense situations when feasible. | Levine Decl., Ex. C, Blake Depo. at 38:17-22. |
| 112. He was trained that tactics and techniques that can assist in decreasing a situation's intensity and in gaining voluntary compliance include exercise of self-control, effective communication, and scene assessment and management. | Levine Decl., Ex. C, Blake Depo. at 77:3-18. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| 113. Officers are trained that de-escalation may minimize or eliminate the need for force. | Levine Decl., Ex. D, DeFoe Depo. at 71:22-72:10. |
| 114. Ofc. Capurro was also trained to give commands that are clear and understandable, and to give individuals an opportunity to comply with commands when feasible. | Levine Decl., Ex. A, Capurro Depo. at 38:23-39:5. |
| 115. Ofc. Capurro was also trained on the use of takedowns and control holds. | Levine Decl., Ex. A, Capurro Depo. at 16:11-14. |
| 116. He was trained that when using the baton, he must justify each strike, and that baton strikes could break bones. | Levine Decl., Ex. A, Capurro Depo. at 11:9-11, 58:22-24. |
| 117. Ofc. Capurro was trained that officers may only use deadly force to confront an imminent threat of death or serious bodily injury, meaning the subject must have the ability, opportunity, and apparent intent to immediately cause death or serious bodily injury. | Levine Decl., Ex. A, Capurro Depo. at 67:20-68:4.<br><br>Levine Decl., Ex. C, Blake Depo. at 61:14-22. |
| 118. He was trained that deadly force should be used only when no other reasonable options are available. | Levine Decl., Ex. A, Capurro Depo. at 70:14-16.<br><br>Levine Decl., Ex. C, Blake Depo. at 63:4-7. |
| 119. He was trained that fear of future harm is insufficient to justify deadly force, no matter how great the fear or how likely the harm. | Levine Decl., Ex. A, Capurro Depo. at 68:5-7.<br><br>Levine Decl., Ex. C, Blake Depo. at 61:23-62:1. |
| 120. He was trained that when using deadly force, officers must justify each shot, and must assess between shots and continuously evaluate the threat the subject poses to determine whether deadly force is, or continues to be, justified. | Levine Decl., Ex. A, Capurro Depo. at 68:8-10.<br><br>Levine Decl., Ex. C, Blake Depo. at 81:17-82:8.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 78:13-14. |
| 121. He was trained to give a verbal warning before using deadly force when feasible. | Levine Decl., Ex. A, Capurro Depo. at 68:11-13.<br><br>Levine Decl., Ex. C, Blake Depo. at 62:2-4. |
| 122. Officers are trained that deadly force is not appropriate even if someone is assaultive, but not engaged in life-threatening conduct, and that only life- | Levine Decl., Ex. C, Blake Depo. at 76:1-9. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| threatening action may justify deadly force. | |
| 123. Ofc. Capurro was also trained to consider his background or backdrop before using deadly force, to ensure bystanders are not struck, and that bullets can ricochet. | Levine Decl., Ex. A, Capurro Depo. at 65:10-12.<br><br>Levine Decl., Ex. C, Blake Depo. at 63:8-17. |
| 124. City Defendants' and Plaintiff's police experts both opined it is important for officers to gather information when they get to a scene if possible. | Levine Decl., Ex. C, Blake Depo. at 22:23-24:23, 25:1-17, 28:8-12, 72:22-73:12.<br><br>Levine Decl., Ex. D, DeFoe Depo. at 47:3-19, 93:11-18, 132:11-133:7.<br><br>DeFoe Decl. ¶¶ 8-9. |
| 125. City Defendants' own expert testified that an officer in Ofc. Capurro's position should wait for additional assistance, gather information, assess the situation, and plan the contact with the subject before approaching. | Levine Decl., Ex. C, Blake Depo. at 25:1-17. |
| 126. He testified that if an officer in Ofc. Capurro's position was unsure whether immediate intervention was necessary or whether he could instead wait for backup, he would question the reporting party regarding the situation, including the suspect's behavior at the time and the location of any reported weapons, pursuant to the officer's training. | Levine Decl., Ex. C, Blake Depo. at 25:18-26:9. |
| 127. He testified that Ofc. Capurro could have done so here and that, had Ofc. Capurro learned there was no active threat aboard the train, it would have been prudent to wait for backup before boarding. | Levine Decl., Ex. C, Blake Depo. at 67:17-68:7. |
| 128. City Defendants' expert opined that Ofc. Capurro's contact with, detention of, and attempted arrest of Mr. Detweiler were contrary to training and department policy due to his failure to first gather information and wait for backup. | Levine Decl., Ex. C, Blake Depo. at 72:22-73:12. |
| 129. Plaintiff's expert agreed and opined that Ofc. Capurro's tactics were | Levine Decl., Ex. D, DeFoe Depo. at 47:3-48:3, 51:16-20, 63:21-64:5, 65:4-18, 68:15-19, 69:13- |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
| --- | --- |
| inappropriate in not waiting for backup, interviewing anyone, formulating or communicating a tactical plan, or removing Mr. Detweiler's bags before approaching and waking Mr. Detweiler, given the information he had indicating Mr. Detweiler could potentially pose a threat, and also in allowing nearby passengers to remain on train and failing to communicate to Mr. Garrett or others what he wanted them to do, which should have been not to get involved and to get out of the way | 71:3, 75:2-14, 76:2-10, 76:25-77:3, 80:13-81:18, 93:11-18, 132:11-133:7.<br><br>DeFoe Decl. ¶¶ 9-10. |
| 130. He opined that a reasonable officer in Ofc. Capurro's position would have done these things and would have used de-escalation tactics, including words and distance, to address an individual who initially was not complying with all commands, pursuant to department policy. | Levine Decl., Ex. D, DeFoe Depo. at 47:20-25, 51:16-20, 53:8-24, 61:11-21.<br><br>DeFoe Decl. ¶ 8. |
| 131. Plaintiff's expert opined that had these been done, deadly force likely would never have been used. | Levine Decl., Ex. D, DeFoe Depo. at 64:4-18, 64:23-65:3, 66:9-15, 71:22-73:21.<br><br>DeFoe Decl. ¶ 7(b). |
| 132. He opined that, among other benefits, having multiple officers present when confronting Mr. Detweiler would have meant they could have controlled his hands, such that Mr. Detweiler could never have put brass knuckles on. | Levine Decl., Ex. D, DeFoe Depo. at 66:19-67:10. |
| 133. Plaintiff's expert opined that Ofc. Capurro escalated the encounter in violation of his training, rather than de-escalating, including by shining his flashlight at Mr. Detweiler, shaking him awake, and not explaining why he was there or anything else. | Levine Decl., Ex. D, DeFoe Depo. at 72:9-18.<br><br>DeFoe Decl. ¶¶ 7(b), 10. |
| 134. He opined that Mr. Detweiler appeared confused as to why he could not grab his bag, believing he was supposed to exit the train, and Ofc. Capurro improperly failed to explain this and thereby further contributed to the situation escalating | Levine Decl., Ex. D, DeFoe Depo. at 75:2-23, 90:24-91:16 |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| unnecessarily. | |
| 135. Plaintiff's expert opined that a reasonable officer in Ofc. Capurro's position would have considered that Mr. Detweiler may have been mentally ill based on the call information and Mr. Detweiler's actions and statements. | Levine Decl., Ex. D, DeFoe Depo. at 19:19-23:2, 25:7-20, 29:8-19, 59:16-61:10, 67:16-68:4.<br><br>DeFoe Decl. ¶ 7. |
| 136. He opined that, based in part on Mr. Detweiler's apparent mental illness, a reasonable officer would have explained his requests to Mr. Detweiler and the reason for them, would have told Mr. Detweiler he was being detained or arrested, would have slowed the pace of the encounter, and would have avoided unnecessary confrontation, but that Ofc. Capurro failed to do these things. | Levine Decl., Ex. D, DeFoe Depo. at 25:7-27:4, 27:20-28:3, 52:5-6.<br><br>DeFoe Decl. ¶ 7(a). |
| 137. He opined that, based in part on Mr. Detweiler's apparent mental illness, Ofc. Capurro did not afford him reasonable time to comply with his commands, and that issuing verbal warnings that he would use force unless Mr. Detweiler complied was particularly important in light of this. | Levine Decl., Ex. D, DeFoe Depo. at 23:17-24:25, 26:17-25, 27:5-12, 86:24-87:12, 89:20-90:16. |
| 138. Plaintiff's expert opined that none of the force used was appropriate, including the taser, baton strikes, and each of the three volleys of shots. | Levine Decl., Ex. D, DeFoe Depo. at 91:17-21, 91:24-92:2, 93:4-8.<br><br>DeFoe Decl. ¶¶ 12, 14-17. |
| 139. He opined that a reasonable officer would have provided verbal warnings before using each form of force and reasonable opportunity to comply. | Levine Decl., Ex. D, DeFoe Depo. at 77:5-9, 83:6-9.<br><br>DeFoe Decl. ¶ 11. |
| 140. He opined that use of baton strikes require that the subject demonstrate assaultive or pre-assaultive behavior at the time of the strikes, and that Ofc. Capurro's baton strikes were inappropriate due to Mr. Detweiler's minimal level of resistance at that time. | Levine Decl., Ex. D, DeFoe Depo. at 92:7-93:3. |
| 141. He also opined Ofc. Capurro had the opportunity to provide a verbal warning that deadly force would be used before the | Levine Decl., Ex. D, DeFoe Depo. at 78:1-11, 78:22-25, 79:13-18. |

