# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiffs,

vs. Case No. 2:24-cv-03100-WBS-SCR

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.
___________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF JEREMIAH CAPURRO

FRIDAY, MARCH 27, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24838

Q. What type of baton did you have at the time?
A. It's a straight-stick baton.
Q. What's it made out of?
A. It's a wooden baton.
Q. Do you have an estimate as to its length?
A. I don't.
Q. Do you have an estimate as to its diameter?
A. Approximately, an inch.
Q. Were you trained that baton strikes could potentially break bones?
A. Yes.
Q. What type of Taser did you have at the time?
A. I believe it was an Axon Taser 7.
Q. Do you know if that Taser carried one cartridge or more than one?
A. It was two cartridges.
Q. Did you ever actually deploy any of the cartridges?
A. I did.
Q. Did you deploy one cartridge or more than one?
A. I believe it was both of them.
Q. Where did you deploy the first cartridge?
A. Into the roof of the train car.
Q. Where did you deploy the second cartridge?
A. I don't recall.

Q. Did you use the Taser at all in a drive-stun mode?

A. I did.

Q. On how many occasions did you do that?

A. I would say, approximately three.

Q. To what parts of the body did you do the drive-stun mode of the individual?

A. To the lower rear torso.

Q. And when you say "the lower rear torso," can you be a little more specific as to which body part or body parts you're referring to?

A. Yeah. It would be, from what I can recall, his lower left back.

Q. Okay. Before we get into more specifics about the incident, I just want to learn a little bit more about you, starting with your education.

I'm assuming you graduated from high school?

A. I did.

Q. What year did you do that in?

A. 2002.

Q. How old are you currently?

A. 43.

Q. How tall are you?

A. 5'8".

Q. How much do you currently weigh?

baseball.

Q. I'm a sports fan, so I'm always interested to know that.

What positions did you like to play in baseball?

A. I like to play second base, as well as center field.

Q. Did you go to any college after high school?

A. I did.

Q. And what time period did you go to college?

A. Immediately after high school, I attended for approximately a year. Took a break. And then I've been kind of continuing, going on and off, over the past since then.

Q. Did you study anything in particular?

A. Yeah. I would say psychology.

Q. Have you gotten a degree yet or not yet?

A. Not yet.

Q. When did you go to the police academy?

A. In 2021.

Q. Where did you go to the academy?

A. To the College of the Siskiyous, in Weed, California.

Q. How long was the academy, approximately?

A. I believe it was approximately seven months.

Q. During the academy, did you have to become familiar with POST Learning Domains?

A. I did.

Q. Did you have training during the academy on police tactics?

A. Yes.

Q. What was the form of that training? Was it written? Oral? You know, simulations? Maybe a combination of all of that?

A. A combination of all of that.

Q. Were you generally trained that good tactics is important in police work?

A. Yes, definitely.

Q. And would that be for the safety of everyone, the officers, the public, and even the suspect?

A. Correct.

Q. And use of force, did you have use of force training at the academy?

A. Yes.

Q. Did that include less-lethal force, as well as lethal force?

A. Correct.

Q. Did you have training, for example, with respect to the Taser, at the academy?

A. I don't believe the academies train on Taser

use, because it's a department-specific training.

Q. Did you have that training once you were at the department?

A. I did.

Q. How about the police baton as an impact weapon? Did you have training with that at the academy?

A. I did.

Q. And deadly force, you would have started your training on deadly force at the academy?

A. Yes.

Q. In your defensive tactics training, did you have training with respect to take-downs? Control holds? Things of that nature?

A. Yes.

Q. Did you have training with -- I'm not sure if I'm going to use the right term here -- grappling or being on the ground and having to grapple with someone?

A. Yeah, I did.

Q. I'm assuming one of the topics that was discussed in your training was de-escalation?

A. Yes.

Q. Did you have some particular training on dealing with people that might have mental health issues or mental illnesses?

A. Yes.

Q. When, approximately, did you graduate from the academy?

A. December 2021.

Q. And where did you first go to work?

A. The Mount Shasta Police Department.

Q. Was that the only department you applied to?

A. I applied to the Siskiyou County Sheriff's Office at the same time.

Q. Those were the two that you applied to at that time?

A. Yes.

Q. And when you started with Mount Shasta, was there a period of field training?

A. There was.

Q. How long was that for, approximately?

A. Approximately, four -- four months.

Q. And you had different field training officers during that time?

A. I did.

Q. Were tactics and use of force also discussed during that time?

A. Yeah, as they came up.

Q. Did you need to familiarize yourself with the written policies on use of force for Mount Shasta during that time frame?

A. I'm working for the Yreka Police Department.

Q. And that's different than the city of Eureka?

A. Correct.

Q. And how long have you worked for them for?

A. Approximately, a year and a half.

Q. Are you assigned to patrol there or something else?

A. I -- I am. I'm a detective with them.

Q. Okay. So let's talk a little bit about this incident. My understanding was you were at the station when you heard a call come out related to this incident; is that right?

A. That's correct.

Q. And what general information did you initially have on the call?

A. I was advised by my dispatch that Amtrak was going to be stopping in Mount Shasta City limits to have a passenger, who was causing a disturbance on the train and threatening people with brass knuckles.

I believe she also advised me the subject on the train had previously assaulted officers in the past, and they were going to be stopping at the Lake Street.

Q. Any other information you recall receiving on the call, other than what you told me so far?

A. No, I don't believe so. Not that I can recall.

Q. And did that come over your police radio?
A. No. I was -- I was in the office when the call came in, and she verbally advised me of that.
Q. Do you know --
MR. KONZ: Dale, I have an objection.
Are you asking did he receive the 911 call or the information from dispatch?
MR. GALIPO: No. I understand he doesn't get 911 calls, Derek. I'm talking about the information from dispatch, whether that came over his police radio.
BY MR. GALIPO:
Q. Is that how you understood the question?
A. Yeah. It -- it -- it did not come over the radio because I was in the office, and I was only a few feet from the dispatch center, so she verbally advised me of it.
Q. Do you know if she put it out over the radio, in addition to advising you of it verbally?
A. She did not. There would be really no reason for her to put it out over the radio, because I was the only officer on.
Q. Okay. So there would be no recording, to your knowledge, of the information you received; is that fair?
A. Correct.

Q. And did you get any updated information related to the call, prior to actually getting to the train station?

MR. KONZ: I'm going to object. It's not at the train station. They just stopped in the middle of town.

MR. GALIPO: Okay. Fair enough, Derek.

BY MR. GALIPO:

Q. Did you get any updated information before you got to the train?

A. I believe I only received a time frame of when the train was going to be stopping, and the update would have been maybe an update on when the train was going to arrive. That was the only information I got.

