# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

JULIA DETWILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiffs,

vs. Case No. 2:24-cv-03100-WBS-SCR

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.
_______________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF BRUCE GARRETT

WEDNESDAY, DECEMBER 17, 2025

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 21830

Q. Were you always assigned to the same geographic area, or did that change over time?
A. No. Since day one, I've always been out of the Sacramento crew base.
Q. So you would have been working for Amtrak a little over eight years at the time that the shooting incident occurs?
A. That sounds correct.
Q. And it's my understanding that you were struck by some of the bullets; is that correct?
A. Correct.
Q. Do you generally know what parts of your body were struck?
A. Yes. I was hit twice, and it would have been in the left and right on the wings. The rib cage is the part of the body that took the brunt of the hits.
Q. And at some point you went to the hospital, following the incident?
A. Yes, I did.
Q. Did they have to perform some surgery on you?
A. Yes. When I went to Redding, Mercy Redding Hospital, I was put into the ER, and they recommended that I have emergency surgery to take care of some issues, and I agreed.
Q. And if you know, was one or both of the bullets

I accepted the ticket, so it added his name to the manifest, and I issued him a boarding ticket.
Q. At that point in time, did Mr. Detwiler verbally threaten to harm you in any way?
A. No.
Q. Did he try to fight with you in any way at that point?
A. No.
Q. Based on at least what you could observe at that point, did he appear to you to be suitable to go on the train?
A. There was -- he did present some weird behavior to me, but not enough where I deemed him un-rideable. I saw the behavior, and -- but I still felt he was good enough to get on the train.
Q. I take it in the time that you have worked in your position, you have seen a large variety of people coming on the train, including people that may have mental health issues. Is that a fair statement?
A. That would be a fair statement.
Q. And you also, I take it from time to time, have seen people who appear to be under the influence of either drugs or alcohol?
A. Correct.
Q. Is part of your training to try to de-escalate

situations with these people, to the best of your ability?

A. Correct.

Q. And it seems like, from reading your statement, you've had pretty good success with that over the years, trying to calm situations down and de-escalate situations with people?

A. I would like to think that that's a skill I have developed over the eight years at Amtrak, yes.

Q. And in addition to that being a skill you developed, would that be also part of the training that you received?

A. We do have de-escalation training as part -- with -- through Amtrak, yes.

Q. And how long was your initial encounter with Mr. Detwiler? I take it it was fairly short?

A. Are you talking about my first interaction in the -- in the station?

Q. Yes.

A. Best guess would be 20 second, tops.

Q. Okay. Are you comfortable with saying that's your best estimate?

A. Yes.

Q. The only reason I say -- I know it sounds silly, but lawyers don't want people to guess. But it's

next stop. And then at that point, I get off the train. Yes.

Q. Is -- does the train pass through Shasta?

A. Yes.

Q. But are you saying that's not a scheduled stop?

A. That is correct.

Q. But you can stop there if the circumstances warrant it?

A. Yes.

MR. KONZ: I'm going to object that "Shasta" is vague. There's a city of Mount Shasta. There's a --

MR. GALIPO: Oh.

MR. KONZ: -- Shasta County, also. There's a Lake Shasta.

MR. GALIPO: Okay. That's fair enough.

MR. KONZ: So it's the -- it would be the city of Mount Shasta, if that's the city you're referring to.

MR. GALIPO: Okay. Thank you for that. I didn't mean to be vague, but I'm showing my ignorance to the geography.

BY MR. GALIPO:

Q. Okay. It would be the city of Mount Shasta. Does that sound correct, Bruce?

A. Yes. The train goes through the city of Mount Shasta.

MR. GALIPO: Okay. I guess, Derick, I saw several references just to "Shasta" in the statement, so that might have thrown me off.

MR. KONZ: Yeah, it throws everybody off. I had to be lectured on that at one point.

MR. GALIPO: Okay. Well, now I have been lectured, so I understand.

MR. KONZ: Right.

BY MR. GALIPO:

Q. So when was the next time you saw Mr. Detwiler?

A. After we departed Klamath Falls, it would have been within ten minutes, I had my next interaction with Mr. Detwiler.

Q. And where was Mr. Detwiler at that time when you had the second interactions with him?

A. That would have been car number 11.

Q. And where was he in car number 11, approximately, when you had this second interaction with him?

A. If my memory -- I have to go back to my DOJ interview that has all of the -- you know, because that's two years, the memory fades a little bit. I would estimate -- he was towards the front of car number 11.

Q. And what was the nature of this interaction

with him, the second one, towards the front of car number 11?

A. Within ten minutes of departing of Klamath Falls, we had a passenger come up in a dining car where myself and conductor Eric McNay were sitting, and they mentioned that a passenger had come into the dining car, put his bookbag down on one of the tables, and pulled out a pair of brass knuckles, and was kind of motioning with his hands and making sure that everybody saw that he had them.

And that person had come up into the dining car to let myself know and the conductor know, and then I proceeded forward in the train to go locate this individual.

Q. And then at some point, you located Mr. Detwiler again?

A. Yes. The person who came into the dining car to report this behavior gave me a description what this person looked like, and it -- it matched Mr. Detwiler's -- what he was wearing.

I walked up into car 11, and I saw him standing towards the front of car 11, and I interacted with him to try and get him to go back to his seat.

Q. And were you successful in doing so?

A. I was, yes.

Q. And how long was that interaction, approximately?

A. Thirty to 60 seconds.

Q. And was the seat that he went to somewhere in car 11?

A. Yes.

Q. Did he at that point, during that second interaction, ever verbally threaten to harm you in any way?

A. No.

Q. Did you see the brass knuckles at any time during that second interaction?

A. No.

Q. Did you ask him if he had brass knuckles on him at that point?

A. I can't remember -- I cannot recall if I did or did not ask.

Q. Up to that point in time, did you have any -- and I mean the time where he sat back in his seat in car 11 -- did you have any information that he had verbally threatened anyone on the train?

A. No.

Q. And did you have any information that he was fighting with anyone on the train, specifically throwing punches or kicks or anything like that?

A. No.
Q. And finally, did you have any information that anyone on the train had been injured by Mr. Detwiler?
A. No.
Q. When you asked him to sit back down in his seat in car 11, and he did so, did you view that as an act of compliance, at that point?
A. Yes.
Q. Did you, up to that point in time, form the impression that Mr. Detwiler could potentially have some mental health issues?
A. Yes.
Q. And what did you observe that made you think he could possibly have some mental health issues?
A. In the DOJ interview, you'll -- if you've seen it, my initial interaction with him, he did what I quoted as the "vampire pose," and that struck me as pretty odd. And when I talked to him on the second intersection in front of car 11, he kept mumbling about --
(Reporter clarification.)
MR. GALIPO: I realize he was talking fast, but you got slow it down just a little bit for the court reporter.
THE WITNESS: He was mumbling and kept saying,

"I'm going to Emeryville. I have a ticket to Emeryville."

I said, "Yes, Nick, you have a ticket. You're good to go."

And then he eventually complied and sat down in his seat.

BY MR. GALIPO:

Q. So based on that, you were thinking he could be a little bit off or have some type of mental health issue?

A. Based on my interactions up to that point, yes. The thought had crossed my mind.

Q. And it sounds like, over the years, Bruce, with your work, with Amtrak, you have dealt with other people that you also thought potentially had mental health issues?

A. Correct.

Q. Could you tell one way or the other whether he was under the influence of anything at that point?

A. No.

Q. After your second interaction with Mr. Detwiler, what, if anything, did you do?

A. After he sat down, I proceeded back to the dining car to go talk to the conductor, Eric McNay, and I informed him on what I found. And, you know,

A. The conductor got on his radio and communicated with the engineers up in the front of the train and driving, who then communicated with the dispatcher that we had a request for police assistance. And then that dispatcher, there's a whole process, the Union Pacific Railroad goes through, for when we call for police fire or EMS. And then they went through their SOP.

Q. Okay. So am I correct that at the time the decision was made to remove Mr. Detwiler from the train, you had not, yourself, seen any brass knuckles yet; is that fair?

A. That is correct.

Q. And you had no information that he had verbally threatened or injured anyone on the train; is that also correct?

A. Correct.

Q. And you did not form the impression, specifically, that he was under the influence of any drugs or alcohol; is that also correct?

A. Correct.

Q. And so what happened with the initial attempts, if you know, to have him taken from the train?

A. When we called the Union Pacific for their assistance, their command center came back and said that the Klamath Falls P.D. would be unavailable to help with

a passenger removal at this time, and that their best guess or best advice was to continue south and have the passenger removed in Mount Shasta or somewhere around Dunsmuir, but to just keep going south, and deal with the problem down the road.

Q. And can you give me some type of estimate as to how far the city of Mount Shasta is from where you were when you made the decision that he should be removed from the train?

A. An estimate would be one hour and 50 minutes.

Q. 5-0?

A. 5-0. One hour, 50 minutes, 5-0.

Q. Do you know, Bruce, what speed the train normally travels at?

A. The speed varies considerably over that territory. We can go as fast as 79; and towards Mount Shasta, the speed drops down to 25; so anywhere between 79 and 25.

Q. When was the next interaction you had with Mr. Detwiler?

A. An estimate would be within 20 minutes of departure. Another person had come up and said that they had seen Mr. Detwiler waving some brass knuckles around, in another coach car.

Q. Okay. And what did you do in response to that

complaint?

A. I looked at the conductor, Eric McNay, and said, "Hey, Eric, I'll go, once again, and take care of this. I'll go up there and find this guy because I have success with getting him to go back to his seat."

I proceeded up into car 12, where Nick was, and him and I had another interaction.

Q. Okay. Tell me about that interaction, please.

A. Nick was towards the front of car 12. I -- at this point, I believe -- I would have to go back to my DOJ interview. I believe at this point, I did see him with the brass knuckles.

And when I confronted him, there was another Amtrak employee from the dining car that was still awake, that had come back to assist me with dealing with this individual, with Nick. And I believe I saw -- I'd have to go back to the DOJ entire. I believe I saw him with the brass knuckles this time.

It was the same thing. Somebody had come up and said, "Hey, there's a guy with brass knuckles waving them around and scaring everybody."

I walked up there, and he did have the brass knuckles on him. And it was the same thing as before: "Hey, Nick, come on, this is not your car. We have to go back to car 11. You're in the wrong car."

And then I waved off the other person that was with me, the other Amtrak employee, because I didn't feel like I needed him at the time. I could tell that Nick was maybe getting agitated by seeing both of us there, feeling possibly boxed in, so I waved the Amtrak employee away and said, "Hey, I'll -- I'll handle this." And I was able to get Nick up to his seat in car 11, again.

Q. And is the reason that you waved the other employee off, just to try to de-escalate the situation a bit, in case that was affecting Nick?

A. Correct.

Q. And you did that, in part, because of your impression of his mental health status?

A. I saw a gentleman sitting there with brass knuckles. I could see him getting more agitated. Nick was in between myself and the other Amtrak employee, and I felt that it created a boxed-in situation. And I wanted to get the other guy to go away because I felt like I could handle Nick.

Q. In part, because you had success in doing that before?

A. Correct.

Q. And you felt you had built a little bit of a rapport with him?

A. Correct.

Q. And did you then, you know, encourage Nick to sit back down, again?

A. Correct.

Q. Do you recall if he put the brass knuckles away?

A. I can't remember exactly when he did it, but at some point, yes, he did put them away, as I was helping him along, convincing him to go back to his seat in car 11.

Q. And if you recall, was it the general same seat that he had been in before?

A. Yes, the same exact seat.

Q. And then what did you do after he got seated, again?

A. After this interaction, I decided to drop back behind him, an estimate, ten rows, and just sit there. I take my hat off, turn my radio down, just look like another passenger, and just kind of observe him. So I was at his back, and just to watch to see if he would get up, to see if he would do anything, you know, for -- I think I was there -- an estimate would be about 20 minutes, 15 to 20 minutes, just watching him.

Q. Had you done that before, with other passengers that were potentially problematic?

A. Yes.
Q. And sometimes has it been your experience, during that observation period, they would act out again, and you would have to take certain steps to deal with that?
A. Yes.
Q. In this case, with Mr. Detwiler, during this 15 or 20 minutes that you were observing him from about ten rows back, did you observe him acting out at all?
A. No.
Q. Could you tell what he was doing? I'm assuming you were looking more like at the back of his head?
A. Correct. He sat with his -- he had a hoodie on. He had the hood up, and he just sat in his seat and just sat there.
Q. Which, from your perspective, was a good thing at that point?
A. Correct.
Q. Now, just to give me a time reference, at some point, the train got to the city of Mount Shasta; is that correct?
A. Yes.
Q. Are you able to give me a general estimate as to how much time passed from you getting Mr. Detwiler to sit back down, that last time, and the train getting to

the city of Mount Shasta?
A. An estimate would be an hour and 45 minutes.
Q. And during that hour and 45 minutes, to your knowledge, did Mr. Detwiler ever get up?
A. No.
Q. Did you have any complaints from any passengers at all during that last hour and 45 minutes, regarding Mr. Detwiler?
A. No.
Q. When the police officer finally got on the train, if you know, was Mr. Detwiler in that same seat that he had been in when you told him to sit down, again?
A. He was still in his assigned seat, yes.
Q. At some point, did you notice whether he had bags with him of some kind?
A. Yes.
Q. What did you notice in that regard?
A. I noticed he had approximately three Wal-Mart plastic bags full of stuff. I'm not sure what was in the bags, but he had some Wal-Mart bags full of stuff.
Q. Did you make another call at some point to speak to a dispatcher, regarding Mr. Detwiler, after that last interaction you had with him?
A. Yes, I did.

Q. And where were you in the train when you made that call?
A. I was seated in the dining car.
Q. So would that be after this 15- or 20-minute period that you were observing Mr. Detwiler from approximately ten rows back?
A. Yes.
Q. So after that you would have returned to the dining car, and then at some point made the call?
A. Correct.
Q. And is that when arrangements were made for law enforcement to make contact and the train to stop in the city of Mount Shasta?
A. That was when we requested help. There was no: "For sure help's going to be there," but that was when I called back to send -- to request help, in Mount Shasta.
Q. At some point, if you know, did you finally get some feedback that they were going to try to assist in Mount Shasta?
A. I called the dispatcher and made a request, but there was no for sure -- to the best of my knowledge, I believe my call was recorded. To the best of my knowledge, there was not a: "For sure, hey, they'll be there. Don't worry." It was just, you know, a request for assistance.

A. That is correct.
Q. And in some of those incidents, when law enforcement entered the train, would you sometimes see more than one officer enter?
A. Yes.
Q. In other words, sometimes it might be two officers working together, for example?
A. Yes.
Q. And when was the last time you had seen Mr. Detwiler, prior to the officer entering the train?
A. As we were approaching Lake Street, once I made the phone calls, about 20 minutes out, I went out there and -- just to kind of look at him. And he was still sitting in his seat. So I was just --
(Simultaneous speakers.)
THE WITNESS: Go ahead. Sorry.
BY MR. GALIPO:
Q. No. I'm sorry. I didn't mean to cut you off. Go ahead, Bruce.
A. Yes. That was, you know, a few minutes before arriving in Mount Shasta would have been the last time I saw him in his seat.
Q. Did he appear to be sleeping at that time?
A. I did not get close enough to see him, to verify what state he was in.

Q. Was he moving at all? Did he appear pretty motionless, if you recall?
A. He did not appear to be moving when I saw him.
Q. And what time, about, was it, just to give me a time reference when the police officer entered the train?
A. An estimate would be 12:20 in the morning.
Q. And do you have an estimate of what time it was in your last encounter or interaction with Mr. Detwiler, when you convinced him to sit down again?
A. An estimate would be 10:30.
Q. So would it be approximately an hour and 50 minutes in between that last interaction and the officer entering the train?
A. Approximately, yes.
Q. The officer that entered, do you recall anything about him, in terms of age, for example, or race?
A. He appeared to be early 30s, is the best -- my best guess or estimate.
Q. Any -- estimate. There you go.
Any estimate as to his height or weight?
A. An estimate would be 5'7", maybe 170.
Q. Do you know, approximately, what your height and weight was at the time?

their direction?
A. Yes.
Q. Did you ever, at any time, from that position, see Mr. Detwiler trying to punch or kick the officer?
A. No, I did not.
Q. Did you see him, at that time, with his brass knuckles pulled out?
A. Dale, just to be clear, you're talking about the initial interaction, the first ten seconds of the Officer Capurro and Mr. Detwiler talking?
Q. Yeah. In other words, when they're still in the area of his seat. I understand at some point they move forward, closer to you. So right now, I'm talking initially when they're in the area of his seat, and you're about 10 feet away.
A. Yes. I did not see Mr. Detwiler with the brass knuckles at that time.
Q. Did you hear Mr. Detwiler use any profanity with the officer at that point?
A. I cannot recall if he did or did not.
Q. Did you hear him verbally threaten to harm the officer at that point?
A. Again, I cannot recall if he did or did not.
Q. At some point, did you hear something that sounded like it might be a Taser?

Q. Did you hear any verbal warning that the Taser was going to be used?
A. I -- I can't recall if I did or did not.
Q. And do you know how far away the officer was from Mr. Detwiler when you heard the sound that you thought might be associated with a Taser?
A. I cannot -- I can't estimate distances at that point.
Q. After you heard the sound that might be associated with a Taser, did Mr. Detwiler start moving more in your direction?
A. I believe so, yes.
Q. At some point, did you hear sounds that you thought might be baton strikes?
A. Did -- yes.
Q. Did you actually see the baton strikes, or hear them, or both?
A. I believe I saw Mr. -- at this point, Mr. Detwiler was in front of me. And he's taller than me, so he obscured a lot of my vision forward.
I believe I saw an arm up, and the officer -- you know, I could hear an escalation of force or, you know, stuff being used in front of me. But, you know, Mr. Detwiler in front me, I couldn't really see much.
Q. So, chronologically, would it be correct to say

Q. Do you know if you had a punctured lung from one of the shots?

A. According to the medical personnel, yes. There was a -- my right lung -- well, there was a partial collapse of my right lung.

Q. And at the hospital, if you know, were you checked for injuries to your body?

A. I believe -- I'm not certain on this. I believe they did the head to toe, where they have the outline of a body; and they went through and checked me.

Q. And obviously, you would have had the two gunshot wounds?

A. Yes.

Q. Do you know if either one of them exited your body?

A. Neither bullet exited.

Q. And we talked about this previously; but one was removed, and the other fragmented; and the decision was made it might be too risky to try to remove the fragments?

A. That is correct.

Q. Did you have any visible injuries to your face or head?

A. Not that I was aware of at the time.

MR. GALIPO: Okay. We've been going about an

but before do I that, I just had a couple follow-ups, just to make sure I have my timing correct.

When you had your -- I guess your third interaction with Mr. Detwiler, the first one being at the station, and then two on the train, and then you got him to sit down again, and you went ten rows back and you were watching him for 15 or 20 minutes.

Do you recall the time frame I'm speaking of?

A. Yes, I do.

Q. After you watched him for 15 or 20 minutes, how much time passed, approximately, until you made that call to dispatch that you believe was recorded, requesting assistance?

A. You're talking about the call I made to the Mount Shasta Police Department?

Q. Yes.

A. An estimate would be an hour and 30 minutes, after watching Nick for the time period we talked about, is when I approximately made the phone call.

Q. Okay. And the 15 or 20 minutes you had been watching him, I think you've already explained, he didn't appear to be doing anything inappropriate or really moving that much? Is that fair?

A. That is fair, yes.

Q. So when you had talked to the people from Mount

Shasta, it had been approximately an hour and 45 minutes, an hour and 50 minutes, since you sat Nick back down in his seat?

A. I would say from the time -- I would say no.

Q. Okay. What's your best estimate?

A. Could you just -- can you just clarify?

Q. Sure.

A. Just clarify, like from what time to what time are you looking for?

Q. Okay. So I thought -- maybe I misunderstood you, but I thought you said after you watched him for 15 or 20 minutes, after he sat down that last time, it was about an hour and 30 minutes that you made the call?

A. Correct.

Q. So I was just adding the 15 or 20 minutes to that from when he initially sat down, before you started watching him?

A. Yes.

Q. That's how I came up with the hour and 45, or the hour and 50. Does that sound about right?

A. That sounds about right, yes.

Q. Okay. So when you were calling them, you were describing conduct that you were aware of that happened over an hour earlier. You weren't describing something that was happening at the time call. Is that a fair

statement?

A. Correct.

Q. Do you recall whether you told them that he might have a mental health issue or not?

A. I -- I'm not a hundred percent certain, but I'm fairly certain I did not say he has a mental health issue. But the call was recorded, so I would have to default to what the call says.

Q. And then I also wanted to follow up on this last interaction before he sat down the last time. You said something to the effect there was another employee there, and you didn't want Nick to feel boxed in. Do you recall us having that discussion?

A. I do, yes.

Q. What was your concern with having Nick feel he was boxed in?

A. Just, you know, both exits for the car were blocked by uniformed employees, and I just felt the employee that I move was on the side that I needed Nick moved to, so I thought it best to just get that employee out of the way, just to de-escalate and make it, you know, you know, to maybe look less menacing.

Q. So you didn't want it to feel threatening for either the employee or Nick, if possible?

A. Correct.

Q. Now, when the Taser was going off, if you know, was Nick in between you and the police officer?

A. To the best of my knowledge, yes, he was in between us.

Q. And when the baton strikes were happening, was he in between both of you?

A. At that time, he was in between us, yes.

Q. And how about at the time of the gunshots? Was he, at least to some extent, in between you and the police officer?

A. Yes.

Q. Had you locked the door nearby you, going into the next car?

A. No.

Q. Had you locked any doors, if you recall, Bruce?

A. No.

Q. No, you don't recall, or no, you don't believe you did?

A. No, I don't believe I did lock any doors.

Q. Okay. So we're going to try to share screen with the initial portion of the video. I think this is from the officer who arrived, from his body-worn camera footage. And I'm going to stop at various times and just ask you a few questions, and also see if it refreshes your recollection.

Does that sound okay?

A. That sounds fine.

Q. Okay. We'll see how it plays. And we'll mark this as Exhibit 1.

Q. It looks like it has the date 12/25/2023. And the time looks like . At least that's what's indicated on this image.

MR. GALIPO: And, Mr. Levine, if you could play it, and then I'll tell you when to stop.

(Video being played.)

MR. GALIPO: Stop.

BY MR. GALIPO:

Q. First of all, were you able to see that, Bruce, on your screen?

A. Yes.

Q. And does this show a part of the train, from the outside, where we were watching previously?

A. It does, yes.

Q. And then there's someone that was greeting the patrol officer. Did you recognize who that was?

A. That was the conductor on record for the train, Eric McNay.

Q. Okay. And what we're looking at now, do you know where this is, in terms of the cars we've been speaking of?

A. Yes.
Q. And where is this?
A. This is the lower level of car number 11.
Q. And it's my understanding that Mr. Detwiler was in the upper level of car number 11; is that correct?
A. That is correct.
MR. GALIPO: Okay. And we stopped it, for the record, at 00:26 minutes and 43 seconds.
MR. GALIPO: Okay. Mr. Levine, please continue to play.
(Video being played.)
MR. GALIPO: Stop right there.
BY MR. GALIPO:
Q. We see a person that's further down the aisle, between the seats. Do you recognize who that is?
A. I do. That would be myself.
Q. Okay. And would you be in car 11 at this point?
A. Yes.
Q. And I take it Nick Detwiler's sitting somewhere as you continue to walk, on the right side?
A. Correct.
Q. Do you happen to recall what row of seats he was in?
A. I -- I do not recall, no.

It's a little choppy there, I'll note for the record. We stopped it at 00:28 and 16 seconds.

BY MR. GALIPO:

Q. Is that the time frame where you were hearing or seeing what you associated with baton strikes?

A. Correct.

Q. At any time up to this point in time, did you see any -- any objects in Nick's hands, after the police officer arrived, up to this point in time?

A. Until this point in time in the video, no, I do not recall seeing anything in Nick's hands.

Q. And did you see Nick, up to this point in time, try to punch or kick the officer in any way?

A. I was -- the way my body was positioned -- well, Nick's body was positioned in front of me most of the time, I can't give a for sure answer on whether or not I saw kicks or punches from Nick.

MR. LEVINE: Okay. So we're going to get back to this in a little bit. But for the record, I stopped it at 00:28 and 16 seconds. And that will be Exhibit 1.

(Exhibit Number 1 was marked.)

And, Mr. Levine, you can take that down, but we are going to play the rest of it in a little while.

BY MR. GALIPO:

Q. And so there's a few portions of your

A. Departure from Klamath Falls is 10:08, and maybe 8:30 in the morning, the next day, would be the arrival time into Emeryville.

Q. Is it actually past after you get to Sacramento?

A. Yes.

Q. You indicated at some point in your statement, tell me if you recall this, that based on your initial observations, Mr. Detwiler did not appear to be intoxicated. Do you remember saying that or words to that effect?

A. From the DOJ interview?

Q. Yes.

A. I can't recall that question being asked. I may or may not have been asked that. I cannot recall.

Q. But did he appear to be intoxicated to you?

A. No. On my initial interactions with him, he did not appear to be intoxicated.

Q. You indicated something to the effect he -- he appeared to be "a little bit of a weirdo." Do you remember using that word?

A. No; but I -- I did have those feelings, yes.

Q. You indicated words to the effect: If he had used profanity or tried to touch you, then you might have denied him entry from the beginning. Is that

generally a correct statement?

A. Again, Dale, this is coming from the DOJ interview?

Q. All of this is the DOJ interview right now, yes.

A. Okay. If it's in the interview, then, you know, I stand by what I said.

Q. Is one of your primary goals passenger safety?

A. Yes.

Q. And is that for all passengers?

A. For all passengers, yes.

Q. Including Mr. Detwiler?

A. Of course, yes.

Q. Do you recall that -- the first person that came up to you to tell you about Mr. Detwiler, do you recall what that person looked like?

A. I do not, no.

Q. Do you recall what their race was or sex was, for example?

A. I -- I cannot recall either, no.

Q. The second person, do you recall what that person looked like, that came up to you to make a complaint about Mr. Detwiler?

A. No, I -- I can't recall that.

Q. The employee that you were talking about when

footage. I believe Nick was, you know, fighting with the officer, and I felt that, you know -- I felt a sense of duty to interject and try and help the situation.

Q. And do you recall what you did to help the situation?

A. I believe, to the best of my knowledge, I went up there and tried to pull Nick off his back. I would default to the camera footage, again. You know, I -- I can't -- without watching the video, I can't exactly say for certain what I did, but I do remember going up there and -- and -- and trying to help pull Nick off the officer.

Q. Do you recall having a hand on the back of Nick's head?

A. At which point in the --

Q. At any point before the shots went off.

A. The hand on the back of Nick's head?

Q. Yes.

A. Yes, I believe I did have, as kind of a bracing position, like this, toward the end of the video. I believe where you stopped it, it shows me in the vestibule with him like this.

(Indicating.)

Q. Okay. Were you in physical contact wit Nick at any time before the shots?

A. Yes.
Q. And what parts of your body were in physical contact?
A. When -- before the shooting, like I had mentioned earlier, a few questions ago, I had felt that the officer might need some help pulling Nick off of him, so I went up there. I can't recall exactly what I did without looking at the body camera footage.
And then, before the shooting, Nick and I were back in the -- we call it the "vestibule" area, the upper door there of car 11, and I had put my hands up in a bracing position to create some separation between Nick and myself.
Q. When -- as Nick was moving closer to you, was he moving away from the officer, if you could tell?
A. At what point in the video are we --
Q. In between the time he got up from his seat. Because I think you said you were about 10 feet away, initially.
A. Correct.
Q. So during the Tasing and the baton strikes, did it appear to you that Nick continued to move closer to you?
A. Yes. Nick was getting closer to me as the situation unfolded, correct.

Q. Do you recall saying in your interview that, during the time the officer was hitting Mr. Detwiler with the club, you jumped on his back?

A. I do not remember saying that.

Q. Is that accurate, if you know?

A. Again, Dale, I would have to look at the video, and then -- or, you know, look at the DOJ transcript and line up the timeline with the video to see, to say with certainty.

Q. You were asked in your interview whether you were injured at all prior to the officer firing, and you said, "I don't believe so." Do you generally recall that?

A. I -- yes, I recall that.

Q. Okay. We're going to try to put up as Exhibit 2, I believe this would be a copy of the lawsuit that your lawyers filed on your behalf that I think you said you have seen before.

(Exhibit Number 2 was marked.)

MR. GALIPO: And, Mr. Levine, if you could try to share screen for us.

BY MR. GALIPO:

Q. Are you able to see that, Bruce, on your screen?

A. Yes, I can.

Q. So the only interview that you're aware of that you gave prior to filing your lawsuit, the one you gave to the Department of Justice?

A. That is -- that is correct.

Q. How long were you off of work for?

A. I would say, I believe it was about seven weeks.

Q. And when you came back to work, were you able to come back in your same position?

A. When I initially returned to work, I did light duty for a few weeks, just to get back into things. And then, yes, I was able to return to my job as a train conductor.

MR. GALIPO: Are we good to go for another ten minutes, people, or would you like to take a short break now?

MR. MURPHY: That's up to the witness.

MR. GALIPO: Kimberly and Bruce, are you okay to go for another ten minutes and then we'll take our last break? Does that work?

THE WITNESS: That works for me.

BY MR. GALIPO:

Q. Okay. I want to mark as Exhibit 3, I think these are some of the service standards from Amtrak. And I had a question regarding a few of them for you.

MR. GALIPO: Could we put up the front page of it, please, Mr. Levine, just so the witness can see it?

(Exhibit Number 3 was marked.)

BY MR. GALIPO:

Q. Bruce, does that look familiar to you, the front page?

A. It does, yes.

Q. I just had a question about a few of the pages.

MR. GALIPO: Can we turn to 1-5, please, Mr. Levine, and put that up?

MR. LEVINE: One moment.

MR. GALIPO: Okay. Can you enlarge that a little bit, so we don't go blind?

Okay. So you see --

MR. MURPHY: One second. Bruce is sitting on kind of the opposite side of the big TV, so if we could get it zoomed in as much as possible, that would be helpful for our eyes here.

MR. GALIPO: Okay, sure.

Collin, is that good enough?

MR. MURPHY: That's for Bruce.

THE WITNESS: That's good. Yeah, that's good right there.

MR. GALIPO: So we know what that tells us, Bruce, you have good eyesight.

Okay. If we can go under the B section, just for a moment. I think it's the other way. Yes.

BY MR. GALIPO:

Q. So you see section B: "Train emergencies"?

A. I see it, yes.

Q. And the first sentence: "Customers traveling on Amtrak have entrusted us with their health and safety."

Do you see that?

A. I see that, yes.

Q. And was that part of your training?

A. Yes.

MR. GALIPO: If we could go to 7-2, please.

Maybe we could go to 7-1 first, just the page before.

BY MR. GALIPO:

Q. Item 4 talks about: "Conditions of carriage."

Do you see that?

A. I see it, yes.

Q. Have you seen this section before, at some point during your training?

A. Yes.

Q. And it talks about, in the B section, when "Amtrak may refuse to carry customers."

Do you see that?

A. Yes.
Q. The first bullet point is: "Someone who's has not paid the applicable fare or do not have a valid ticket."
Do you see where I'm reading from?
A. Correct. Yes.
Q. You would at least agree that Mr. Detwiler did have a valid ticket?
A. I would agree with that, yes.
Q. The second bullet point: "Someone who has monthly 10-ride or 6-ride tickets and have not made a ride reserve confirmation," that would not apply to Mr. Detwiler. Is that a fair statement?
A. That is fair. Yes.
Q. The next one: "whose conduct is objectionable, such as, but not limited to being under the influence of alcohol or narcotics."
I think you told me that you did not have the impression he was under the influence. Is that part correct?
A. Yes. I did no believe -- in my estimation, he was not under the influence when I met him.
Q. But you would say the brass knuckle conduct would have been objectionable; is that generally fair?
A. Absolutely.

Q. Okay. And then personal hygiene, that really didn't play a role here, did it?

A. Correct.

Q. Did he ever refuse to comply with any of your commands?

A. No.

Q. You believe you de-escalated certain situations with Mr. Detwiler; is that a fair statement?

A. That would be a fair statement.

Q. From your perspective, did it appear to you that the police officer de-escalated the situation with Mr. Detwiler?

A. That is -- again, I cannot speak -- have never been an officer of the law. I cannot speak to what police SOP tactics -- I -- I -- I can't speak to that.

Q. I get that. But did you think that the officer was de-escalating the situation, from what you observed?

MR. KONZ: Objection. Calls for expert opinion.

BY MR. GALIPO:

Q. You may answer.

MR. KONZ: Sorry to interrupt.

BY MR. GALIPO:

Q. Go ahead, Bruce.

A. I don't feel it would be appropriate for me, as

a train conductor, to pass judgment or speculate on police or any other type of law enforcement conduct.

Q. You would at least agree that you filed a lawsuit against the police officer, alleging misconduct?

A. There was a lawsuit filed on my behalf, I would agree to that.

Q. Do you recall in your original interview talking about the situation escalated after the police officer arrived?

A. Without seeing the DOJ interview, again, I would stand behind, you know, what -- what was said when I interviewed.

Q. Okay. And then lastly, before we take our break, if we could look at page 7-2, the next page of this -- of the service standards. Under item F, you see where it references: "Removal of a customer from the train"?

A. Yes.

Q. The first bullet point: "A customer should be removed and/or restrained only when other methods, including a firm request to the customer have failed."

Do you see that?

A. I see that, yes.

Q. Is that part of the training and standards from Amtrak?

A. It is, yes.
Q. Then it says: "A customer may be physically restrained, but only if personal injury is threatened or reasonably anticipated."
Do you see that bullet point?
A. I see it, yes.
Q. And then the next one: "If it becomes necessary to use force, only reasonable force must be used."
Do you see that?
A. I see that, yes.
Q. And again, that's all part of the training and standards?
A. For Amtrak conductors and employees, correct.
Q. And then under: "Involuntary removal," section G, there's a bullet point that says: "Involuntary removal of a customer or customers from an Amtrak train is an extremely serious action that should only be taken when the customer refuses to refrain from conduct that might endanger their own lives or jeopardize the safety and comfort of others."
Do you see that?
A. I see that, yes.
Q. Do you think Mr. Detwiler ever refused to refrain from any conduct?

MR. KONZ: Objection. Vague as to time.

MR. MURPHY: Yeah, vague and ambiguous.

Go ahead.

THE WITNESS: Dale, could you repeat the question?

BY MR. GALIPO:

Q. Sure. Do you think Mr. Detwiler ever refused to refrain from my conduct, before the police officer arrived? Let's start with that.

MR. MURPHY: Vague and ambiguous.

(Reporter clarification.)

MR. GALIPO: Please take that down, Ben.

THE WITNESS: I'm not sure how to answer that. I -- I'm not sure of the question.

BY MR. GALIPO:

Q. Okay. You told me earlier that you requested him to do certain things. You talked to him. You de-escalated, and he eventually complied with your request; is that true?

A. That is true.

Q. So in your presence, did he ever refuse to refrain from any conduct that you thought would endanger other people?

MR. MURPHY: Vague and ambiguous.

THE WITNESS: I -- he -- he was scaring

passengers with the brass knuckles. I told him to sit down and he sat down.

BY MR. GALIPO:

Q. I get that. I appreciate that. I'm just wondering if you ever asked him to do anything that he refused?

MR. MURPHY: If he, personally, or -- yes, okay. Not Amtrak, right, with the brass knuckles?

MR. GALIPO: No. He, personally.

MR. MURPHY: Okay.

THE WITNESS: No. The -- both times that I interacted with Nick Detwiler and asked him to go back to his seat, he complied.

MR. GALIPO: Okay. Why don't we take our last break. I think we're almost done, gentlemen, at least from my questions. But if we come back in 10 minutes, I'm hoping I can finish my questioning within 10 or 15 minutes.

THE VIDEOGRAPHER: Going off the record at 3:54 p.m.

(Break taken.)

THE VIDEOGRAPHER: We're back on the record at 4:06 p.m.

BY MR. GALIPO:

Q. Okay. Are you ready to continued, Bruce?

A. That was when Nick and the officer were, you know -- I felt Nick was attacking the officer, and I felt that I needed to, you know, get involved in the situation and try and pull Nick off the officer.

Q. And what did you do to try to pull him off?

A. I would have to defer to the body camera footage. I don't -- I cannot clearly state what I did. I would have to default to the camera -- to the body camera footage.

Q. But would you have grabbed some portion of Nick's body and pulled him backwards?

A. Yes.

Q. Did you --

MR. KONZ: Belated objection. Lacks foundation.

He already said he didn't remember it.

BY MR. GALIPO:

Q. Did you also -- strike that.

Did you actually see Nick striking the officer at any time?

MR. KONZ: Vague. It's been asked and answered.

But go ahead.

THE WITNESS: Yeah. I -- I can't say for certain, but there was a reason why I felt I needed to

Q. You had finished that a maneuver?
A. To the best of my knowledge, that -- that maneuver was finished, and, you know, it was seconds later or however longer later in the whole event.
Q. How much time do you think passed from you trying to pull Nick backwards, towards you, I take it; right?
A. Correct. Towards myself.
Q. How much time would you say passed from you trying to pull Nick backwards to hearing the shots?
A. Approximately, 15 to 20 seconds.
Q. Do you know if any baton strikes were occurring when you tried to pull Nick backwards?
A. I can't recall one way or another.
MR. GALIPO: Okay. I think that's all the questions I have. I don't know whether the other lawyers have any questions today.
MR. KONZ: I just have couple. I know this has been a long day and this is kind or tiring, so I'll try to make this real quick. Okay?
THE WITNESS: Okay.

EXAMINATION

BY MR. KONZ:
Q. Okay. Bruce, you testified earlier that the first interaction you had with Mr. Detwiler was in the

train station at Klamath Falls when you checked his ticket; right?

A. That is correct.

Q. Did you have any information about Mr. Detwiler before that point?

A. I did, yes.

Q. And what information was that?

A. One of the station agents had mentioned to the conductor, Eric McNay, that Mr. Detwiler had a, you know, criminal history, and that part of his history involved police resistance, fighting police officers.

Q. Do you recall during that first interaction with him at the train station, thinking that he may be on methamphetamine?

A. Not -- no.

Q. Okay. Do you recall saying during your DOJ interview that you thought he might be a meth head?

A. I believe I said his behavior lent itself towards, you know, meth-head behavior that I had seen in the past.

Q. Okay. Are there cameras on the train?

A. There are no cameras in any car on any train -- or on this particular train set.

Q. Okay. Whose decision was it to remove Nick from the train?

remember it?

A. My view was obscured. I can't say with certainty if I saw it, you know, live, in person.

Q. Okay. And when you watched the video earlier today, did you also see Mr. Detwiler take a swing at your head when he had the brass knuckles on?

A. Yes.

Q. Do you recall that, when it happened?

A. My last clear memory is when Mr. Detwiler Was -- when I was bracing myself to keep some distance, he turned around and looked at me, and he a look of range in his eyes. And then he started swinging on me.

And then that's pretty much my last memory until I was on my knees.

Q. So in that moment when he turned to look back at you, and you said he had a look of range in his eyes, you said during your DOJ interview you thought, "Oh, shit." Is that accurate? Did that cross your mind?

A. Yes, because -- yes, it did.

Q. Did you see in the video today when you and Mr. Detwiler both went to the ground together?

A. Yes.

Q. Could you see in the video that he had you in some type of a choke hold?

MR. GALIPO: Objection. Mischaracterizes the

video.

THE WITNESS: From what I saw, yes. And I had no memory of that until I actually watched the footage that, yes. It did appear that I was in some type of head restraint, head lock, something, as we were on the ground.

MR. KONZ: Okay. Thank you. I'm going to stop.

MR. GALIPO: Does anyone else have any other questions?

MR. MURPHY: Not yet.

MR. GALIPO: Okay. I'm going to ask a few follow-up, based on the questions Derick asked, but I won't be long.

FURTHER EXAMINATION

BY MR. GALIPO:

Q. In terms of prior criminal history, did you have any information that he ever had been convicted of any crimes?

A. No. I had no prior knowledge of actual convictions on anything.

Q. Any information that he had ever injured anyone in his life before?

A. No.

Q. You're saying the decision to remove him was a

the train?

A. No, I did not.

Q. And you mentioned about the swing or the punch. I think you already told me you had no visible injury to your face or head. Do you remember saying that?

A. I do, yes.

MR. GALIPO: That's all that I have, gentlemen. I don't know if there's any other questions?

MR. KONZ: None from me.

MR. MURPHY: Same. Nothing.

MR. GALIPO: Okay. I think we can go off the video record, Kimberly. Is that okay?

THE CERTIFIED STENOGRAPHER: Yes.

THE VIDEOGRAPHER: Going off the record at 4:31 p.m.

THE CERTIFIED STENOGRAPHER: Mr. Murphy, are you ordering a copy?

MR. MURPHY: Yes, please.

THE CERTIFIED STENOGRAPHER: Mr. Konz, are you ordering a copy?

MR. KONZ: Yes, please.

(4:32 p.m., deposition concluded.)

--oOo--

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 4th day of January, 2026.

________________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR