# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiffs,

vs. Case No. 2:24-cv-03100-WBS-SCR

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.
_______________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE DEPOSITION OF DAVID BLAKE

THURSDAY, JULY 16, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 28965

were en route. Officer Capurro arrived on the scene and made a phone call, I believe before the trained arrived.

Talked to a female deputy. The female deputy told him it was going to be about -- initially, I think it was going to be another five or ten minutes. I think they were -- best memory, they were responding from Weed, so I don't know what the driving time from there was. But that's -- five to ten minutes is my recollection.

Q. And could you tell from looking at the body-worn camera footage that, after the shooting occurred, they actually got there within a couple of minutes?

A. Yes.

Q. Did you note in reviewing Officer Capurro's deposition, that at some point I asked him whether or not as a law enforcement officer, he's had the experience of sometimes getting information from dispatch or otherwise, that proves to be inaccurate, and one of the things you need to do when you go to a scene is to try to investigate and gather more information?

A. I do recall that, yes.

Q. Do you agree with that, that it's important when an officer gets to the scene to try to gather more information, if he can and has time?

A. I -- I agree with it. I would generally add one caveat to it, but --

Q. Sure.

A. Oh. I would just -- the information that comes from dispatch, officers are told generally, if it comes through a 911 line with an identifiable caller, that is reliable information. But I don't disagree with the fact that officers, if time and opportunity presents itself, could gather more information on scene.

Q. And I think if you could turn to page 45 of your report, please.

Let me know when you have that in front of you.

A. I have it.

Q. And you have a section there on: "Assessment"?

A. Yes, sir.

Q. And part of it reads: "California peace officers are trained, when feasible, to contact reporting parties to gather additional information, such as the subject's current location, recent conduct, weapon location, and the specific nature of any reported crimes."

Do you see that reason --

A. Yes.

Q. That sentence?

A. Yes.

Q. And do you agree with that sentence? I'm assuming you do since you wrote it in your report.

A. Yes.

Q. And what was the source of that sentence? Is that from POST or basic training or a combination?

A. I believe that would be a combination POST, being the LDs are basic trainings. It would be from the POST LDs and probably advanced officer training, to some degree.

Q. And what's the benefit, briefly, of gathering additional information, as you noted in that sentence, when you can?

A. Generally, you have a better idea where the person is, what their conduct is, what their conduct has been. Weapons information, description, additional details. Any additional context.

Q. And in your reviewing this case, I'm assuming part of your review was the body-worn camera footage when Officer Capurro was approaching the train and getting on the train?

A. Yes.

Q. Did he, based on your review, attempt to gather additional information, with respect to any recent conduct, weapon location, et cetera?

A. No.

Q. If you turn to page 54 of your report, please.
A. I'm there.
Q. There is a section entitled: "Application to the Facts?"
Do you see that section?
A. I do.
Q. And under 1(a), there is a section that says: "Assessment"?
A. Yes.
Q. The second sentence says: "For these reasons, a similarly situated officer should wait for additional assistance, gather information, assess, and plan the contact when feasible."
Do you see that?
A. Yes.
Q. And is that part of your opinion in this case?
A. Yes.
Q. And going to page 60 of your report. Again, you have a section at the bottom entitled: "Assessment."
Do you see that?
A. Yes.
Q. And you say: "A similarly situated officer would, consistent with training, query the reporting party about the current situation, the suspect's

behavior at that moment, and the location, and status of any reported weapon, so that a contemporaneous risk assessment could inform whether the situation required immediate intervention or allow time for backup."

Do you see that sentence?

A. Right. Yes.

Q. And is that one of your opinions in this matter?

A. Yes.

Q. The next sentence says: "As a general matter, officers are trained to wait for assistance, when feasible, before contacting a subject who is reportedly armed and potentially violent."

Do you see that sentence?

A. Yes.

Q. So in reviewing Officer Capurro's deposition, did you note a part where he said had he known that nothing was going on of an urgent nature and the last contact was over an hour and a half ago, had he known that, he would have waited for backup, rather than boarding the train himself.

Do you recall reading that portion?

A. I recall reading something similar in nature and that context, yes.

Q. And do you agree that if Officer Capurro had

that information, that would have been a prudent tactical choice, to wait for backup, if nothing was occurring urgently?

A. It -- it could have. I'll just -- I think that's -- that's appropriate per training. Whether that changes the outcome of the case, I don't know.

Q. But just from a training perspective, you would agree that that would be appropriate?

A. Generally, yes.

Q. And I think even Officer Capurro, in his deposition, talked about the benefits of having multiple officers. Do you recall that?

A. Yes.

Q. And do you agree there are benefits to having multiple officers present in a situation like this?

A. Generally, that's the training. Again, I don't think we know what happens, irregardless of how many officers are there. Certainly we've seen shootings when multiple officers were on scene.

But, yes, I agree with the idea that having additional officers is what's trained.

Q. And pursuant to the training, what are some of the trained benefits of having multiple officers present in a situation such as this?

A. I think ultimately it comes down to

contact/cover training, and having one officer deal with the situation while another officer is looking for pre-assaultive indicators or threats. So having two people in a -- in your typical environment -- this is a little bit different -- but in your typical environment, having two officers there affords a little bit more opportunity to have more eyes on potential threats.

Q. From a tactical training standpoint, do you believe that Officer Capurro should have at least tried to gather some information about what the current status was before boarding the train without backup?

A. I think that's consistent with training, yes.

Q. And do you think, consistent with tactics and training, that if Officer Capurro received information that, you know, nothing had been going on lately, for example, he'd been in his seat not bothering anyone for an hour and a half or so, that it would have been consistent tactics and training for him to wait for backup before entering the train?

A. I think that's consistent with tactics and training, yes.

Q. When, eventually, Officer Capurro entered the train and went to the second level; is that your understanding?

A. Yes.

A. No verbal warning, no.
Q. Is the Taser considered an intermediate use of force?
A. It is.
Q. And are baton strikes also considered an intermediate use of force?
A. They are.
Q. Again, to page 18 of your report, you have a section entitled: "Pre-contact facts/data."
Do you see that?
A. I do.
Q. And you have a section related to Officer Capurro and another one to Bruce Garrett.
Do you see where I'm looking?
A. Yes.
Q. And then, going to page 19, you have a section that talks about "on-Scene Facts/Data."
Do you see that?
A. Yes.
Q. And again, you break it down to portions of Capurro's interview, and that goes on for several pages?
A. Correct.
Q. And under 1.1, and I'm looking at page 19, there's a reference -- and I think you mentioned this earlier -- about Capurro having information that his

And then at the top of page 20, you have a sentence that said: "Added that he asked no questions of either employee and agreed that gathering information can be helpful in developing a tactical plan."

Do you see where I'm reading from?

A. Yes.

Q. And we kind of talked about that already, right, the benefit of having additional information to create a tactical plan?

A. Yes.

Q. And under the scenario of this case, if he had asked and found out that nothing had been going or for an hour and a half, and backup was close by, one potential tactical plan would have been to wait for backup before boarding? Would you at least agree with that?

A. Yes.

Q. In fact, didn't Officer Capurro initially, like, contact the sheriff's department requesting backup?

A. I believe the initial call was from dispatch, and then he made a phone call to, I believe, a female deputy who told him she was five to ten minutes away and in a city, I believe, called Weed.

Q. Was Mr. Detweiler ever told, based on your

review, that he was under arrest?
A. No.
Q. Was he ever told he was being detained?
A. He was not verbally told he was being detained.
Q. Do you recall Mr. Detweiler several times saying that he wanted to leave the train?
A. I do, to directly answer your question. But there's a caveat to it from the force perspective; but, yes.
Q. You're aware that Officer Capurro is alleging that Mr. Detweiler punched him twice?
A. I am aware of that.
Q. And you looked at the video carefully; would that be a fair characterization?
A. Yes.
Q. Did you look at it frame by frame at times?
A. I did.
Q. Did you slow it down at times?
A. I don't really slow it down. I look at it full view, and then go back and go back and forth, frame by frame.
Q. Okay. Did you ever -- in your view of the video, either frame by frame or in realtime, ever see contact between Mr. Detweiler, hand or fist, and Officer Capurro's face?

A. No, I didn't. And I would just add that it would be highly unlikely that a body-worn camera would capture that.

Q. Do you have an understanding as to whether or not Officer Capurro's claim that Mr. Detweiler punched him or attempted to punch him happened before or after the initial Taser deployment?

A. My understanding is it happened after. And when you -- again, I just want to clarify, initial Taser deployment, first arc display and activation that I see on the Taser report and in the video, it was -- it was after that.

Q. Yes. Thank you.

In terms of tactics, is one of the concepts trained officers, de-escalation?

A. Yes.

Q. Are officers trained to try to de-escalate situations when they can?

A. Yes.

Q. Is part of de-escalation sometimes talking in a calm voice, if it's safe and feasible to do so?

A. It can be, yes.

Q. Are officers trained, in terms of giving commands, that they should give commands that are clear, if they can, and understandable?

A. It was out of the jails, on the street.

Q. Okay. And then the other thing, did you note that, after the shooting incident, when Officer Capurro walked off the train -- and I think the body cam might have been still been going or somebody's was -- he had a conversation with a supervisor?

A. Yes.

Q. And do you recall during that conversation with the supervisor, Officer Capurro indicating to the supervisor that Mr. Detweiler was sleeping when he approached him and he woke him up?

A. Yes. I have the -- the -- that broken down on page 28.

(Reporter clarification.)

BY MR. GALIPO:

Q. Okay. Thank you.

And then in terms of information known about Mr. Detweiler, prior to getting to the train, one thing involved brass knuckles. That was part of the information. Is that correct?

A. Yes.

Q. And was there an indication that the brass knuckles he carried in his left back pocket or words to that effect?

A. I think it was right back pocket.

Q. So about 13 altogether?
A. Movements consistent with, yes.
Q. And then going to page 24 of your report, please.
A. I'm there.
Q. I'm looking at 1.20.7.
A. Yes.
Q. And you're referencing -- the "memory that Detweiler was on the right side of the doorway and Garrett's position differed; the video shows Garrett directly behind Detweiler, then moving to the left side of the doorway when Detweiler turns and strikes him."
Do you see that?
A. Yes.
Q. And is it your understanding, from reviewing Officer Capurro's deposition testimony, that the reason he -- he used deadly force was because he wanted to protect Garrett from immediate death or serious bodily injury?
A. That's my understanding.
Q. And is it your understanding, from reviewing Garrett's deposition, that he was -- according to Garrett, he was never actually struck in the face or head by Mr. Detweiler?
A. I believe that there were no injuries

consistent with being struck. I can't remember exactly what Mr. Garrett said.

For some reason, I want to say that he mentioned something about being a little fuzzy during that time, but I -- I don't think he ever actually stated he received an injury from that, if that answers your question?

Q. Yes. Thank you.

And your understanding is that Mr. Garrett, at some point, was shot?

A. Yes.

Q. And do you have an understanding as to whether Mr. Garrett was in close proximity to Mr. Detweiler at the time of the shots?

A. Based on the -- the video, my definition of close proximity, yes. I would say they were, yes.

Q. And do you have an understanding as to how many times Mr. Garrett was struck?

A. For some reason, the only thing that's sticking out to me -- I didn't -- I don't think I saw medical records -- is seeing when his shirt was removed, and I saw one shot to the right side, from his perspective, right side belly area.

I think there was some discussion about a potential second shot or a through-and-through, but I

A. Correct.

Q. And you note that he "moves his baton in a manner consistent with striking Detweiler several times."

Do you see that reference, three lines from the bottom?

A. Yes.

Q. And then in the next entry at 00:28:07, you talk about: "Garrett appears to be attempting to restrain Detweiler."

Do you see that?

A. Yes.

Q. The last line?

A. Yes.

Q. And then at 00:28:26, the last sentence, you have a reference: "I need to leave the train with you."

Is that said by Detweiler?

A. Where do you see that? I'm sorry.

Q. The reference at 00:28:26, the last line, there's a quote.

A. I think I have my pages outside of order.

Q. Okay. Page 27, the first entry at the top, 00:28:26.

A. Yes. Sorry.

Q. No, because I said "26," you probably went to

00:28:44?

A. Yes.

Q. Frame No. 4798?

A. Correct.

Q. And then you have two round 3s; but did you mean the fourth entry to be round 4?

A. Yes.

Q. And that would be at 00:28:44?

A. Yes.

Q. Then it seems like, if I'm reading your report correctly, round 5 was at 00:28:47?

A. Yes.

Q. So approximately three seconds between round 4 and round 5?

A. That doesn't seem right. I know there was a delay between round 4 and 5 and 6, but that three seconds -- that's what I have here. I'd have to go back and look and make sure it's correct. Three seconds seems like it's a bit of a long time.

Q. Okay. Well, look at the frame numbers. You see "4807" for round 4?

A. Yes.

Q. And then 4901 for round 5?

A. Yes, about a hundred frames, approximately. So that's 1 point -- a little bit more than 1.5 seconds.

I'm sorry. My mistake.

It's -- every 30 frames would be about a second, so we're talking 63 -- that matches, as well. So maybe it was 3 seconds. It seems like a long time. Sorry.

Q. That's okay. But you recall there being a pause or delay between shots 4 and 5?

A. I do.

Q. You indicated that Detweiler and Garrett fell to the ground during that timeframe?

A. Yes. They were -- they were in that process, yes.

Q. Do you recall, in reviewing the video, that Detweiler and Garrett were actually on the ground at the time of the fifth shot?

A. I'd have to go back and look. They -- they were almost completely down, but I believe there was still some of that falling motion going on.

But I -- I would agree they were very, very close to being completely on the ground.

Q. And would you agree that, at least according to Officer Capurro, he only observed one striking motion from Detweiler to Garrett?

A. Yes.

Q. And he, at least at some point, conceded that

he did not specifically see contact; is that fair?

A. Yes.

Q. And so after shot -- or round 5, when they had fallen, there was also a round 6; is that correct?

A. Yes.

Q. And how many frame numbers are there between round 5 and round 6?

A. It looks like 41 frames, which is 1.25.3 seconds.

Q. Okay. So based on the frame counts, there would be approximately 3 seconds between round 4 and 5, and a little over 1 second between round 5 and round 6. Does that sound correct, based on the frame count?

A. Yes. Yes.

Q. Then you have a reference just below round 6 -- oh, for round 6, you indicate: "Garrett just began sitting up and moving away from Detweiler."

Do you see that?

A. Yes.

Q. That would be at the time of round 6?

A. Yes.

Q. Did you form an impression, from reviewing the video or the case, which of the shots struck Garrett, whether it was one of the first four or one of the last two?

A. No. I -- honestly, I did not look for that.
Q. Okay. Then you have a reference that: "The brass knuckles can be seen lying on the ground, between Detweiler's legs."
Do you see that reference?
A. Yes.
Q. And could you tell when the brass knuckles became dislodged and went to ground, in terms of the shooting?
A. I didn't look for it, so I don't know.
Q. Okay. Going to page 28, please.
A. Okay.
Q. There's a long narrative where it starts: "Capurro provided a second statement."
Do you see that?
A. Yes.
Q. Now, would this be part of that conversation to the supervisor, outside the train?
A. Yes.
Q. And I think if we go about five or six lines down, he says: "I get up there. He was sleeping. I shake him. He's not waking up."
Do you see that reference?
A. I do.
Q. And then, about eight lines from the bottom, he

says: I -- "I've hit him multiple times with my baton. I was crushing his hand with my baton."

Do you see that?

A. Yes.

Q. Did you understand that was relating to the baton strikes he was describing?

A. It would be an assumption, I think a reasonable assumption.

Q. Then he goes on to say: "He goes to the employee and starts to fuckin' hit him. And at that point, I fuckin' fired."

Do you see that?

A. Yes.

Q. He says: "I don't remember how many shots, and I don't remember if he came at me."

Do you see those references?

A. Yes.

Q. And then he says at the end: "I don't remember if I fired after he hit him or before he was going to hit him."

Do you see that?

A. Yes.

Q. So let me just ask you a few questions about the standards -- and I know you have this later in your report -- that applied to the use of deadly force.

A. Okay.

Q. Some of it is discussed in POST Learning Domain 20; is that fair?

A. Yes.

Q. And you're aware that some of that language actually comes from the Penal Code Section 835(a) that was, at some point, updated or revised?

A. Yes.

Q. And so, some of the language in the Learning Domain 20, which applies to the use of deadly force, if you know, does some of that come from that Penal Code Section?

A. I believe the majority of it is verbatim.

Q. And so, is part of the language that an officer can only use deadly force if there is an imminent or immediate threat of death or serious bodily injury to the officer or others?

A. Just imminent.

Q. Okay. And is "imminent" defined as the person having the ability, opportunity, and apparent intent to immediately cause death or serious bodily injury?

A. Yes.

Q. And does it go on to say that, "Fear of future harm, no matter how great the fear or how likely the harm, is insufficient to use deadly force"?

A. It does say that, yes.
Q. Are officers trained to give a verbal warning before using deadly force, when feasible?
A. Yes.
Q. Are officers trained that they need to justify each of their shots when firing?
A. I don't think there's a written construct there. I don't mean to be vague. I think, generally, they're taught that you're responsible for your rounds and you're responsible for your use of force. Obviously, using the use of force, the firing of the rounds, rounds leaving the weapon, have to be based on a reasonable interpretation of what we just discussed.
Q. Do you recall me asking Officer Capurro in his deposition about some of his training, with respect to the use of deadly force?
A. I do.
Q. Would you agree that if there was not an immediate threat or imminent threat of death or serious bodily injury, then deadly force would be inappropriate?
A. Sure. If -- if -- if there is no -- if it doesn't fit the guidelines as stated, then you can't -- you would not use deadly force.
Q. And the guidelines would include what we just talked about: the ability, opportunity, and apparent

intent to immediately cause death or serious bodily injury; is that fair?

A. Yes.

Q. Do you recall Officer Capurro testifying in deposition that deadly force should only be used if there are no other reasonable options?

A. I do remember him saying that.

Q. Do you recall him saying that you should consider your background or backdrop when using deadly force?

A. I do recall him saying that, yes.

Q. Are you familiar with some that training, the consideration of background or backdrop?

A. Yes.

Q. And is that at least a factor that should be considered?

A. It is a factor that should be considered, yes.

Q. So that the officer could balance the imminency of the threat versus perhaps the risk to somebody -- to an innocent person being struck?

A. That's an interesting question.

Q. Well, I finally asked one.

A. Yeah. You've piqued my -- my wheel's turning.

Obviously, that is a factor. I don't know that there is specific written training that talks to

weighing that, the risk of striking something in the background as opposed to stopping a threat that's occurring right in front of him, in regards to the use of deadly force.

I understand, generally, the concept of your background is important. But that's also a part of the decision-making process is: Do I stop the threat that's unfolding right in front of me in lieu of all of the possibilities, secondary to that?

Yeah, I think that's an interesting question. And I don't know -- I will agree with you that the background is a trained factor. And I think that probably sums it up.

Q. Have you worked on any other officer-involved shooting cases where the officer used deadly force to protect a third-party from injury, and the officer ended up shoot shooting that third party he was trying to protect from injury?

A. I -- I have not personally. I know one pops up in my head, but I didn't work it.

Q. Given the proximity of Mr. Detweiler and Mr. Garrett at the time of the six shots being discharged, did you think there was a possibility that Garrett could be struck?

A. In hindsight, it's -- it's obvious that he

could be struck, because he was. It's --

(Simultaneous speakers.)

BY MR. GALIPO:

Q. How about -- go ahead, David.

A. It was a difficult decision. Do I stop -- do I stop the unfolding threat of serious bodily injury or death, or do I wait and play it out and not do what needs to be done in lieu of another option? I don't -- I don't know that there was a secondary reasonable option in the moment.

Q. Do you have an understanding as to where Mr. Garrett was in relation to Mr. Detweiler when the shots were fired?

A. That was a very small area. I mean, both of their bodies filled up at least half of it at any given time. There was a lot of movement.

Mr. Garrett was situated somewhere behind Mr. Detweiler as the movement occurred, probably closer to being right behind him about the time the shots were fired, or somewhere close by, at least a portion of his body.

Q. Do you recall, in reviewing Officer Capurro's deposition, he acknowledged that when he fired there was a possibility that the Amtrak employee could get shot?

A. I remember him discussing it. I don't remember

there was a passenger on the train, I think on the right side, not too far away from the shooting?

A. Yes.

Q. And you recall reading about the issues of whether bullets could ricochet?

A. I remember the word "ricochet" being discussed, yes.

Q. And the train where the shooting occurred, the next train forward of that, as you understand the materials, had multiple individuals in it?

A. Honestly, I know that that came up in Officer Capurro's deposition. I don't know if he knew it was full. I remember discussions about people on the train, and there were multi- -- there were people in other train cars. I don't remember exactly whether it was full or not.

Q. And -- and one of the questions that Officer Capurro could have asked the train person before boarding the train is whether there was an ongoing active threat? Is that an example of a question that could have been asked, or words to that effect?

A. Yes.

Q. And do you recall in Officer Capurro's deposition, saying if he knew there was no active threat he would have waited for backup?

A. I do recall that language, yes.
Q. And do you agree that would be prudent from a tactical perspective, if there was knowledge of no active threat, waiting for backup?
A. I think that's generally what's taught. I -- I -- I agree with the con- -- concept. I think there's some other factors in play. But generally, yes.
Q. Do you recall Officer Capurro testifying, based on his training, it's a good idea to wait for backup when you can?
A. Yes.
Q. And you generally agree with that?
A. Generally, yes.
Q. Do you recall Officer Capurro testifying in his deposition that if there had been multiple units that, in his opinion, it likely would not have rose to the level of deadly force?
A. I do remember him saying that, yes.
Q. So going back to page 28 of your report, you then have a section 4 on the Taser report. And we've talked about this a little bit already; correct?
A. Yes.
Q. And then going to 29, you have your "Opinion" section under Roman numeral 9?
A. Yes.

coloration item marking, consistent with the brass knuckles. And that's just prior to, I believe, when he turned around and -- and made the motion to strike Mr. Garrett.

And then, Figure 13 is a evidence photo of those -- of a pair of yellow/gold brass knuckles on the floor of the train.

Q. And in Figure 12, what is Garrett's position generally, relative to Detweiler?

A. I can only see a leg there, with this particular image. It looks like it's pretty much right behind him, bladed-wise. Maybe slightly off.

Q. Okay.

A. I mean, they're both to the -- from Mr. Garrett's perspective looking out from here, they both appear pushed back against the right side wall, from their perspective.

Q. All right. And then going to page 41 in your report, opinion 2 talks about: "The Contact and Detention/Arrest"?

A. Correct.

Q. And you say: "It is my opinion that aspects of Officer Capurro's contact, detention, and attempted arrest of Mr. Detweiler both align with and departed from the training, policy, guidance, and performance

expectations for similarly situated California peace officer, given the information available to him at each decision point."

Do you see that?

A. Yes.

Q. What do you think -- what actions or inactions, in your opinion, departed from the training policy, guidance, and performance expectations?

A. It really goes to what we've already discussed in some detail, in reference to the pre-contact information gathering and assessment, and waiting for cover.

Q. And we've talked about already; is that fair?

A. It is very fair.

Q. And going to page 45 of your report, there's a couple sections on "Assessment." And then I think we may have talked about this.

A. Yes.

Q. Okay. And then going to page 46, you reference: "Opinion 3: The Use of Non-Lethal and Intermediate Weapons"?

A. Yes.

Q. And that would be the Taser and the baton strikes?

A. Yes. And -- and also, any hands-on.

Q. And then on page 48, you have a table, and at the bottom, there's: "Force Option," "Non-Deadly Force," "Intermediate Force," and "Deadly Force."
Do you see that?
A. I do.
Q. And you told me earlier that the Taser would be intermediate force?
A. Yes.
Q. And baton strikes would be intermediate force?
A. Yes.
Q. And intermediate force is defined as force which has a significant risk of injury?
A. Yes. And can I clarify?
Q. Sure.
A. I -- I would never discuss this in court, but since it's this, I study the law as much as I can as a layman, and it's my understanding that the Court's not differentiated between drive-stun and probe mode in a Taser.
But in lieu of that lack of bifurcating, they are addressed in police training differently. They are addressed in police policy differently. So I just want to make that classification.
Q. Okay. Sure.
Let me just ask you a couple more questions,

Q. And based on -- as defined in this table and according to POST standards, is deadly force appropriate if someone is assaultive, but not life threatening?

A. No. And I just, again, want to characterize this is a training guideline.

Q. So based on this training guideline, the only time deadly force would be appropriate would be in a life-threatening situation, as defined?

A. Right.

MR. GALIPO: Okay. So I think we've been going about an hour, again. Is ten minutes good for everyone?

THE WITNESS: Good for me.

MR. GALIPO: Okay. Sounds good. And we can go off the record.

(Break taken.)

BY MR. GALIPO:

Q. With respect to your frame-by-frame analysis, I'm assuming you have something that has the frame by frame on it that you created?

A. Yes, sir.

MR. GALIPO: And, Derick, is that something we'll be able to get at some point, because I don't know if we received that yet?

MR. KONZ: Let me talk to Mr. Blake, after we're done here, and I'll let you know.

MR. GALIPO: Okay. Sure.

BY MR. GALIPO:

Q. All right. So, I think we were up to page 50 of your report. There's a section on "Deescalation"?

A. Yes.

Q. And then you have a sentence that says -- from Table 3C: "Tactics and techniques may assist in decreasing the situational intensity of a situation and gain voluntary compliance."

Do you see that sentence?

A. I do.

Q. And then you have bullet points, the first one being: "Self-control"?

A. Yes.

Q. The second being: "Effective communication"?

A. Yes.

Q. The third: "Scene assessment and management"?

A. Yes.

Q. And the fourth: "Force options"?

A. Yes.

Q. Under "Force options," you write: "reasonable use of force techniques may reduce situational intensity for the safety of all parties."

Do you see that?

A. Yes. I just wanted to clarify, because you

Q. And we've talked about some of the standards that relate to the use of deadly force; correct?
A. Yes.
Q. On page 68, at the top you talk about: "Ability, opportunity, and apparent intent."
Do you have that wording, because that's what's in the Learning Domain, with respect to the use of deadly force?
A. Yes, sir. That's what -- that's what officers are trained, not only in the Learning Domain, but in their standard, like, force options simulator training, and so forth.
Q. And then going to page 69, you talk about "Warning before" using "deadly force."
You have a section on that?
A. Yes, sir.
Q. And then at the top of page 70, there's a section f: "Pause in the string of fire"?
A. Yes.
Q. And you note in his deposition on page 9: "Officer Capurro identified a pause in his string of fire after the fourth round, which is consistent with training that emphasizes assessment between shots and continued evaluation of the threat."
Do you see that?

A. Yes.

Q. So there is training on assessment between shots and continued evaluation of the threat?

A. The -- the general idea is that, again, you have to observe and orient yourself to the event as it unfolds, and escalate and deescalate force per what is occurring in front of you. So that is yes -- the answer is yes to that assessment process.

Very difficult, obviously. And we've talked about this before, when it comes to very, very rapid assessments and complex situations.

Q. Okay. And then the pause that he describes, after shot four, that's consistent with your review of the audio and the video?

A. Yes.

Q. And there also, I think, was a little over a second between the fifth shot and the sixth shot; is that your understanding?

A. Yes.

Q. Your work as a law enforcement officer before you retired in 2014, can you just remind me briefly of the type of work you did, your last ten years as a law enforcement officer?

A. My last ten years, or all?

Q. The last ten years, first.

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 31st day of July, 2026.

________________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR