# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

| | | |
|---|---|---|
| JULIA DETWILER, | ) | Case No. |
| Plaintiff, | ) | 2-24-CV-03100-SCR |
| vs. | ) | |
| CITY OF MT. SHASTA, et al., | ) | |
| Defendants. | ) | |

--oOo--

VIDEOCONFERENCE DEPOSITION

OF

SCOTT A. DeFOE

--oOo--

WEDNESDAY, AUGUST 19, 2026

--oOo--

CERTIFIED TRANSCRIPT

26-357
Stenographically Reported By:
KELLEY JORDAN, CSR 6780

(Off-the-record discussion.)
(Isabella Carmichael joined the deposition via Zoom.)

Q. BY MR. KONZ: So Mr. DeFoe, I understand you have been retained by Mr. Galipo and the plaintiff to provide police practices opinions in this case; is that right?

A. Yes.

Q. Okay. What -- what do you -- what's your -- in your opinion, what's your role in this case? What is -- what's your job? What have you been hired to do?

A. To review the materials that are listed on my Rule 26 report, beginning on page 2 through 3, to look at any relevant POSTs, which is Peace Officer Standards and Training, learning domains, and then to formulate objective opinions in the case on my review of the material, based on the officers, actually, and specifically, call for service, the -- was there a tactical plan? The use of any de-escalation in this matter; the utilization of deployment of less-than-lethal-force options in this case; the Taser 7 and/or the baton; ultimately, the use of lethal force including all six rounds that were fired and --

(Reporter interruption.)

THE WITNESS: From three volleys,

contained in a vehicle; so they didn't have any type of interaction with him as they would maybe on a personal encounter up close, didn't have an opportunity to talk to him or speak to him.

None of the comments in the case indicated that he -- actually, there were no -- it was not a call for service. It was more an observation that resulted in a pursuit and then ultimately use of lethal force.

Q. BY MR. KONZ: Okay. So you -- you don't know whether or not he had mental health issues. You -- I guess you just concluded that the officers didn't have enough information to make that determination at the time; is that fair?

A. Yes. I didn't -- though -- that was never a factor in this -- that particular case. I have testified in a number of cases where the mental health -- mental health was a factor in many of the 450 or so police shootings I've been retained on.

Q. Okay. You -- you have opinions in this case that mental health was a factor and is part of your analysis; right?

A. A consideration, not that the involved Officer Capurro was to diagnose, obviously, the decedent in this case, that -- but is -- based on the comments of the call, based on his initial interaction with him once he

awakened him, I think it was reasonable to, once again, not conclude, but to consider that the decedent was potentially mentally ill and/or experiencing a mental crisis, based on the comments of the call, his actions preceding Officer Capurro's arrival, and then during the interaction once he awakened him on the train.

Q. Okay. What -- what specific facts support that?

A. For one, I think based on his -- his initial interaction with him was part of it. I believe it stated that he was acting potentially erratic on the CAD log and I believe, just based on his initial interaction with him, once again, not to diagnose, but a consideration that obviously the subject was, in fact, you know, potentially -- potentially, you know, mentally ill or experiencing a mental crisis.

Mr. Garrett, the -- Mr. Garrett, the -- obviously, the conductor, who did interact with him, he believed that the subject could, once again, have some mental issues. That was on page 20 of his deposition.

Q. What about the initial interaction between Capurro and Detweiler would indicate that he was suffering from a mental health crisis?

I mean, you told me that the initial interaction should have -- should have kind of clued

Capurro into that, but to me, that's kind of a vague conclusion.

What exactly about that interaction would lead a person to believe that this guy has a mental health issue?

A. I think that the way in which he was being responsive, the way his interactions -- the grabbing of the bag, the manner in which he was startled. I mean, he just looked off. Once again, not to diagnose.

I think even, you know, his response, you know, the way in which he was, you know, calling him "Guy. Hey guy." I think there were some things that I reasonably believed that he should have considered -- not to diagnose. It's no officer's responsibility to do that -- but had to take into consideration, once again, just based on the comments of the call, and he could have found that out as well had he decided to talk to Conductor Garrett or any of the other employees that he had access to regarding the actual mannerisms and actions of the decedent prior to his interaction with him, but he failed to do that.

Q. Okay. So I'll try to break that apart.

So you -- so some indicators that you saw in the material that should have clued Capurro in that this guy had a mental health issue was that he grabbed the

bag. Is that -- so him wanting to grab this bag, that's an indication of someone undergoing a mental health crisis?

And if so, can you point me to any kind of, like, learning domains or any data that would support that?

MR. LEVINE: Misstates testimony.

THE WITNESS: Not to -- pardon me, Mr. Levine. Not specifically his grabbing of the bag. Just his overall response. I think that he appeared to be off. Once again, obviously, an untrained conductor felt the same way, that -- Mr. Garrett, that he seemed to be off and potentially experiencing some mental health issues.

So I think it's just based on the totality of the circumstances, just how he interacted with the officer during the initial -- once he was awakened by Officer Capurro.

So it wasn't just the grabbing of the bag. There's nothing specifically in Learning Domain 37 that specifically states if someone grabs a bag, they can be mentally ill.

It's looking at the totality of the circumstances, the call for service, the manner in which he responded to the officer. I just think it would be reasonable to -- to potentially consider that the

decedent was mentally ill or experiencing a mental crisis.

Q. BY MR. KONZ: Did -- did he have any trouble understanding the fact that Capurro was a law enforcement officer at the initial contact?

MR. LEVINE: Calls for speculation.

THE WITNESS: You know, I -- I don't know. I mean, obviously, Capurro was obviously attired in a police uniform. I think that he -- you know, once again, I can't speculate to that, but you know, I think it would be reasonable to assume that he understood that Capurro was, in fact, a law enforcement officer.

Q. BY MR. KONZ: Did Capurro tell him that he was law enforcement?

A. He did. He -- at 1:12 of the video he said, "Police department." He identified himself.

Q. Do you -- did you review any materials that made you think that Detweiler did not understand the commands that were given by Capurro during the initial contact?

A. That's really outside of my scope, you know, his ability to respond to commands. I -- I don't know. I didn't see him really -- you know, once again, I think that the situation evolved so quickly that it's not just a command; it's a reasonable opportunity to comply with

that command is what would be reasonable, based on the totality of the circumstances, prior to any application of force.

Q. Yeah, but I'm not talking about how much time he was giving him. I'm kind of in this area right now of your opinion that he had a mental health issue, and to me, someone that has a mental health issue possibly does not understand normal language, normal commands.

Is there any indication that Mr. Detweiler did not understand the commands that Officer Capurro was giving him?

MR. LEVINE: Argumentative.

THE WITNESS: You know, once again, I don't know, but the purpose of the reasonable opportunity to comply is: I'm going to ask you, "Sir, do you understand what I need you to do? Yes or no." And then that's -- you'd understand, but just to wake someone up and then have -- you know, obviously, we know that the decedent asked, "Hey, is this the stop?" thinking that is this the end of the route for him to get off, and then, all of a sudden, there became some really abrupt commands and without a reasonable opportunity to comply.

I don't know if there was any denying or refusing to comply to any commands, because there wasn't an opportunity -- reasonable opportunity to comply.

Q. BY MR. KONZ: Well, he was given a command to put the bag down; right?

A. He did it at the same time in which Capurro grabbed the bag. So it was almost simultaneous that he grabbed the bag at the time at which he told him not to touch the bag.

Q. Are you saying that Capurro prevented him from letting go of the bag?

MR. LEVINE: Misstates testimony.

THE WITNESS: No. He -- he -- Capurro said, "Don't touch anything," and then obviously -- once again, which speaks to Detweiler's mental health, potentially, at -- when he stated that at 1:30 of the video, Detweiler's response was, "Hey, guy," like he was kind of taken back. That's not a typical response you'd expect from you and I if a police officer gave us a command. I'm not going to respond to the officer as, "Hey, guy."

So, once again, those are just little subtle clues and, you know, once again -- so I don't know, but he grabbed the bag thinking it was at the stop. He just asked, "Hey, is this the stop?" He said, "Yes, it is." So grabbing his belongings to leave is what it had seemed -- assumed that Detweiler was going to be doing.

And then, obviously, at that point, once he

grabbed the bag, Capurro -- which I don't, you know, fault Capurro for telling him not to grab anything. I'm fine with that. I think that's a good officer safety tactic, not to grab anything, but once again, an explanation would have -- preceding that or even at the time of that I think would have been reasonable, based on the totality of the circumstances.

Q. BY MR. KONZ: But you have to admit that he was -- Detweiler was told not to touch anything and to put the bag down, and he did not comply with those commands; correct?

A. Well, once again, they -- at 1:33 when he told him that when he had his Taser out, that's when they tugged on the bag a little bit -- there's a little bit of a brief little tug of war that happened, and then shortly after that the Taser was deployed.

So yes, he was told not to touch the bag or told not to touch anything is what he stated which, you know, I'm okay with. I think that's reasonable, but once again, you have to give someone a reasonable opportunity to comply, and I think having a conversation, "Hey, we're here to investigate a crime. I need to have a conversation with you," have him step away from his items, and then have a conversation with him.

If you're going to detain him for a crime, then let him know he's being detained. If you're going to handcuff him, let him know you're going to handcuff him, if that's what the objective of the call was.

Q. Do you think that Detweiler failed to comply with any commands, or do you think that he was compliant with every command that was given to him?

A. No, I'm not saying he was compliant. Once again, I was saying that it's a reasonable opportunity to comply. If I tell you to do something, I need to give you a -- especially if I reasonably believe or should consider that someone may be slow to respond.

Obviously, we know there was a bottle of alcohol on the seat that was found, and someone under the influence of a central nervous system depressant, if they are, that would be a consideration that people are slower to respond, and so all of those are factors in consideration, based on the totality of the circumstances.

Q. So your opinion is just that Detweiler didn't have enough time to comply with any commands. Is that what you're saying?

A. Well, what Capurro didn't do, Counsel, respectfully, he didn't tell him the reason for being there. He just basically woke him up, shined a light in

his face, grabbed on his sweatshirt, woke him up. He'd been sleeping for 45 minutes prior to the interaction; so there wasn't a crime in progress.

Q. Well, let me just stop you there. How do you know that? How do you know he was actually asleep?

A. Once again, he appeared to be asleep -- he appeared -- when he was startled. It seemed -- Garrett stated he did not have any complaints from any of the passengers 45 minutes prior to, on his deposition page 29; so it appeared that he was asleep.

I mean, was he actually sleeping? I don't -- I don't know, but it appeared, based on the way he was startled and he woke up, and was kind of -- looked scared, initially, when he woke up, I believe he appeared to be sleeping.

Q. Don't you base your opinions on a conclusion that he was asleep? At least that's what your statement of facts says, that he was asleep. So I'm assuming that's what you base your opinions on.

A. Well, I think it's reasonable, you know, on a train at night, at 12:20 in the morning -- he has no interaction with him prior. Once again, all could have been found out by debriefing someone prior to the interaction, which didn't occur, but he appeared to be sleeping.

I mean, was he sound asleep? Was he in a REM sleep? I have no idea, but he was -- he appeared to be sleeping.

Q. In your experience as a police officer, have you ever come across a suspect that was pretending to be asleep but wasn't?

A. Yes.

Q. Okay. You have opinions in here that Detweiler -- and this -- this is on page 4 of your report -- Detweiler was not functioning in a rational manner.

Is that -- do you have that -- that's one of your opinions; right?

A. Yes.

Q. Okay. And you have an opinion -- it's very similar -- on page 5. It says, "Detweiler was not" -- and the words are "functioning normally." That's one of your opinions; correct?

A. Yes.

Q. Okay. Did you review any records that indicated that Detweiler was ever diagnosed with a mental health disorder?

A. I don't believe I received any medical records from plaintiff's counsel in this matter.

Q. Okay. Detweiler was told repeatedly after he

was at gunpoint to get on the ground; right?

A. Yes. He was told to get on the ground.

Q. And did he do that?

A. Well, the question was could he do it? Because he was obviously being restrained at that time by -- by Mr. Garrett.

And Madam Court Reporter, that's G-a-r-r-e-t-t, is my understanding.

So, once again, could he get on the ground? I don't know. You know, I know what he did state --

Q. So you have --

A. Pardon me. I know what he did state prior to that, at 2:15 of the body-worn cameras, that he's trying to leave the train with him is what he stated.

So at that point, he told him to get on the ground, and then he pulled out his -- obviously, pulled out his pistol, or he displayed his pistol. I don't know if it was out at the time.

Q. So your -- your opinion is that, yes, he was given commands to get on the ground, but he may not have been able to get on the ground, because Garrett was preventing him from doing that?

A. I couldn't tell from the positioning if he was being restrained in a way that didn't allow him to go onto the ground. I don't know.

clicking on the body-worn camera I think is part your responsibility. I wouldn't say it's commendable.

Q. Okay. When -- when Detweiler turned and swung at Garrett's head with the brass knuckles on -- well, first of all, do you accept that fact -- foundation that that happened?

MR. LEVINE: Assumes facts. Argumentative.

THE WITNESS: It appeared -- yeah, it's hard to tell if he was aiming at his head or not. It did appear that he turned and attempted to strike Mr. Garrett, which we know didn't connect, but there was an attempt to strike. Was it at the head? I -- I can't tell by the video, but it was, you know, upper torso, towards the upper part of the body.

Q. BY MR. KONZ: And he had brass knuckles on at that time on the hand that he was swinging with; right? You accept that foundation?

A. Yes, sir. I saw that on the video.

Q. Okay. Do you believe that the firing by Officer Capurro, at that moment when Detweiler swung at Garrett's general head area with brass knuckles on -- is it your opinion that that use of deadly force at that moment violated standard police procedures in California?

A. Yes. He would have to articulate the reason

for him doing that; he reasonably believed there was an imminent threat of bodily injury or death at that time. The fact that someone swings and misses or attempts to swing in itself I think -- I think from that distance, once again, would have likely caused great bodily injury or death. Hard to determine. I'm not offering medical opinions.

But no, I think based on positioning and based on the actions, the initial firing of the initial four rounds were unreasonable.

Q. What's the standard that you -- you judge that by?

A. Well, 835(e) subsection (2) of -- obviously talks about an imminent threat of great bodily injury or death, based on the totality of the circumstances, when the officer believes the suspect has the ability, opportunity, and apparent intent to cause harm to someone or himself.

Q. Okay. And it doesn't include a requirement that they actually did cause harm; right?

Like, for example, he doesn't have to wait until Garrett is actually punched in the face before it's okay to shoot; isn't that right?

A. Well, it's not the fact of waiting until someone's punched in the face. You're right, you don't

need to wait until the act is completed. You just have to reasonably believe that the act is likely to cause great bodily injury or serious bodily injury or death.

Q. And you don't think that swinging at someone's head with brass knuckles is likely to cause serious bodily injury?

MR. LEVINE: Assumes facts. Argumentative.

THE WITNESS: Once again, possibly. I'm not offering medical opinions in this case, but based on the totality of the circumstances, I don't believe the shooting was reasonable based on the facts known at the time and the subject's level of resistance.

Q. BY MR. KONZ: That's not my question. It's -- and I'm not asking you to render a medical opinion, because the standard that you told me is an officer in California, it's okay for an officer to use deadly force under the circumstances you described, generally, when someone poses an immediate threat of serious bodily injury.

You -- so your opinion, then, if this -- if the shooting did not comply with that, your opinion must be that Detweiler did not pose an immediate threat of serious bodily injury to Garrett when he turned around and swung at his head with brass knuckles; right? You -- you must have that opinion.

A. Once again, if Det- -- if Capurro knew that he swung at him with brass knuckles on and he reasonably believed he was going to be punching him in the head with brasses knuckles, then he could articulate there was an imminent threat of great bodily injury or death and the shooting would be reasonable.

Q. Okay. And that's exactly what happened, isn't it?

MR. LEVINE: Assumes --

THE WITNESS: I'm not assuming that line of facts, Counsel. I -- I -- he turned towards him.

Q. BY MR. KONZ: Which one -- what fact are you not assuming?

A. Well, I'm -- when he turned towards him and attempted to swing, I'm not saying he was trying to punch him in the head. Those are your facts.

I'm just saying when he went to swing, it appeared he was looking to swing at that point, but once again, I can't discern from looking at the video if I would reasonably believe that that punch was going to be striking him in the head, or he was looking to leave the train, or he was looking to create space so he could leave the train. I can't tell from the video.

So I can't discern that he was attempting to punch him in the head with the brass knuckles on, based

on my review of the video.

Q. Okay. So then I'll just create a little hypothetical. Let's just assume he was trying to punch Garrett in the head with the brass knuckles. Would deadly force be acceptable then?

MR. LEVINE: Incomplete hypothetical. Assumes facts not in evidence.

THE WITNESS: If I reasonably believed that a subject was about to strike someone in the head with brass knuckles which would cause, I believe, depending on the level of force, serious or great bodily injury or death, then the use of lethal force would be reasonable, based on those -- your hypothetical.

Q. BY MR. KONZ: Okay. What's your understanding of the legality of possessing or using brass knuckles?

A. It's a felony in the State of California.

Q. It's a felony to even have them; right?

A. Correct.

Q. And what -- is it your understanding that if you actually used brass knuckles on a person, you -- you could be convicted for assault with a deadly weapon?

MR. LEVINE: Objection. Vague and ambiguous.

THE WITNESS: Yes. Once again, if you use them and it caused, you know, injury to the subject, there's a likelihood that you could be convicted of 245

think my investigation.

Q. Okay. Now, the -- you -- you have an opinion in here that there were three volleys of shots; right?

A. Yes, sir.

Q. And how many shots total were fired?

A. Six shots.

Q. Okay. And how do you break up those six shots into the three volleys? Was it two-two-two, two-one-three? How do you do that?

A. I -- well, the way I -- I looked at the videos as recently as this morning, I -- basically, four. We know that two struck Mr. Garrett, and then obviously as Mr. Garrett and the decedent were falling to the ground, the third round was volley number second, and then once he was on the ground completely -- almost completely on the ground was the final volley, or the sixth shot, which was to the back of the decedent.

Q. Okay. So let me break that apart.

So the first four shots, in your mind, that's the first volley, and that's when they're both -- Detweiler is still standing -- completely standing; is that right?

A. Correct. They're both still standing, and he starts to fall right at the -- the time of the fourth shot or just at, you know, right around that time.

We know that Garrett's hit at that point, twice. They both fall to the ground, and then the third volley -- or the second volley -- pardon me -- or the fifth shot that is obviously performed by -- by Capurro, and then the sixth shot, which Capurro doesn't remember firing, was at the -- as he was already on the ground.
Q. Okay. So your -- so the first volley, in your mind, are the first four shots; the second volley is the fifth shot; and the third volley is the sixth shot?
A. Yes, sir, that's the way I looked at it.
Q. What is the -- how much time passed between the fourth shot and the fifth shot, which would be the end of volley one and the start of volley two? What's the -- how much time is between there?
A. You know, I'm not a -- I didn't do a reconstruction of the shooting. That's outside of my scope, but it -- it appeared, you know, a second or little bit more than a second, and then the same between round number five and number six.
Q. What's your understanding of the total time from shot one to shot six?
Again, I know you're not a video expert and all this, but like, you know, you watched the video and just what -- you have to base your opinions on what you think the timing was, I'd assume.

So what is your understanding of the time between shot one and shot six?

A. Probably, three and a half seconds.

Q. Okay. And the justification for shot six and -- and shot five, I believe, is that Detweiler still had Capurro in a chokehold.

Did you see that on the video, that Detweiler's arm was wrapped around Garrett's neck after the first volley?

MR. LEVINE: Argumentative. Misstates evidence.

THE WITNESS: No, I didn't see any chokehold at all during this incident.

Q. BY MR. KONZ: You did not see Detweiler's arm wrapped around -- or I'm sorry -- you did not see Detweiler's arm wrapped around Garrett's neck?

A. No.

Q. Okay. Well, let's assume, then, that it was. Would that constitute an imminent threat of serious bodily injury?

MR. LEVINE: Incomplete hypothetical. Calls for speculation.

THE WITNESS: Not at that time, Counsel. I've been retained on more -- probably 75 neck restraint cases, including George Floyd and others, and, no, that

would not constitute an imminent threat if his arm was draped around someone's neck for -- based on your hypothetical, that I didn't see.

It would have to be significant pressure to the front part of the neck, specifically the hyoid bone area, in some way that would restrict breathing that a reasonable officer would have to believe that the -- the -- there was an imminent threat of the -- of whoever it may be, of great bodily injury or death, based on that neck restraint, that you would be depriving oxygen to the brain.

So, yes, I think I -- as it relates to this case, I did not see that. If it's your hypothetical, it would have to be to a point where you -- if you did not immediately intervene, then there's a likelihood that a subject -- great bodily injury or imminent death would be likely.

Q. BY MR. KONZ: Generally speaking, though, choking somebody can cause serious bodily injury or death. You would agree with that, wouldn't you?

A. It depends. Is the arm around the carotid artery which is typically you'll see, like, in an MMA fight where there's not any -- it's just depriving oxygenated blood to the brain. It's not causing any injury. Those are the carotid arteries on the side of

the neck.

If the pressure's to the front of the neck, the area of the trachea or the hyoid bone, yes, you could cause injury over time, but not within the one to three and a half seconds in this case. Even if he did have a full neck restraint on, which I didn't see, that in itself wouldn't be an imminent threat of great bodily injury or death.

Q. Do you know how many people were on the train?

A. I do not know. I know there was an Asian man to the right where this all occurred. I don't know the number of occupants on the train.

Q. Do you have an estimate of how far away, generally, Detweiler and Garrett were during the shooting from this other passenger?

A. Well, the other passengers were immediately to the right. They're just feet away.

Q. Okay. Did you -- did you read Garrett's interview and deposition statements?

A. Yes.

Q. Are you aware that he sought -- he testified that when Detweiler turned around with the brass knuckles and swung at him, he saw a look of rage on Detweiler's face? Are you aware of that?

A. Yeah, I don't recall if he described it as

statement and deposition; right?
A. Yes, sir.
Q. What did he say that he knew?
A. I don't recall everything that he stated regarding what he knew at the time, other than the call for service regarding what I just stated. I don't know if he specifically knew all of those factors or considered it, you know, an assault with a deadly weapon type of call.
So, once again, if that was the case, it even illuminates the fact that his pre-incident tactics were so poor, if he reasonably believed he was boarding a train with a violent suspect, his approach -- obviously, not waiting for backup, not interviewing anyone on the train prior to -- either conductor prior to ascending the stairs and approaching Mr. Detweiler would be inconsistent if he reasonably believed that there was a -- a potential threat from Mr. Detweiler on the -- on the train.
Even the manner in which he approached him and shook him, if he reasonably believed someone's armed with a weapon, that's not a reasonable approach to someone, and allowing passengers in close proximity to stay on the train, not advising Garrett or others what he wanted them to do, not waiting for backup which we

know was just a few minutes away, those are all things he should have done if he reasonably believed that Mr. Detweiler was, in fact, a threat.

Q. How -- what did -- what was Officer Capurro's understanding, when he decided to board the train, how -- how far away or how many minutes away backup was?

A. I don't know. But we do know, you know, in 6 minutes and 14 seconds on the video backup did, in fact, arrive.

Once again, the train was stopped. Detweiler was, in fact, sleeping or, in your words, feigning sleeping, whatever it may have been, but he hadn't bothered anyone for 45 minutes prior to the -- the arrival by Officer Capurro. There was no rush of --

Q. My question is -- my question is much simpler than that.

What was Officer Capurro's understanding of how far away or how many minutes away backup was? When -- at the moment -- at the time that Officer Capurro decided to board the train, what was his understanding of how many minutes away backup was?

MR. LEVINE: Asked and answered.

THE WITNESS: Yeah, I don't know.

MR. KONZ: Well, it was asked but it wasn't answered.

lawfully in the State of California -- or anywhere in the United States, actually.

Q. And in California it's a felony?

A. It is.

Q. Okay. So under these -- those circumstances, and he's -- officer has information that this person possesses an illegal weapon, which is a crime, he has then authority to detain him, because there's reasonable suspicion of a crime. Do you have any issue with detaining him off the train, like, removing the passenger from the train and then actually, like, detaining him and finding out if he has brass knuckles, or do you think that should have just all occurred on the train?

MR. LEVINE: Same objections.

THE WITNESS: Well, from one -- for one, I'm not going to enter the train if I don't have to, unless there's a crime in progress. I'm going to wait for backup, because it's reasonable and it's prudent and it's good officer safety tactics, but if I do decide to make the poor decision of going and approaching him, the first thing I'm going to want to do is, obviously, I'm not going to want to walk him off the train. I'm going to probably try to limit his movement and probably handcuff him initially before I walk him off the train,

because I've not searched him. So I don't know where the brass knuckles are; so I'm going to want, obviously, to prevent his movement.

I'm gonna have him step away from his bags. I'm going to let him know why I'm there. I'm going to tell him, for his own safety, I need to handcuff him. I'm going to handcuff him. I'm going to pat him down to see if the brass knuckles are on his person. If they are, I'm going to retrieve them.

I'm then going to separate him from his bags, walk him off the train away from any potential, you know, clients -- or passengers, better said, and then I'm going to deal with him outside.

And then, once another unit gets there, if I decided to enter the train by myself, I'll have them grab his belongings, come outside, inventory the belongings, see if a crime, in fact, did occur other than the possession of the brass knuckles. And then I will either arrest him for the brass knuckles and/or if there was a crime committed with the brass knuckles.

Q. BY MR. KONZ: Did Officer Capurro make a decision that he was going to handcuff -- he intended to handcuff Mr. Detweiler on the train?

A. You know, I don't know if he stated that or not of what his intent was. His actions were contrary

to that.

Q. Well, he did -- he did state that he intended to do that.

What would you do -- so in your scenario, you would handcuff the person on the train and then separate them from their bags and escort them off the train and conduct the investigation from there.

What would you do if the person resisted and fought with you when you attempted to handcuff them?

MR. LEVINE: Assumes facts. Incomplete hypothetical. Calls for speculation.

THE WITNESS: Well, once again, if I could find that the -- initially, the conversation was the individual being noncompliant, I would probably, once again, use words and actions, create a little bit of distance, try to see what the ETA on the backup officer was.

We know with, obviously, multiple officers there's a -- many times a deterrent from a subject acting in a certain manner. Backup was reasonably close. I would just try to engage him in conversation and let him know, "Hey, this" -- you know, once again, to de-escalate the situation. Once backup arrived, then obviously take him into custody.

If he use -- if he resisted and obviously

used -- depending on the level of resistance, used reasonable force to overcome the resistance, prevent escape or effect an arrest.

Q. BY MR. KONZ: So force would have been -- force would be appropriate in that situation if the person is physically resisting a lawful handcuffing?

A. Correct, reasonable force would be allowed.

Q. Okay. And is it your understanding -- do you understand that Mr. Detweiler grabbed Officer Capurro's Taser?

MR. LEVINE: Misstates evidence.

THE WITNESS: Yes, when he was being drive -- it appeared when he was being drive stunned, which is common response from individuals because, once again, you're trying to push the Taser away, because it hurts. The application in drive-stun mode hurts. So I -- he either grabbed or reached towards is what I could see on the video.

Q. BY MR. KONZ: And there was a -- there was a struggle for a few seconds over the Taser when Officer Capurro had his hands on it and Detweiler had his hands on it, wasn't there?

MR. LEVINE: Assumes facts.

THE WITNESS: It appeared -- it appeared there was. I couldn't see a struggle on the Taser. I could

injured somehow by -- by Mr. Detweiler.

Q. Okay. Is it a crime to punch a police officer in the face?

A. It's felony battery of a peace officer, yes.

Q. Okay.

THE WITNESS: Can we take a break whenever there's a good stop, give Madam Court Reporter a break?

MR. KONZ: Yeah. Sure. Yeah. It's 10:21. You guys want to come back at 10:30? Does that work?

THE WITNESS: That's great.

MR. LEVINE: Yep.

MR. KONZ: Okay. Thanks.

THE WITNESS: Thank you, everybody. Appreciate it.

(RECESS TAKEN.)

Q. BY MR. KONZ: Okay. Mr. DeFoe, I'm going to talk about the opinions that you have in your report here, and you have the opinions broken down into six -- six general opinions; right?

A. Yes.

Q. Okay. And your first opinion -- this would be on page 7 of the report, or at least it starts on page 7 -- is that "a reasonable officer would have initially determined that -- that Mr. Detweiler was mentally ill, and/or experiencing a mental health crisis (as read)."

That's -- that's your opinion; right?
A. Correct.
Q. Okay. At what point in the encounter would a reasonable officer have been able to determine that?
A. Well, it could have been prior to the interaction with Mr. Detweiler had the parole [sic] interviewed Mr. Garrett regarding what transpired prior to his arrival. That would have been one way to make that determination, because Garrett believed that Detweiler was experiencing some mental health issues.
And as I testified earlier this morning, obviously, at the time in which he woke him up when he was sleeping and at that point I think, based on the totality of the circumstances, that it would be reasonable to consider that Mr. Detweiler may be -- have mental health-related issues, experiencing a mental crisis, as a consideration.
Q. Okay. You say in your report there were "overwhelming indicators of mental illness"; right?
A. Correct.
Q. And -- and again, what were the overwhelming indicators of mental illness?
A. Once again, it would have been based on the interviewing of Mr. Garrett regarding what transpired prior to the call for service.

Q. Let me just -- hold on. Sorry to interrupt. Let me stop you there. I'm not asking what could have been learned by interviewing Garrett. I'm asking you what were the overwhelming indicators of mental illness?

A. What -- as I mentioned, when he awoken him, startled him, the interaction just with him not being somewhat responsive, the use of the word "guy," just the overall mannerisms of Mr. Detweiler at the time, I think it would be reasonable to consider that he may be mentally ill and/or experiencing a mental crisis.

Q. Aren't officers trained, though, that even if they suspect that someone may be suffering from a mental illness, that officers are still not required to compromise safety to accommodate that; isn't that right?

A. Well, once again -- well, I mean, that's my whole point, that if he reasonably believed there's an officer safety issue, as outlined even in their own de-escalation policy, is to create time and distance from a subject, request additional resources, find out as much information as you can at that time prior to the interaction, unless there's an immediate need to intervene, which there wasn't in this case.

Q. My question is just more general.

Doesn't Learning Domain 37 advise officers that they should not compromise safety to accommodate a

mental illness?

A. 37 does state that, yes.

Q. And it also says that they should stabilize the scene first before accommodating a mental illness for safety; right?

A. It does state that, yes.

Q. Okay. In your experience, does someone that is suffering from a mental illness, does it -- does that make them less dangerous?

A. It just depends on the mental illness, depends on the person. You have to consider all the factors, if there's a propensity for violence, but mental illness in itself does not make them more dangerous. It just depends on, you know, the -- the individual, the type of mental illness. Are they on or off psychotropic medication at the time? Are they self-medicated on illicit substances? There's a number of factors to fill in.

Q. Somebody that's on illicit substances or under the influence of alcohol and is acting abnormal because of that, that doesn't qualify as a mental health issue; right?

MR. LEVINE: Assumes facts.

THE WITNESS: Well, it can, I mean, because a lot of -- as we know, many of our homeless population or

transients or those with mental health-related issues use illicit substances, primarily, you know, central nervous system stimulants and/or alcohol because they either don't have access to proper medical care, they don't have access to psychotropic medication; so we find that many individuals will self-medicate if they don't have access, or even if they do have access, depending on how those psychotropic medications make them feel.

Q. BY MR. KONZ: Do you have any information that Mr. Detweiler was on any -- or prescribed any type of medications?

A. No, sir.

Q. Do you understand that Officer Capurro had some information before boarding the train that Mr. Detweiler had a history of fighting with police officers?

A. No, I don't -- I didn't know he knew that.

Q. You didn't -- so you didn't know he knew that. So that didn't factor into your opinions then, obviously; right?

A. No, because if he knew that, it would even really probably illuminate or enhance my opinion on the reasonableness of his failure to plan and his tactical approach.

If you reasonably believe someone's fought

with the police in the past, you shouldn't be entering the train by yourself when backup's 5 to 10 minutes away. You should wait for backup and then obviously formulate a plan, if you reasonably believe someone's been violent with the police or anyone in the past.

Q. Is there any -- in California training standards for police officers, is there a prohibition on using force against someone who is mentally ill?

A. It's not a prohibition, but once again, there's a standard. It's like any other, you know, ADA-related issues, that you need to consider that someone may be mentally ill, and with that, you should try to use proper de-escalation, use time and distance, use proper words and actions to influence behavior, but it's going to be -- the force used is going to be based on the subject's level of resistance at the time in which the force is used.

Q. Yeah, agreed.

Have you ever used force against somebody that was mentally ill?

A. I believe so, yes. I -- more than likely, I have.

Q. Okay. Your opinion also says that Officer Capurro's failure to use de-escalation substantially contributed to the escalation that followed and

increased the likelihood of deadly force; right? Is that your opinion?

A. Yes, sir.

Q. Okay. Isn't that just speculation, though, what would have happened had Officer Capurro done something different?

A. It's not. I mean, a properly trained police officer would know that if I waited for backup and two people entered the train, I evacuated the people around the incident to insure that they're not in harm's way, if I would have advised the personnel there, like Mr. Garrett, not to get involved in any type of restraint or attempted restraint of anyone, let him know that, "I need you to not get involved. We're going to handle this," once again, as police officers formulate a plan and have discussion with officers, I believe that, without a doubt, the use of lethal force would not be necessary, based on the totality of the circumstances.

Q. But doesn't that assume that you know how Mr. Detweiler would have responded to alternative tactics?

A. Well, once again, I know that when he was woken he wasn't -- didn't wake up and start swinging. At that point, while he was sleeping, two officers could approach and obviously just take him by his wrists and

put him in handcuffs, as officers are trained in Learning Domain 33 to be able to do that, and if it escalated beyond that, then, you've got two officers. You don't have a train that has any passengers on it; so the use of OC spray would be reasonable. You have other less lethal force considerations that you have. You know, you've got office -- more than one officer at that point, if necessary.

But, yes, more likely than not -- you know, the use of lethal force is a rarity, and typically, in this -- a case like this with a subject on a train that may have brandished a weapon and be in possession of a weapon or even may have committed the assault -- an assault with a weapon, officers take people like that into custody all day without the use of lethal force.

Q. Yeah. Well, that -- I agree with that, but doesn't that -- that has to assume that you know how Detweiler would have responded to that.

For example, isn't it possible, just as possible as any speculation that you have, that had more officers got on the train, Detweiler would have put on the brass knuckles anyway and started attacking them? Isn't that possible?

MR. LEVINE: Incomplete hypothetical. Calls for speculation.

THE WITNESS: Well, for one, I'm not -- with multiple officers, I'm not going to allow you to put on the brass knuckles and put them on your hand; so I'm going to immediately approach you when you're asleep. I'm going to this -- I'm going to take your right arm, my partner's going to take the left arm. We're going to control the arms, we're going to control the hands, and we're going to put him in handcuffs and mechanical restraints, not allow him to actually put the brass knuckles on.

So, once again, because the call involved brass knuckles, the concern is getting him restrained which, you know, was contrary to what Capurro did when he approached Mr. Detweiler and woke him up while he was sleeping.

Q. BY MR. KONZ: But you admit that Detweiler was not functioning in a rational manner on this day; right?

A. I agree that Mr. Detweiler, as I test- -- wrote in my report, I believe a reasonably trained officer would believe that Mr. Detweiler was mentally ill or experiencing a mental crisis, based on the totality of the circumstances.

Q. Yeah, but your report on page 4 says that Detweiler was not functioning in a rational manner. It -- it -- I mean, in that -- and you say, and I think

your opinion is, well, and he wasn't and, therefore, Capurro should have recognized there's a mental health issue; right?

A. Correct.

Q. Okay. So how are you able to speculate what would happen had the officers done something different to a person who's functioning in an irrational manner? How can you assume you know what Detweiler would have done and that this would still have not resulted in an officer-involved shooting?

A. Counsel, I -- I reasonably believe, based on my training and experience, and the facts in this case, that had more than one officer approached Mr. Detweiler -- once again, I'm not saying immediately go for the force option. You know, obviously, not shine a light in his eyes and shake him and to startle him, but just immediately grab those bags that are on the -- on the bench and move them out of the way, and then obviously ask him to stand up, and if he does not comply, I'm going to use reasonable force to effect an arrest, overcome resistance, or prevent escape.

I don't believe any of that would have involved the use of a firearm in this case. It would have been simply taking him into custody, which officers do every day without the use of lethal force.

Q. Do officers get punched in the face every day by suspects that they're trying to arrest?

A. No, not every day. I mean, it occurs, unfortunately, but you know, hopefully not that frequently as every day.

Q. Right. Also, probably doesn't happen that frequently that officers have someone try to take their Taser away from them; right?

MR. LEVINE: Lacks foundation. Calls for speculation.

THE WITNESS: Correct. That would be something that occurs very infrequently, typically.

Q. BY MR. KONZ: Yeah. Do you have any data to support this conclusion you have that things definitely would have -- would have turned out differently had another officer been on the train?

MR. LEVINE: Misstates testimony.

THE WITNESS: I'm not testifying to definite. I'm saying what would be reasonable, based on the totality of the circumstances.

In my experience, arresting tens of thousands of people, once again, is that you -- he leaves the station, he knows he's coming to a call, he knows that he's got backup coming. He simply could have said: Where is he at? What is he doing? Oh, he's sleeping in

the chair. Nonresponsive for the last 45 minutes. Great, no rush. Let's get an officer/officers there. Let's formulate a plan. Let's see if there's any victims of a crime. Did he actually strike anyone with the brass knuckles? Important to know.

Let's talk to Garrett and see, hey, did you notice any behavior that would be concerning? Yeah, I believed he was mentally ill. Okay, great. Okay. How are we gonna approach -- formulate a plan to de-escalate the situation? And then take him into custody.

And if he resists, Counsel, then, once again, you're going to use reasonable force, but that would be the appropriate way to do it to alleviate force. It's a appropriate way to de-escalate, obviously tactical pauses and plans, obviously tactical repositioning. You're looking at increasing reactionary distances. If he needed to use a cuff -- a Taser, you've got a designated Taser person.

All these things are reasonable -- what officers are reasonably trained to do, according -- even in the own Shasta [sic] Police Department's policy regarding de-escalation. These are tried and tested tactics that work, rather than arbitrarily entering the train without a whole lot of information, abruptly approaching someone, shining a light in their face,

shaking them, and then expecting their actions to be any different than what we saw on the -- on the body-worn camera.

Q. BY MR. KONZ: So you would expect a person to react the way that Detweiler did in this circumstance?

A. I think with the shining of the lights and being startled, I think that would be reasonable, until you discern what's going on.

You get someone on the train. You know, once again, trains aren't safe places for people to use -- probably none of us on this call today have probably been on an Amtrak train, more likely than not, but -- and there are a lot of people. Unfortunately, there's crimes that occur on trains and any other type of conveyance like that; so being concerned about that would be important -- right? -- for your own safety.

So -- but the rational, once again, response by Detweiler supports my Opinion Number 1 and the facts of this case, that he didn't respond rationally, because he appeared to be mentally ill or experiencing a mental crisis.

Q. Are you saying that Officer Capurro caused Detweiler to disobey the command to let go of the bag?

MR. LEVINE: Misstates testimony.

THE WITNESS: What I'm saying, there's manner

in which to use words and actions to influence behavior. It's called de-escalation. It's in their very policy, Shasta [sic] Police Department's policy. So if you properly de-escalate -- the reason for that is to minimize the use of force or reduce it completely or eliminate it, hopefully. And that's the reason why tactics -- and there's certain benchmarks and training associated with de-escalation.

Now, you're looking to obviously de-escalate a situation; so not to escalate it. So all of the events that occurred, from the shining of the light, to the pushing, to the startling, to him asking if it's the stop he wanted to get off on, not explaining any reason why you're there, all of a sudden now he's grabbing his belongings to leave, you tell him not to touch the bag and now there's tug of war over the bag, and then shortly after that a Taser deployment, and then the situation evolves.

So all of that could have been remedied by simply having a plan, walking up, speaking to him in a manner -- you know, lightly waking him up, getting the bags away from him -- I don't know if the bags contained the brass knuckles or not -- and then obviously, control the hands and take him into custody, if that's what your objective is.

Q. It might have changed the outcome, but you don't know for sure that it would have; right?

A. Well, the outcome would not have transpired as it did in this case. It would not have transpired in the manner in this case. There would be no reason to deploy your Taser in the ceiling. There would be no reason to even -- I believe even to use a Taser, because if I take my Taser out of my Taser holster, what can't I do at this point? I can't handcuff you, because I have a Taser in my hand. So now I have a Taser or weapon retention concern.

So once I've taken my Taser out, I can no longer apply handcuffs; so now I've taken that which is the ultimate objective in this case is to restrain the hands.

So now I have someone else that could be the Taser officer or be designated as less lethal. Now I have a Taser out. Now I've got a concern about the retention of that Taser, and now I can't handcuff him. So, yeah, it's a poor tactic, as demonstrated on the video.

Q. Is it your opinion that Officer Capurro caused Detweiler to put on the brass knuckles after he was at gunpoint and swing at Garrett? Is it your --

A. Of course not.

just want to make sure.

You don't have an issue with Officer Capurro demanding that Detweiler, like, leave his bag alone and keep his hands free; right? You think that's an okay -- that was an okay tactic?

A. Well, sure. I mean, a better tactic, as I just stated, are let me get the bags away from the seat. I don't know what's in them; so I'm not going to give you access to something, especially when you're sleeping. Before I wake you up, let me just get that stuff away from you. I don't know what's in it; so I'm going to get that away before I shine a light on you and before I startle you. I want those bags away from you to prevent access.

But to answer your question, being that he didn't do that, which would have been reasonable, yeah, I don't -- yes, I don't want him grabbing a bag of any sort or anything. I believe he does so, because he believes he's obviously leaving the train, but nonetheless, an explanation would have been better because, once again, Detweiler seemed confused as to why he couldn't grab his bag and then became, you know, the tugging of the bag between the two of them.

So -- but yes, I don't want him -- I want nothing in his hands. I want his hands restrained, and

that's what the objective should have been.

Q. Okay. I'll move to your second opinion. This would be on page 12, and the opinion is that -- there's a few in here. The first one I -- I can find is that, "Officer Capurro failed to formulate, communicate, and implement a reasonable tactical plan before initiating contact with Detweiler (as read)."

That's one of your opinions; right?

A. Correct. That's what we just discussed. That's correct.

Q. Yeah. Okay. So we've -- we've gone over that.

Your next opinion -- you have another opinion in here under -- this is under Opinion 2, but there's several, like, I guess subparts to this -- that Officer Capurro "failed to obtain or request additional information" from the conductor. You've -- you fault him for that; right?

A. Yes, sir.

Q. Okay. And we've talked about that.

You have another part in here that he "failed to wait for backup before boarding the train."

You've discussed that; right?

A. Yes, sir.

Q. You have a part in here that says he "failed

to formulate a tactical plan or communicate any plan to the train staff (as read)"; right?

A. Yes, sir.

Q. And I believe we've gone through these.

Do you have any other opinions within Opinion 2 other than those?

A. The warning of the Tasers in there as well -- we already discussed that -- and the reasonable opportunity to comply.

Within the tactical plan, there's obviously other considerations that one would have to take into consideration. It's kind of redundant there, but in the event that, once again, you wait for an officer, you come up with a plan. He doesn't comply with the plan. What's the response to his noncompliance going to be? That's part of the plan. So yes, that's -- that's all contained in Opinion 2 through pages 15 of 28.

Q. Okay. Am I missing any of the opinions within Number 2?

A. No, sir, you're -- you got them all.

Q. Okay. Number 3 -- it starts on page 15 -- you have an opinion that no verbal warning was provided before Officer Capurro fired the duty weapon. That's an opinion of yours; right?

A. Correct.

Q. Okay. At what point do you think Capurro should have warned Detweiler that "I'm going to shoot you"?

A. Well, I don't believe he ever should have shot him, but if he was going to shoot him he should have warned him that, you know, at the point of him attempting to -- you know, at the time in which you can see him putting on the brass knuckles on the video, at that point he could have told him that "If you attempt to use or strike someone, I'm going to shoot you" would be an opportunity at that time of providing a warning.

Once again, that would be just for the first volley of rounds. We're taught to assess with each round that we fire, insure a) -- you know, based on Mr. Garrett's position as well, I -- even a trained former LAPD SWAT sergeant, I'm not taking that shot, because I would be concerned about shooting Mr. Garrett, which in fact happened. So I'm going to consider my background or backdrop. You know, I've got a train with passengers on it. I've got a bullet traveling 2,200 feet per second.

So -- but to answer your question, it would be prior to the actual putting on the brass knuckle on his right hand and -- removing his glove and then putting on the brass knuckle.

Q. But you accept the fact that -- you must -- that Officer Capurro did tell Mr. Detweiler several times while he had a gun pointed at him to get on the ground; right?

A. You know, I don't know if he tells him prior to. I know he told him to get on the ground at some point. I don't know -- right after Detweiler says, "I'm trying to leave the train with you," Capurro says, "Get on the ground." Then you can see his pistol at that point, and then as -- I think there's a command or two after that, and then there's the firing of the handgun, at approximately 2:40 of the body-worn camera.

Q. But when Officer Capurro has the gun pointed at him and is saying, "Get on the ground, get on the ground," that's the time that you think he should have said, "I'm going to shoot you if you try to punch somebody"; right? It's the same time period?

A. Yeah, within that time period. A command is, "Get on the ground." A warning is an ultimatum.

Q. Okay. Isn't that a little bit of hindsight, though, because now we know he did try to punch Garrett. So, like, isn't it hindsight to say "Don't punch him or I'm going to shoot you" when you don't know what he's going to do?

A. Correct. I mean, we may not use the word

"punch," but you can warn him that, "Hey, do not put on those brass knuckles or I'm going to," assuming that he's putting them on as a pre-assault indicator would be a way, but you know, once again, attempting to punch -- you're correct -- would be speculation, because we didn't know what he was going to do at that point.

Once again, as we know, the attempted punch occurred, then the rounds were fired so -- in three different volleys; so that's what I'm critical of.

Q. You just said that he should have warned him, "Hey, don't put those brass knuckles on or I'm going to shoot you."

Would it have been -- was it -- just in a hypothetical world, is it appropriate for a police officer to shoot somebody just because they put on brass knuckles?

A. No. It's based on the fact that, once again, I don't believe Garrett should have ever been there. We talked about that in my last opinion, about directing him not to get involved, but I'm not victim blaming Mr. Garrett by any means. He was shot in this case, and having been shot in the past I can tell you I know that he went -- probably went through a lot.

But you know, the point of that is, is that that comes down to the planning part of it. Garrett

should never have been behind, obviously, Mr. -- you know, Mr. Detweiler at the time.

So, yes, the -- the command to do that or the warning to do that should have obviously preceded the shooting.

Q. Are you talking about a warning should have been given to Garrett?

A. For one, warning Garrett should have been told the minute he tried -- when he approached and from the act to tell him to get out of the way there, because you've got a gentleman to the right, you've got Garrett in your backdrop, you've got your pistol out, and I don't want him anywhere around there. So I'm going to tell Garrett to get out of the way.

I would have already told him not to get involved -- my actions would have been different -- but being that he didn't do that, I would have told him to get out of the way and not, you know, attempt to assist.

I mean, Garrett was trying to do the best he can do, I believe, to try to assist the officer who was by himself, but nonetheless, I would have told him to get out of the way, because background or backdrop is important, and officers are trained, prior to using lethal force, they need to consider their background, which apparently he didn't because he shot Mr. Garrett,

to do, which is obviously apply handcuffs.

So the use of Taser by himself right there was counterproductive. It shouldn't even have came out of his Taser holster, because I can't handcuff you with my Taser in my holster, and I can't use it in probe mode or dart mode to achieve neuromuscular incapacitation. Only way I can use it is in drive-stun mode, which is clearly ineffective based on the proximity of Detweiler and Capurro.

Q. Do you have any data or statistics to back up the fact that you said when someone gets Tased in drive-stun mode they're likely to swing at you?

A. Well, Taser International -- probably be Axon now -- even in their training documents, within their manual, many departments discourage the use of drive-stun mode unless, obviously, to effect a handcuffing technique, and that's with two officers present. One is going to drive stun while they're providing commands and warnings to someone so that I can free up the hand if the hand maybe is secreted.

Yes, there's plenty of information there that you're going to -- I'm not saying that it caused you to punch or swing at a police officer. I'm saying that the pain associated with the Taser will cause people to do a couple things: They're going to run. They're going to

flail. If they're on the ground, they may kick.

It's no different than being bit by a K-9 -- police K-9. You're not -- you're not -- you're not resisting the K-9 or resisting the officers. You're resisting the force associated and the pain associated with the actual less lethal force option such as a Taser.

Q. Well, what's the data to back this opinion up that that's what a person does?

A. Well, I don't know I can -- I'm sure there's data out there, Counsel. I can tell you from conducting a hundred use-of-force investigations using the Taser, being a certified Taser instructor with Axon, or Taser International initially, yes, that's -- it's common.

I've been retained on a hundred Taser cases where the use of drive -- Taser in drive stun prolongs the incident unless it's used to effect -- it's very effective if used appropriately in effecting a handcuffing technique, but me just putting the Taser against your torso, against your side or lower left back, like in this case, it's going to cause you to move. It's going to cause you to flail, because it's painful. And it would -- any one of us would be responding the same way, because it hurts.

And I can tell you, from being Tased in

drive-stun mode inadvertently, it hurts, and you're going to respond to that pain by either moving away from it or trying to stop it. You'll see people will try to grab the Taser, because they're trying to stop the pain associated with being Tased.

Q. Do you know how long the Taser was pointed at Detweiler before Officer Capurro used it in drive-stun mode?

A. You know, it's hard to tell, because he -- in the -- in the actual -- on the body-worn camera you can see it come up, you know, at one point. So, you know, it's hard to -- it's hard to tell at what point it -- it comes up.

You know, he -- when he -- right after the fact that, you know, he tells him, "Don't touch anything" which is like at 1:30 -- 1:33 or so is when you can see the Taser, and then he's Tased at 1:42, I believe, which is about 9 seconds.

Q. Okay. So from your -- the foundation you're using is the Taser was pointed at him for about 9 seconds before it was used?

A. Yes. That's according to my review of the video. I think that's about right.

Q. Okay. Now, isn't that just inherently a warning, when someone has a Taser pointed at them and

they're being given commands, that you follow these commands or you're gonna get Tased? Isn't that just inherent?

A. Well, for you and I it's inherent. Someone that might be mentally ill it may not be. So someone who's going through a crisis at that time, it may not be. You and I maybe see a Taser pointing at us, we're probably going to comply; we should, I would suggest.

But you know, that's why my opinions are such that I didn't believe that Mr. Detweiler was making appropriate decisions based on what I believed to be him potentially mentally ill or experiencing mental crisis.

Q. Isn't it just as likely that he's just a defiant criminal?

MR. LEVINE: Calls for speculation. Argumentative.

THE WITNESS: Well, once again, he may be defiant. I -- obviously, in possession of brass knuckles, he's committed a crime; so -- to use your terms.

Once again, that doesn't change the -- the officer's responsibility to de-escalate, depending on if someone's defiant or if they've committed a criminal act either at the time or in the past. You still have to use reasonable de-escalation techniques, proper tactics,

Capurro told Detweiler in those 9 seconds, "I'm going to Tase you," that this would have turned out differently?

MR. LEVINE: Incomplete hypothetical. Calls for speculation.

THE WITNESS: Well, for one, as I testified earlier, you know, the Taser in that area -- in that proximity would have been ineffective, because the objective is to get someone handcuffed.

Q. BY MR. KONZ: That's not my question. That's not my question.

My question is just you say -- you have an opinion that no verbal warning was given before using the Taser, and you're critical of Officer Capurro for that.

My question is do you think that had Officer Capurro given a verbal warning, and then used the Taser, that that would have mattered?

MR. LEVINE: Same objection.

THE WITNESS: Hopefully.

Q. BY MR. KONZ: And we're talking about giving a verbal Taser warning to a person who's not, in your mind, functioning in a rational manner; right?

A. Correct, even more reason to give him a verbal warning.

Q. Why is that?

A. Because you know that he's not functioning in a rational manner. You want to give him a reasonable opportunity to comply and let him know, "I need you to do certain things here and if you don't, I'm going to Tase you. Do you understand that?"

"What do you want me to do?"

"I want you to put the bag down. I want you to turn around, put your hands behind your back. I'm going to put you in handcuffs temporarily. We're going to figure this out. Is that okay?"

It's just using words. He can say no, and then, once again, then, I'm going to respond to whatever level of resistance that he chose, but I'm going to try to afford the opportunity for him to do that is what the objective should be, and that's what the policy states they should do.

Q. Well, Officer Capurro did tell him before any force was used, "Put your hands up"; right?

A. Yes.

Q. "Don't reach for your bag"; right?

A. Yes.

Q. "Turn around"; right?

A. Yes.

Q. Okay. So he -- he was giving these commands. And did Detweiler respond to them in a

positive way or comply?

MR. LEVINE: Vague and ambiguous.

THE WITNESS: Once again, it's -- he asked -- all those commands to keep his hands up and turn around was after, once again, you know, Detweiler asking, "Is this the stop?" -- right? "Is this where I'm getting off?" And then, obviously, Capurro says, "Yes, it is. It's the stop."

So once again, I think there may have been some confusion there as, "Hey, we want you to leave the train and, you know, you've been sleeping. Now the stop is -- now we gotta get you off the train."

So I don't know. Once again, it would have been more, I think, appropriate to explain to him as to what you wanted him to do and the reasons for that from the onset, and that comes with a proper tactical plan.

Q. BY MR. KONZ: Okay. Move on to Opinion 4 which starts on Page 16, and this is the opinion that Officer Capurro should not have used lethal force; right?

A. Yes, sir.

Q. Okay. And I think I've -- I don't have any further questions about that. I covered that already.

And then you -- within that, you also have an opinion he should not have used the baton or the Taser;

right?

A. Correct.

Q. Okay. Generally speaking, is it okay to use -- for an officer to use a baton against somebody that will -- refuses to be handcuffed, punches you in the face and tries to take your Taser?

Let's just assume that's a hypothetical. Under that scenario, would it be appropriate for an officer to use a baton in order to gain compliance and take the person into custody?

MR. LEVINE: Assumes facts. Incomplete hypothetical.

THE WITNESS: Yes. If the person's trying to take your Taser and you took out your ASP or baton and struck them with that, that would be reasonable. If the subject struck you or is attempting to strike you, that would be reasonable to use an impact weapon such as a baton.

Noncompliance, once again, it just depends on what the subject's level of resistance is at the time. The fact that they tried to and now you've maintained control of your Taser, can you then just strike them with the baton? No. It's going to be based on their level of resistance at the time.

Baton strike is an intermediate use of force

and the subject's level of resistance is typically going to be beyond active and at -- either at assaultive or pre-assaultive behavior.

Q. BY MR. KONZ: Okay. Your next opinion is on page 20 -- this would be Number 5 -- and I think this opinion is just that the use of deadly force violated POST standards. Is that -- is that fair?

A. And the department's policy.

Q. Okay. Anything else?

A. No.

Q. Okay. And then moving on to the last opinion you have, Number 6, this is on Page 21.

"Tactical conduct and decisions preceding deadly force was unnecessary, unreasonable, and inappropriate based on the totality of the circumstances (as read)." That's your opinion Number 6; right?

A. Yes, which encompasses everything we spoke about this morning.

Q. Right. Okay.

You -- you also cite some police standards, like -- I think you called them, you know, nationally recognized police standards, and those are not POST standards; right?

A. No. They're -- they're not. I mean, the IACP, International Associations of Chief [sic] of

standards in this matter?
A. No. I'm not critical of anything Mr. Garrett did in this matter.
Q. Are you critical of anything that Amtrak did?
A. Not at all.
Q. Do you have any opinions at all about what Garrett or Amtrak did in this matter?
A. Well, just that Capurro should have not -- should have interviewed him, should have interviewed someone there to find out what transpired, should have advised him not to get involved, should have properly evacuated the portion of the train that would have involved Mr. Detweiler to insure that everyone was safe.
I'm not critical of Amtrak for not doing that. I'm critical of Capurro for not taking those steps and speaking to Mr. Garrett or someone regarding, you know, where he's located, what he's done, and all the other factors that I think were critically important in this case that did not transpire.
But I believe Mr. Garrett was trying to help out when he was shot. I think he was trying to assist the officer. I don't have any fault of him being shot. I have the fault of Officer Capurro firing his weapon and not the result of him firing his weapon.
Q. All right. So is it true that you have no

adverse opinions about Amtrak or Garrett in this case?
A. Not a single opinion.
Q. Okay.
A. Are you waiting for my response?
Q. No. I heard you say, "Not a single opinion." That eliminates a lot of questions. So I'm going through my -- I'm going through my outline.
Do you have any -- so you have absolutely no opinions as it relates to Garrett or Amtrak, other than what you've already testified to, in terms of what you deem as -- as Officer Capurro's failure to handle Garrett differently in terms of interviewing, tactical plan, telling him to stay away, that kind of thing?
A. Correct. That was not really my scope from plaintiff's counsel. It was specifically on the actions of Officer Capurro. I did not find any -- based on what I know, on what I've read, that my criticisms are of Officer Capurro and not of Mr. Garrett or anything involving Amtrak.
Q. Okay. Do you have any information, from any source whatsoever, about Mr. Detweiler's prior involvement with police officers before this interaction?
A. No.
Q. If -- if you were to learn that Mr. Detweiler

In terms of your opinion that had Officer Capurro brought cover or waited for cover that this incident would not have happened, do you just base that on your experience across the board in terms of officers waiting for cover?

MR. LEVINE: Vague and ambiguous.

THE WITNESS: Waiting for back -- waiting for backup, yes. There's a reason -- like my former agency, they put two officers to a car and not one. Is that -- there's a reason for that, and a) I can provide less lethal cover, can provide lethal cover. It's going to be much easier for two officers to take somebody into custody.

Certain officers are good at initiating dialogue; others aren't so much -- you know that working with people -- the person that would be the contact officer who's going to initiate dialogue and then the cover officer who's going to cover the officer while he's initiating dialogue with either less-than-lethal or lethal coverage.

So it's going to depend. Know that, obviously, part of the command presence and -- is strength in numbers. So, yes, there's a -- not only my training and experience, but being retained on over 900 or so cases and these type of cases, that the more --

you know, other than cases I've had, like George Floyd or Tyre Nichols where the number of officers didn't matter because all of -- none of the officers properly intervened when excessive force was occurring. That's not always the case.

But in this particular case, I think -- or the approach, response, planning, tactics, less lethal force considerations, application of force would have been completely different if there were more than one officer in this case, or properly -- or an officer who responded appropriately even if, you know, there was only one officer.

Q. In those -- in those 900 cases, what percentage of those involved one officer versus more than one officer?

A. I don't know. I've never calculated. I don't want to guess.

Q. Do you have any estimate?

A. Most agencies, you know, most sheriff's departments have one officer. Most smaller agencies will have one officer based on size of the agency. So it just depends. I've got cases all the way in West Virginia or Canada.

So it just depends on if it's a rural agency, if it's a metropolitan agency like New York, Chicago,

Boston, LA. Just depends on the area and the type enforcement activity they're involved in.

Q. All right. Did you review any of the Amtrak corporate witness depositions?

A. I don't believe I received any of those, nor did I review them.

Q. And is it your opinion that, upon arrival at the train, Officer Capurro was in charge in terms of the removal of Mr. Detweiler?

A. Yes.

Q. And is it your opinion that the Amtrak employees, based on the evidence you reviewed, deferred to Officer Capurro in terms of his tactical decisions on the removal?

A. Those -- I couldn't say they deferred to him, because he didn't discuss anything with them prior to doing that; so I don't know if they deferred or not to that.

You know, I obviously wish Mr. Garrett didn't get involved. Obviously, he wouldn't have got injured, but, yes, there wasn't a deference because Capurro never even took the time to stop and have a conversation with them to ascertain what transpired, how he can help, where his location is, other than, you know, "Where is he?" And he started walking through the door, then he

was directed upstairs, on the body-worn camera.

So, yes, I think he should have spoken to them. They were the best source of information, you know, especially with the information that came out in the deposition from Garrett, you know, that he was not bothering anyone for 45 minutes preceding it, that he was -- appeared to be asleep, that -- which, once again, you know, Capurro advised on his to -- on body-worn camera to his supervisor that he believe he woke up Mr. Detweiler, and -- yes.

So I believe that -- I won't say they deferred to him. It was just -- it was his scene. Amtrak, or at least Garrett -- and I know Amtrak has some sort of police department or officers in some capacities I believe, but the reasonable suspicion to detain or the detention of him came from -- you know, came by Officer Capurro and not by Mr. Garrett.

Q. Sure. Do you find fault, in any way, with Garrett's request for police assistance?

A. No. I don't know if he articulated that there was an assault with a deadly weapon, if he provided that to -- to the dispatch or not.

If he did and a assault with a deadly weapon didn't occur, then I would be critical of that, because that wouldn't be true.

If he didn't, you know, assault anyone with the brass knuckles and merely displayed them, or had them -- someone observed them, but if he didn't try to assault someone with them or threaten to assault, then that would be an erroneous call if that's, in fact, happened.

Q. Did you listen to the dispatcher recording of Mr. Garrett's call to the Mt. Shasta Police Department dispatcher?

A. I don't believe I received that. I just received the actual CAD log which is part of discovery. I don't believe I received the audio recording.

Q. So I mean, just so I'm sure, you do not intend to offer any opinions concerning Garrett or Amtrak, other than what you believe Officer Capurro should have done with sources of information available to him; correct?

A. Yes.

MR. MURPHY: All right.

Okay. Thank you.

THE WITNESS: Thank you, Mr. Murphy.

MR. KONZ: Thank you, Mr. DeFoe. I have no further questions either.

THE WITNESS: Thank you, Mr. Konz. Appreciate it.

REPORTER'S CERTIFICATE

State of California )
) ss.
County of Humboldt )

I, KELLEY JORDAN, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That I am a disinterested person herein; that the witness, SCOTT A. DeFOE, named in the foregoing deposition, was by me duly sworn via Zoom videoconference to testify the truth, the whole truth, and nothing but the truth; that the deposition was reported in shorthand by me, KELLEY JORDAN, a Certified Shorthand Reporter of the State of California, and thereafter transcribed using computer-aided transcription and is a true and correct record of the testimony so given.

IN WITNESS WHEREOF, I hereby certify this transcript at my office in the County of Humboldt, State of California, this 4th day of September, 2026.

KELLEY JORDAN, CSR NO. 6780
Certified Shorthand Reporter of the State of California