**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Tel: (818) 347-3333
Fax: (818) 347-4118
*Attorneys for Plaintiff Julia Detweiler*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

JULIA DETWEILER, individually and as successor-in-interest to Nicholas Detweiler, deceased,

Plaintiff,

v.

CITY OF MOUNT SHASTA; JEREMIAH CAPURRO; NATIONAL RAILROAD PASSENGER CORPORATION; BRUCE GARRETT; and DOES 1 through 10, inclusive,

Defendants.

Case No. 2:24-cv-03100-WBS-SCR

*Hon. William B. Shubb*

**DECLARATION OF SCOTT A. DEFOE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

**DECLARATION OF SCOTT A. DEFOE**

I, Scott A. DeFoe, declare as follows:

1. I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. My opinions are based in part on my training, professional experience, and education. I am a twenty-year veteran of the Los Angeles Police Department. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 commendations, including the Medal of Valor, Purple Heart, and Police Star.

4. Before reaching my opinions in this case, I reviewed the following materials:

a. Complaint for Damages, Case No. 2:24-at-01414.

b. Taser 7, (X400IE9AH), Log, 2023-12-27-1422, (MSPD 000001-19).

c. Photographs, (MSPD 000020-80).

d. Officer Jeremiah Capurro, BWC Video, AXON Body 4, D01A1245j, (23-22), 12/25/23.

e. Audio-Recordings:

i. Incident Report, (MSPD Audio 001).

ii. Request for Assistance, (MSPD Audio 002).

iii. Local Law Enforcement Assistance, (MSPD Audio 003).

iv. Request for Assistance, (MSPD Audio 004).

v. Train Dispatch, (MSPD Audio 005).

vi. Request for Additional Assistance, (MSPD Audio 006).

vii. Request for CHP Assistance, (MSPD Audio 007).

viii. Request for Medical, (MSPD Audio 008).

ix. Weed PD Asking if Assistance is Needed, (MSPD Audio 009).

x. Call to Medical, (MSPD Audio 010).

xi. Status Update, (MSPD Audio 011).

xii. Supervisor Notification, (MSPD Audio 012).

xiii. Request for Additional Ambulance, (MSPD Audio 013).

xiv. Request for Update, (MSPD Audio 014).

xv. Chief Notification, (MSPD Audio 015).

xvi. Confirmation of Information, (MSPD Audio 016).

xvii. Confirmation of Officers on Scene, (MSPD Audio 017).

xviii. Status of Conductor, (MSPD Audio 018).

f. Transcript of Officer Capurro, Interview #1 & 2, IA Case No. 2312M-0505, (MSPD 000091-120).

g. Transcript of Bruce Garrett, Interview #1 & 2 (GAR 000013-14).

h. Final Report, Administrative Investigation, Confidential, Case No. 22312M-0505, (MSPD 000132-150).

i. Mt. Shasta Police Department, Policy Manual, Use of Force, (MSPD 000367-377).

j. Mt. Shasta Police Department, Policy Manual, Policy, Officer-Involved Shooting and Deaths, (MSPD 000378-386).

k. Mt. Shasta Police Department, Policy Manual, Policy, Firearms, (MSPD 000387-396).

l. Mt. Shasta Police Department, Policy Manual, (MSPD 000418-1145).

m. Deposition Transcript of Jeremiah Capurro taken on March 27, 2026.

n. Deposition Transcript of Bruce Garrett taken on December 17, 2025.

o. Bruce Garrett Complaint for Damages, Case No. 2:25-cv-00420-DAD-CKD.

p. California POST Basic Learning Domains as Follows:

i. #1: "Leadership, Professionalism and Ethics."

ii. #2: "Criminal Justice System."

iii. #3: "Policing in the Community."

iv. #15: "Laws of Arrest.

v. #20: "Use of Force."

vi. #21: "Patrol Techniques."

vii. #23: "Crimes in Progress."

viii. #33: "Arrest and Control."

ix. #34: "First Aid, CPR, and AED."

x. #35: "Firearms/Chemical Agents."

xi. #37: "People with Disabilities."

5. I was retained in this matter to provide opinions regarding police training and standards, and regarding the conduct, tactics, and uses of force by Police Officer Jeremiah Capurro during the incident at issue in this case.

6. I was not retained in this matter to provide opinions regarding Amtrak or conductor Bruce Garrett, or regarding the propriety of their conduct. Opinions regarding Amtrak or conductor Bruce Garrett, or the propriety of their conduct, would be outside of the scope of my expert opinions in this case. I have, and express, no such opinions in this case.

7. Based on my review of the evidence in this matter and nationally recognized law-enforcement standards governing encounters with persons suffering from mental illness, it is my opinion that a reasonable police officer would have initially determined Mr. Detweiler was mentally ill and/or experiencing a mental crisis, based on his manner, speech, and appearance.

a. It is also my opinion that Police Officer Jeremiah Capurro either failed to recognize this, or recognized this but failed to modify his tactics and conduct in response. Under either scenario, Police Officer Jeremiah Capurro's conduct fell below generally accepted law-enforcement standards, which have long recognized that encounters involving a subject who may be mentally ill and or experiencing a mental crisis require a substantially different tactical response than ordinary criminal investigations, including by slowing the pace of the encounter, reducing stimulation, avoiding unnecessary confrontation, and communicating clearly and calmly.

b. It is also my opinion that this failure by Police Officer Jeremiah Capurro was a significant contributing factor in the subsequent escalation of the encounter and materially increased the likelihood that force, including deadly force, would be used against Mr. Detweiler.

8. In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident. There was no rush. Mr. Detweiler was asleep in his seat on the train. There was time to wait for back-up which was just a few minutes away and formulate a tactical plan. It is my opinion that Police Officer Jeremiah Capurro failed to de-escalate with Mr. Detweiler and instead escalated the encounter. Police Officer Jeremiah Capurro failed to employ numerous available and recognized de-escalation measures, including tactical pauses, tactical repositioning, increased reactionary distance, containment, cover, additional information gathering, crisis-intervention communication strategies, and the creation of time and distance.

9. It is my opinion, to a reasonable degree of professional certainty, that Police Officer Jeremiah Capurro failed to formulate, communicate, and implement a reasonable tactical plan before initiating contact with Mr. Detweiler on December 25, 2023. There were additional law enforcement officers that were responding to assist with this call for service, en route, and minutes away. This was particularly important given the rail car setting. In addition, upon his arrival Police Officer Jeremiah Capurro failed to obtain or request additional information from train staff regarding Mr. Detweiler or the current circumstances aboard the train, failed to provide train staff with any plan or instruction, failed to wait for backup before boarding the train, and failed to formulate a tactical plan or communicate any plan or direction to train staff. Upon boarding the train and observing that Mr. Detweiler was asleep in his seat, Police Officer Jeremiah Capurro failed to wait for backup and to obtain or request additional information from train staff before confronting and waking Mr. Detweiler.

10. In addition, it is my opinion that Police Officer Jeremiah Capurro unnecessarily initiated physical contact with a possibly mentally ill individual who was not actively threatening anyone at the time of the initial contact. Mr. Detweiler was seated on the train and appeared to be

sleeping. There was no rush. Police Officers are taught time and distance. Mr. Detweiler agreed to get off the train and grabbed his bag that contained his belongings at which time Police Officer Jeremiah Capurro unnecessarily escalated the situation by grabbing the bag. In addition, Police Officer Jeremiah Capurro unnecessarily escalated the situation by prematurely unholstering his Taser 7 and pointing it at Mr. Detweiler, and by deploying the Taser and baton strikes. In addition, it is my opinion that Police Officer Jeremiah Capurro's actions created a foreseeable and unnecessary escalation of the encounter. In addition, it is my opinion that Police Officer Jeremiah Capurro's failure to provide any instruction to train staff, including any instruction to Bruce Garrett to step out of the way, resulted in Bruce Garrett's intervention into the encounter and in Bruce Garrett ultimately being shot by Police Officer Jeremiah Capurro.

11. Standard Police Officer training and Mt. Shasta Police Department policy provide that a verbal warning should be issued prior to application of the TASER device, police baton, and deadly force when feasible, along with a reasonable opportunity to comply with such verbal warning. Police Officer Jeremiah Capurro did not issue any verbal warning before his use of any of these forms of force against Mr. Detweiler. It is my opinion that such verbal warnings were feasible prior to each use of force, and Police Officer Jeremiah Capurro improperly failed to provide such verbal warnings.

12. In addition, it is my opinion that a reasonable Police Officer acting consistent with standard police practices would not have deployed the Taser or baton strikes in this situation. It is my opinion based on my review of the facts, video and testimony in this matter and to a reasonable degree of professional certainty Police Officer Jeremiah Capurro used unnecessary, unreasonable and inappropriate force when deployed the Taser and baton strikes injuring Mr. Detweiler and unnecessarily escalating the situation further.

13. At the time of the shooting of Mr. Detweiler on December 25, 2023, police officer standards and training on the use of deadly force included that:

a. Deadly force is the highest level of force.
b. When feasible, a warning should be given before using deadly force, as well as less-lethal force.

c. Deadly force can only be used on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury. In other words, a subjective fear is not enough, a fear of future harm is not enough, and an objectively reasonable belief that the suspect poses a threat of harm less than death or serious bodily injury is not enough.

d. A suspect's failure to comply with officer commands alone is an insufficient basis for the use of deadly force.

e. A suspect holding a weapon or potential weapon alone is an insufficient basis for the use of deadly force.

f. Deadly force can only be used in an "immediate defense of life" situation; in other words, in defense of immediate or imminent death or serious bodily injury.

g. The decision to use deadly force must be guided by the reverence for human life.

h. An officer must justify every shot he or she fires.

i. An overreaction in using deadly force is excessive force.

14. Under the facts of this case, it would not have been appropriate for Police Officer Jeremiah Capurro to shoot Mr. Detweiler simply because Mr. Detweiler had already swung while holding brass knuckles, but had not struck anyone and was not attempting to strike anyone during any of the shots Police Officer Jeremiah Capurro fired.

15. In my opinion, the evidence I reviewed in this case, including Police Officer Jeremiah Capurro's body-worn camera video recorded during the subject incident, does not show that Mr. Detweiler presented an immediate risk of death or serious bodily injury at the time of any of the six shots Police Officer Jeremiah Capurro fired, including across three volleys. The six shots fired by Police Officer Jeremiah Capurro consisted of three volleys, of four shots, one shot, and one shot, respectively, based on the distinct pauses between the volleys and the opportunity for reassessment that those pauses provided.

16. Police officers are trained that they can only use deadly force in an immediate defense of life situation, in other words, when there is an immediate or imminent threat of death or serious bodily injury. There was no immediate defense of life situation when Police Officer Jeremiah Capurro fired his six lethal shots at Mr. Detweiler. Mr. Detweiler was not using or attempting to use a weapon against anyone at the time Police Officer Jeremiah Capurro fired his initial volley of four shots. Bruce Garrett was not injured by Mr. Detweiler and did not appear to be injured by Mr. Detweiler during the incident, and the only injuries he sustained were from gunshots fired by Police Officer Jeremiah Capurro. When Police Officer Jeremiah Capurro fired his second volley at Mr. Detweiler's back, Mr. Detweiler was on the ground and did not appear to be applying any pressure to Bruce Garrett's throat or have him in a chokehold. A reasonable officer in Police Officer Jeremiah Capurro's position would have paused and evaluated to determine whether Mr. Detweiler was in fact using force against Bruce Garrett in this position before continuing to use deadly force without issuing any verbal warning. When Police Officer Jeremiah Capurro fired his third volley at Mr. Detweiler's back, Mr. Detweiler was chest-down on the ground and clearly not harming or preparing to harm anyone after having already been shot multiple times. Based on my review of the evidence in this case, Police Officer Jeremiah Capurro either improperly failed to reassess whether further use of deadly force was appropriate after firing his first volley of four shots before firing two additional volleys of shots, or did reassess but nevertheless continued to inappropriately use deadly force when such reassessment would have confirmed to a reasonable officer that additional deadly force was inappropriate.

17. From the standpoint of police practices and basic police training, Police Officer Jeremiah Capurro's uses of deadly force were contrary to Peace Officer Standards and Training ("POST"), improper, and inappropriate, including (but not limited to) for the following reasons:

a. **No immediate verbal threats**. Mr. Detweiler did not verbally threaten to harm anyone at any point during the encounter.

b. **Officers Must Justify Every Shot.** Police officers must justify every shot they fire. Force is unreasonable when the type, degree, and duration of the force employed was not necessary or appropriate. In this case, each of the six shots, fired

across three volleys, were inappropriate and unjustified. Police Officer Jeremiah Capurro overreacted, and an overreaction in using deadly force is excessive force. Police Officer Jeremiah Capurro fired his second volley as Mr. Detweiler was going to the ground or on the ground, and his third volley as Mr. Detweiler was on the ground.

c. **Other reasonable alternative measures available**. Police officers deputies are trained that they can only use deadly force in a "last resort" situation. Shooting was not a "last resort" in this case. Other reasonable alternative measures were available, including providing clear instruction and explanation to Mr. Detweiler in light of his apparent mental illness and/or mental crisis, giving a warning that he was prepared to use the Taser or baton strikes if Mr. Detweiler did not comply with commands, giving a warning that deadly force would be used if Mr. Detweiler continued not to comply with commands, and using both hands to restrain Mr. Detweiler's hands behind his back and handcuff him to remove him from the train without the need for further force.

d. **No reverence for human life**. Police officers are trained that they must show a reverence for human life. Police Officer Jeremiah Capurro showed no reverence for human life when he fired six rounds at Mr. Detweiler and Bruce Garrett, striking both men, with another occupied train car in his background, while other passengers were feet away from him on the train, without issuing a verbal warning that deadly force would be used.

I declare under penalty of perjury of the laws of the United States of America, that the foregoing is true and correct. Executed on October 27, 2026, at Huntington Beach, California.

[signature]

Scott A. DeFoe