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| first volley when Mr. Detweiler was putting on the brass knuckles, and that a reasonable officer would have said that if Mr. Detweiler attempted to use them or strike someone he would shoot. | |
| 142. Plaintiff's expert opined that firing the first volley was inappropriate both because of a lack of an immediate threat of death or serious injury by Mr. Detweiler at the time of the shots and due to risks to others from backdrop and crowded train. | Levine Decl., Ex. D, DeFoe Depo. at 33:3-37:1, 78:1-5, 78:14-21.<br><br>DeFoe Decl. ¶¶ 16-17. |
| 143. He opined that firing the second volley at Mr. Detweiler's back was inappropriate because Mr. Detweiler did not appear to have Mr. Garrett in a chokehold or be otherwise applying pressure to Mr. Garrett's throat, and because even if Mr. Detweiler had his arm around Mr. Garrett's neck, it would not constitute an immediate threat of serious bodily injury justifying deadly force. | Levine Decl., Ex. D, DeFoe Depo. at 42:18-43:8.<br><br>DeFoe Decl. ¶¶ 16, 17(b). |
| 144. And he opined that firing the third volley at Mr. Detweiler's back was further inappropriate because Mr. Detweiler was chest-down on the ground, clearly not harming or preparing to harm anyone, and had already been shot repeatedly. | DeFoe Decl. ¶¶ 16, 17(b). |
| 145. Plaintiff's expert was not retained to express opinions regarding Amtrak or Mr. Garrett or the propriety of their conduct, which are outside of the scope of his expert opinions, and he has rendered no such opinions in this case. | Levine Decl., Ex. D, DeFoe Depo. at 6:4-23, 127:6-128:19, 134:13-18.<br><br>DeFoe Decl. ¶ 6. |
| 146. Based on this incident, Mr. Garrett | Case No. 2:25-cv-00420-WBS-SCR, Dkt. 1.[2] |

[2] Plaintiff requests that the Court take judicial notice of the cited court filings in the Mr. Garrett's action, Case No. 2:25-cv-00420-WBS-SCR. These court filings are properly subject to judicial notice as adjudicative facts. *See* Fed. R. Evid. 201(b)(1), (c)(2); *Applied Underwriters, Inc. v. Lara*, 530 F. Supp. 3d 914, 923-24 (E.D. Cal. 2021) (Shubb, J.) ("Courts routinely take judicial notice of documents on file in federal or state courts."). Per an order of this Court, Mr.

(footnote continued)

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| sued Ofc. Capurro and the City of Mt. Shasta for excessive force under the Fourth Amendment, battery, negligence, and violation of the Tom Bane Act. | |
| 147. In his complaint, Mr. Garrett alleged that:<br>• Mr. Detweiler was sleeping when Ofc. Capurro approached him;<br>• Ofc. Capurro woke Mr. Detweiler and "escalated the situation" by "issuing conflicting orders in a hostile manner";<br>• Ofc. Capurro "did not issue appropriate commands" to Mr. Garrett or Mr. Detweiler before shooting;<br>• Ofc. Capurro "did not employ tactics to de-escalate the situation," "failed to approach and speak to [Mr. Detweiler] in a non-threatening manner, and failed to give [Mr. Detweiler] the opportunity to consent to and cooperate with instructions";<br>• Ofc. Capurro was capable of "neutralizing and/or effectuating the seizure of [Mr. Detweiler] using any of a variety of readily available less intrusive means and strategies" short of deadly force;<br>• "The force used by [Ofc. Capurro] was unnecessary, excessive, and unreasonable | Case No. 2:25-cv-00420-WBS-SCR, Dkt. 1 ¶¶ 15, 18-20, 25, 30, 43. |

Garrett's action was assigned to the same judge overseeing this case, as a related case. No. 2:25-cv-00420-WBS-SCR, Dkt. 9.

| Plaintiff's Additional Material Fact | Plaintiff's Supporting Evidence |
|---|---|
| under the totality of the circumstances";<br>• Ofc. Capurro "failed to investigate or appropriately consider or assess whether [Mr. Detweiler] was mentally ill and/or experiencing a mental crisis, despite readily apparent indications that he was";<br>• Ofc. Capurro "inten[ded] to use excessive force against [Mr. Detweiler]"; and<br>• It was "feasible" for Ofc. Capurro to "give a verbal warning or adequate commands prior to shooting." | |
| 148. Mr. Garrett's lawsuit was subsequently dismissed following a settlement. | Case No. 2:25-cv-00420-WBS-SCR, Dkt. 14-22. |

DATED: October 30, 2026 LAW OFFICES OF DALE K. GALIPO

By *\/s/ Benjamin S. Levine*

Dale K. Galipo
Benjamin S. Levine
*Attorneys for Plaintiff Julia Detweiler*