Q. Okay. For example, did you have the name of the individual who was the suspect?

A. I don't believe I did.

Q. Did you have height or weight or age of the individual?

A. No.

Q. Any clothing description?

A. I don't recall that, but I don't believe I did.

Q. Did you have any information that anyone specifically had been injured by this individual?

A. No. Not injured, just threatened.

Q. Did you have any understanding what the nature of the threat was, specifically; whether it was verbal? Non-verbal? What it was?
A. I was assuming it was more than just a verbal, because I recall there was threats and brass knuckles were brandished.
Q. Okay. Do you know if he attempted to hit anyone with the brass knuckles, for example?
A. I don't believe I received that specific information.
Q. Do you know if he had verbally threatened to harm anyone with the brass knuckles?
A. I don't believe I received that information.
Q. Did you have an understanding as to when this -- this brandishing of the brass knuckles took place, time-wise?
A. I was assuming it was just prior to them notifying law enforcement.
Q. Did anyone tell you when it had taken place, aside from your assumption?
A. I don't believe so.
Q. When did you get the information, approximately, when you were at the station, in relation to the shooting?
A. When did I receive my call for service --

Q. Yeah. In other words, I think you said the shooting happened maybe about 12:20 in the morning, approximately?

A. Yeah. I would -- I would -- yeah. That's what I would estimate. Just from memory, I would say the call came in -- I know it was Christmas morning, so it was probably just after midnight.

Q. Did anyone tell you that this -- this alleged brandishing of the brass knuckles had happened approximately an hour and a half or an hour and 45 minutes earlier?

A. No.

Q. And what was your understanding as to what was being requested of you in this call?

A. To have the passenger removed from the train.

Q. And who was it -- who did you understand wanted the passenger removed?

A. The Amtrak staff members. I don't know who, exactly.

Q. So at some point, you head out towards where you understand the train was going to stop?

A. Correct.

Q. And did the train get there a little earlier than you had anticipated?

A. It did.

Q. Was there some type of a plan that you were going to board the train at some point after it stopped?

A. Of course.

Q. And was part of that plan that you were -- initially, at least, that you were going to board the train with some deputy sheriffs?

A. That's correct.

Q. And how did that plan come to take place? Was there some communication, if you know, between your department and the sheriff's department?

A. Yeah. When I received the initial call for service and I was given that information, especially with the subject having a history of -- of assaulting police officers and knowing that there was a prohibited deadly weapon involved, I had her contact the sheriff's department for additional units and give them a time frame.

Q. So did you do that over your police radio?

A. No. Well, the dispatcher contacted the sheriff's department, I would say, on the telephone. And then when I left the department, I contacted one of the deputies, with my telephone, asking what their ETA was, and that the train was going to be there in a certain time frame.

Q. You placed a call in to one of the deputies?

Q. And I take in your training at the academy and field training, up to that point in time, you learn of the advantages of having multiple officers, when you can?

A. Yes.

Q. And what were some of the advantages you learned in that regard?

A. Well, there's power in numbers. It's great to have a team and cover units. There's several advantages.

People are less likely to potentially use force if there's multiple units there. You can -- there's definitely more strategy and strategic things you can do with -- with more officers on scene.

Q. At some point, you decided to board the train without waiting for the backup officers to arrive. Is that a fair statement?

A. Yeah. Yes, it is.

Q. But you did you understand they were en route?

A. Yes.

Q. And you understood, at least the initial plan, was to board the train together?

A. It was a request, yes.

Q. Did you call back this deputy that you had his cell phone number to let him know you were boarding the

train?

A. I don't recall. I believe while I was -- while I was on the phone, I believe I heard the train arriving. While I was on the phone with that deputy, I believe I heard the train in the distance.

Q. Did you ask him, if you remember, how far out he was?

A. Again, I think it was a location.

Q. What location do you recall?

A. It was somewhere in -- in Weed.

Q. Did you have a supervisor on that shift?

A. An on-call supervisor.

Q. And who was that?

A. I don't recall who the supervisor -- the on-call supervisor was that night.

Q. Is that a person that you can call, if necessary?

A. Yes.

Q. Did you have that person's phone number, or would you generally have the phone number?

A. Yes.

Q. Did you call the person to let them know you were considering boarding the train by yourself and see if they thought that was a good idea?

A. No.

Q. So you, yourself, decided you were going to board the train and not wait. Is that a fair statement?
A. That's a fair statement.
Q. And did you see anyone that you believed was an Amtrak employee, prior to boarding the train?
A. Yes. There was an Amtrak employee that greeted me at the doorway.
Q. Okay. And do you remember if that was a male or female?
A. A male.
Q. And did you take that time to try to get some information from the employee as to exactly what was going on, just so you had that information before boarding the train?
A. I don't recall. I remember the train pulling up and the door opening while it was still moving, so I figured whatever was happening was -- whatever disturbance was taking place was still occurring. And I remembered the employee's demeanor was -- he seemed a little upset, so I figured there was something happening.
So my initial response was to get to that location as quickly as possible, so I don't recall how much information was exchanged between me and the employee.

Q. For example, did you ask the employee if anyone was hurt? If he had attempted to hit anyone with these brass knuckles? You know, is it going on now? When did this occur? Any questions at all?

A. No. Not that I can recall.

Q. Would any of that have been helpful information to you? For example, if you knew that he had been sleeping for an hour and a half and there had been no incidents in the last hour and a half and he had not verbally threatened or tried to harm anyone with the brass knuckles, would any of that information, as a law enforcement officer, been helpful to you?

MR. KONZ: Objection. Calls for speculation. It's his hindsight at this point.

BY MR. GALIPO:

Q. You may answer.

A. Yeah, I think any information is -- is valuable and important. But the information that I went off of and that I was preparing for was what I was given from my dispatch, just minutes prior to me boarding. So I didn't assume that he was sleeping and the incident occurred an hour and a half ago. I assumed that it occurred as the call was received by my dispatch.

Q. Would you agree, as a law enforcement officer, there are situations where people call in to dispatch

and sometimes the information received is not accurate?
A. I would agree with that.
Q. And one of the roles of the law enforcement officers, when they go to the scene, is to investigate and find out exactly what is going on?
A. Correct.
Q. And sometimes when you ask questions and have conversations with people, you find out more information or you find out different information than was dispatched. Is that generally a fair statement?
A. Yes.
Q. And then based on that information, that's helpful to you, as a law enforcement officer, in developing a tactical plan?
A. Correct.
MR. KONZ: Objection. Incomplete hypothetical.
BY MR. GALIPO:
Q. Did you get the feeling that if you had asked some questions to this Amtrak employee, he would not have answered?
MR. KONZ: Objection.
Are you asking did he get that feeling in the moment?
MR. GALIPO: Yes.
MR. KONZ: Or in hindsight, now does he feel

that way?

MR. GALIPO: No, right then. When he saw the employee, he said something like he appeared -- I forget the words he used -- upset or distraught.

BY MR. GALIPO:

Q. Did you think if you had asked him questions, he would not have responded to you, or did you just think it wasn't necessary to ask him questions?

A. No. I was more concerned with his -- his mannerisms and -- and his appearance, because he seemed -- I was -- I was basing that off of him being distraught. So I figured that something was occurring, like, at that moment.

Q. Did you ask him what was going on? What's -- you know, what's happening, just to get some information before boarding the train?

A. I don't believe so. I believe I asked him where he was. I don't know if I -- I can't recall if I asked him any other questions.

Q. Do you recall him giving you any other information?

A. I don't recall.

Q. At some point, did he direct you to the upper level?

A. He did.

Q. And at some point, did you see a separate Amtrak employee?

A. Yeah. I believe there was two of them.

Q. Did you ask the second Amtrak employee any questions about what was going on or what had happened?

A. No. I believe the second employee was in a seat and got up and left as soon as I came in. I don't even --

Q. I'm sorry?

A. It was very dark. I don't remember if I knew it was an employee immediately, because I think he was sitting in a seat and it was dark. And I think as soon as he got up, I saw his clothing and saw that it was an employee. But it's been a while, so I can't say for sure.

Q. At some point, at the end of this incident, you were aware that you had unintentionally struck with one or more of your shots, an Amtrak employee; is that fair?

A. That's fair.

Q. Was that the same person, the one you shot that greeted you when you first came on the train, or was that someone else?

A. I don't know.

Q. I'm just wondering -- I understand you saw the Amtrak employee that greeted you at first. Do you

recall seeing any other Amtrak employee, other than the person you said that was sitting down and walked away?

A. I remember there was one that was involved with the incident, and I'm not sure if that was the same one that greeted me at the door or was already in the upstairs train car. But I believe there was two of them.

Q. And the second one, you didn't ask any questions of, either?

A. No.

Q. At some point, did someone point out to you where the individual was seated?

A. Yes.

Q. And who did that, if you recall?

A. Again, I don't know which one it was, but it was one of the two Amtrak employees.

Q. And did the person appear to be sleeping when you first saw him?

A. I guess that's fair.

Q. Did the person appear to be involved in any criminal activity when you first saw them sleeping in the seat?

A. No.

Q. Were you intending to arrest the person?

A. Yes.

Jeremiah Capurro

Q. And what were you going to arrest them for?
A. Well, the plan was to detain him with possibility of being arrested for the possession of the brass knuckles.
Q. Did you ever tell the person he was going to be detained?
A. I don't recall if I told him he was going to be detained.
Q. Did you ever --
(Simultaneous speakers.)
A. But --
Q. Other, sorry.
A. I was going to say, typically I would have him removed from the train to discuss it, somewhere a little bit safer.
Q. So your intent was to remove him from the train, and then have the discussion with him?
A. Yes, that was my initial intent.
Q. But to your recollection, you never told him he was being detained or under arrest while he was on train? Is that fair?
A. I don't believe I used either one of those two words, no.
Q. Did you ask him to leave the train?
A. I did, initially.

A. Yeah, I do.

Q. And is that a time period you were, you know, getting into that or at least pursuing that potential career?

A. Yeah, it was a student project.

Q. Is that like an acting school, or would you say -- characterize it as --

A. It's a film production school.

Q. And what time period did you attend? Somewhere in the area of around 2006?

A. Correct.

Q. Okay. So going back to the initial encounter, do you recall if -- when you first saw the individual -- do you know his first name, by the way, now? The person that was sitting in the seat that you shot, do you know if it's Nicholas?

A. Yes.

Q. So if I say "Nicholas," you'll know who I'm referring to?

A. Yes.

Q. When he was first seated -- sleeping in the seat, do you recall if he had some type of a sweatshirt on?

A. I believe he had his hoodie on.

Q. And do you recall whether you ever took his

please, Ben, and see if we can share screen?

MR. LEVINE: Are you referring to the still?

MR. GALIPO: Yes.

MR. LEVINE: One moment.

MR. GALIPO: Okay. I think we have Julia Detweiler on with her name.

Are we able to see that, everybody?

THE VIDEOGRAPHER: I see it.

BY MR. GALIPO:

Q. Are you able to see this on your screen?

A. Yes.

(Exhibit Number 1 was marked.)

BY MR. GALIPO:

Q. Does this appear to be the position he was in when you first approached?

A. Yes.

Q. And initially, did he appear to be potentially sleeping to you?

A. I mean, I can't tell that. That wasn't my initial thought.

MR. GALIPO: Can we look at Exhibit 2?

(Exhibit Number 2 was marked.)

BY MR. GALIPO:

Q. Do you recall him at some point, putting his hands up after he got up from the seat?

A. One hand, yes.
Q. His left hand?
A. Yes.
Q. Did you ever see him put his right hand up?
A. I don't recall.
Q. You don't recall one way or the other, or you don't recall him putting his right hand up?
A. I don't remember. It's -- it's been a long time since I've seen this video.
MR. GALIPO: Okay. Can we look at Exhibit 3, please?
(Exhibit Number 3 was marked.)
BY MR. GALIPO:
Q. Are you able to see both hands in this image?
A. Yes. Not super clear, but, yes. There are two hands there.
Q. At this point, did he have anything in his hands?
A. No. But my concern was the initial call of brass knuckles, which could easily be under those gloves.
Q. Did you ever ask anyone where the brass knuckles were, if they knew, before approaching Nicholas?
A. No.

Jeremiah Capurro

Q. If they had seen the brass knuckles in his back jean pocket, would that have been helpful information for you to know?

MR. KONZ: Objection. Calls for speculation.

THE WITNESS: Possibly, but so much time has passed since the call to this encounter, that they could have been anywhere. It's just like when you get a call to a firearm, you have no clue where it is.

BY MR. GALIPO:

Q. Did he -- did Nicholas, at this point, ever use any profanity with you?

A. I don't recall.

Q. Did he ever verbally threaten to harm you at this point?

A. I don't believe so.

Q. Do you recall anything he said during this time frame?

A. No.

Q. Do you recall him ever asking if he could just leave the train, please?

A. Yes.

Q. Do you recall him asking if he could have his bag, please?

A. I don't know if he asked for his bag.

MR. GALIPO: Can we look at Exhibit 4, please?

Jeremiah Capurro

A. Are you talking about during incident, or up at this point in time after we've looked at those photos?

MR. GALIPO: Both. I'll break it down.

BY MR. GALIPO:

Q. Did you see any brass knuckles up to this point in time, during incident?

A. No.

Q. Have you seen any brass knuckles in any of the images that we've looked at?

A. No. But in my mind, that doesn't mean that he does not have them or any other deadly weapon, like a knife or a firearm. So just because I don't see something, doesn't mean that it's not there.

Q. Were you given any information that he had a knife or a firearm?

A. No, but I don't need that information. Because everybody that I contact that potentially -- they could potentially have a knife or a firearm, every contact I make. I treat everybody the same.

Q. Did you ever see what you believed to be a knife, at any time?

A. No, because it could have been in that bag.

Q. Did you ever see what you believed to be a gun, at any time, on Nicholas?

A. I did not, no.

A. It's an arm and head in a maroon sweatshirt. I can't tell you.

MR. KONZ: We can all see the picture just the same and draw the same -- different -- same conclusions, so --

MR. GALIPO: I'm not so sure about that latter part, but I would agree with you that we could all see it.

Okay. We can take that down, Ben.

BY MR. GALIPO:

Q. So did you -- and I think you've already told me, you didn't give any verbal warning you were going to Tase him?

A. No. It was implied. My Taser was drawn and pointed in his direction.

Q. And did you ever try to drive-stun him before you shot the Taser into the ceiling of the train car?

A. No.

Q. Did you ever try to drive-stun him after you shot the Taser probes in the ceiling of the train car?

A. Yes. After he struck me several times, I did attempt to drive-stun him.

Q. He struck you several times, where?

A. In the head.

location, and that appeared ineffective. So I kept moving the Taser to try to have an effective Tase, and they weren't appearing effective.

Q. At this the point in time, did you consider creating distance to try to de-escalate the situation?

A. No.

Q. What were you saying, if anything, to Nicholas to try to de-escalate the situation?

MR. KONZ: Objection. Vague.

THE WITNESS: I don't believe anybody was saying anything. This was -- it was the middle of a struggle between three people.

BY MR. GALIPO:

Q. When you say "the middle of a struggle between three people," you're including the Amtrak employee?

A. Correct.

Q. And what was the Amtrak employee doing in the struggle, up to the time that you were attempting to drive-stun Nicholas?

A. He appeared to be attempting to help me, after I was struck.

Q. In what way?

A. Pulling Nicholas off of me.

Q. That's something you observed?

A. It seemed so.

Q. Was Nicholas facing in your direction when the Amtrak employee was -- appeared to be pulling Nicholas off you?
A. I don't recall.
Q. Did you see how the Amtrak employee was pulling Nicholas off you?
A. No. And to be honest, I don't know if he pulled him off, or -- or if Nicholas turned around and began to fight with him. I don't -- I don't recall.
Q. So after you fired your Taser into the roof line of the car and attempted to drive-stun Nicholas on three occasions, at some point, did you take out your baton?
A. Eventually, yes.
Q. And when you say "Eventually," how much time do you think passed between your last drive-stun and your first baton strike?
A. I couldn't tell you. It's -- it's been too long.
Q. Do you have any estimate?
A. No.
Q. Are you trained that, in terms of baton strikes, you have to justify every strike?
A. I would hope so, yes.
Q. Up to the time of your last drive-stun, did you

Jeremiah Capurro

Q. We can see Nicholas in this image; correct?
A. Correct.
Q. Do you know if he was trying to block some of your baton strikes with his left arm?
MR. KONZ: Objection. Calls for speculation.
THE WITNESS: I don't know what he's doing there. To me, it looks like he's reaching into his pocket for something, but do I see his left arm up.
MR. GALIPO: Okay. Exhibit 14, please.
(Exhibit Number 14 was marked.)
BY MR. GALIPO:
Q. You see the Amtrak employee behind Nicholas in this image?
A. Yes.
Q. You were aware the Amtrak employee was behind Nicholas. Is that true?
A. Yes.
MR. GALIPO: Exhibit 15, please.
(Exhibit Number 15 was marked.)
BY MR. GALIPO:
Q. You have your gun out at this point. Is that correct?
A. Correct.
Q. When you fired your weapon, were you trying to shoot Nicholas center mass?

A. Yes.

Q. And what was center mass, from your perspective, when you fired, initially?

A. I don't understand.

Q. In other words, was it the front of his body, the back of his body, or some other part?

A. In that image, it would be the front, but I don't remember if that's what it was when it occurred, because another incident happened when he reached for the brass knuckles and put them on, and then grabbed the conductor or the Amtrak employee.

So I don't -- he wasn't full-on, like that.

MR. GALIPO: Okay. Let's look at Exhibit 16, please?

(Exhibit Number 16 was marked.)

BY MR. GALIPO:

Q. Do you know if you fired any shots at Nicholas's back?

MR. KONZ: Objection. Calls for speculation.

BY MR. GALIPO:

Q. If you know.

A. I -- I don't remember.

Q. Was he ever turned away from you during any of your shots?

A. I don't recall. He could have been, but I

don't remember.

Q. Do you know where the Amtrak employee is in this image?

A. I believe he's on the ground.

Q. Were you aware that there was another train car in front of this car?

A. Yes.

Q. Did you assume there were people in that car?

A. Yes.

Q. Were you aware, from your training, that bullets could ricochet?

A. Certain calibers, yes.

Q. Were you aware that there was a -- a passenger sitting to your right, close by this altercation?

A. Not until after the fact.

Q. When did you see the passenger after the fact?

A. When I reviewed the footage with my attorney, days after the incident.

Q. And where was that passenger located?

A. I believe he's either in that seat where the -- I believe that's my Taser on the seat there. I believe he's either in that seat all way to the right or in the seat behind it. I -- somewhere in that area. I don't remember exactly where.

Q. Would it be correct that in your statement that

you gave following the shooting, the one with your attorney present, you indicated you never actually saw Nicholas strike the Amtrak employee, before you fired?

A. He was in the act of striking him. His hand was raised, and he was in the act of striking him with the brass knuckles, which I saw him put on.

Q. Right. But you would agree that in your interview, you never said that you actually saw him strike the Amtrak employee before you fired? Would you agree with that?

MR. KONZ: Objection. Lacks foundation. Calls for speculation.

He already testified he didn't review the statement.

THE WITNESS: I -- I -- don't know. I don't -- I don't remember.

BY MR. GALIPO:

Q. You don't remember what you said in your interview?

A. Regarding the -- regarding that question, correct.

Q. Okay. Would you agree, now, that you never saw Nicholas actually strike the Amtrak employee before you fired, actually make contact?

A. Yes, I guess.

Q. Are you aware that the Amtrak employee did not have any visible injuries to his face or head after incident?

MR. KONZ: Objection. Lacks foundation.

THE WITNESS: No, I did not know.

BY MR. GALIPO:

Q. Did you see the Amtrak employee after the shooting?

A. Immediately after?

Q. At any time after.

A. Yes.

Q. Did you see any injuries to his face or head?

A. I wasn't looking for those types of injuries.

Q. Did you see any injuries to his body?

A. Yes.

Q. Where did you see those injuries?

A. His torso.

Q. And where on his torso?

A. I don't recall.

Q. Are you trained with respect to the use of deadly force, that you can only use deadly force if there is an immediate or imminent threaten of death or serious bodily injury?

A. Yes.

Q. Are you trained that there has to be the

ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to use deadly force?

A. Yes.

Q. Are you trained that fear of future harm is insufficient?

A. Yes.

Q. Are you trained you're responsible to justify each shot?

A. Yes.

Q. Are you trained that you should give a verbal warning before using deadly force, when feasible?

A. When feasible, yes.

Q. Are you trained that you should consider your background or backdrop before using deadly force?

A. Yes.

Q. And that is so innocent individual -- people do not get struck?

A. That is correct.

Q. And when you were shooting at Nicholas, you were aware that the Amtrak employee was nearby him; is that true?

A. Correct.

Q. You were also aware that there was a car behind Nicholas that had multiple people in it, train car?

A. Correct.
Q. And I think you've already told me you were aware bullets could ricochet?
A. Certain calibers and ammunition, yes.
Q. Are you aware now that two of your shots struck the Amtrak employee?
A. I believe it was -- I was -- I only was under the impression it was one.
Q. You saw two separate bullet wounds; correct?
A. I believe I saw an entry and an exit.
Q. You don't know whether there was a bullet recovered from his body or not? In other words, you don't know whether those were separate strikes or the same strike?
A. No.
Q. If you know, did the Amtrak employee sue you for using unreasonable deadly force?
A. I don't understand.
Q. Do you know if the Amtrak employee that you shot sued you for using unreasonable force against him?
A. I don't know.
Q. Do you know if there was a lawsuit filed by the Amtrak employee related to this incident?
A. I believe so.
Q. Do you know if you were a defendant in that

lawsuit?

A. I must have been.

Q. Were you ever served with that lawsuit?

A. I believe so.

Q. Did you read the lawsuit after receiving it, to see what the allegations were?

A. I don't recall.

Q. Do you recall reading allegations that you had used inappropriate tactics and unreasonable force?

A. No.

Q. To your knowledge, has that case resolved or settled?

A. I believe so.

Q. Were you trained that deadly force should only be used when there are no other reasonable options?

A. Yes.

Q. Is it your impression or understanding that the shot or shots that struck the Amtrak employee by you were ricochet shots as opposed to direct hits, or you don't know?

A. I don't know.

Q. Did you fire any -- you told me earlier that you fired four shots, and then there was some type of a pause or slight break in the sequence?

A. Correct.

there was what appeared to be a gunshot wound.

Q. Did you attempt to provide any medical attention for the Amtrak employee?

A. I did.

Q. And what did you do to attempt to give him medical attention?

A. As I was assessing his wounds and removing his shirt to see exactly what was the extent of his injuries, that was when the deputies showed up and we provided the Amtrak employee with chest seals and planned to get him out of the train to the ambulance.

Q. Did you do anything to assist Nicholas?

A. My actions after I fired and they went to the ground, as I'm trained, you handcuff the suspect, you check him for weapons; and it's triage at that point.

And I moved to the Amtrak employee to assess his wounds; and then I was going to move back to Nicholas, at which point the deputies arrived and assisted and provided him aid.

Q. How soon after the shooting did the deputies arrive?

A. I don't recall. I would say less than a minute, maybe. It's tough to say.

Q. I'm sorry. I didn't mean to cut you off.

A. Uh-huh.

Q. These are the deputies that you knew were en route as your backup?

A. Yes.

Q. Was one of the deputies that arrived the one that you had called on the phone?

A. Yes.

Q. So when you checked Nicholas for weapons, did he have any on him?

A. I didn't do a full -- full-body search. I didn't check his socks or ankles or anything like that. I checked his waistband and didn't find anything, but he did have the brass knuckles on his hands.

Q. You indicated that prior to your first shot, it looked like Nicholas was about to strike the Amtrak employee; is that generally a fair statement?

A. He was in the act of striking him, yes.

Q. Okay. And -- and you told me you never saw him actually strike him; is that also fair?

A. Yes.

Q. So my next question is, during these shots, shots one, two, three, four, five, and six, did you see Nicholas trying to strike the Amtrak employee during any of your shots while they were occurring?

A. I don't recall.

Q. Do you recall at some point having a

conversation with a supervisor on scene?

A. I know my -- my supervisor showed up. I don't remember exactly what was said.

Q. Did you tell him what happened?

A. Not the details. I remember he was wondering what was going on, and I started to say something, and he told me to not say any more.

Q. Did you have an understanding as to why he told you not to say any more?

A. Yes, I did.

Q. What was your understanding?

A. That it's part of an investigation, and I'm not supposed to say what happened.

Q. Did you ever speak to a supervisor from Amtrak?

A. No, I don't believe so. I don't remember.

Q. Did you go towards the ambulance at some point and speak to one of the paramedics?

A. Yes.

Q. And do you recall telling them to get the Amtrak employee, you know, to the hospital, that was the priority?

A. Yes.

Q. And do you recall also telling them that the other person, who we now know to be Nicholas, was already dead?

A. Likely, yes.
Q. How did you know Nicholas was already dead or likely dead?
A. I just assumed.
Q. Why did you assume that?
A. Because the deputy that was rendering aid to him, I could tell by his reaction.
Q. Did you ask anyone what the status of Nicholas was?
A. No. I was preoccupied with other things, like trying to save the Amtrak worker's life.
Q. Did you do anything to try to save Nicholas's life?
A. I did not have time. I had to choose at that point.
Q. So when you told the ambulance or paramedic that Nicholas was dead or likely dead, you were wanting them to focus their priority on the Amtrak employee?
A. Yes. I knew there was another ambulance en route. This was the first ambulance there. Nicholas was still on the train. I have the conductor outside. Get him to the hospital.
Q. Did you consider, by telling the paramedic that the other person was already dead, that might delay them getting him medical attention?

A. It could also cause the Amtrak worker to die from his injuries.

Q. Did you consider, before firing your shots, that the Amtrak employee could potentially get struck either in the background or by ricochet?

A. It wasn't on the forefront of my mind, but there's always a possibility.

MR. GALIPO: I'm going to look at my notes, so we'll keep going for about ten minutes, and then we'll take our last break. If there's a gap in the questioning, it's because I already asked you and I don't want to keep asking the same question. Okay?

THE WITNESS: Okay.

MR. MURPHY: And I don't want anyone to get their hopes up, but I don't know if it's going to be our last break, because I have some questions.

MR. GALIPO: Well, that's okay. My last break, Mike.

MR. MURPHY: Understood.

MR. GALIPO: After you take over, it's your show.

MR. MURPHY: Understood.

THE VIDEOGRAPHER: Okay. Going off record at 12:07 p.m.

MR. GALIPO: Oh, I didn't want to go off yet.

strike you once, and that was after you Tased him in his leg?

MR. MURPHY: Vague and ambiguous.

"Attempted to strike" or -- once or did strike him twice? I'm confused by the question, Dale, based on the previous testimony. It's vague and ambiguous.

MR. GALIPO: Okay. I can rephrase.

BY MR. GALIPO:

Q. Is it true that there was only one strike by Nicholas to you, and that was done after you Tased him?

A. No.

Q. What part of that do you believe is untrue?

A. He struck me twice. I had two injuries.

Q. Do you believe the strikes were after you Tased him?

A. I don't recall that part, but if my statement said so, then, yes.

Q. At the time you used deadly force, were you using it to protect the Amtrak employee from injury?

A. Or death, yes.

Q. Not yourself? You were -- at that time, it was to protect the Amtrak employee?

A. From injury or death, yes.

Q. And you ended up shooting him at least once?

A. Who?

Q. The Amtrak employee that you were trying to protect.
A. Unintentionally, yes.
Q. The Taser wires that you had shot into the ceiling of the train car, at some point, did you, yourself, get current from those wires?
A. Yes.
Q. And how did that happen?
MR. KONZ: Objection. Vague.
BY MR. GALIPO:
Q. If you know, how did you get current? Did you try to grab them? What caused you to get current, if you know?
A. No, I didn't try to grab them. I must have brushed up against them while I was attempting to drive-stun. I -- I don't recall. I just remember getting Tased myself.
Q. Do you recall in your interview saying that you did approximately ten baton strikes?
A. Do I recall that?
Q. Yes.
A. No.
Q. Do you think you may have done as many as ten baton strikes?
A. I don't know. This was almost two and a half

years ago. I'd have to watch the -- the video. There is recording of it, so you can count them.

Q. Okay. And do you recall separately doing four to five jabs to his stomach area?

A. No. I believe I told you earlier I recall, at this point, three; but if the video shows four to five, then it was four to five.

Q. If you said "four to five" in your statement, do you think that would be accurate?

A. I don't know. Usually, when somebody goes through a traumatic event like that, their memories aren't 100 percent accurate, so I couldn't tell you.

Q. Do you recall doing those jabs to his stomach with all your energy?

A. As much as I could, in such a confined space, yes.

Q. The -- that film that we were talking about earlier, I think it's called "Reflection," was about a character living in a mental rehab facility.

Do you recall that, generally?

A. Vaguely. It was a school project. I don't see how that's relevant; but, yes, it was a school project.

Q. You said you had training with mental health, dealing with people with mental health issues as a law enforcement officer?

my mind, but that wasn't one of the reasons I shot.

Q. After you approached Nicholas and saw that he was sleeping and not committing any crime or disturbance at that time, did you consider maybe checking to see where the backup was, or spending a little more time talking to the Amtrak employees to get the background as to what had happened?

A. No, because I didn't believe that he was actually sleeping.

Q. Well, did you ask the Amtrak employees whether he had been sleeping for some period of time?

A. No.

Q. Would you at least agree when you first saw him, he did not appear to be committing any crime?

A. Yes. I agree with that.

Q. And he either appeared to be sleeping or resting in the seat?

A. Or pretending to be asleep, yes.

Q. I'm just wondering why you didn't take that opportunity to have a conversation with the Amtrak employee to figure out, you know, what had occurred, when it had occurred, just to get you more information?

A. Because I felt he was faking.

Q. "Faking" what? Sleeping on a train at 12:20 in the morning?

Jeremiah Capurro

A. Yes, exactly. Because I had just I received a call for him causing a disturbance and threatening people with a prohibited deadly weapon. So if I had just received that information, how would he actually be asleep?

Q. Well, that's why I'm wondering whether you would have thought to ask the Amtrak employee. Do you know now that this alleged brandishing he did of the knuckles was an hour and 45 minutes before you got on the train?

A. I did not know that.

Q. But you're aware of that now?

A. I am now, yes.

Q. So that's why I'm asking you the question. You come on. You don't know all the details. You're assuming things. When you saw him there, did you think maybe I should talk to these people to get a little more information?

A. Either way, he was asked to be removed from the train. So I was going to remove him from the train and investigate outside of the train car.

Q. Well, who asked him to be removed from the train, if you know?

A. My dispatched received a call saying that they wanted a passenger removed from the train. I don't know

who wanted him removed from the train, but that was my job, was to go remove him from the train. I was not there to have a conversation. I was there to escort somebody out of the train for causing a disturbance and threatening people.

Q. Even without asking the employees what had happened or getting Nicholas's side of the story?

A. Yes.

Q. So you didn't think part of your job was to go and talk to people and get more information as to what when had actually occurred?

A. It was, once he was out of the train car.

Q. You didn't think it was important to do that before he got off the train?

A. I couldn't tell you what thought was running through my time -- my mind at that time.

Q. Right. Because how did you plan on talking to the Amtrak employees after he got off the train and the train left?

A. Well, I didn't assume it was going to leave immediately.

Q. Okay. And how did you plan on -- since you didn't wait for backup and you didn't talk to the Amtrak employees, how were you intending to get him off the train by yourself?

A. Well, I was going to escort him out until his demeanor changed, and I could tell that he wasn't going to listen to any sort of commands once he grabbed the bag. At that point, I was not going to let him walk through a train car, with minimum, the brass knuckles, which is a felony to possess, and who knows if there's any other weapons on his person.

I'm not going to let him walk out on his own free will with a potential knife, a firearm, with a train car full of people. So at that point, based off of his mannerisms and actions, I was going to handcuff him and escort him out of the train.

Q. Okay. But up to this point in time, no one told you he had a gun or a knife, had injured anyone, or even verbally threatened anyone; isn't that true?

A. That's true. But that doesn't matter. He still has brass knuckles, which he could still easily kill somebody.

Q. Right. But you hadn't confirmed that he had brass knuckles yet, had you?

A. There were reports of it. That's why I was going to investigate once he was outside of the train car.

I'm not going to risk walking him through a crowded train car, just because he might or might not

have brass knuckles. It came in as a report of brass knuckles. I was going to escort him out and investigate from there.

Q. Okay. But didn't he tell you several times he wanted to leave the train or was willing to leave the train?

A. Yes, after his demeanor changed.

Q. And when he said he wanted to leave the train or was willing to leave the train, did that include after you attempted to Tase him?

A. I believe so.

Q. Did it include after you struck him with your baton?

A. I don't recall.

Q. Why didn't you just allow him to leave the train and escort him out at that point?

A. Because he just struck an officer two times in the face, as well as fought an employee, has a potential of a deadly weapon on him.

I'm not going to let him walk through a train car that is crowded with people just because he wants to walk out. If he's going out, he's going out detained, in handcuffs.

Q. Did you ever consider just telling him, "Hey, I'm here. You've been asked to leave the train.

Someone reported that you had brass knuckles on you. I need you to leave the train. I'm going to walk you out and we're going to talk about it outside"?

Did you ever consider doing that?

A. Not at the time.

Q. And so are you saying that you were going to handcuff him before escorting him off the train?

A. Correct.

Q. Did you ever take your handcuffs out?

A. No.

Q. Did you ever tell him you wanted to handcuff him?

A. No.

Q. Did you ever tell him to put his hands behind his back or anything like that?

A. I don't recall that.

Q. Were you trained as an officer that your tactical conduct before using force could be considered, under the totality of the circumstances, as to whether the force was appropriate or not?

A. I believe so.

Q. At some point you dispatch, "Shots were fired" after the incident?

A. Correct.

Q. Do you recall giving an estimate in your

initial statement of 10 to 12 baton strikes?

A. I don't recall.

Q. Do you believe your recollection of the number of strikes may have been better at the time of your original statement than it is now?

A. Yes.

Q. Would you agree that if you thought the Amtrak employee was at risk of being struck by one of your bullets, you would not have shot?

MR. KONZ: Hold on. Objection. Lacks foundation.

Are you saying now in hindsight, or are you asking --

MR. GALIPO: No, at the time.

MR. KONZ: At the moment?

BY MR. GALIPO:

Q. At the moment, if you were aware that the Amtrak employee was at risk of being struck by one of your bullets, would you agree you would not have shot?

A. I agree.

Q. And do you recall stating words to that effect in your initial interview?

A. I don't recall.

Q. Do you recall saying that if -- and I'm paraphrasing, if you thought the Amtrak employee was at

risk of being shot, you would not have shot; you would
have come up with another option?

MR. KONZ: Is the question: Do you remember saying that?

MR. GALIPO: Yeah, I'll break it down.

BY MR. GALIPO:

Q. The first question is: Do you remember saying that in your interview?

A. No, I don't remember saying that in my interview.

Q. But would you agree with that now that --

(Simultaneous speakers.)

A. Yes.

Q. -- if you thought the Amtrak employee was at risk of being struck, you would not have shot; you would have come up with another option?

A. Yes.

Q. Was it your impression that the Amtrak employee was trying to help you, by trying to help you fight this person or take control of him?

MR. MURPHY: Vague and ambiguous. Calls for speculation.

BY MR. GALIPO:

Q. You may answer.

A. He wasn't trying to fight him. He was trying

debriefing that you were a part of? I know you talked about this incident was shown in some subsequent class. Was there any debrief about this particular incident that you were a part of?

A. No, not that I remember.

Q. Was there any discussion with your supervisors to the effect it might have been a good idea to wait for backup officers to arrive?

A. For possible future events, yes.

Q. Was there any discussion with your supervisors about being careful when firing your shots when innocent civilians are in the background?

A. No.

Q. That was something you had been trained previously?

A. Yes. Always know your background, backdrop.

Q. When using deadly force?

A. No. Always.

Q. Would that include when using deadly force?

A. Correct.

Q. I mean, I think we've already talked about this, but obviously, if someone is in the background, potentially, they could get shot?

A. Correct.

MR. GALIPO: Okay. Ben, unless you think

there's anything else you think we need to go over --

I guess, Mike, do you have an estimate as to your length of questioning today?

MR. MURPHY: Yeah, I'm going to be quick.

MR. GALIPO: What is "quick"? Quick to some people, Mike, is different than others.

MR. MURPHY: Dale, did I ask you for a time estimate on yours?

MR. GALIPO: No, no, no.

MR. MURPHY: Ten minutes or less, depending on the answers.

MR. GALIPO: Okay. That's fine. Why don't we just do it now, because I was going to take another break, but if it's okay, I'll turn it over to you.

MR. MURPHY: Great. Thank you.

EXAMINATION

BY MR. MURPHY:

Q. Detective Capurro, nice to meet you. I met you before, off the record, and thank you for what you do, law enforcement. Appreciate that.

Sir, is this -- is this a correct statement: You used lethal force on Mr. Detweiler because he disobeyed multiple commands to not touch his bag, where you thought there might be a weapon? Disobeyed multiple commands to get on the ground? And then while he's

staring at you, he applies brass knuckles to his right hand, and then turned and was mid-swing of smashing a civilian in the head, so you shot him?

A. Correct.

Q. All right. Did you weigh in that moment: Okay, there's this civilian standing behind this suspect who has the brass knuckles on his hand, and he's mid-swing at hitting the civilian in the head; I'm better off shooting this guy and risking the background shot than having him kill the civilian, with brass knuckles to the head?

A. Yes.

Q. Okay. You weren't going wait around and wait for Mr. Detweiler to actually finish that swing, strike the civilian in the head, and then apply deadly force; true?

MR. GALIPO: Objection. It's leading. It's compound. It mischaracterizes the evidence, and assumes facts not in evidence.

And I made a similar objection to the prior question, but I didn't realize I was muted.

BY MR. MURPHY:

Q. Is that true?

A. I -- I know that one swing when brass knuckles are applied, hit in the right area of the head, could

cause death.

Q. Okay. So let me clean it up for the objections. Why did you use deadly force on Mr. Detweiler? What did you observe?

A. There was imminent threat of great bodily injury or death if I did not do something about that.

Q. Did you see Mr. Detweiler apply brass knuckles to his hand?

A. Yes. While I had him at gunpoint, he applied his brass knuckles.

Q. Okay. Did you see and hear Mr. Detweiler refuse to obey your multiple commands not to touch his bag?

A. Yes.

Q. Did you fear that Mr. Detweiler may have weapons in that bag?

A. Yes.

Q. Did you see -- did you see Mr. Detweiler refuse multiple commands for him to get on the ground?

A. Yes.

Q. And after that, did you see him apply the brass knuckles to his fist?

A. Yes.

Q. And after that, did you see him swinging and apparently going to make contact with a civilian's head

with brass knuckles?

A. Yes.

Q. And after you saw all of that, you -- you shot him?

A. Correct.

Q. Okay. Does your department policy or your training require you to wait until a suspect kills a civilian before shooting them?

A. No.

Q. Based on the totality of the circumstances, in the minute or so that this entire encounter lasted with Mr. Detweiler, did you deem his -- his swinging fist with brass knuckles at the head of a civilian, an imminent threat of death or serious injury to a civilian?

A. Yes.

Q. All right. And that's why you deployed your weapon?

A. Correct.

Q. Up until that point, you did not intend to deploy your weapon; true?

A. True.

Q. In the video that we just watched, did you see that when Mr. Detweiler and the conductor went to the ground, after you had fired four shots, that Mr.

MR. MURPHY: Yeah.

MR. KONZ: All right. Let's get out of here.

MR. GALIPO: Hold on. I have some follow-up questions.

FURTHER EXAMINATION

BY MR. GALIPO:

Q. So given all the information you had, as you approached Mr. Detweiler in his seat, how did you plan to get him out of his -- how did you plan to get him off the train? I'm still unclear on that.

A. So before I saw his demeanor and what appeared to be a non-cooperative person, I was going to escort him out.

Q. And how were you going to escort him out?

A. I was going to walk him out, initially, until I saw --

Q. Un-handcuffed?

A. Correct. Until I saw his demeanor change. And I knew that he was not going to listen, and he was a threat at that point.

Q. And when you say you "saw his demeanor change," after he got up from his seated position?

A. Correct.

Q. And then how did you intent to get him off the train at that point?

A. I already stated I was going to handcuff him and escort him out.
Q. And how were you going handcuff him?
A. I was going to put a handcuff on each wrist and walk him out.
Q. Were you going to tell him that you were going to handcuff him or tell him --
(Simultaneous speakers.)
(Reporter clarification.)
BY MR. GALIPO:
Q. -- or ask him to put his hands behind his back?
A. Well, we do not tell people, "Hey, we're going to handcuff you." We do tell people to put hands behind their backs, and I was going to, but that opportunity never came, because I was focused on the threat at that point.
Q. Okay. Given the information you had before you got on the train, did you consider that one possibility was that this person was not going to cooperate with you?
MR. KONZ: Objection. Vague as to time.
BY MR. GALIPO:
Q. Before you got on the train, did that thought cross your mind, given the information you had that this person may be possibly uncooperative?

A. Yes. Any time you receive a call, you always think worst case, and that would be worst case, somebody not cooperating. So, yes, it crossed my mind.

Q. Once you got the Amtrak employee to the ambulance, did you ever check to see whether Nicholas was receiving attention from a separate ambulance or paramedic?

A. I vaguely remember there being an ambulance on the opposite side of the train car. I believe one went to west side and one went to east side, and I remember there being some confusion.

I don't know the details of that, but I believe the second one did arrive. So I don't know. I couldn't tell you for sure.

Q. But I know you made steps to make sure the Amtrak employee got a paramedic or ambulance. I'm wondering whether you did anything similar for Nicholas?

A. Well, there were several other law enforcement officers up there with him. So I can only do what I can do, and I was focused on the employee at that time.

(Simultaneous speakers.)

(Reporter clarification.)

Q. I'm sorry. I didn't it mean to cut you off.

A. I said I could not be in two places at one time.

Q. But you have a police radio; correct?

A. Yes. But there are already other law enforcement officers with Nicholas, rendering him aid, So me being up there, involved in what they're doing, is irrelevant. I'm focused on what I'm doing.

Q. Okay. Did you have any specific information before you got on the train that Nicholas was under the influence of drugs or alcohol?

A. I don't believe so.

Q. Did you have any specific details regarding the prior -- potential prior assault on another officer, other than what you have told me already?

MR. KONZ: It's been asked and answered.

THE WITNESS: All I know is I was advised he had previously assaulted police officers. That's the only information I had.

BY MR. GALIPO:

Q. If you had gotten to the scene and you were told that: He's sleeping now. He's been sleeping for an hour and a half. He didn't injure anyone or verbally threat anyone. This happened about an hour and a half ago. We're going to be here for least 15 minutes on this stop, so there's nothing going on right now, if you had had that information, would you have considered waiting for your backup?

MR. KONZ: Incomplete hypothetical.

MR. MURPHY: Yeah. Same, incomplete hypothetical. Calls for speculation.

MR. KONZ: Join.

THE WITNESS: Of course. I mean, that makes sense, because there's no active threat. Why would I get on the train without backup? But that didn't happen.

BY MR. GALIPO:

Q. Okay. But if you were -- if you had been provided that information from the Amtrak employees, then you're saying tactically, you would have waited for backup?

A. Sure.

(Simultaneous speakers.)

(Reporter clarification.)

(Record read.)

THE WITNESS: Yes.

MR. MURPHY: Incomplete hypothetical. Calls for speculation.

MR. KONZ: Same.

BY MR. GALIPO:

Q. And the reason you would have waited for backup would be, what?

MR. KONZ: Same objection. Incomplete hypothetical. Calls for speculation.

MR. MURPHY: Join.

BY MR. GALIPO:

Q. You may answer.

A. I don't understand the question.

Q. Why under -- if you had been told that there was nothing ongoing now, that it happened an hour and a half ago, he's been sleeping for an hour and a half, and the train's going to be there for another 15 minutes so there's nothing imminent, why would you have waited for backup, tactically?

MR. MURPHY: Same objections, and it assumes facts not in evidence, and argumentative to that extent.

Go ahead.

MR. KONZ: Join.

THE WITNESS: Because there was no active disturbance or imminent threat at that time.

BY MR. GALIPO:

Q. And what would have been the benefit, from law enforcement perspective, of waiting for backup before getting on the train?

A. I would have had additional support units.

Q. And how might that have helped?

MR. KONZ: Calls for speculation. Incomplete hypothetical.

MR. MURPHY: Join.

Jeremiah Capurro

THE WITNESS: Multiple units. We could have kept it hands-on and not had to use any of our tools.

BY MR. GALIPO:

Q. Including any force?

A. Well, there would have likely been some force, but there would have likely not been what occurred.

Q. Meaning it rising to the deadly force?

A. Correct, but I couldn't tell you for sure.

MR. KONZ: Just to be clear, this is all just a big hypothetical scenario, right, we're talking about?

MR. GALIPO: I'm just asking my questions. If you have an objection, you can make it.

MR. KONZ: Well, okay. Lacks foundation.

MR. MURPHY: Yeah, lacks foundation. Join. Incomplete hypothetical, and hypothetical assumes facts.

BY MR. GALIPO:

Q. And we talked earlier about the importance -- the benefits of having multiple officers acting together; correct?

A. Sure.

Q. And we also talked earlier about if time permits, the importance of gathering information once you get to the scene?

A. Correct.

MR. GALIPO: Okay. That's all I have.

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 7th day of April, 2026.

__________________________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR